IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANNA BORKOWSKI                              *

    and                                 *

KATELYN FRANK                               *

    and                                 *

OTHERS SIMILARLY SITUATED,                  *

    Plaintiffs,                         *       Civil Action No.:  1:18-cv2809

    v.                                  *

BALTIMORE COUNTY, MARYLAND *

    And                                 *

BALTIMORE COUNTY                            *
POLICE DEPARTMENT,
                                            *
    and
                                            *
THE BOARD OF REGENTS FOR
THE UNIVERSITY SYSTEM                       *
OF MARYLAND,
                                            *
    and
                                            *
UNIVERSITY OF MARYLAND
BALTIMORE COUNTY,                           *

    and                                 *

LISA DEVER,                                 *

    and                                 *

SCOTT SHELLENBERGER,                        *

and

                                     *

BONNIE FOX,

                                     *

and

KRYSTIN RICHARDSON,       *

   and                   *

NICHOLAS TOMAS,          *

   and                   *

KRISTEN BURROWS,        *

   and                   *

KRISETEN MONTGOMERY,   *

   and                   *

PAUL DILLON,             *

   and                   *

BERNADETTE HUNTON,    *

   and                   *

PAUL DORFLER,            *

   Defendants.            *

*    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT

Plaintiffs Anna Borkowski, Katelyn Frank, and those similarly situated, by and

through their attorneys, Rignal W. Baldwin V and BaldwinLaw LLC, bring this suit

against Baltimore County Maryland, the Baltimore County Police Department ("BCPD"),

Board of Regents for the University System of Maryland ("Board of Regents"),

University of Maryland, Baltimore County ("UMBC"), The University of Maryland

Police Department, Scott Shellenberger, Lisa Dever, Paul Dorfler, Bonnie Fox, Krystin

Richardson, Nicholas Tomas, Detective Kristen Burrows, Lane Montgomery, Paul

Dillon, and Bernadette Hunton.

Preface

One in five female college undergraduates in the University System of Maryland

will be sexually assaulted during their enrollment period.  This is a civil rights lawsuit

brought to address the plan, practice, policy, custom, and procedures instituted and

perpetrated by individuals acting under color of state law to deprive female sexual assault

victims of their civil rights and equal protection, in contravention of federal and state law.

Plaintiffs' Constitutional and Civil Rights Claims

The state's protection against private violence is the central, minimal guarantee of

the equal protection clause.  This lawsuit addresses private violence and shameless

corruption.  In contravention of Plaintiffs' rights to equal protection, Defendants

intimidated witnesses, deceived victims, and intentionally misstated the applicable law.

They conducted punitive investigations and retaliated against victims' families.  They

humiliated and deceived those who complained of sexual assault.

This is not a "failure to protect" lawsuit; it is about intentional misconduct

designed to cover up justifiable complaints of sexual assault.

<u>Plaintiffs' Title IX Claims</u>

In addition to the claims for violations of their constitutional rights, Plaintiffs seek redress for violation of Title IX of the Education Amendments of 1972.  As a result of the University Defendants' actions and inactions, Plaintiffs were excluded from participation in, denied the benefits of, and subjected to discrimination by the University Defendants.

Parties

<u>Plaintiffs Anna Borkowski and Katelyn Frank</u>

1.      Plaintiff Anna Borkowski is a resident of Maryland and former University of Maryland, Baltimore County and current Towson University student who was incapacitated and sexually assaulted by three UMBC students.

2.      Plaintiff Katelyn Frank is a resident of Maryland and a former University of Maryland, Baltimore County student who was assaulted by another UMBC student on campus.

<u>Defendants</u>

3.      Defendant Baltimore County is a municipality that is responsible for the training of the Baltimore County Police Department and UMBC Police Department.

4.      Defendant Baltimore County Police Department is the law enforcement agency responsible for law enforcement duties in Baltimore County.

5.      Defendant Scott Shellenberger is the State's Attorney for Baltimore County. He is responsible for prosecuting, on behalf of the State of Maryland, all cases in which the State has an interest.  His prosecution must be in accord with the fair and impartial administration of justice, untainted by any contaminating influence.

6.      Defendant Lisa Dever is and Assistant State's Attorney and the Chief of the Sex Offense and Child Abuse Division ("SOCAD") of the Baltimore County State's Attorney's Office.  SOCAD is responsible for investigating and prosecuting sexual crimes committed against victims in Baltimore County.

7.      Defendant Bonnie Fox is an "Investigator" for SOCAD of the Baltimore County State's Attorney's Office.  She is an employee of Baltimore County and acts as an agent of Defendants Shellenberger and Dever.

8.      Defendant Krystin Richardson is an Assistant State's Attorney, and head of the Baltimore County State's Attorney's Office's Family division

9.      Defendant Nicholas Tomas is a BCPD Detective, assigned to the Special Victims Team.  The Special Victims Team is a team of detectives and other police officers that constitutes part of the Special Services Unit of the Persons Crimes Section of the Criminal Investigation Division of the BCPD.

10.      Defendant Kristen Burrows is a BCPD Detective, assigned to the Special Victims Team.

11.      Defendant Paul Dorfler is a BCPD Detective, assigned to the Special Victims Team.

12.      Defendant Kristen Montgomery is a BCPD Detective, assigned to the Special Victims Team.[1]  Ms. Montgomery is an employee of Defendant Baltimore County.

---

[1] For ease of reference, Defendants Baltimore County, BCPD, Shellenberger, Dever, Fox, Burrows, Tomas, Montgomery, and Dorfler are referred to as the "County Defendants," notwithstanding that Defendants Shellenberger is not a County employee.

13.     Defendant Board of Regents ("Board of Regents" or "Board") of the University System of Maryland is the governing body of the University System of Maryland, a body corporate and instrumentality of the State of Maryland.

14.     Defendant University of Maryland, Baltimore County ("UMBC") is a constituent institution of the University System of Maryland under the jurisdiction of the Board of Regents.  The Board of Regents has the power to delegate authority to the President, University of Maryland, Baltimore County.  To the extent that Plaintiffs are seeking relief against UMBC the Plaintiffs will refer to the Defendant as "UMBC" (University of Maryland, Baltimore County).  Any allegation against UMBC or the Board is necessarily an allegation against the other.

15.     Defendant Paul Dillon is the Chief of the UMBC Police Department ("University Police").  The University Police is a Commission on Accreditation for Law Enforcement Agencies accredited law enforcement agency.  The University Police acts pursuant to a Memorandum of Understanding with BCPD that delineates the investigative and enforcement power of the two agencies.

16.     Defendant Bernadette Hunton was paid by UMBC to investigate Ms. Frank's student misconduct claims.

17.     All individual Defendants are being sued in their individual and official capacities.

Jurisdiction and Venue

18.     Jurisdiction is proper in this Court under 28 U.S.C. §1331, as this case involves claims "arising under the Constitution, laws, or treaties of the United States."

19.     The claims arise from Defendants' violations of 42 U.S.C. §§1983, 1985, and 1986; 20 U.S.C. §1681.

20.     Jurisdiction is also proper pursuant to 42 U.S.C. § 1988.

21.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as "a substantial part of the events or omissions giving rise to the claim occurred" in Maryland.

BACKGROUND

The Concealed Epidemic of Sexual Assault in Baltimore County

22.     In 2015 and 2016, the BCPD, the County, and UMBC were the subjects of a series of media articles that exposed a common practice of underreporting instances of sexual assault, misleading female victims of sexual assault, and mistreating those who reported sexual assault.

23.     One of the articles related to the gang rape of a UMBC student by four members of the UMBC basketball team.

24.     In that case, the victim was not raped because, as Detective Tomas explained, for "some of the sex acts to be performed, she would have had to be conscious to participate."

25.     Detective Tomas testified on behalf of the accused assailants at their student conduct hearing hearings.  His testimony was that based on his investigation of charges brought by the victim, the four men were not involved "as alleged."

26.     The reports revealed a failure to report accurate data on sexual assaults even though UMBC and the University Police are required to do so by law.

27.     The media reports also revealed BCPD, the University Police, and UMBC's manipulation of the Federal Bureau of Investigation's Uniform Crime Reporting Program ("UCR")[2] codes to misclassify and conceal reports of sexual assault against women.

28.     For example, BCPD, working with Defendant Dever at SOCAD, would routinely classify credible reports of sexual assault as "unfounded" without conducting any investigation of the report, *i.e.*, no interviews, no collection of evidence, no substantive police work.

29.     The media reports further revealed the general mistreatment of victims of sexual assault.

30.     For example, the Baltimore County Defendants intentionally misinformed victims of the elements of sexual assault crimes to convince victims that no crime occurred.

31.     No such practice exists for other crimes that do not disproportionately affect women; the statistical data reflect inexplicable anomalies in the reported rates of sexual assault in Baltimore County.

32.     BCPD is one of the nation's leaders in "data-driven" policing – the collection use of crime statistics to analyze and ultimately prevent crime.

---

[2] The FBI's UCR Program is a nationwide data collection program tracking reports of crime and the disposition of those reports.  Almost 18,000 law enforcement agencies voluntarily report data on crimes reported to them by residents. The primary objective of the program is to generate reliable information from the data submitted.

BCPD's And The University Police's Strategy of "Unfounding"

33.     A report of sexual assault is legitimately classified as "unfounded" when "the incident did not occur (*i.e*., a false or baseless complaint[3]), or the incident was determined to have occurred in another jurisdiction.

34.     BCPD's Field Manual provides that "[t]he refusal of the victim to cooperate or failure of the State's Attorney's Office to prosecute does not unfound a legitimate offense."

35.     BCPD's Field Manual also provides that "[a]n Incident Report will be made on all calls . . . of sexual assault."

36.     By coding hundreds of legitimate reports as unfounded, BCPD eliminated or concealed the reports as if they were never made.

37.     Defendants applied the facially neutral statutes with a manipulative and uneven hand.  Assaults of women by men were treated differently than other crimes in that the crimes against women were not investigated or under-investigated.

38.     The intent and effect of the Defendants' intentionally discriminatory policies was to lower the number of reports of sexual assault in Baltimore County.

39.     While reports were artificially lowered, the practice undoubtedly had the effect of raising the actual number of sexual assaults in Baltimore County, as perpetrators of sexual assault are more likely to commit multiple offenses before apprehended and have a high rate of recidivism.

---

[3] A "baseless" report is a report of a non-criminal act.

40.     Defendants are under pressure to lower reports of crime in their jurisdictions.

41.     Defendants Shellenberger and Dever are under pressure to maintain high conviction rates.

42.     For years, BCPD recorded one of the highest "unfounded" rates of reports of sexual assault in the country.

43.     In 2013, Defendants classified forty-three percent (43%) of reports of sexual assault in Baltimore County as "unfounded."[4]  When a woman reported a sexual assault to BCPD, forty-three percent (43%) of the time the victim was told that no crime occurred, or the report was determined to be fallacious.

44.     In 2014, thirty-four percent (34%) of reports of sexual assault in Baltimore County were classified as unfounded.  The national average that year was seven percent (7%). In 2015 the number had fallen to twenty percent (20%). In 2016, twenty percent (20%), and in 2017, nine percent (9%).

45.     The number of sexual assaults classified as "unfounded" by the BCPD from 2013 to 2017 was a statistical impossibility.

46.     In Baltimore County, the arrest rate, per report of sexual assault, is approximately 12 percent (12%).

47.     This arrest percentage had remained relatively unchanged despite the reforms detailed *infra.*

---

[4] Only one in five victims of a sexual assault report it to police.  Of those reports, it is estimated that fewer than six percent are false reports.

48.     When a woman reports a sexual assault to Baltimore County, there is approximately a one in ten chance an accused perpetrator will be arrested.

49.     This arrest rate is less than half of the national average.

50.     The persistent misclassification and miscoding practices have resulted in the manifold illusion that: 1) there are relatively few women sexually assaulted in Baltimore County, and, 2) when women are sexually assaulted, their reports are investigated to a reasonable conclusion.

51.     The opposite is true.  BCPD covers up reports and refuses to investigate those it cannot cover up.

52.     Due to the County and University Defendants' pattern of manipulation and concealment, the extent of the coverup is currently unknown.  The number of assaults misclassified as other, less serious crimes, or worse, non-crimes, is unknown.

53.     In addition to improperly classifying reports of sexual assault as "unfounded," the County and University Defendants have a practice of misclassifying reports so that they do not even appear as a report of sexual assault in the first place.

54.     The County and University Defendants employed non-UCR codes to classify certain reports of sexual assault.  This practice concealed those Defendants' refusal to investigate the credible reports of crimes perpetrated by men that overwhelmingly affected women.

Baltimore County Executive Promises Review and Reform While Defendants Withhold
And Conceal Evidence of Their Malfeasance – Thwart Reform.

55.     After Baltimore County Defendants' discriminatory practices were exposed by

the media, Baltimore County Executive Kevin Kamenetz[5] ordered an independent 2016

Audit of the County's procedures.

56.     The 2016 Audit was to " to identify systemic concerns regarding policies and

procedures" relating to sexual assault.

57.     The 2016 Audit was performed by the Executive Director of the Maryland

Coalition Against Sexual Assault ("MCASA") and retired Baltimore County Circuit

Court Judge Barbara Howe.

58.     The 2016 Audit was limited to purportedly "unfounded" reports of second

degree rapes that occurred from 2013 to 2015– a total of 139 reports.[6]

59.     The selective nature of the 2016 Audit, specifically why the review was limited

to "unfounded" reports of second degree sexual assault is unclear.

60.     The reviewers relied on information provided by Baltimore County.

61.     A Report based on the 2016 Audit was prepared and provided to many

Defendants.  That Report is not publicly available.

---

[5] There is no indication that Executive Kamenetz acted with anything other than good faith and integrity.
Plaintiffs differ in their interpretation of the MCASA Report, *infra.*

[6] This number is certainly too low.  For example, from 2015 through 2017, at least 42
rapes were reported but classified as merely "suspicious circumstances," which does not
show up in the official statistics.

62.     Even based on the limited cases reviewed, the Report concluded that the cases "clearly demonstrated the deficiencies in and interpretation of Maryland's sexual assault statutes" by BCPD and the State's Attorney's Office.

63.     The Report also noted BCPD's practice of "victim-blaming," noting that "[f]or example, one victim was asked why she didn't fight the suspect off and why she didn't scream for help."

64.     "In other cases, officers asked victims to explain why they thought they were raped after they gave a statement about what happened.  In some of these cases, the victim decided not to proceed with the case after being questioned in this manner."

65.     The Report criticized BCPD's "inadequate investigation into the victim's ability to resist or appraise the circumstances" in cases where the victim was intoxicated.

66.     In response to the Report, County Executive Kamenetz attempted to implement reforms relating to the investigation of reports of sexual assault and the mistreatment of victims of sexual assault by County employees, such as Defendants Dever, Tomas, Burrows, and Montgomery.

67.     Among those reforms was a purportedly "formalized" and "clear" system of communication between BCPD's SVT and the SOCAD in the State's Attorney's Office.

68.     Unfortunately, the individuals working within these two groups were the worst offenders in perpetrating the concealment and misclassification of crimes against women.

69.     BCPD was required to have an SVT detective (rather than a patrol officer) interview victims and suspects in all reported cases of first and second-degree sexual assault.

70. The Report specifically stated that "Communication between sex crimes detectives and the Baltimore County State's Attorney's Office should be increased and documented. Communication with prosecutors is particularly important in cases involving interpretations of the law on force and in cases involving 'mentally incapacitated individuals' under Criminal Law §3-301(c)."

71. The State's Attorney's Office stated that it "agreed" that it would "make all final legal decisions in all sexual assault cases," when that was not the suggested reform. This was a mischaracterization of the recommendation.

72. As a result of the increased expertise applied to reports, the natural inference is that arrest rates for sexual assaults would rise. They did not.

73. The current practice is that SOCAD reviews all reports of rape or sexual assault with an SVT detective, and then makes a charging decision. The natural inference is that arrest rates would climb relative to reports due to the close cooperation. They fell.

Destruction of SAFE Exams

74. If a citizen willfully destroys evidence, he has committed a crime, destruction of evidence. *See, e.g.*, Md. Code Ann., Crim. Law § 9-307.

75. Federal law provides that a woman reporting sexual assault be given a Sexual Assault Forensic Exam ("SAFE") at no charge.

76. A SAFE can last up to four hours, and involves a victim's genitals being prodded, swabbed and photographed as well as pubic hair combing and other invasive procedures.

77.    The SAFE exams are usually performed by a Forensic Nurse Examiner ("FNE").

78.    For no legitimate reason, BCPD had a policy of destroying sexual assault examination kits ("SAEK's"), sometimes within thirty days of the collection of the SAEK.

79.    This was the shortest period of any Maryland County.

80.    Montgomery County, for example, does not destroy SAEK's, as there is no statute of limitations for rape in Maryland.

81.    Victims were not told that the kits would be destroyed so quickly.

82.    The unnecessary destruction of SAEK's is a sign of the County Defendants' willful indifference to sexual assault crime committed against women.

Defendants Concealed Information from The Investigators and The F.B.I.

83.    Because they were not provided by BCPD or the County, the 2016 Audit did not include examination of reports of sexual assault that were coded as "cleared by exceptional circumstances" or "exceptional means."[7]

84.    Nor did the 2016 Audit include instances of sexual assault that had been otherwise miscoded.  This miscoding was an inherent and intentional part of the manipulation and concealment.

---

[7] As explained *infra*, these were not the only two ways in which the Baltimore County Defendants concealed or discouraged reports of sexual assault.

85.     According to the FBI's UCR standards, to clear a case by "exceptional means," the police must have:

- Identified the offender;

- Gathered enough evidence to support an arrest, make a charge, and turn over the offender to the court for prosecution;

- Identified the suspect's exact location so that he could be taken into custody; but

- Encountered a circumstance outside the control of law enforcement that prohibits the agency from arresting, charging, and prosecuting the offender.

86.     Circumstances that are appropriate for exceptional clearances are:

- the death of the offender;

- the victim's refusal to cooperate with the prosecution after the offender has been identified;

- or the denial of extradition because the offender committed a crime in another jurisdiction and is being prosecuted for that offense.

87.     BCPD's Field Manual provides for a totally different procedure when "an adult was not arrested but was identified as a suspect and warrant/summons procedures were explained so the victim can file charges," and the Baltimore County Police "have the name and address of the suspect."  The BCPD puts the onus of prosecution on the female victim of the assault.

88.     Even this procedure is ignored.  *See infra.*

89.     This procedure, utilized for sexual assaults but not for other crimes, discriminatorily places an undue burden on female crime victims.

90.     BCPD's Field Manual Provides for an "Other Ex-Clear" disposition only when "a suspect was identified but not charged because:

a.      The suspect is deceased;

b.      The State's Attorney will not pursue prosecution; or

c.      The case was closed by the Department of Social Services (DSS).

91.     The language regarding the State's Attorney and DSS is inconsistent with the UCR's mandate, yet BCPD persists in submitting false data to the FBI

92.     Since at least 2013, Baltimore County has engaged in a deceitful and discriminatory pattern and practice of "clearing" valid and credible reports of sexual assault against women under exceptional circumstances, without satisfying the preconditions set forth by the FBI's UCR Program.

93.     This action is applied with discriminatory intent with a particular animus towards women, including Plaintiffs.

94.     Even if the policies were facially neutral – they are not – they are applied with an evil eye and uneven hand.

"Suspicious Circumstances" – The Improper Use of The A46 Code

95.     BCPD and SOCAD maintained, and still maintains, a policy and practice of recording credible reports of sexual assaults against women as merely reports of "suspicious circumstances."

96.     This practice was not disclosed to the reviewers who conducted the 2016 Audit of Defendants' sexual assault investigative policies.

97.     Defendants UMBC and the University Police also uses this code to avoid federal requirements to track and report on-campus crime.

98.     Defendants routinely code reports of sexual assault as "suspicious circumstances," despite clear allegations of sexual assault contained in the reports.

99.     Defendants' pattern and practice of coding reports of sexual assaults as merely "suspicious circumstances" or "suspicious conditions" is an attempt to avoid accountability for their unjustified refusal to investigate credible reports of sexual assault against women.

100.     BCPD's written policy of documenting reports when a "specific offense or victim cannot be substantiated . . . [by] using the offense code 'Suspicious Incident/Condition/Person/Vehicle'" is at odds with its the FBI requirement that truly unsubstantiated reports be coded as unfounded.

101.     "Suspicious circumstances" and "suspicious condition" are not UCR categories, so these reports of sexual assault are not reported to the FBI or disclosed in Clery reporting as required by federal law.

102.     A report of sexual assault misclassified as a "suspicious circumstance" or "suspicious condition" is deliberately hidden, depriving the victim of an investigation and equal protection.

103.     The victims of these assaults are thereby hidden from any oversight by State or federal organizations or private interest groups.

104.    A "suspicious circumstance" or "suspicious condition" results in a UCR disposition of "Non-Criminal Disposition - the incident was not a crime."  This practice deprives Plaintiffs, and all similarly situated women, of a full and fair investigation of their reports.

105.    Defendants' pattern and practice of miscoding sexual assaults as "suspicious circumstances" in order to avoid reporting and investigating reports of sexual assault, is a violation of equal protection as it intentionally discriminates against victims of crimes that disproportionately affect female victims.

Defendants Promised Reforms, But Just Changed Methods of Misclassification

106.    After the MCASA Report, Defendants Baltimore County, Shellenberger and BCPD promised to reform the unfair and discriminatory system.

107.    Despite these promises of reform, Defendants continued deceptively miscoding reports of sexual assault in new ways, for the same end, depriving women of equal protection of the law.

108.    Now, BCPD miscodes more reports of sexual assault as "cleared" due to "exceptional circumstances" to avoid dealing with the scrutiny of "unfounding" cases.

109.    The "new" pattern and practice is evident in BCPD's own statistics: While fewer reports of sexual assault were deemed "unfounded," the number of arrests per report actually decreased with increased investigation.

110.    In 2013 BCPD made arrests in 30 of the 185 complaints of rape where the perpetrator was an adult, 16 percent of the total.

111.    In 2014, it was 14 percent.

112.    In 2015, 15 percent,

113.    In 2016, 12 percent.

114.    In 2017, 9 percent.

115.    The State's Attorney "agreement" that it would "make all final legal decisions in all sexual assault cases" was telling, as no such recommendation had been made.

116.    There has been no follow up review of the Defendants' practices, as Defendants are not subject to audits of their investigation/prosecution.

117.    Despite the provisions of the Field Manual, the facts contained in BCPD reports coded as "Ex-Clear" do not meet the UCR requirements for clearance due to exceptional circumstances.

Police Misconduct And The Unlawful Conspiracy with Baltimore County State's Attorney's Office

118.    Baltimore County Police officers, specifically the Detectives in the SVT, engage in a pattern and practice of encouraging victims not to submit to medical examination after a reported sexual assault.

119.    If the SVT detective and/or SOCAD were not interested in investigating a report, the detective would "explain" the SAFE[8] exam to the victim in the most unappealing and discouraging way possible.

---

[8] A SAFE exam includes invasive vaginal and rectal probing, swabbing, and examination with photographs of a victim's breasts and genitals.

120.    Frequently, the victim would decline the exam, giving SVT detectives and other County Defendants an excuse to discontinue any investigation with the "non-cooperative" victim.

121.    SVT detectives did not tell the victim that they would not investigate a report of sexual assault if the SAFE exam was not completed within five days of the assault.

122.    Nor were rape victims who endured a painful exam informed that the results would be maliciously destroyed in as little as 30 days.

123.    There is evidence that County Defendants used self-created "lack of evidence" as pretextual justification to later refuse to investigate a report for insufficient physical evidence.

124.    For example, Defendant Dever has publicly and privately stated that she does not consider a female victim's testimony alone to be sufficient "evidence" for a conviction.

125.    County Defendants discourage women from reporting sexual assault by emphasizing the absence of any evidence of physical resistance and falsely telling victims that their testimony is insufficient for a conviction.

126.    These policies and practices are illegal in that they violate applicable standards, deceive and intimidate victims, and create a false impression as to the nature and extent of sexual assaults in Baltimore County.

Defendants' Misleading Victims Regarding The Elements of Sexual Assault to Decrease Reporting

127.    Defendants intentionally mislead victims by falsely telling them that the sexual assault that the victim reported did not meet the elements of a crime.

128.    Defendant Dever has intentionally misstated the elements of "incapacity" to dissuade victims or their families from pursuing charges.

129.    Defendant Dever has stated that a victim must be "passed out behind a dumpster" to be incapacitated.

THE PLAINTIFFS

Plaintiff Katelyn Frank

130.    In the fall of 2015, after graduating from a private Catholic high school, eighteen-year-old Katelyn Frank began attending University of Maryland, Baltimore County as a freshman.

131.    Ms. Frank lived in an on-campus dormitory, the "Patapsco" dorm.

132.    On September 10, 2015, a fellow UMBC student lured Ms. Frank to his dorm room and raped her.

133.    Ms. Frank awoke, bleeding, in her assailant's bathroom.

134.    The University had credible evidence that her assailant had assaulted other students in the same dormitory.

135.   Ms. Frank reported the assault to Rina Rhines.[9]  With Ms. Rhines' support, Ms. Frank reported the assault to Defendant Dillon.

136.   Defendant Dillon improperly persuaded Ms. Frank not to "report" her assault to the police.

137.   Defendant Dillon told Ms. Frank that the "administrative method" was "faster and easier," "more victim friendly," and was "easier to prove."

138.   In doing so, Defendant Dillon violated UMBC's MOU with BCPD.

139.   He also failed to record Ms. Frank's unambiguous report of sexual assault.

140.   He convinced Ms. Frank to handle the matter "administratively."

141.   This is functionally impossible, as Defendant Dillon was a sworn police officer with various reporting duties.

142.   Defendant Dillon failed to generate a police report, despite having received a report of rape.  The reported but unrecorded sexual assault did not appear in UMBC's Clery reporting statistics.[10]

143.   Ms. Rines stated that she was concerned that Defendant Dillon was violating UMBC's MOU with BCPD.

144.   Defendant Dillon brushed off the concern, stating that the incident was not sufficiently serious to report to BCPD.

_____

[9]  Ms. Rines has since left UMBC and now works as the Title IX Coordinator at Goucher College.

[10] While there is no private cause of action in the Clery Act, a police officer's failure to create a record of a violent sexual assault generates an inference of malice.

145.   On September 14, 2015, Ms. Frank submitted to a SAFE exam at GBMC.

146.   The Forensic Nurse Examiner ("FNE") reported the assault to BCPD, who recorded it as a suspicious circumstance, not as a rape.  The report was assigned an incident number, but on incident report was created.

147.   The FNE found extensive bruising that was a result of the assault four days earlier.

148.   Ms. Frank chose to "delay reporting" the assault to BCPD due to Defendant Dillon's and UMBC's promises of a fair investigation.  A delayed report simply means that the victim may request a police investigation at a later date.

149.   The incident was classified as a "suspicious circumstance," despite a clear allegation of sexual assault.

150.   No one told Ms. Frank that the evidence she had endured a painful and intrusive examination to collect would be destroyed before the administrative process could finish.

151.   A 2018 audit of SAEK's performed by BCPD for the Attorney General's Office shows that Ms. Frank's kit was destroyed.

152.   In addition to objective evidence of sexual assault, Ms. Frank provided credible evidence to the BCPD, SOCAD and the University that she had been drugged.

153.   UMBC employee Stephanie Lazarus, the Title IX Coordinator tasked with supervising the investigation, did not investigate the drugging or assign anyone to do so.

154.    UMBC hired Defendant Hunton, an attorney specializing in defending colleges and universities from allegations of sexual harassment, to investigate and prepare the Title IX Draft Report and Final Report.

155.    Hiring an attorney who defends claims of sexual misconduct warrants an inference of an "uneven hand."

156.    Defendant Hunton scheduled Ms. Frank's initial investigative interview for October 20, 2015 but did not specify a time.

157.    Around 5:00 a.m. on October 20, 2015, Defendant Hunton emailed or texted Ms. Frank to tell her that her interview was scheduled for 9:00 that morning.

158.    Ms. Frank was sleeping and did not receive the message.

159.    Ms. Frank was awakened by Defendant Hunton's phone call informing Ms. Frank that she was "late" to an interview that had been scheduled barely three hours before.

160.    Ms. Frank rushed across campus to attend the interview.

161.    Ms. Frank was not able to have her choice of support person (her mother) at the hastily scheduled interview.

162.    This fact is intentionally misrepresented in Defendant Hunton's report.

163.    Instead, Ms. Frank's suitemate came, but was not permitted to be in the room as Defendant Hunton improperly applied a sequestration rule that does not apply in a Title IX context.

164.    Defendant Hunton told Ms. Frank not to bother attempting to retrieve her text messages, as Defendant Hunton would not consider them.

165.    Defendant Hunton found that Ms. Frank had spoliated the text messages Defendant Hunton had expressly instructed Ms. Frank not to try to recover.

166.    Ms. Frank was not provided with the Title IX Draft Report when it was issued, and instead had to inquire why she had not been provided with a copy.

167.    Ms. Frank was informed that Defendant Lazarus had deliberately chosen to withhold the Draft Report so as not to "overwhelm" Ms. Frank during finals.

168.    Defendant Hunton's acts had the opposite effect: Ms. Frank suffered from severe anxiety and other physical and emotional distress because she knew the Draft Report should have been issued and did not know why she had been denied access.

169.    The Draft Report erroneously exonerated the assailant of all reported acts.

170.    Ms. Frank was given no more than one week, during finals, to respond to the Draft Report.

171.    Ms. Frank responded to the Draft Report and raised numerous procedural and evidentiary issues.

172.    The Final Report was issued without material change from the Draft Report.

173.    The UMBC Board of Review accepted the recommendation contained in the Final Report.

174.    Ms. Frank appealed the decision, as it had been unfair for the University to utilize double-hearsay character evidence and a defense attorney to draft the report.

175.    Ms. Frank's appeal was wrongfully denied.

176.    After the completion of the sham UMBC investigation, Ms. Frank again reported the sexual assault to the Baltimore County Police.

Ms. Frank's Discriminatory Treatment by BCPD And SOCAD

177.    Ms. Frank went to the Catonsville Precinct of BCPD to report the sexual assault.

178.    Ms. Frank was forced to wait for hours while BCPD Officer Timothy Lee arrived to take her statement.

179.    Officer Lee was obviously and overtly uninterested in taking Ms. Frank's report.

180.    Officer Lee required Ms. Frank to give her account of the assault, her one and only sexual experience at that time, in a crowded lobby full of civilians and other strangers.

181.    Even so, Ms. Frank gave BCPD a detailed description of rape in the first degree, rape in the second degree, sexual assault in all degrees, and simple assault.

182.    Officer Lee of the BCPD drove the half mile from the Catonsville precinct to the UMBC Police Department.  When he returned, he informed Ms. Frank that the University had no record of the assault.

183.    This was extremely surprising to Ms. Frank, as she had copies of the records from the Title IX investigation.

184.    Consistent with BCPD's practice of concealing sexual assault, Officer Lee disingenuously misclassified Ms. Franks rape as a "suspicious condition," and it was closed with a "non-criminal disposition."

185.    Ms. Frank's rape was reported three times, once to Defendant Dillon, once to BCPD via the FNE, and once to Officer Lee, but never recorded.

186.    Defendants Dever, Burrows, Tomas, Lee, Montgomery and Dillon acted together to make a thrice reported rape "go away."

187.    Defendant Dever has stated that, to prosecute a sexual assault she "need[s] more than just [the victim's] credible testimony because the suspect will present equally credible testimony at trial that this was consensual and [the victim] was not incapacitated."  This statement is untrue.  In Maryland, a victim's testimony alone is sufficient evidence for a conviction.

188.    When Ms. Frank's mother requested more information regarding the investigation, Defendant Dever forwarded the email to Defendant Montgomery and wrote "Hahaha! Her response from my being so nice."

189.    County Defendants would not have acted with such deliberate indifference if an allegation of assault was made by a man.

190.    Ms. Frank is but one of hundreds, possibly thousands, of women who suffered this violation of the equal protection doctrine in Baltimore County.

Plaintiff Anna Borkowski

191.    On October 19, 2017, Towson University Junior Anna Borkowski and her female classmate, A.H., met up with three UMBC students at a local Towson bar.  All three men were members of UMBC's Conference Championship-winning baseball team.

192.    At approximately 1:00 a.m. on 20th of October 2017, the three men went with Ms. Borkowski and her friend to her friend's nearby apartment.

193.    The three men encouraged Ms. Borkowski and her friend to drink from a bottle of vodka and wine.

194.    The men pretended to drink but did not.

195.    According to the men, they later poured the contents of the bottle of vodka out over the apartment's balcony in an attempt to conceal their surreptitious drugging of Ms. Borkowski and her friend.

196.    There is no record of any attempt to investigate the destruction of evidence, though the men are adamant that they disclosed this fact to the police.

197.    The men had most likely placed drugs in the bottle of vodka.

198.    Ms. Borkowski became disoriented and blacked out.

199.    In the early morning hours of October 20, 2017, Ms. Borkowski and A.H. were Ms. Borkowski and A.H. were gang-raped and repeatedly assaulted, in series, by the three men.

200.    Due to her incapacitation, Ms. Borkowski was unable to consent to the sexual assault.

201.    Ms. Borkowski, due to her incapacitation, does not remember the entire assault, but she has horrific fragmentary memories of waking up while being sexually assaulted by combinations of the three men.

202.    At the same time, Ms. Borkowski witnessed her unconscious or semi-conscious friend being raped by one of the men, and then by another.

203.    Ms. Borkowski was, by any definition, incapacitated and incapable of giving consent, as she could not and did not apprise the nature or consequences of the sexual acts.  A. H. was unconscious or semi-concious.

204.    That same day, upon regaining consciousness, Ms. Borkowski and A.H. were both in intense pain and realized they had been raped.  The women reported the assaults to the TUPD police.  Pursuant to TUPD's Memorandum of Understanding with BCPD, they were transported to Greater Baltimore Medical Center (GMBC) for examination and treatment.

205.    A SAFE Exam performed at GBMC confirmed that Ms. Borkowski was suffering "injuries consistent with sexual assault," specifically vaginal tearing.

206.    Ms. Borkowski understood the forensic value of the painful and invasive exam. She submitted to the exam in order provide objective evidence of an assault, and to assist the County Defendants in capturing and prosecuting her rapists.

207.    Ms. Borkowski did not know that Defendants' interest was in concealing, not investigating or prosecuting, the crime.

Baltimore County's Sham Investigation

208.    Just after midnight on October 21, 2017, less than 24 hours after the assault, Ms. Borkowski's case was inexplicably closed.

209.    Her report was "cleared" by "exceptional circumstances."  No notation reflecting the clearance is in the investigative file.

210.    The only reason it is known is because a date-stamped copy of the report was faxed to TUPD at 5:47 a.m. on October 21st.

211.    In violation of its own "reforms," BCPD did not investigate the allegations before clearing the report.

212.    Even though the case was closed, Detective Hummel performed a single investigatory act: she visited the apartment building where the assault occurred and requested video.

213.    Other than visiting the building where the rapes occurred, BCPD performed no investigation.  BCPD did not subpoena the surveillance tapes from the bar or the apartment building.

214.    Sometime later, Defendant Burrows noted that the report was coded as "open" or "open suspended."  There is no supplement in the file that indicates that the case disposition had changed.

215.    Defendant Burrow's note in the BCPD Investigative File appears to have been a ruse to conceal the fact that the case was wrongfully close on October 21, 2017.

216.    The BCPD never visited the crime scene or collected any evidence.

217.    Blood stains on the bed were ignored.

218.    The suspicious bottle of vodka was never tested.

219.    BCPD performed no analysis of the SAEK related to the assaults.

220.    Lead Detective, Jessica Hummel, visited the building (not the apartment) where the assault occurred.

221.    She reported that important surveillance footage was not available.  She was either ill-informed or untruthful.  Valuable evidence was lost or intentionally spoliated.

222.    Several days later, Detective Hummel was transferred out of the SVT at Defendant Dever's instructions, notwithstanding Defendant Dever's lack of authority to do so.

223.    BCPD assured Ms. Borkowski that "even though it may not seem as though it is being worked on, trust that it is and will be thoroughly investigated."

224.    BCPD did not interview any of Ms. Borkowski's friends who were present for part of the evening.

225.    The "investigation" sat dormant for days.

226.    After pressure from Defendant Fox to close the case, Defendant Burrows scheduled interviews with the three men.

The BCPD Conducts Sham Interviews

227.    On November 15, 2017 Defendants Tomas and Burrows interviewed the three men, together, at a Chik-fil-A.

228.    All three men admitted to having simultaneously engaged in sexual acts with Ms. Borkowski and A. H while the women were extremely intoxicated.

229.    The men said they did not understand what the issue was.

230.    They claimed that the assault was consensual, despite Ms. Borkowski and A. H's obvious incapacity to consent and both women's phisical injuries.

231.    Despite the admission that they engaged in injury-causing sexual activity with Ms. Borkowski and A. H, Defendant Dever, chief of the SOCAD, refused to charge any of the three men with a crime.[11]

232.    Defendant Dever's rationale was that "the boys had to know it was a crime."

---

[11] Ms. Dever purported to "dismiss" charges on March 23, 2018, instead of exercising her discretion to enter a *nolle prosequi* and face public accountability.  The matters are currently on appeal.

233.    Defendant Dever is legally responsible for making non-discriminatory charging decisions pursuant to the Fourteenth Amendment to the U.S. Constitution.

234.    While Defendant Dever has prosecutorial discretion, she is not permitted to discriminate against a protected class – women − as is alleged in this Complaint.

235.    Defendant Dever refused to proceed despite having acknowledged that she "believed" that Ms. Borkowski had been raped.

236.    Defendant Dever claimed that she was ethically prohibited from bringing charges, despite having probable cause to bring charges.[12]

237.    Defendant Dever has, in the past, defined "incapacity" for female victims of sexual assault as "passed out behind a dumpster" – which is at odds with Maryland law.

238.    Defendants Dever, Tomas, Burrows and Shellenberger simply accepted the mens' explanation, that two women had consented to injurious multiple-partner sex with three men and refused to proceed with a meaningful investigation.

239.    This is astounding considering Ms. H has no recollection whatsoever of the events, was seen being raped while unconscious, and Ms. Borkowski was left with vaginal tearing.

240.    This is but two examples of Defendant Dever's past pattern of intentional deception of victims regarding the legal distinction between incapacity and helplessness, or consent and rape.

---

[12] By coding as Adult-Ex-Clear, the BCPD and the State's Attorney's Office have affirmed probable cause for arrest and charges.

241.    According to Defendants Dever, Tomas and Burrows, Ms. Borkowski's and A.H's report "did not meet the elements for a crime."  This is the definition of "unfounded – baseless" per the UCR.

242.    Although she acknowledged that she "believed" Ms. Borkowski was the victim of a sexual assault, Defendant Dever has expressed her belief that no crime occurred, again the very definition of "unfounded."

243.    Specifically, Ms. Dever "determined that the facts and evidence in the case did not meet the elements of rape under the Maryland Law CR§ 3-304."

244.    In direct contradiction to Ms. Dever's statement, Defendant Burrows expressly stated that Ms. Borkowski's report was "not unfounded."

245.    While it would be reasonable to assume that Defendant Burrows is merely incompetent, the context suggests the opposite.

246.    Defendant Burrows subsequently miscoded the disposition of Ms. Borkowski's Rape report as "cleared due to exceptional circumstances."[13]

247.    It appears that the case has now been re-opened for the purpose of investigating Ms. Borkowski, though the file does not reflect when or by whom.

248.    The F.B.I. is unambiguous.  To clear by "exceptional circumstances," the Defendants must acknowledge that a crime has taken place, that Defendants have

---

[13] It appears from the records that the entry reflecting the change was fraudulent, and it has since been recoded as both "open suspended" and "Adult Ex clear."

probable cause to arrest a suspect, and that the authorities are unable to effect the arrest or otherwise prosecute the offender.

249.     The inability to locate, identify and arrest of Ms. Borkowski's assailants was not a factor in Ms. Borkowski's case, nor was it applicable to the hundreds of other legitimate reports of sexual assault  that have been "ex cleared" by BCPD.

Discriminatory Treatment of Ms. Borkowski − Including Criminal Acts by Defendants Shellenberger, Dever, Burrows, and Thomas

The First Applications for Statements of Charges

250.     BCPD acknowledged that probable cause for the arrest of the assailants existed.

251.     On March 14, 2018, Ms. Borkowski decided to avail herself of her rights pursuant to section 2-607 of the Courts and Judicial Proceedings Article of the Maryland Code.

252.     Section 2-607 provides that "[a]n individual may file an application for a statement of charges with a District Court Commissioner."

253.     The Commissioner is then tasked with examining the affidavit and issuing a statement of charges or, in the absence of probable cause, denying the application.

254.     Ms. Borkowski submitted sworn applications for statements of charges with District Court Commissioner John Robey.  Commissioner Robey's duty was to examine the affidavits for the probable cause to issue a summons.  Probable cause had already been affirmed by BCPD, when the case was closed by "exceptional circumstances."

255.    After Ms. Borkowski submitted affidavits and applications, Commissioner Robey demanded that Ms. Borkowski wait in the hallway.

256.    With Ms. Borkowski safely out of earshot, Commissioner Robey contacted Defendant Montgomery of the SVT and Defendant Dever in the State's Attorney's Office by telephone.

257.    Defendant Montgomery (a member of the executive branch) and Defendant Dever (the delegee of an elected Constitutional officer) improperly instructed Commissioner Robey to deny the applications for statements of charges.

258.    This is irreconcilable with their joint acknowledgement of probable cause – unless they were acting with a malicious intent to frustrate the administration of justice and to deny Ms. Borkowski of her civil rights.

259.    Commissioner Robey, in dereliction of his duties to make an independent inquiry, complied with County Defendants' instructions.

260.    The denied applications were forwarded to Baltimore County Administrative Commissioner Whitney Wisniewski.

The Second Applications for Statements of Charges

261.    Because Commissioner Robey's denial was the result of improper influence and clear legal error, Ms. Borkowski made a second attempt to submit applications for statements of charges.

262.    On March 20, 2018, Ms. Borkowski submitted sworn applications for statements of charges against the three men in the District Court for Baltimore County, in Towson.

263.   Ms. Borkowski's applications were reviewed by Managing Commissioner Colleen Ellingson,[14] who was fully aware of the previous applications and the State's Attorney's Office's and BCPD's prior interference with Ms. Borkowski's EP rights of fair administration of the District Court Commissioner system.

264.   After carefully reviewing the sworn statements, Managing Commissioner Ellingson charged all three of the men with first degree rape, second degree sexual assault, third degree sexual offense, second degree assault, fourth degree sexual contact, and perverted practice.

265.   The summonses were sent out the next day to be served on the three assailants.

266.   A trial date was set for May 5, 2018.

Defendants Immediately Interfere with Summonses

267.   The next morning, March 21, 2018, Defendant Burrows was inexplicably monitoring the CaseSearch for any activity related to Ms. Borkowski.

268.   Defendant Burrows learned that Ms. Borkowski had been able to submit an application for a statement of charges without BCPD or Defendants Shellenberger and Dever's unlawful and discriminatory interference.

269.   An online docket entry reflected that lawful summonses had been properly issued for each of the three men.

270.   The summonses had yet to be served.

---

[14] Commissioner Ellingson has served at the Judicial College as an instructor for other Commissioners and, as Managing Commissioner, currently oversees the training of new Commissioners.  She is the authority on D.C. Commissioners' duties.

271.    No preliminary hearing date was set.

272.    In an unethical and illegal act that defies any logical explanation, and on orders from Defendants Dever and Shellenberger, Defendant Burrows contacted the Baltimore County police officer in charge of serving the summonses on the three men and instructed him not to serve them.

273.    Ms. Borkowski received a subpoena to testify, as a witness, dated March 21, 2018.

274.    On March 22, 2018, the first day the courthouse was open, Detective Burrows raced to the District Courthouse to obtain a copy of Ms. Borkowski's previously-denied Applications for Statements of Charges.

275.    Defendant Burrows' report gives no reason for her urgent trip, though there is a reasonable inference of animus and malice.

276.    BCPD was now investigating Ms. Borkowski, not the rapists.

277.    A clearer example of the discriminatory application of the law is nearly impossible.

278.    According to notes that were withheld for months by Defendants, the BCPD defendants acted on orders from Defendants Shellenberger, Dever, and Fox.

279.    Apparently, Defendants were unable to obtain copies of the denied applications without a subpoena, as they are "secret" pursuant to Maryland law.

280.    Defendant Burrows requested a subpoena, and Defendant Dever issued a grand jury subpoena to "investigate" Ms. Borkowski for unlawful exercise of her rights.[15]

281.    Defendant Burrows unlawfully served the subpoena on Administrative Commissioner Wisniewski, via email, on March 22, at 11:48 am.

282.    Defendant Burrows also interfered with Ms. Borkowski's rights and the administration of justice by convincing Commissioner Wisniewski to "sen[d] out a department-wide email instructing Commissioners not to act if they receive[d] any further applications" from Ms. Borkowski, and "instructed Commissioners to forward [to her] any applications if submitted."

283.    Defendant Shellenberger ordered Defendant Dever to instruct Commissioner Wisniewski "not to file charges."

284.    Defendant Burrows, acting on plainly illegal orders from Defendants Dever and Shellenberger, and in conspiracy with them,[16] denied Ms. Borkowski access to the courts in violation of her civil rights.

285.    Defendants Shellenberger, Dever, and Fox ordered Defendants Burrows and Tomas to "to tell Ms. Borkowski that she has to stop bringing these additional charges or they will file criminal abuse of process charges against her."

286.    This order was unlawful as BCPD does not report to the State's Attorney or his delegees.

---

[15] This is an abuse of subpoena power.

[16] And most likely Commissioner Wisniewski.

287.     It was also in violation 42 U.S.C. 985(2)

Defendants' Unlawful Conspiracy to Intimidate Ms. Borkowski from Giving Sworn
Testimony to A Judicial Officer.

288.     Defendants Dever and Shellenberger instructed Defendants Burrows and

Tomas, accompanied, in a show of force, by uniformed, armed Patrol Officer Paul

Dorfler,[17] to go to Ms. Borkowski's home in Baltimore City, where she lived with her

grandparents.  The purpose was intimidation.

289.     Defendants Shellenberger, Dever, and Fox had ordered Defendants Burrows

and Tomas to tell Ms. Borkowski to "stop going to [the] Comm[issioner]" or face

"criminal charges."

290.     The above-named Defendants have no police powers in Baltimore City.

291.     Defendants Burrows and Tomas knew this was an illegal order and proceeded

to carry it out based on their animus and malice towards female victims of sexual assault.

292.     When the trio of officers arrived, Ms. Borkowski's grandmother answered the

door.

293.     At that time in the afternoon, Ms. Borkowski was volunteering at a local

nursing home.

294.     Detective Burrows demanded to know where the nursing home was and what

time Ms. Borkowski would return to her home.

---

[17] Sending the patrol officer was Defendants Shellenberger's and Dever's idea.

295.   Ms. Borkowski's grandmother referred the officers to Ms. Borkowski's attorney.

296.   Detective Burrows pretended that she did not know Ms. Borkowski was represented by counsel.[18]

297.   Acting as agents for Defendants Shellenberger and Dever, and ignoring that Ms. Borkowski was represented by counsel, Defendants contacted Ms. Borkowski directly on the cell number she had provided as part of the rape investigation.

298.   Defendants Burrows and Tomas then called Ms. Borkowski and demanded to know where she was.

299.   Defendants Burrows' and Tomas' notes reflect that they had also unlawfully obtained a copy of Ms. Borkowski's Towson class schedule, in violation of federal educational privacy laws and the Fourth Amendment.

300.   When Ms. Borkowski's attorney learned of the illegal intimidation conspiracy, he offered to meet with Ms. Borkowski and Defendants Tomas and Burrows that afternoon in his office.

301.   Defendant Tomas initially stated that Defendant Dever wanted to attend the meeting, and Ms. Borkowski stated that Defendant Dever was welcome to attend.

302.   Defendants Tomas and Burrows conferred with their co-conspirators, Defendants Dever and Shellenberger.

---

[18] Her notes reflect prior knowledge that Ms. Borkowski was represented.

303.    The Baltimore County Defendants suddenly decided not to pursue a meeting with Ms. Borkowski, *i.e.*, "Scott [Shellenberger] said not to go b[e]c[ause] of attorney" to Defendants Burrows and Tomas.

Unlawful Dismissal of The Charges Against The Defendants.

304.    The next day, March 23, 2018, Defendant Dever purported to file a "Motion to Dismiss" without a certificate of service.

305.    The Motion was not "filed" with the Clerk, but was sent via email in violation of the Maryland Rules.

306.    The Motion was never made part of the file, or it has been removed from the file.

307.    Defendant Dever also requested that the District Court place the criminal cases on the preliminary hearing docket for the same day.

308.    The preliminary hearing had not been scheduled, and she did not intend to conduct a preliminary hearing.

309.    Defendant Dever performed these unlawful acts in response to a complaint by one of the assailants' attorneys that his baseball schedule was being affected by the criminal charges.

310.    UMBC had an "away" game in which one of the assailants was scheduled to play.

311.   At 1 p.m. District Court for Baltimore County called the Criminal Defendants' cases and dismissed them.[19]

312.   Ms. Borkowski was not contacted regarding this dismissal.

313.   Defendant Dever, purporting to act on behalf of the State, then moved to expunge the Criminal Defendants' records, something she lacks standing to do.

314.   Defendants Burrows and Tomas' note reflect that they participated in this scheme.

315.   In Maryland, assault cases may only be dismissed with the victim's consent and the court's approval, neither of which Defendant Dever requested or received.

316.   Ms. Borkowski was, again, intentionally denied access to the court, due process rights, and equal protection rights because of County Defendants' malice towards her and other similarly situated victims of sexual assault.

317.   In court filings, Defendants now claim that Defendant "Dever dismissed the charges because she did not believe there was probable cause sufficient to proceed any further in th[e] case[s]."[20]

318.   This statement is contradicted by Defendant Dever's consultation with Defendant Burrows and acknowledged sufficient probable cause.

---

[19] The State's Attorney's Office has since mischaracterized this as either as a preliminary hearing and entry of a *nolle prosequi*, despite not doing either of these things.  The charges are listed as having been "Dismissed" on March 23, 2018.  The matter is on appeal.

[20] While the filing is signed by Robyn Coffin, it was drafted by Defendant Dever and a law clerk.

Defendants Enjoy No Immunity

319.    Defendants' acts specified more fully above have demonstrated malice, deliberate indifference, and recklessness.

320.    Defendants' policies and procedures were enacted to carry out Defendants' discriminatory purposes.

Others Similarly Situated

321.    Ms. Borkowski's and Ms. Frank's experiences are representative of victims of sexual assault in Baltimore County, Maryland.

322.    Ms. Borkowski's and Ms. Frank's experiences are representative of victims of sexual assault by UMBC students.

323.    Ms. Borkowski's and Ms. Frank's experiences are representative of individuals who file complaints with UMBC for sexual assault.

324.    The class of women who have had similar experiences to Ms. Borkowski and Ms. Frank is clearly defined.

325.    It will be possible and practical to identify potential class members, because they are identified in police reports and Title IX complaints.

326.    There is a large enough number of class members that joinder would be impractical.

COUNT I:
Violations of 42 U.S.C. §1983 –
Deprivation of First Amendment Rights
by Anna Borkowski
Against Defendants Baltimore County, Baltimore County Police Department,
Shellenberger, Dever,
Fox, Montgomery, Tomas And Burrows

327.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

328.    Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Lane and Montgomery acted under the color of State law, granted by their official positions.

329.    Baltimore County and Baltimore County Police Department failed to train remaining Defendants in the proper conduct of an investigation.

330.    Defendants violated 42 U.S.C.A. § 1985(2) by deterring, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully.

331.    Ms. Borkowski's right to present sworn testimony to a Maryland District Court Commissioner is protected speech under the First Amendment.

332.    Defendants also acted to deprive Ms. Borkowski of her right to provide testimony to a District Court Commissioner *i.e.,* her access to the courts.

333.    Defendants violated Ms. Borkowski's First Amendment right to free speech – specifically the right to be free from retaliation by a public official for the exercise of her right.

334.    Defendants' retaliatory actions adversely affected Ms. Borkowski's constitutionally protected speech in that she was intimidated from testifying.

335.    There is a direct relationship between Ms. Borkowski's speech and the Defendants' retaliatory action, and Defendants admit as much in police reports and emails.

336.    Defendants intended to create, and created, a realistic threat of arrest that was calculated to instill fear in Ms. Borkowski.

337.    As a result of County Defendants' actions, Ms. Borkowski has suffered emotional and physical distress.

338.    As a result of County Defendants' actions, Ms. Borkowski's family has been harassed and retaliated against.

COUNT II:
By Anna Borkowski
Violations of 42 U.S.C. §1983
Deprivation of Equal Protection − Retaliation Against Ms. Borkowski's Family –
Deprivation of Familial Relations
Against Defendants Baltimore County, Baltimore County Police Department,
Shellenberger, Dever, Richardson, and Fox

339.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

340.    On April 18, 2018, Emily Borkowski, Anna Borkowski's sister, was accepted into the internship program at the Baltimore County State's Attorney's Office Domestic Violence Section.

341.    Defendant Fox admitted, in an email to Defendants Dever and Coffin, to having "stalked" Anna Borkowski to ferret out any connection between Anna and Emily Borkowski.

342.    Defendants Shellenberger, Coffin, Dever, Richards, and Fox further retaliated against Ms. Borkowski by firing Ms. Borkowski's sister, Emily Borkowski, from an internship with the Baltimore County State's Attorney's Office.

343.    On May 11, 2018, Emily Borkowski was fired.

344.    Defendants admitted that the retaliatory firing was in response to a purported accusation of "misconduct" made by Ms. Borkowski's attorney.[21]

345.    Emily Borkowski's firing was a retaliatory, unjustified act, undertaken intentionally and maliciously to punish Ms. Borkowski for attempting to assert her Title IX and other rights.

346.    Defendants knew or should have known that the firing was a violation of Ms. Borkowski's civil rights.

COUNT III:
By Anna Borkowski
Violations of 42 U.S.C. §1983
Deprivation of Equal Protection
Against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Montgomery

347.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

---

[21] Anna Borkowski, despite having ample grounds, has not filed a complaint with Bar Counsel, the reference is to a filing in Circuit Court for Baltimore County that noted procedural irregularities in the assailants' Circuit Court cases.

348.    Defendants subjected Ms. Borkowski to a deprivation of her right to equal protection under the law.

349.    Namely, Defendants subjected Ms. Borkowski to a deprivation of her right to equal protection in that the investigation of her sexual assault demonstrated deliberate indifference to crimes against her as a woman as it was was not carried out with the same vigor and zeal as the investigation of other crimes (or even the non-crime of going to a District Court Commissioner).

350.    The purpose and effect of this deprivation is to deny women equal protection of the laws, in that women are disproportionately the victims of sexual assault.

351.    Defendants knew or should have known that they were violating Ms. Borkowski's civil rights.

<u>COUNT II:</u>
<u>By Katelyn Frank</u>
<u>Violations of 42 U.S.C. §1983</u>
<u>Against Defendants Board of Regents, UMBC, UMBC Police Department, and Dillon</u>

352.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

353.    It is unlawful for a law enforcement officer to dissuade a victim from filing a police report.

354.    Defendants Board of Regents and UMBC failed to adequately train or supervise Defendant Dillon.

355.    Defendant Dillon attempted to, and did, persuade Ms. Frank not to pursue a criminal investigation her assailant.

356.    As a result of Defendant Dillon's acts, Ms. Frank did not report her rape

directly to the police until after the police had destroyed her SAEK.

COUNT IV:
By Anna Borkowski
Violations of 42 U.S.C. §1985
Against Defendants Baltimore County, Baltimore County Police Department,
Shellenberger, Dever, Fox, Burrows, Tomas

357.    This Count incorporates the remainder of this Complaint as if set forth fully

herein.

358.    Defendants Shellenberger and Dever conspired with Defendant Fox and

Defendants Tomas and Burrows to intimidate Ms. Borkowski from giving testimony

before a Maryland District Court Commissioner.

359.    Records reflect Defendants agreement to violate Ms. Borkowski's

constitutional rights.

360.    A contemporary account of Defendant Dever's statements reflect that

Defendants' conspiracy was to arrest Ms. Borkowski and/or charge her with "criminal

charges."

361.    Defendants Shellenberger and Dever conspired to abuse their subpoena power

to deprive Ms. Borkowski of a Constitutionally-Protected right.

362.    Defendants were motivated by invidiously discriminatory animus towards Ms.

Borkowski as a female victim of sexual assault.

363.    Defendants thus conspired to go out of their lawful jurisdiction and on to

another's property for the purpose of depriving Ms. Borkowski of equal protection under

the law and her right to free expression under the First Amendment.

364.   Defendants' acts were part of a broader conspiracy to prevent and hinder Ms. Borkowski, and other female victims of sexual assault, from enjoying equal protection under the law.

365.   Ms. Borkowski was harmed by Defendants' acts in furtherance of the conspiracy in that she suffers from anxiety, sleep loss, intrusive thoughts, fear, and other physical and mental injuries.

366.   Defendants knew or should have known that their actions would deprive Ms. Borkowski of her civil rights.

COUNT V:
Violations of 42 U.S.C. §1986
Against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Montgomery, and Dorfler

367.   This Count incorporates the remainder of this Complaint as if set forth fully herein.

368.   Any of the Conspirators to the civil rights violations alleged in this Complaint could have stopped the conspiracy at any time but refused to.

COUNT VI:
Violations of 20 U.S.C. § 1681
Discrimination
By Katelyn Frank
Against Defendants Board of Regents, UMBC, University Police, and Hunton

369.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

370.   Federal law provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

371.    The law is an expression of the Equal Protection doctrine embodied in the United States' Constitution.

372.    Defendants Board of Regents, UMBC, and University Police receive federal financial assistance and Defendant Hunton receives payment from UMBC consisting in part of federal funding.

373.    Defendants were deliberately indifferent to Ms. Frank's rape in that they assigned a biased investigator to investigate the allegations made by Ms. Frank.

374.    Defendants created a hostile environment in which Ms. Frank could not study or learn.

375.    Defendants allowed Ms. Frank's assailant back on to campus after the flawed investigation.

376.    As a result, Ms. Frank suffered severe emotional distress, a decline in academic performance, and lost tuition.

COUNT VII:
Violations of 20 U.S.C. § 1681
Erroneous Outcome
By Katelyn Frank
Against Defendants Hunton, the Board of Regents, and UMBC

377.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

378.    The investigation was rife with procedural and other irregularities which cast significant doubt on the accuracy of the outcome.

379.    Ms. Frank was denied the opportunity to attempt to recover her text messages, while the Investigator accepted and credited incomplete, selectively-deleted, text messages offered by the assailant.

380.    Ms. Frank's interview was scheduled when no reasonable college freshman would be awake, for approximately three hours later.

381.    Contrary to UMBC's policies, Ms. Frank was denied the opportunity to have her chosen support person, her mother, present.

382.    Contrary to UMBC's policies, Ms. Frank was denied the opportunity to have her second-choice support person, her suitemate, present.

383.    The Investigator claimed that Ms. Frank's suitemate was a witness, but the Investigator also concluded that the suitemate was not a material witness, and her "testimony was not likely to change the findings of [the] investigation."

384.    Ms. Frank's suitemate was never interviewed.

385.    The assailant, on the other hand, was permitted to have two support persons, of his choice, present at his interview.

386.    The Investigator mischaracterized Ms. Frank's statements in her initial interview and elsewhere.

387.    The Investigator did not ask questions soliciting certain information at Ms. Frank's initial interview.

388.    The Investigator drew an adverse inference against Ms. Frank when Ms. Frank pointed out these deficiencies in her response to the Draft Report.

389.    The Investigator refused to draw an adverse inference against the assailant for selectively deleting text messages.

390.    The Investigator and the University were motivated, at least in part, to minimize UMBC's Clery Act reporting.

391.    For example, UMBC did not report Ms. Frank's report of rape, as it was erroneously deemed only a "suspicious circumstance," not a report of a crime.

392.    Falsely deflating the number of sexual assaults victims have attempted to report has a disproportionate impact on women, who are more often the victims of sexual assault.

393.    Ms. Frank's roommate's mother made statements to the Investigator regarding her daughter's supposed belief that Ms. Frank "brought it on herself."

394.    Ms. Frank had no opportunity to cross examine the roommate or the mother regarding these statements.

395.    These statements reflect an antiquated and discriminatory view of women that had no place in a modern Title IX investigation.

396.    The Investigator took Ms. Frank's roommate's refusal to cooperate in the investigation as proof that she would give testimony that was unfavorable to Ms. Frank.

397.    The investigation into Ms. Frank's complaint was procedurally and substantively flawed to a degree that denied Ms. Frank her rights under Title IX.

398.    Defendants investigation of Ms. Franks complaint was procedurally flawed.

399.    The procedural flaws led to an adverse and erroneous outcome.

400.    The particular circumstances of Defendants investigation, including the conclusions of the investigator, suggest that gender bias was a motivating factor behind the erroneous finding.

<u>COUNT VIII:</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Failure to Prevent Sexual Harassment</u>
<u>By Katelyn Frank</u>
<u>Against Defendants Board of Regents, UMBC, University Police, and Hunton</u>

401.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

402.    Ms. Frank's assailant had previously sexually assaulted others.

403.    Defendants knew or should have known

404.    Any reasonable person knowing what Defendant knew or should have known would have known of the danger presented by Ms. Frank's assailant.

405.    Defendants failed to take any action to remove or otherwise modify that danger.

406.    This failure was part of a pattern and practice of not addressing dangerous sexual assault risks.

<u>COUNT VIII:</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Denial of Educational Opportunities</u>
<u>By Anna Borkowski and Katelyn Frank</u>
<u>Against Defendants Board of Regents, UMBC, University Police, and Hunton</u>

407.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

408.    Ms. Frank was a student at UMBC at the time of her assault.

409. Ms. Borkowski was a former student, and was planning on applying to a UMBC program.

410. After being assaulted, and the subsequent investigation, Ms. Frank suffered severe educational setbacks.

411. Ms. Frank lost at least one year of educational time.

412. Ms. Frank now attends a community college.

413. Both before and after her tenure at UMBC, Ms. Frank had been, and now continues to be, an A-student.

414. Ms. Frank was unable to continue her education at UMBC after the UMBC Defendants' tortious and discriminatory behavior.

415. Ms. Borkowski is understandably unwilling to apply to UMBC after the discriminatory and tortious manner in which UMBC handled her report.

416. Plaintiffs have been denied educational opportunities due to

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Honorable Court:

a) Certify this action as a class action under Rule 23;

b) For damages in excess of $75,000.00, in compensatory and punitive damages;

c) Enjoin Defendants from engaging in unconstitutional and illegal practices abridging Plaintiffs' civil rights and denying Plaintiffs educational opportunities;

d) Award to Plaintiffs reasonable costs and attorney's fees; and

e) Grant such other relief as this Court shall determine is just and proper.

<u>Prayer for Jury Trial</u>

Pursuant to Rule 38, Plaintiffs demand a trial by jury on all issues so triable.

<u>/S/ Rignal W. Baldwin V</u>
Rignal W. Baldwin V
Federal Bar No.: 30136
Stephen C. Rigg
Federal Bar No.: 19891
BaldwinLaw, LLC
111 South Calvert Street
Suite 1805
Baltimore, Maryland 21202
Telephone: (410) 385-5695
Facsimile: (443) 703-7772
*Attorney for Plaintiffs,*
*Anna Borkowski and Katelyn Frank*