IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANNA BORKOWSKI, et al., | * |
| Plaintiffs, | * |
| v. | *  Civil Action No. 1:18-cv2809 |
| BALTIMORE COUNTY, MARYLAND, et al., | * |
| | * |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DILLON'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendant Paul Dillon, the Chief of Police of the University of Maryland, Baltimore County Police Department ("UMBC PD"), through his undersigned counsel, submits this Memorandum of Law in Support of his Motion to Dismiss the sole count against him. Count IV (mislabeled as Count II), in which Plaintiff Frank asserts a claim under 42 U.S.C. §1983 against Defendant Dillon, should be dismissed for failure to state a claim upon which relief can be granted. Alternatively, Defendant Dillon is entitled to summary judgment and/or qualified immunity.

**INTRODUCTION**

Plaintiffs Anna Borkowski and Katelyn Frank have filed a multi-count putative class action complaint against a number of defendants, including the University of Maryland, Baltimore County ("UMBC" or the "University") and some of its officials, including Chief Dillon, and numerous members of the Baltimore County Police Department ("BCPD") and of the Baltimore County State's Attorney Office (with the BCPD officers, the "Law Enforcement Defendants").

Ms. Frank's claims relate generally to UMBC's handling of her allegation that she was sexually assaulted by another UMBC student on the UMBC campus in 2015. Complaint at ¶¶

130-176.  At the time, Ms. Frank was a UMBC student.  *Id.* at ¶ 130.  After a Title IX investigation, UMBC Board of Review hearing, and internal appeal, UMBC found the alleged assailant not responsible.  *Id.* at ¶¶ 169-175.  Thereafter, Ms. Frank reported the alleged sexual assault to BCPD.  *Id.* at ¶ 176.  Ms. Frank asserts separate claims against some of the Law Enforcement Defendants regarding their handling of her criminal complaint.  *Id.* at ¶¶ 177-190.

Ms. Borkowski's claims relate primarily to the Law Enforcement Defendants' handling of her allegations that she was sexually assaulted by three UMBC students in a Towson apartment.  *Id.* at ¶¶191-318.  Ms. Borkowski was a Towson University student at the time of the alleged assault.  *Id.* at ¶191.  She has not asserted any claims against Chief Dillon.

The only allegation in the entire complaint against Chief (then Deputy Chief) Dillon relates to a single interaction between Ms. Frank and Chief Dillon, when Ms. Frank reported the alleged assault to him.  *Id.* at ¶¶ 135-144 and ¶¶ 352-56.  Specifically, Ms. Frank alleges that Chief Dillon "improperly" persuaded her to not file a police report about the alleged assault.  *Id.* at ¶ 136.  In fact, Chief Dillon merely explained to Ms. Frank her reporting options: namely, to file an internal complaint with UMBC's Title IX office, pursuant to UMBC's "Interim Policy on Prohibited Sexual Misconduct and Other Related Misconduct in effect in September 2015" (the "Policy," a copy of which is attached as **Exhibit 4**); to file a police report; or both.  Not only were Chief Dillon's actions not improper, even if the Court accepts Ms. Frank's allegations as true, they were not unlawful.  Accordingly, the Court should dismiss the claim against him, grant summary judgment in his favor, or find that he is entitled to qualified immunity.

# FACTUAL BACKGROUND[1]

### ALLEGATIONS IN THE COMPLAINT

Ms. Frank alleges that on September 10, 2015, another UMBC student lured her into his dorm room and raped her. Complaint at ¶ 132. She reported the assault to Rina Rhyne[2] and, with her support, reported the alleged assault to Chief Dillon. *Id.* at ¶ 135. She alleges that Chief Dillon "improperly persuaded [her] not to 'report' her assault to the police" and told her that the "'administrative method' was 'faster and easier,' 'more victim friendly,' and was 'easier to prove.'" *Id.* at ¶ 137. She further alleges that Chief Dillon "convinced [her] to handle the matter administratively" (*id.* at ¶ 140) in alleged violation of the terms of UMBC's Memorandum of Understanding ("MOU") with BCPD (*id.* at ¶ 138) and that he failed to include the assault in the University's "Clery Report."[3] *Id.* at ¶ 142. She alleges that Ms. Rhyne was "concerned" that Chief Dillon was violating the terms of the MOU, but Chief Dillon "brushed off" that concern and stated that the "incident was not sufficiently serious to report to BCPD." *Id.* at ¶¶143-44. Finally, she alleges that Chief Dillon persuaded her not to pursue a criminal investigation of her assailant (*id.* ¶ 355), and as a result she did not report her rape to BCPD until later. *Id.* ¶ 356. She alleges it was "unlawful for a law enforcement officer to dissuade a victim from filing a police report" (*id.* ¶ 353) – although she does not cite the law that was allegedly violated. Based on these alleged facts, Ms. Frank contends that Chief Dillon violated 42 U.S.C. §1983. *Id.* at ¶¶ 352-56.

It should be noted that Ms. Frank does ***not*** allege that Chief Dillon failed to tell her about her option to file a police report or that he refused to accept a criminal complaint from her. Her

---

[1] The Factual Background is divided into two parts: the allegations in the Complaint, and additional facts based on the affidavits and exhibits attached to this Memorandum of Law.

[2] In the Complaint, Plaintiffs misspell Ms. Rhyne's last name; it is Rhyne, not "Rhine."

[3] Federal law requires institutions of higher learning to prepare, publish, and distribute an annual report containing campus crime statistics and security policies. This is known as a "Clery Report."

only allegation is that he persuaded her to file a Title IX complaint with UMBC pursuant to the Policy.

### ADDITIONAL INFORMATION[4]

Chief Dillon is a sworn police officer who has worked for university police departments since 1987. *See* **Exhibit 1**, Dillon Affidavit at ¶ 2. He started as a Police Officer with the University of Maryland, College Park Police Department Operations Department, and rose through the ranks, eventually reaching the rank of Major in 2002. *Id.* In 2010, he joined the UMBC Police Department ("UMBC PD") as Deputy Chief of Police. *Id.* He was promoted to Chief of Police in the UMBC PD in July of 2018.[5] During 2015, Chief Dillon was the Deputy Chief of the UMBC PD. As part of his duties, he regularly met with students who alleged they were victims of sexual assaults, often with Rina Rhyne. *See* Ex. 1, Dillon Aff. at ¶ 3; **Exhibit** 2, Rhyne Aff. at ¶ 8.

Rina Rhyne was the Program Coordinator for the Voices Against Violence ("VAV") program at UMBC from August 25, 2014, until July 15, 2016. *See* Ex. 2, Rhyne Aff. at ¶ 2. In her position as Program Coordinator, one of her primary duties was to provide support to sexual assault victims. *Id.* She was not part of UMBC's Title IX office and did not investigate allegations of sexual assault. *Id.* Instead, she provided the initial response efforts when a student disclosed sexual assault to non-confidential staff or faculty members or to her office directly. *Id.* In this role, she provided victims with an explanation of options and resources, helped victims to access on-campus and off-campus services, and generally served as support for them. *Id.* Pursuant to

---

[4] This additional information is based on the affidavits of Chief Dillon and Rina Rhyne, a former UMBC employee, copies of emails, and the UMBC Sexual Misconduct Policy in effect in September 2015.

[5] A copy of Chief Dillon's resume outlining his experience, education, awards and commendations is attached as **Exhibit 3.**

4

UMBC's Policy (**Exhibit 4),** Ms. Rhyne was a "quasi-confidential resource," which meant that victims' conversations with her and their identity could remain confidential if the victim chose not to report a sexual assault, unless there was a continuing threat of harm or a legal obligation to reveal such information.  *See* Policy, § VI.B, at p. 9; Ex. 1, Dillon Aff. at ¶ 3.

In 2015 (and today), when a student alleges a sexual assault, the student has the choice of filing a criminal complaint (i.e., a police report), filing a complaint with the University's Title IX office under the Policy, filing both types of complaints, or not filing a formal complaint at all.  *See* Ex. 4, Policy § VII, at p. 11 (giving a victim the choice of whether and when to report an alleged violation of the Policy, and providing that "A Reporting Party can choose to pursue both a report under this Policy and a criminal investigation at the same time.");[6] Ex. 1, Dillon Aff. at ¶ 4; Ex. 2, Rhyne Aff. at ¶ 4.  A student is not compelled to file a formal report – the Policy specifically protects the student's right to choose not to do so - and the Policy does not obligate the University to file a police report if the student chooses to pursue only an administrative claim through the University's process or to not file any formal complaint.  In short, the student chooses how and when to proceed. Ex. 4, Policy § VII; Ex. 2, Rhyne Aff. at ¶ 4.  "[I]t is common for students who allege that another student sexually assaulted them to pursue university/college Title IX remedies only, or no process at all, and to not file criminal charges." Ex. 2, Rhyne Aff. at ¶ 5; *see also id.* at ¶ 11.

Ms. Frank, accompanied by her friends, came to meet with Ms. Rhyne in her capacity as Program Coordinator in mid-late September 2015. Ex. 2, Rhyne Aff. at ¶ 3. Ms. Frank reported that she was the victim of a sexual assault committed by another UMBC student. *Id.* Ms. Rhyne

---

[6] Section XI of the Policy clarifies that a report to the University under the Policy is independent from any criminal investigation.

accompanied Ms. Frank, along with one of Ms. Frank's friends, another UMBC student, to Greater Baltimore Medical Center ("GBMC") for a SAFE exam. *Id.* UMBC did not conduct the SAFE exam and had no role in determining what would be done with the results of the exam. *Id.*

On or about October 7, 2015, Ms. Rhyne asked Ms. Frank if she would like to speak with a representative of the UMBC police department about her options. Ex. 2, Rhyne Aff. at ¶ 6. Ms. Frank agreed, and Ms. Rhyne asked then-Deputy Chief Dillon to attend a meeting with her. Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 6. The meeting took place on October 7, 2015, and included Ms. Rhyne, Chief Dillon, Ms. Frank, and Ms. Frank's mother. *Id.*

During the meeting, Chief Dillon explained the different reporting options Ms. Frank had:[7] filing a complaint with the University's Title IX officer to initiate a University investigation under the Policy; filing a criminal complaint with the UMBC police, which would likely be referred to the BCPD (if the allegations constituted rape in the first or second degree); filing both types of complaints; or doing neither and not filing a complaint. Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 7. Ms. Frank asked Ms. Rhyne and Chief Dillon about the differences between the criminal/judicial process and UMBC's process.  Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 8. Chief Dillon provided details such as the timeline of the different types of investigations and the different evidentiary standards of the processes. Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 8. For example, he explained that the two processes have different standards of proof. Ex. 1, Dillon Aff. at ¶ 5. He explained that, to obtain a conviction in a criminal process, the prosecutor must show that the Respondent (i.e. the accused assailant) is guilty beyond a reasonable doubt, a stringently high standard. Ex. 1, Dillon Aff. at ¶ 5. He further explained that, in contrast, under UMBC's process the reporting party (i.e. Ms. Frank) must show by a preponderance of the

---

[7] Ms. Rhyne also explained these options to Ms. Frank. Ex. 2, Rhyne Aff. at ¶ 4.

evidence that the Respondent was in violation of the Policy. Ex. 1, Dillon Aff. at ¶ 5. He explained that the preponderance of the evidence standard is a lower standard than the criminal standard of guilt beyond a reasonable doubt. *Id.* When asked about how long each process might take, he informed Ms. Frank (and her mother) that UMBC's Policy strives to adjudicate all Sexual Misconduct related matters within a sixty (60) day timeframe, whereas a criminal process could take longer. *Id.* Chief Dillon also explained that the evidentiary rules were different, adding that the Court holds subpoena powers whereas UMBC does not. *Id.*.

Throughout this discussion, Chief Dillon only answered Ms. Frank's and her mother's questions and objectively informed them of the different processes and reporting options. Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 8. He never attempted to persuade or dissuade Ms. Frank from choosing one process over the other (or from filing complaints in both venues).[8] Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 8. He did not discuss possible outcomes, much less guarantee a certain outcome. Ex. 1, Dillon Aff. at ¶ 5. The meeting lasted for around twenty (20) minutes. *Id.* At the conclusion of the meeting, Ms. Frank informed Chief Dillon and Ms. Rhyne that she wanted to think about her options, but appeared to be more inclined to file a complaint with UMBC's Title IX office and not to file a police report. Ex. 1, Dillon Aff. at ¶ 5; Ex. 2, Rhyne Aff. at ¶ 9.

Contrary to the allegation in the Complaint, Chief Dillon did not tell Ms. Frank that the "'administrative method' was 'faster and easier,' 'more victim friendly,' and was 'easier to

---

[8] While Ms. Rhyne was at UMBC, she met with several sexual assault victims with Deputy Chief Dillon, and at no time did she ever hear him try to persuade or dissuade a complainant from any course of action. Ex. 2, Rhyne Aff. at ¶ 8. She recalls Deputy Chief Dillon assisting several students who came through the VAV program with criminal complaints. *Id.* When a student would disclose a sexual assault to Chief Dillon, he would often call his contacts at BCPD to prepare them for a pending criminal complaint (as he did in this case, as discussed below). *Id.* Furthermore, Chief Dillon willingly arranged for his officers to take students to and from GBMC for SAFEs if they needed transportation, where they could also get connected to BCPD officers. *Id.*

prove.'" (Complaint at ¶ 137). Ex. 1, Dillon Aff. at ¶ 6. At no time did he explicitly state that the UMBC Title IX proceeding would be easier or that any outcome was guaranteed. *Id.* Ms. Frank and Ms. Frank's mother, however, may have drawn such conclusions from his explanation about the different processes, the anticipated length of the different proceedings, and the different burdens of proof. *Id.* Chief Dillon did not encourage or discourage Ms. Frank from pursuing one process over the other. Ex. 1, Dillon Aff. at ¶ 6; Ex. 2, Rhyne Aff. at ¶ 8. At all times, as stated in the Policy, it was Ms. Frank's choice whether and how to report the alleged assault. Ex. 1, Dillon Aff. at ¶ 6; Ex. 2, Rhyne Aff. at ¶ 11; Ex. 4, Policy at § VII.

In the evening of October 7, 2015, Ms. Frank and Chief Dillon exchanged emails. Ex. 1, Dillon Aff. at ¶ 7. Ms. Frank sent Chief Dillon a statement describing the sexual assault and providing him with information about her vehicle so that UMBC PD could make alternative parking accommodations for her.[9] Ex. 1, Dillon Aff. at ¶ 7. In that email exchange, Chief Dillon asked Ms. Frank to confirm in writing her "wishes for no police report and . . . for the Univ. Investigation." Ms. Frank responded that "I forgot to include in my original statement that I would like to go through with a university investigation, not a police investigation." Ex. 1, Dillon Aff. at ¶ 7. A true and accurate copy of this email exchange is attached as **Exhibit 5.** Thus, Ms. Frank confirmed in writing that it was her "wish" to file a complaint under UMBC's Policy and not a police report.

Ms. Rhyne interacted with Ms. Frank and her mother throughout the University's investigation of Ms. Frank's complaint against the Respondent, and at no time did Ms. Frank ever

---

[9] Due to the sensitive nature of the allegations, a copy of the emailed incident statement is not attached to this Motion, and the identifying details about Ms. Frank's vehicle are redacted in Exhibit 5. These documents are available to the Court and Ms. Frank's counsel should they desire to see them.

complain to Ms. Rhyne that she had wanted to pursue criminal charges but that Chief Dillon had discouraged her or otherwise obstructed her in any way from doing so. Ex. 2, Rhyne Aff. at ¶ 10.

If Ms. Frank had decided to file a criminal report, UMBC PD would have referred the matter to the BCPD, if the allegations were of a 1st or 2nd degree rape, pursuant to the terms of the MOU between BCPD and UMBC PD, and BCPD would have handled the criminal investigation. Ex. 1, Dillon Aff. at ¶ 8. Ms. Frank alleges that Ms. Rhyne expressed concern that, by not causing a police report to be filed about the alleged sexual assault, Chief Dillon was violating the terms of the MOU. Complaint ¶¶138, 142-43. Actually, Ms. Rhyne never expressed that concern (Ex. 1, Dillon Aff. at ¶ 9; Ex. 2, Rhyne Aff. at ¶ 12), and the MOU did not require UMBC PD to file a report with BCPD when the victim chose not to file a police report. *Id.* To the contrary, the Policy specifically provided that it was Ms. Frank's decision, and Ms. Frank's decision alone, to decide if she wanted to make a police report to BCPD and thus initiate a criminal investigation. Ex. 1, Dillon Aff. at ¶ 9; Ex. 2, Rhyne Aff. at ¶¶4,11; Ex. 4, Policy at § VII.

Ms. Frank also alleges that Chief Dillon said the incident was not sufficiently serious to report to BCPD. Complaint at ¶ 144. That is incorrect.[10] Ex. 1, Dillon Aff. at ¶ 10. To the contrary, at 4:03 pm on October 7, 2015, immediately after Chief Dillon's meeting with Ms. Frank, her mother, and Ms. Rhyne, Chief Dillon emailed Michael Peterson, who at that time was a Lieutenant in charge of the Sexual Crimes Division with BCPD, to advise him of a possible upcoming report of an alleged rape (although, consistent with the Policy, he did not reveal Ms.

---

[10] *See* Note 8. Making such a statement would be contrary to Chief Dillon's regular practice, as observed by Ms. Rhyne, of actively supporting students who decided to file criminal charges, and is contradicted by the fact that he immediately contacted BCPD about Ms. Frank, as described herein. *See* Ex. 2, Rhyne Aff. at ¶ 8.

9

Frank's name). Ex. 1, Dillon Aff. at ¶ 10. A copy of the email is attached as **Exhibit 6.** Chief Dillon advised Officer Peterson that he:

> just had a meeting with a rape victim along with her mother… The mother and daughter just really wanted to know about options they had about filing a police report and how a Title IX process would work as well. I answered their questions and she is going to think about it…. I asked no questions about the incident just [sic] answered questions about the process. If she decides to come forward to us-then you I [sic] would like to make arrangements for her to meet with your folks directly, will that be OK? I think it is unlikely she will file a police report she [sic] seemed more inclined to go the Title IX route.

*Id.* Officer Peterson responded on October 8, 2015, in pertinent part as follows: "I am glad you had the opportunity to inform the victim of her options. We will be glad to assist in any way, should the victim wish to file a police report…." *Id.* Thus, not only does evidence indicate that Chief Dillon did ***not*** tell Ms. Frank that her allegations were not serious enough to report to BCPD, he specifically informed a Lieutenant in charge of the Sexual Crimes Division with BCPD about the rape allegations immediately after his meeting with Ms. Frank, in case she wanted to pursue criminal charges. The choice was hers whether or not to do so.

Ms. Frank also alleges that her report of a sexual assault does not appear in UMBC's Clery reporting statistics. Complaint at ¶ 142. This is incorrect. Ex. 1, Dillon Aff. at ¶ 11. Attached as **Exhibit 7** to the Memorandum is a copy of UMBC's Clery crime statistics report for 2015. For 2015, UMBC reported ten reported "Rape" cases in the Clery Report. *See* Ex. 7; Ex. 1, Dillon Aff. at ¶ 11. Also attached to Exhibit 7 is the detailed report of sexual assault crimes reported in the Clery Report. Ex. 1, Dillon Aff. at ¶ 11. Ms. Frank's allegation of a sexual assault is listed as item no. 5 in the category of "Forcible Rape Cases" and was included in the Clery Report's listing of ten reported "Rapes." Ex. 1, Dillon Aff. at ¶ 11. Thus, UMBC did report Ms. Frank's alleged sexual assault in its 2015 Clery Report.

**STANDARD OF REVIEW**

To survive a motion to dismiss for failure to state a claim on which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court is required to "'take the facts in the light most favorable to the plaintiff,'" the Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal citation omitted)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

To the extent that the Court considers documents not referenced and not integral to the Complaint, the summary judgment standard applies. *See* Fed. R. Civ. P. 12(d). Under Fed. R. Civ. P. 56, this Court must grant summary judgment when there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. R. 56(c). "Recent cases of the Supreme Court have made increasingly clear…the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses from proceeding to trial.'" *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). In determining whether summary judgment may be granted, the Court must perform a dual inquiry into the genuineness and materiality of any purported factual issues. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (emphasis in original), *rev'd on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 238 (1989).

**ARGUMENT**

I. **BECAUSE PLAINTIFF HAS FAILED TO IDENTIFY ANY CONSTITUTIONAL PROVISION OR FEDERAL LAW THAT CHIEF DILLON VIOLATED, HER CLAIM THAT HE VIOLATED 42 U.S.C. § 1983 FAILS AS A MATTER OF LAW.**

Even without considering extrinsic evidence, the Complaint fails to state a claim against Chief Dillon for violation of 42 U.S.C. § 1983. Ms. Frank's only allegation against Chief Dillon is that it was "unlawful" for him to dissuade her from filing a police report regarding the alleged rape. Complaint at ¶¶ 353, 355. As noted above, Plaintiff does not allege that Chief Dillon failed to inform her of her options or prohibited her from filing a police report - just that he discouraged her from doing so.

"Section 1983 imposes liability on state actors who cause the deprivation of any rights, privileges, or immunities secured by the Constitution. To state a claim under § 1983 a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (internal citations and quotations omitted). Thus, Ms. Frank must allege facts showing that Chief Dillon's actions violated her rights under the Constitution or federal law.

The Complaint fails to satisfy this standard. Ms. Frank does not allege *what* law Chief Dillon violated when he allegedly discouraged her from filing criminal charges. Chief Dillon is not required to guess the basis for the claim against him. "To proceed under 42 U.S.C. § 1983, a plaintiff must establish violation of a Constitutional right or federal law. A plaintiff must specify what constitutional provision or federal laws were allegedly violated, and identify the actors who allegedly violated these provisions or laws." *Asemani v. Wexford Health Sources, Inc.*, No. RDB-16-3488, 2016 WL 6462065, at *2 (D. Md. Oct. 31, 2016) (citations

omitted); *see also Cumbo v. Dovey*, No. JFM-15-3374, 2017 WL 978975, at *3–4 (D. Md. Mar. 10, 2017) (dismissing plaintiffs' § 1983 claims with prejudice because "[plaintiff] does not specify what federal law or constitutional guarantee either [defendant] allegedly violated by [the alleged actions], and none is apparent from the record"). Thus, in a similar case of a plaintiff failing to identify the basis for a §1983 claim (even though, unlike here, the basis was discernible), the District Court for the Middle District of North Carolina held, "the Court notes that Plaintiff's Complaint itself does not state any basis for Plaintiff's § 1983 claim. In other words, Plaintiff's Complaint does not identify any 'right, privilege or immunity' secured by a provision of the Constitution or laws of the United States that has been violated. Therefore, Plaintiff has failed to state a claim for violation of § 1983, and the Court will grant Defendants' Motions to Dismiss as to this claim." *Beck v. City of Durham*, 129 F. Supp. 2d 844, 849–50 (M.D.N.C. 2000) (citation omitted).

Ms. Frank's complaint wholly fails to meet this simple pleading standard. She does not allege any constitutional or federal statutory legal prohibition on a police officer discouraging (but not prohibiting) a victim from filing a criminal complaint. Nor could she, as there is no such prohibition.[11] The closest allegation Ms. Frank makes is the conclusory assertion that Chief Dillon violated the MOU between UMBC and BCPD by not reporting her allegations to BCPD. Complaint at ¶ 138. Even if this conclusory allegation were true, and even if the MOU had the

---

[11] *See, e.g., Banisaied v. Clisham*, 992 F. Supp. 128, 131 (D. Conn. 1998). In that case, the court dismissed claims against a chief of police who allegedly attempted to dissuade plaintiffs from pursuing a criminal complaint against him. *Id.* The court found that the actions did not violate any federally guaranteed right. *Id.* The court also noted a distinction between discouraging someone from filing a complaint and refusing to accept a criminal complaint. *Id.* at 131-32 ("Moreover, plaintiffs do not aver that defendant, while acting in his capacity as Chief of Police, took action to prevent an investigation into his conduct.").

force of Maryland state law, it would not support a § 1983 claim. A § 1983 claim cannot be based on the violation of state or local laws or common law torts. *See Snider Intern. Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014) ("Conduct violating state law without violating federal law will not give rise to a § 1983 claim."); *Street v. Surdyka*, 492 F.2d 368, 370-71 (4th Cir. 1974) ("[S]ection 1983 does not provide a remedy for common law torts. Instead it creates a federal cause of action against those acting under color of state law who cause a 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws (of the United States).'") (quoting 42 U.S.C. § 1983).

Accordingly, Count IV of the Complaint should be dismissed with prejudice.

## II. BECAUSE MS. FRANK HAS NOT ALLEGED THAT SHE SUFFERED ANY DAMAGES AS A RESULT OF CHIEF DILLON'S ALLEGED CONDUCT, HER CLAIM UNDER 42 U.S.C. § 1983 FAILS AS A MATTER OF LAW.

Ms. Frank's § 1983 claim also fails because Ms. Frank has not alleged that she suffered any compensable damages as a result of Chief Dillon's actions. It is undisputed that Ms. Frank was able to pursue her Title IX claims against the respondent, which was her express choice. *See* **Ex. 5.** Even though she was unhappy with the ultimate outcome of that process, she does not allege that Chief Dillon was in any way responsible for the University's ultimate decision that the Respondent was not responsible for violating the Policy. She also complains that by the time the Title IX process was over, the results of the SAFE exam had been destroyed and that, when she did file a criminal complaint, the Law Enforcement Defendants failed to handle it properly. Complaint at ¶¶ 150-51, 356. It is undisputed, however, that Chief Dillon (and UMBC) had no control over either the disposition of the SAFE exam or the handling of the criminal complaint. Ex. 2, Rhyne Aff. at ¶ 3; Complaint at ¶¶ 177-90. Ms. Frank has not alleged any specific injury that she suffered as a result of Chief Dillon's discouraging her from filing criminal charges in

14

October 2015.  Because Ms. Frank has failed to allege that she suffered any compensable damages proximately caused by Chief Dillon, her § 1983 claim fails as a matter of law.

### III. CHIEF DILLON IS ENTITLED TO SUMMARY JUDGMENT.

Even if Count IV of the Complaint is not defective on its face, Chief Dillon is entitled to summary judgment on the claim.  Chief Dillon did not discourage Ms. Frank from filing a police report, as confirmed by both Chief Dillon's and Rina Rhyne's affidavits.[12]  Moreover, the fact that Chief Dillon did not discourage Ms. Frank from filing a police report is confirmed by the email exchange between Ms. Frank and Chief Dillon, in which Ms. Frank explicitly confirmed her wish to proceed only with a University investigation, and not a criminal investigation.  **Ex. 5**.  It is also confirmed by the email exchange between Chief Dillon and Lt. Peterson, immediately after Chief Dillon's meeting with Ms. Frank, in which Chief Dillon specifically advised Lt. Peterson that he had just met with a rape victim who might wish to file a criminal complaint.  **Ex. 6.**  This email exchange proves that not only did Chief Dillon not discourage Ms. Frank from filing a police report, he actually laid the groundwork for her to file a police report with the BCPD if she chose to do so.

Because the factual predicate of Ms. Frank's § 1983 claim is refuted by the affidavits of Chief Dillon and Rina Rhyne and the contemporaneous email correspondence between Chief Dillon and Ms. Frank and Chief Dillon and Lt. Peterson, the Court should enter summary judgment in favor of Chief Dillon on this claim.

### IV. CHIEF DILLON IS ENTITLED TO QUALIFIED AND ELEVENTH AMENDMENT IMMUNITY.

In addition to the legal defects set forth above, the claim against Chief Dillon should be

---

[12] Ms. Rhyne's affidavit is particularly entitled to weight, as she is not a party to the case and is no longer employed by UMBC.

dismissed and/or summary judgment granted in his favor because Chief Dillon is entitled to qualified and Eleventh Amendment immunity. The immunity defenses should be addressed at this initial stage in the case, as qualified immunity is an "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). The Supreme Court has thus stressed granting "qualified immunity at the earliest possible stage of litigation." *Id.* at 232. Unless the complaint states a "violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal **before the commencement of discovery**." *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 265 (4th Cir. 1998) (citation omitted) (emphasis added). "The qualified immunity doctrine relieves officers of having 'to stand trial or face the other burdens of litigation'; thus, it is crucial for courts to 'resolv[e] immunity questions at the earliest possible stage in litigation.'" *McCaskill v. Yankalunas*, 245 Fed. App'x 274, 277 (4th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194 (2001)). This means that the Court can take into account external evidence and consider it, in the context of a summary judgment motion, at an early stage in the proceedings before discovery. Given the paucity of the allegations against Chief Dillon, the absence of any clearly established legal standard he is alleged to have violated, and the overwhelming factual evidence that he did not discourage Ms. Frank from filing a criminal complaint, he is entitled to qualified immunity on the § 1983 claim.

> 1. *Chief Dillon is Entitled to Qualified Immunity in His Personal Capacity.*

The "doctrine of qualified immunity is designed to ensure that government officials performing discretionary functions can exercise their duties 'free from the specter of endless and debilitating lawsuits.'" *Jackson v. Hogan*, 2016 WL 6680209, at *4 (D. Md. Nov. 14, 2016) (Xinis, J) (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991)). To decide qualified immunity, the Court conducts a two-pronged inquiry:

> First, we must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was ***clearly established at the time*** such that it would be ***clear to an objectively reasonable officer*** that his conduct violated that right.

*Cloaninger ex. rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 330-31 (4th Cir. 2009) (emphasis added). The Court may use its "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first…." *Pearson*, 555 U.S. at 236.

Here, the first prong is not satisfied because, as discussed above, Ms. Frank has failed to allege any constitutional or federal statutory right of hers that Chief Dillon violated. She is unable to proceed on the basis of an alleged violation of the MOU because that document does not create any right under the Constitution or federal law. Moreover, even if she did have a right to be free from persuasion to not file a police report, the evidence shows Chief Dillon did not discourage her from doing so.

The second prong is not satisfied either. For a constitutional right to be "'clearly established' means more than that it is well-known or easily articulated." *Cloaninger*, 555 F.3d at 331. Rather,

> the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* (quotations and citations omitted). Qualified immunity shields "bad guesses in gray areas" and permits liability only "for transgressing bright lines." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (quotations omitted). It protects officials from "being blindsided by liability derived

17

from newly invented rights or new, unforeseen applications of pre-existing rights." *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995). In deciding whether a right is "clearly established," federal district courts are generally limited to "the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Doe ex rel. Johnson v. So. Carolina Dep't of Social Servs.*, 597 F.3d 163, 176 (4th Cir. 2010).

In this case, the plaintiff cannot establish that Chief Dillon violated a "clearly established" law, when she fails to allege what law he violated.

Chief Dillon should not be exposed to a claim for money damages of this magnitude on such a speculative and frivolous claim.

### 2. *Chief Dillon is Immune from Suit in His Official Capacity.*

Chief Dillon is also entitled to immunity in his official capacity. The Eleventh Amendment bars federal courts from hearing claims brought by a citizen against a State. U.S. Const. amend. XI. UMBC is an instrumentality of the State of Maryland and partakes "of the State's Eleventh Amendment immunity." *Palotai v. Univ. of Md. College Park*, 959 F.Supp. 714, 716 (D. Md. 1997) ("University of Maryland is such an arm of the State partaking of the State's Eleventh Amendment immunity."); Md. Ann. Code, Educ. §§ 12-101(b)(6)(i)(2); 12-102(a)(2). Although Congress may waive immunity, "Maryland is not a 'person' within the meaning of § 1983." *Pavlovic v. Univ. of Md. Baltimore County.*, 2013 WL 4775530, at *4 n.5 (D. Md. Sept. 4, 2013) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Therefore, any Section 1983 claims against Chief Dillon "in [his] official capacities seeking monetary or retrospective damages are barred by the Eleventh Amendment." *Middlebrooks v. Univ. of Md.*, 980 F. Supp. 824, 828 (D. Md. 1997). The Court should therefore dismiss Chief Dillon in his official capacity.

**WHEREFORE,** Defendant Dillon requests that this Court dismiss the claim against him with prejudice or, in the alternative, grant summary judgment in his favor.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland


*Christopher B. Lord*
CHRISTOPHER B. LORD, #26117
ERIK J. DELFOSSE, #18881
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, MD   21202-2021
Telephone (410) 576-6559
clord@oag.state.md.us
edelfosse@oag.state.md.us