IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANNA BORKOWSKI,                          *

    and                                      *

ANNEMARIE HENDLER,                       *

    and                                      *

KATELYN FRANK,                           *

    and                                      *

MARCELLA FEGLER,                         *

    and                                      *

KAILA NOLAND,                            *

    and                                      *

OTHERS SIMILARLY SITUATED,               *

    Plaintiffs,                          *      Civil Action No.:  1:18-cv2809

    v.                                   *

BALTIMORE COUNTY,                        *
MARYLAND,
                                         *
    and
                                         *
BALTIMORE COUNTY
POLICE DEPARTMENT,                       *

    and                                      *

THE BOARD OF REGENTS FOR                 *
THE UNIVERSITY SYSTEM
OF MARYLAND,                             *

and                                            *

FREEMAN HRABOWSKI III,                         *

and                                            *

UNIVERSITY OF MARYLAND,                         *
BALTIMORE COUNTY,
                                               *
and
                                               *
UNIVERSITY OF MARYLAND,
BALTIMORE COUNTY                               *
POLICE DEPARTMENT,
                                               *
and
                                               *
LISA DEVER,
                                               *
and
                                               *
SCOTT SHELLENBERGER,
                                               *
and
                                               *
BONNIE FOX,
                                               *
and
                                               *
KRYSTIN RICHARDSON,
                                               *
and
                                               *
JAMES JOHNSON,
                                               *
and
                                               *
TERRENCE SHERIDAN,
                                               *
and
                                               *
NICHOLAS TOMAS,
                                               *

and                                        *

KRISTIN BURROWS,                            *

and                                        *

KIMBERLY MONTGOMERY,                         *

and                                        *

MORROW LANE,                                *

and                                        *

ROSEMARIE BRADY,                            *

and                                        *

PAUL DORFLER,                               *

and                                        *

TIMOTHY LEE,                                *

and                                        *

PAUL DILLON,                                *

and                                        *

BERNADETTE HUNTON,                          *

Defendants.                                 *

*     *     *     *     *     *     *     *     *     *     *     *     *     *

## FIRST AMENDED COMPLAINT

Plaintiffs Anna Borkowski, Annemarie Hendler, Katelyn Frank, Marcella Fegler, and Kaila Noland ("Named Plaintiffs"), on their own behalf and on behalf of those similarly situated (the "Class"), by and through their attorneys, Rignal W. Baldwin V,

Stephen C. Rigg, and BaldwinLaw LLC, bring this suit against Baltimore County, Maryland, the Baltimore County Police Department ("BCPD"), the Board of Regents for the University System of Maryland ("Board of Regents"), the University of Maryland, Baltimore County ("UMBC"), the University of Maryland, Baltimore County Police Department ("University Police"), Scott Shellenberger, Lisa Dever, Paul Dorfler, Bonnie Fox, Krystin Richardson, Nicholas Tomas, Kristin Burrows, Rosemarie Brady, Morrow Lane, Kimberly Montgomery, Paul Dillon, Bernadette Hunton, Timothy Lee, Freeman Hrabowski III, James Johnson, and Terrence Sheridan.

<u>Preface</u>

In Baltimore County, there is systematic, institutionalized indifference to crimes of sexual violence, coupled with bias against women.  Women represent the overwhelming majority of the victims of sexual assault.  Defendants treat victims with indifference and disrespect, intimidating female victims, frequently downplaying to victims and the public the seriousness of sexual violence, discouraging women from reporting sexual assault or seeking justice, holding women to outdated stereotypes, and minimizing or excusing the culpability of the men who commit sexual assault.

Defendants' biases and abuse of civil rights have eroded public trust in the criminal justice system and have placed women in Baltimore County at an increased risk of sexual assault.  Defendants have intentionally made sexual assaults committed in Baltimore County nearly impossible to prove and prosecute, to the detriment of women who live in or visit Baltimore County.

I.   Defendants' Manipulation of Already-Harrowing Numbers

Nine percent (9%) of sexual assault victims are male, while ninety-one percent (91%) of sexual assault victims are female.[1]  One (1) in five (5) female college undergraduates will be sexually assaulted during their enrollment period, many more than once.[2]  A similar percentage of the overall female population of Maryland are raped at some time in their lives.

Fewer than one (1) in three (3) sexual assaults are reported to police.[3]  Of those sexual assaults reported in Baltimore County, too few are properly recorded as a sexual assault.[4]  Of the sexual assaults that are recorded in Baltimore County, fewer than one (1) in five (5) results in an arrest.[5]  Of those arrests, generally only one (1) in five (5) is

[1] U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats., Rennison, C. M., *Rape and sexual assault: Reporting to police and medical attention, 1992-2000* (Aug. 2002), https://www.bjs.gov/content/pub/pdf/rsarp00.pdf.

[2] U.S. Dep't of Just., Nat. Inst. of Just., Fisher, B.S., Cullen, F.T., & Turner, M.G., *The sexual victimization of college women* (Dec. 2000), https://www.ncjrs.gov/pdffiles1/nij/182369.pdf.

[3] Fed. Bureau of Investigation, Nat. Incident-Based Rep'g Sys., 2012-2014 (2015).  The percentages are even lower for sexual assaults in general.

[4] The exact number is difficult to ascertain, as Baltimore County self-reports its own data, and many reports of rape and sexual assault are classified as reports of non-crimes. However, between 2009 and 2014, thirty-four percent (34%) of reports of rape and sexual assault in Baltimore County were classified as "unfounded," meaning that, while the victim described a crime, investigators did not believe a crime occurred.  The national average of "unfounded" reports during that period was seven percent (7%).  Baltimore County dismisses female victims' accounts at five (5) times the national rate.

[5] Baltimore County claims an arrest rate approaching forty percent (40%), in some years. If this is accurate, it is likely due to the inclusion of child abuse and sex trafficking cases, which are handled differently and/or by other police units.

referred to prosecutors for charges.[6]  Of those charges, generally only one (1) in two (2) results in a conviction and jail time.[7]  The situation in Baltimore County is undoubtedly worse than nationally.

This lawsuit is brought to address the manipulation of statistics for Defendants' personal and professional gain and to address the plans, practices, policies, customs, and procedures instituted and perpetrated by individuals acting under color of state law to deprive female sexual assault victims of their civil rights and equal protection, in contravention of federal and state law.  Defendants' actions, policies, patterns of behavior, deliberate indifference, failure to train or supervise, and departure from normal procedures reflect their gender-biased discrimination against Named Plaintiffs and Class Members.  This lawsuit seeks to end that discrimination.

II.   Plaintiffs' Constitutional And Civil Rights Claims Against Defendants

This lawsuit seeks to address the hidden corruption and *ultra vires* illegal acts by those entrusted to investigate and protect women against rape and sexual assault.[8]  For years, Defendants have deprived female victims of sexual assault in Baltimore County of

---

[6] Fed. Bureau of Investigation, Nat. Incident-Based Rep'g Sys., 2012-2014 (2015).

[7] Fed. Bureau of Investigation, Nat. Incident-Based Rep'g Sys., 2012-2014 (2015).

[8] In 2017, Maryland reclassified "sexual offense in the first degree" and "sexual offense in the second degree" as "rape in the first degree" and "rape in the second degree."  Md. Code Ann. Crim. Law §§3-303 and 3-304.  As used in this Complaint, the term "rape" includes rape and acts previously criminalized as sexual assault in the first or second degree.  The term sexual assault includes all rapes, as well as lesser degrees of sexual assaults.  *See, e.g.*, Md. Code Ann. Crim. Law §§3-301 – 3-310.

equal access to justice and of equal protection under the law.  Defendants conducted

punitive investigations of victims while ignoring evidence implicating assailants.  As part

of a pattern and practice of intimidation, Defendants charged victims with making false

reports, retaliated against victims' families, and humiliated victims, all in order to lower

the reported numbers of sexual assaults.  Defendants' conduct is influenced by and results

from their personal biases, indifference to sexual violence against women, and a failure to

train or supervise those who are supposed to be protecting Baltimore County residents.

In contravention of Plaintiffs' rights to equal protection, Defendants discriminated

against and deceived female victims, intimidated female victims and witnesses, and

intentionally misstated the applicable law to the detriment of female victims, in order to

benefit themselves and, in the process, protected male perpetrators of sexual assault.

This is not a "failure to protect" lawsuit, nor is it a challenge to legitimate

prosecutorial and police discretion.  This lawsuit targets intentional misconduct, gross

negligence, and willful indifference, which are motivated by corrupt and malicious

objectives and designed to suppress legitimate reports of rape and sexual assault.

III.   Plaintiffs' Title IX Claims Against UMBC And The Board of Regents

In addition to redress for violations of their federally protected and constitutional

rights, Plaintiffs seek redress for violation of Title IX of the Education Amendments of

1972 of 20 U.S.C. §§ 1681-1688 ("Title IX").  As a result of certain Defendants' actions

and omissions, Plaintiffs were excluded from participation in and denied the benefits of

educational opportunity, while being subjected to gender discrimination by the University

Defendants.

<u>Parties</u>

I.  <u>Named Plaintiffs Anna Borkowski, Annemarie Hendler, Katelyn Frank, Marcella
    Fegler, And Kaila Noland</u>

1.      Named Plaintiff (and putative class representative) Anna Borkowski is a

resident of Maryland, former University of Maryland, Baltimore County student, and

current Towson University student-athletes.  In 2017, Ms. Borkowski, incapacitated by

alcohol and/or surreptitious drugging, was sexually assaulted by three (3) UMBC

students.  Ms. Borkowski reported the assault to the police and submitted to a painful and

invasive Sexual Assault Forensic Exam ("SAFE") at the Greater Baltimore Medical

Center ("GBMC").

2.      Named Plaintiff (and putative class representative) Annemarie Hendler is a

resident of Maryland, a former University of Maryland, Baltimore County student, and a

current Towson University student.  In 2017, Ms. Hendler, incapacitated by alcohol

and/or surreptitious drugging, was sexually assaulted by three (3) UMBC student-

athletes.  Ms. Hendler reported the assault to the police and submitted to a painful and

invasive SAFE at GBMC.

3.      Named Plaintiff (and putative class representative) Katelyn Frank is a resident

of Maryland and a former University of Maryland, Baltimore County student.  In 2015,

Ms. Frank was raped by another UMBC student on campus.  Ms. Frank reported her

assault, and submitted to a painful and invasive SAFE at GBMC.

4.      Named Plaintiff (and putative class representative) Marcella Fegler is a former

UMBC student who, in 2014, was sexually assaulted by four (4) members of the UMBC

- 8 -

basketball team on the UMBC campus.  Ms. Fegler reported her assault to UMBC, University Police, and BCPD officials, and relied on Defendants' assurances in 2016 that her case would receive a proper review.

5.     Named Plaintiff (and putative class representative) Kalia Noland is a former University of Maryland, Baltimore graduate student.  In 2016, Ms. Noland was sexually assaulted by a UMBC graduate student who worked in her lab on the UMBC campus. Ms. Noland reported her assault to University officials.  The officials acknowledged that Ms. Noland had been sexually assaulted, then referred her assailant to one (1) counseling session as a "penalty."

6.     Named Plaintiffs bring this class action on behalf of all women who have been subjected to rape or sexual assault in Baltimore County, Maryland, who have reported their assault; and/or underwent invasive testing in the preparation of a SAEK;[9] and/or were denied educational access on the basis of their gender in connection with a report or attempted report of rape or sexual assault; and/or were improperly dissuaded, coerced, intimidated, or otherwise impeded from reporting or pursuing a rape or sexual assault; and therefore adversely affected by the Defendants' policies (collectively, the "Class" or "Class Members").

7.     The Class may be divided into the following subclasses (collectively, the "Subclasses"):

---

[9] A "SAEK" is a "Sexual Assault Forensic Examination Kit," explained *infra*.

a. All adult women who were raped or sexually assaulted in Baltimore County, Maryland who reported their assault to Baltimore County authorities, and were adversely impacted by Defendants' policies (the "Baltimore County Reported Rape/Assault Subclass").

b. All adult women who were raped or sexually assaulted in Baltimore County, Maryland who reported their assault to UMBC and the UMBC Police Department and were adversely impacted by Defendants' policies (the "University Police Reported Rape/Assault Subclass").

c. All adult women who were raped or sexually assaulted in Baltimore County, Maryland and underwent invasive testing in the preparation of an SAEK, and were adversely impacted by Defendants' policies (the "Invasive Testing Subclass").

d. All adult women who were denied educational access based on gender as a result of Defendants'[10] policies (the "Title IX subclass").

II.  Defendants

   A.  The Baltimore County Defendants

8.       Defendant Baltimore County (the "County") is a political subdivision of Maryland.  Defendant Baltimore County operates and is jointly responsible for the training, policies, procedures and actions of Defendant Baltimore County Police Department ("BCPD") and its employees.  Defendant Baltimore County is sued based on

---

[10] Namely, Defendants UMBC, University Police, Dillon, Hrabowski, and Hunton, the University Defendants, and any other Defendants who receive federal funding for education.

its unconstitutional policies, regulations, decisions, and customs, which have resulted in Constitutional deprivations to the Named Plaintiffs and Class Members.

9.      Defendant Baltimore County Police Department is the law enforcement agency responsible for law enforcement duties in Baltimore County.  Defendant BCPD's Officers knowingly followed illegal instructions from both inside and outside the organization, in order to reduce the number of reported sexual assaults recorded in Baltimore County.

    B.  The State's Attorney Defendants

10.     The State's Attorney Defendants ("SAO Defendants") are individuals who are or were the Baltimore County State's Attorney or employees of the Baltimore County State's Attorney's Office.

11.     Defendant Scott Shellenberger is the State's Attorney for Baltimore County. Defendant Shellenberger is responsible for prosecuting, on behalf of the State of Maryland, all cases within Baltimore County in which the State has an interest. Defendant Shellenberger performs supervisory, investigative, and administrative tasks that are separate and apart from his prosecutorial duties.

12.     Defendant Lisa Dever is the Assistant State's Attorney and the Chief of the Sex Offense and Child Abuse Division[11] of the Baltimore County State's Attorney's Office. Defendant Dever performs supervisory, investigative, and administrative tasks that are separate and apart from her prosecutorial duties.

---

[11] Defendant Dever's division is responsible for prosecuting crimes of a sexual nature in Baltimore County.

13.     Defendant Krystin Richardson is an Assistant State's Attorney and head of the Baltimore County State's Attorney's Office's Family Division.  Defendant Richardson performs administrative, supervisory, and investigative duties separate and apart from her prosecutorial duties.

14.     Defendant Bonnie Fox is an "Investigator" for the Sex Offense Division of the Baltimore County State's Attorney's Office and reports directly to Defendant Dever.

   C.  The Baltimore County Police Department

15.     The Baltimore County Police Department Defendants ("BCPD Defendants") are individuals who were or are employed by Defendants BCPD and the County.[12]

16.     Defendant Nicholas Tomas is a BCPD Detective assigned to the Special Victims Team.  The Special Victims Team is a group of detectives and other police officers who constitute part of the Special Services Unit of the Persons Crimes Section of the Criminal Investigation Division of the BCPD.

17.     Defendant Kristin Burrows is a BCPD Detective assigned to the Special Victims Team.

18.     Defendant Kimberly Montgomery is a BCPD Detective assigned to the Special Victims Team.

19.     Defendant Morrow Lane is a BCPD Detective assigned to the Special Victims Team.

---

[12] For ease of reference, Defendants Baltimore County, BCPD, Johnson, Sheridan, Burrows, Tomas, Montgomery, Lane, Brady, Lee, and Dorfler are also referred to as the "County Defendants."

20.     Defendant Rosemarie Brady is a former BCPD Sergeant Detective and the former head of the Special Victims Team.

21.     Defendant Paul Dorfler is a BCPD Officer.

22.     Defendant Timothy Lee is a BCPD Officer.

D.  Baltimore County Police Department Supervisory Defendants

23.     The Baltimore County Police Department Supervisory Defendants ("BCPD Supervisory Defendants" or "Supervisory Defendants") are or were individuals responsible for policies, training, and supervision of Defendant BCPD and the BCPD Defendants.[13]

24.     Defendant James Johnson is the former Chief of Police of the BCPD.  He was responsible for BCPD policies, training, and supervision from May 31, 2007, to January 31, 2017.

25.     Defendant Terrence Sheridan is the current Chief of the BCPD.  He is responsible for the policies, training, and supervision of the BCPD from January 31, 2017, to the present.

E.  The University Defendants

26.     The University Defendants are individuals and organizations responsible for promulgating and enforcing rules and regulations at the University of Maryland, Baltimore County.

---

[13] Where applicable, the Supervisory Defendants are also included in the County Defendants and BCPD Defendants.

27.     Defendant Board of Regents of the University System of Maryland ("Board of Regents" or "Board") is the governing body of the University System of Maryland.

28.     Defendant Freeman Hrabowski is the President of Defendant UMBC, which is a member of the University System of Maryland ("USM").  The Board of Regents has delegated its authority to Defendant Hrabowski, and he is ultimately responsible and accountable for policies promulgated by Defendant UMBC.

29.     Defendant University of Maryland, Baltimore County is a constituent institution of the University System of Maryland, under the jurisdiction of the Board of Regents.  Defendant UMBC has not expelled a student for a Title IX violation since at least before the 2015-2016 academic year.

30.     Any allegation against Defendant UMBC, the Board of Regents, or Defendant Hrabowski is necessarily an allegation against the other University Defendants.

31.     Defendant Bernadette Hunton was a contractor for Defendant UMBC, retained to investigate Ms. Frank's, Ms. Noland's, and Class Members' complaints of sexual misconduct.  Defendant Hunton acted as a purported "Independent Investigator."

     F.   The University of Maryland, Baltimore County Police Department Defendants

32.     The University of Maryland, Baltimore County Police Department Defendants ("University Police Defendants" or "UMBC Police Defendants") are or were individuals and organizations responsible for the creation, promulgation, and enforcement of the

rules and regulations of Defendant University of Maryland, Baltimore County Police Department.[14]

33.    Defendant University of Maryland, Baltimore County Police Department ("Defendant University Police" or "Defendant UMBC Police") is a security force maintained by Defendant UMBC.  The University Police have entered into a Memorandum of Understanding with BCPD, dividing the investigative and enforcement power of the two agencies.

34.    Defendant Paul Dillon is the current Chief and former Deputy Chief of Defendant University Police.  Defendant Dillon is responsible for Defendant University Police's crime-reporting obligations.

G.    Defendants' Capacities

35.    Except as otherwise noted, all individual Defendants are being sued both in their individual and official capacities.

36.    The State's Attorney Defendants are being sued in their individual capacities for monetary damages, and in their official capacities for injunctive relief from actions that were (and continue to be) unconstitutional, *ultra vires,* illegal, grossly negligent, malicious, and harmful to Plaintiffs.

37.    All state officer Defendants are being sued in their individual capacities for monetary damages, and in their official capacities for injunctive relief.

---

[14] Where applicable, the University Police Defendants are also included in the University Defendants.

Jurisdiction and Venue

38.     The claims arise from Defendants' violations of 42 U.S.C. §§1983, 1985, and

1986; 20 U.S.C. §1681; and State law.

39.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, as this case

involves claims "arising under the Constitution, laws, or treaties of the United States."

40.     Jurisdiction pursuant to 28 U.S.C. §1343 is proper as this case seeks to "redress

the deprivation, under color of any State law, statute, ordinance, regulation, custom or

usage, of any right, privilege or immunity secured by the Constitution of the United

States or by any Act of Congress providing for equal rights of citizens or of all persons

within the jurisdiction of the United States."

41.     Jurisdiction is proper pursuant to 28 U.S.C. §1367 over all state law claims, as

any state law claims form part of the same case or controversy as claims otherwise falling

under this Court's original jurisdiction.

42.     Jurisdiction is also proper pursuant to 42 U.S.C. § 1988.

43.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as "a substantial

part of the events or omissions giving rise to the claim occurred" in Maryland.

BACKGROUND

I.     Defendants' Policies Violated The Civil Rights of Female Victims of Sexual
       Assault And Concealed An Epidemic of Sexual Assault in Baltimore County

44.     In 2015 and 2016, Defendants Baltimore County, BCPD, UMBC, and the SAO

Defendants were the subjects of a series of media articles relating to their manipulative

practice of underreporting instances of sexual assault, misleading and intimidating female victims of sexual assault, and mistreating those who reported sexual assault.

45.     Defendant Baltimore County, Defendant BCPD, and the SAO Defendants were also the subject of media reports regarding the failure to test and willful destruction of SAEKs in their possession, custody, or control.

46.     One of the media articles related to the gang rape of a UMBC student by four (4) members of the UMBC basketball team.  The victim was Named Plaintiff Marcella Fegler.[15]

47.     UMBC and the University Police are required by law to make accurate public reports of crimes committed on or near UMBC's campus.  See, *e.g.,* 20 U.S.C. § 1092 (f), the "Clery Act."

48.     Defendants UMBC and the University Police are required to prove that a sexual assault did not occur before determining that the complaint is "unfounded."  *See infra.*

49.     Media reports also revealed Defendants BCPD and the University Police manipulated the Federal Bureau of Investigation's Uniform Crime Reporting Program ("UCR")[16] codes to misclassify and conceal reports of sexual assault against women.

---

[15] In that case, Defendant Tomas "explained" to Ms. Fegler that she had not been raped because for "some of the sex acts to be performed, she would have had to be conscious to participate."  Defendant Tomas also volunteered to testify on behalf of the accused assailants at their student conduct hearings.  His proposed testimony was that the four (4) men were not involved "as alleged."

[16] The F.B.I.'s UCR Program is a nationwide data collection program tracking reports of crime and the disposition of those reports.  Almost 18,000 law enforcement agencies

50.     Defendants UMBC and the University Police have intentionally failed to make accurate public reports of crimes of sexual assault, in order to conceal these crimes and to manipulate crime statistics.  Prospective and matriculating students rely on those inaccurate reports when choosing to attend, or not to attend, UMBC.

51.     BCPD Defendants, working with SAO Defendants, including Defendants Dever, Shellenberger, and Fox, would routinely and maliciously classify credible reports of sexual assault as "unfounded," without conducting any investigation of the report, *i.e.*, no interviews, no collection of evidence, no substantive police work.

52.     Defendant BCPD and the BCPD and Policymaking Defendants purport to engage in "data driven policing," but instead manipulate crime data to avoid investigating (and making public) reports of rape and sexual assault of female victims.

53.     The Baltimore County Defendants, BCPD Defendants, and the SAO Defendants generally mistreated victims of sexual assault, in contrast to the treatment of the victims of other crimes.

54.     For example, the Baltimore County Defendants, BCPD Defendants, Defendant Shellenberger, Defendant Dever, and Defendant Fox intentionally misinformed female victims of the elements of sexual assault crimes to convince those female victims, including Class Members, that no crime occurred.

---

voluntarily report data on crimes reported to them by residents. The primary objective of the program is to generate reliable information from the data submitted.

55.     Different practices exist for crimes that do not disproportionately affect women.  Those crimes are not under-investigated or misreported as part of a pattern and practice.  Nor is the investigation of those crimes improperly trained for or supervised.

56.     As a result, the statistical data reflect inexplicable anomalies in the reported rates of sexual assault in Baltimore County as compared to other crimes in Baltimore County and other comparable regions in the United States.

57.     For example, in 2015, when Baltimore County finally implemented a years-old change in the UCR definition of "rape," thirty-eight percent (38%) of the total increase in reported rapes or sexual assaults in Maryland came from Baltimore County.

  A.   BCPD's, The BCPD Defendants', And The University Police's Strategy of "Unfounding" Legitimate Reports of Sexual Assault to Artificially Deflate Crime Numbers.

58.     All Defendants have or had professional, personal, or political self-interests in statistics that reflect a low crime rate in Baltimore County, generally, and in their respective areas of responsibility, specifically.

59.     Defendants are under internal and external pressure to lower reports of crime and maintain high "clearance rates" in their jurisdictions, precincts, and areas of responsibility.

60.     Defendant Hunton had an interest in minimizing how many Title IX complaints were upheld, for her personal gain and stature, as well as for the stature of Defendant UMBC and the University Defendants.

61.     Defendant Shellenberger, Defendant Dever, and the other SAO Defendants are under internal and external pressure to maintain high conviction rates, for their personal gain and stature.

62.     Defendants Dillon and the other University Defendants are under internal and external pressure to lower reports of crime in order to make UMBC more appealing to prospective students and their parents and to enhance the stature of the institution.

63.     In keeping with BCPD's previous promises of reform (*see infra*) and other legal obligations, BCPD's Field Manual now requires that "[a]n Incident Report will be made on all calls . . . of sexual assault."

64.     BCPD's Field Manual also provides that "[t]he refusal of the victim to cooperate or failure of the State's Attorney's Office to prosecute does not unfound a legitimate offense."

65.     Regardless of the Orders in the Field Manual, Incident Reports were not made, or were coded in a way to avoid reporting, for many female victims' complaints of sexual assault.

66.     A report of sexual assault is legitimately classified as "unfounded" when "the incident did not occur" (*i.e.*, a false or baseless report[17]), or "the incident was determined to have occurred in another jurisdiction."

---

[17] A "baseless" report is a report of a non-criminal act a "false" report is a report that the officer believes in untruthful.

67.     By coding hundreds of legitimate reports as "unfounded," Defendant BCPD, the County, the SAO Defendants, Defendant Dillon, and the BCPD Defendants created the illusion that certain reports of sexual assault were never made.

68.     By diverting reports of rape and sexual assault to non-police entities at UMBC, Defendant Dillon created the illusion that the assaults did not occur and ensured that they received minimal attention.  Most of the reports treated this way never even got a formal Title IX investigation.

69.     In doing so, Defendants guaranteed that sexual assaults of women were, and continue to be, treated differently than other crimes.  These crimes committed by men against women were and are not investigated, under-investigated, and concealed from public scrutiny.

70.     The intent and effect of Defendant the County, Defendant BCPD, BCPD Defendants, and SAO Defendants' intentionally discriminatory policies was to artificially lower the number of recorded reports of rape and sexual assault in Baltimore County and on the UMBC campus.

71.     The BCPD Supervisors, such as Defendants Sheridan and Johnson, were grossly negligent in their failure to train and supervise their subordinates and to promulgate or enforce appropriate policies.  The BCPD Supervisors also failed to implement the policies that were in place in a consistent and non-discriminatory manner.

72.     Male perpetrators of rape and sexual assault are more likely than other criminals to commit multiple offenses before being apprehended.

73.     While reports of rape and sexual assault were fraudulently lowered, Defendants BCPD, the County, University Police, and BCPD and SAO Defendants' practice increased the actual number of sexual assaults in Baltimore County, including assaults on members of the Class.

74.     Defendants' actions and inactions increased the number of sexual assault crimes committed, while decreasing the number of perpetrators brought to justice.

75.     Defendants Shellenberger and Dever, in concert with the BCPD Defendants, enforced an antiquated, sexist, and unlawful version of Maryland law regarding rape and sexual assault, by requiring force or resistance to establish rape, a requirement which has not existed since the 1960's.[18]

76.     For many years, as a result of all Defendants' discriminatory, unlawful, and dangerous practices, BCPD recorded one of the highest "unfounded" rates of reports of sexual assault in the country.

77.     In 2013, County and SAO Defendants[19] classified forty-three percent (43%) of reports of rape and sexual assault in Baltimore County as "unfounded."  When a woman

---

[18] The SAO Defendants' unwillingness to enforce the law as it existed required the General Assembly to pass a 2017 law which "clarified" out what had been Maryland common law for years, that a victim need not use force to resist a rape.  *See* Md. Code Ann., Crim. Law, §3-319.1.  Ironically, Defendant Shellenberger, in an effort to shift blame for the civil rights violations, testified in support of this bill.  Despite the "clarification," the State's Attorney's Office's conviction rates remain abysmal.

[19] BCPD Officers would often call Defendant Shellenberger from the emergency room to ask if they should proceed with an investigation.  To this day, the SAO Defendants have an unlawful influence over the coding of reports.

reported a rape or sexual assault to BCPD, forty-three percent (43%) of the time the victim was told that no crime occurred, or that the report was determined to be untruthful.

78.    Another quarter (25%) of the reports of rape were cleared by "exceptional means" or "exceptional circumstances."  *See infra*, Background Section II. D.

79.    Thus, a large majority of women's reports of rape and sexual assault are dismissed as unbelievable or for "exceptional" reasons.  These women have become the rule, not the exception.

80.    Between 2009 and 2014, thirty-four percent (34%) of reports of rape and sexual assault in Baltimore County were classified as unfounded.  The national average during that period was seven percent (7%).

81.    In 2015[20] and 2016, the number of rape reports classified as unfounded in Baltimore County was approximately eighteen percent (18%).

82.    In 2017, after the media exposure and subsequent purported "reforms" detailed *infra*, the number fell to eleven percent (11%).

83.    The number of sexual assaults classified as "unfounded" by the BCPD from 2013 to 2016 is a statistical impossibility; the decline in unfounded reports after the media exposure shows that Defendants were engaged in improper practices.

84.    After receiving a request regarding "unfounded" case reports relating to this lawsuit, BCPD reclassified a number of "unfounded" cases as "open."

---

[20] While BCPD claims that the F.B.I. changed the definition of "rape" for UCR purposes in 2015, the definition was changed in 2011 and was applicable as of 2013.

85.     In Baltimore County, the arrest rate, per recorded report of rape, is relatively stable, fluctuating between eighteen percent (18%) and twenty-two percent (22%).

86.     In 2017, the arrest rate, per recorded report of rape, was eighteen percent (18%).

87.     SAO Defendants directly, personally, and unlawfully participated in the BCPD's manipulation of investigative dispositions, despite lacking any State or other authority to do so.

88.     SAO Defendants directly, personally, and unlawfully made *ultra vires* policy decisions on behalf of the BCPD, decisions that they had no authority to make, that harmed Named Plaintiffs and the Class Members.

89.     As a result of BCPD's unlawful practice and the SAO Defendants' *ultra vires* actions, the arrest percentage remained relatively unchanged despite certain purported "reforms," detailed *infra.*

90.     The purported reforms were a political sham, announced for the protection and self-preservation of Defendants but never implemented.

91.     Baltimore County's actual arrest rate for rapes is half (50%) of the national average of thirty-six percent (36%).[21]

92.     Defendants' intentional case attritionstrategies, unlawful misclassification, miscoding, and other manipulative practices have resulted in the illusion that: 1) there are

---

[21] U.S. Dep't of Just., Fed. Bureau of Investigation, *Uniform Crime Report, Crime in the United States, 2016: Offenses Cleared*, https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/clearances.pdf.

relatively few women sexually assaulted in Baltimore County; and, 2) when women are sexually assaulted, their reports are investigated to a reasonable conclusion.

93.     Instead, Defendants, including the SAO Defendants, acting unlawfully and outside the scope of their authority, participated in covering up reports and refusing to investigate those that they could not conceal.

94.     Defendants, including the SAO Defendants, performed many of these acts in their personal capacities including intimidation of female complainants and fraudulent concealment of assailants' criminal conduct.

95.     In addition to improperly classifying reports of sexual assault as "unfounded," Defendant Baltimore County, the County Defendants, Defendant BCPD, BCPD Defendants, SAO Defendants, and University Defendants have a pattern and practice of misclassifying reports so that they do not appear as a report of sexual assault.

96.     The County, BCPD, SAO, and University Defendants also unlawfully and maliciously manipulated non-UCR codes to conceal certain reports of sexual assault.[22] This practice concealed those Defendants' refusal to investigate the credible reports of crimes perpetrated by men against Named Plaintiffs and the Class.

97.     Due to the Defendant Baltimore County, Defendant BCPD, the SAO Defendants, and University Defendants' pattern of manipulation and concealment, the extent of the manipulation is currently unknown.

---

[22] UMBC has claimed, in writing, that a misclassified report of sexual assault does not count as a report of sexual assault.

98.    The number of rapes and other sexual assaults misclassified as other, less serious crimes, or worse, non-crimes, is unknown.

   B. Baltimore County Executive Promises Review And Reform While Defendants Withhold And Conceal Evidence of Their Malfeasance to Thwart Reform.

99.    On October 13, 2015, the Baltimore Post Examiner published an article that detailed UMBC's failure to record valid reports of rape and sexual assault on campus.

100.    Nearly a year later, on September 8, 2016, the website "Buzzfeed" reported that rape victims were being mistreated in Baltimore County.

101.    On or about September 9, 2016, County Executive Kamenetz ordered Defendant Johnson to review how Defendant BCPD handles reports of rape that were "unfounded" by Defendant BCPD.

102.    In response, Defendant Johnson directed Defendant BCPD to have the Criminal Investigation Bureau (CIB) re-examine all "unfounded" rape cases from 2013, 2014, and 2015.

103.    This "re-examination" never occurred.

104.    Defendant Johnson, on behalf of Defendant BCPD and the County, pledged to "take a fresh look to ensure that the investigation(s) were handled properly and that justice was done."

105.    This "fresh look" never occurred.

106.    On October 19, 2016, Baltimore County Executive Kevin Kamenetz[23] ordered an independent Audit of the County's procedures relating to reports of rape and sexual assault.

107.    The stated purpose of the 2016 Audit was "to identify systemic concerns regarding policies and procedures" relating to sexual assault.

108.    The 2016 Audit was performed by Lisa Jordan, Esquire, the Executive Director of the Maryland Coalition Against Sexual Assault ("MCASA") and retired Baltimore County Circuit Court Judge Barbara Howe.

109.    The 2016 Audit was limited to purportedly "unfounded" reports of rape that occurred from 2013 to 2015, a total of 124 reports.

110.    The reason for limiting the Audit to "unfounded" reports, as opposed to those coded as "suspicious circumstances" or cleared by "exceptional circumstances," is likely because the Buzzfeed article had only uncovered reported on, and publicized the "unfounded" reports.

111.    The reviewers relied on information provided by Defendant BCPD, BCPD Defendants, SAO Defendants, Defendant Baltimore County, and the Baltimore County Defendants.[24]

---

[23] There no indication at this time that the late County Executive acted with anything other than good faith and integrity.

[24] For example, this review excluded Ms. Frank's 2015 report of rape to Defendant Dillon, Defendant UMBC, and the University Defendants that was coded "unfounded" by the University Police and as "A46" by BCPD. *See infra*.

112.    A Report containing findings and recommendations relating to the 2016 Audit was provided to many Defendants and/or their policymaking supervisors.

113.    The findings were published on February 1, 2017.

114.    Despite the limited scope of the Audit and the suspect nature of the information recorded and then provided by Defendants, the Report concluded that the cases "clearly demonstrated the deficiencies in and interpretation of Maryland's sexual assault statutes" by BCPD Defendants and the SAO Defendants.[25]

115.    The Report also noted BCPD's practice of "victim-blaming," specifically, that, "[f]or example, one victim was asked why she didn't fight the suspect off and why she didn't scream for help."

116.    The Report found that "[i]n other cases, officers asked victims to explain why they thought they were raped after they gave a statement about what happened.  In some of these cases, the victim decided not to proceed with the case after being questioned in this manner."

117.    In one case highlighted by the Report, the victim was forced to "go to the stairs of her home and reenact being forced to the ground and having her hands pinned behind her head."  The investigator also subpoenaed the victim's educational and cell phone records.  The report was marked "unfounded."

---

[25] While the Report concluded that none of the cases reviewed were currently viable for prosecution, this is not surprising, as the "deficiencies" had led to the destruction of most, if not all, of the SAEKs involved.  Further, neither Judge Howe nor Ms. Jordan were prosecutors or former prosecutors.

118.    As it pertains to the Named Plaintiffs and the Reported Rape/Assault Subclass, the Report criticized BCPD's "inadequate investigation into the victim's ability to resist or appraise the circumstances" in cases where the victim was intoxicated.

119.    The Report strongly recommended that the "[c]ommunication between sex crimes detectives and the Baltimore County State's Attorney's Office should be increased and documented.  Communication with prosecutors is particularly important in cases involving interpretations of the law on force and in cases involving 'mentally incapacitated individuals' under Criminal Law §3-301(c)," *i.e.*, all of the Named Plaintiffs and hundreds of members of the Class.

120.    The deliberate refusal to investigate the actual elements of sexual assault crimes led to the non-prosecution of hundreds of rapes and sexual assaults prior to the Audit.

121.    The day he released the Report, County Executive Kamenetz announced the implementation of certain reforms.

122.    The reforms were aimed at improving the investigation of reports of sexual assault and the mistreatment of victims by Defendants Baltimore County, BCPD, and the BCPD and SAO Defendants.  Due to Defendants' malfeasance and gross negligence the reforms were ineffective or unimplemented.

123.    Among those reforms was a purportedly "formalized" and "clear" system of communication between Defendant BCPD's Special Victim's Team and the State's Attorney's Office.

124.    However, the individuals working within these two groups were, and are, the worst offenders in perpetrating the concealment and misclassification of sexual assault crimes against female victims in Baltimore County.

125.    As a result of the "reforms," Defendant BCPD is now required to have an SVT detective (rather than a patrol officer) interview all victims and suspects in any reported "Sexual Crime" under Subtitle 3 of Title 3 of the Criminal Law Article of the Maryland Code.

126.    The State's Attorney's Office stated that it agreed with the recommendation, but that it would "make all final legal decisions in all sexual assault cases."

127.    This was not the suggested reform and is a mischaracterization of the recommendation.  The SAO Defendants sought to reinterpret and avoid implementation of the reforms.

128.    Defendants' practice of improperly coding credible reports of rape and sexual assault as merely "suspicious conditions" reflects their deceptive avoidance of accountability, and, specifically their avoidance of the reforms they purportedly agreed to implement.

129.    The Report's recommendations are directly related to Named Plaintiffs' rapes and sexual assaults, some of which occurred before, and some of which occurred after, the "reforms."  All Named Plaintiffs, for example, were intoxicated at the time of their rapes and sexual assaults.

130.    As a result of the increased expertise applied to reports of sexual assault, arrest rates for rape and sexual assault should have risen.  Arrest rates fell.

C.  Destruction of SAFE Exams And Documented Willful Indifference to
    Plaintiffs' Rights Pursuant to Equal Protection And Fourth Amendment
    Protections Against Unreasonable Search And Seizure

131.   County Defendants and SAO Defendants willfully destroyed and/or spoliated

evidence of crimes against hundreds of women in the Class.  Defendants, including

Defendant BCPD and the BCPD Defendants, did so at the direction of the Supervisory

Defendants and Defendant Shellenberger.

132.   If a citizen willfully destroys evidence of a criminal act, they have committed a

crime.  *See, e.g.*, Md. Code Ann., Crim. Law § 9-307.

133.   Federal law provides that a woman reporting sexual assault to law enforcement

be given a SAFE at no charge.

134.   A SAFE can last up to four (4) hours, and involves a victim's genitals being

prodded, swabbed, and photographed, as well as pubic hair combing and other invasive

procedures.

135.   Currently, in Baltimore County, SAFE examinees must sign a waiver releasing

the results of the exam to Maryland's Department of Health and Mental Hygiene, the

police, and the State's Attorney, should the victim "elect" to report the sexual assault to

the police and "elect" to cooperate with a prosecutor.

136.   As part of the pattern and practice to diminish the prosecution of sexual assault

crimes, Defendant BCPD has its own waiver through which Defendant BCPD encourages

female victims not to request an investigation.

137.   The SAFEs are usually performed by a Forensic Nurse Examiner ("FNE").

138.    The SAFE results in the creation of evidence, a Sexual Assault Examination Kit ("SAEK").  An SAEK is half the size of a shoe box and does not require refrigeration. There is not valid reason to destroy the SAEKs.[26]

139.    Defendant Baltimore County, Defendant BCPD, the BCPD Defendants, and the SAO Defendants had no public written policy on the retention of SAEKs, and SAFE examinees were not informed of the SAEKs' destruction.

140.    In 2015, Baltimore County applied for a grant, claiming that it had DNA evidence from hundreds of "cold cases."

141.    For no articulated reason, Defendants BCPD, Johnson, and Sheridan, at the direction of Defendants Shellenberger and Dever, destroyed SAEKs within ninety (90) days of the collection of the SAEK.

142.    On October 7, 2016, the Survivors' Bill of Rights Act was signed into law which guaranteed that "a sexual assault survivor has the [right to] have a sexual assault evidence collection kit or its probative contents preserved, without charge, for the duration of the maximum applicable statute of limitations or 20 (twenty) years, whichever is shorter."

---

[26] Montgomery County, for example, does not destroy SAEKs, as there is no statute of limitations for rape in Maryland.

143.   The Maryland Attorney General reported in 2017 that the ninety (90) day destruction policy was Baltimore County's self-reported policy.[27]

144.   This was the shortest period of any Maryland jurisdiction.

145.   This policy only changed after a 2017 Maryland law mandated that SAEKs be retained for at least twenty (20) years.

146.   Defendant BCPD has made a number of conflicting statements regarding what forensic evidence is in its custody, and did not have a dedicated inventory of SAEKs as of March of 2018.

147.   Baltimore County also claimed, disingenuously, that it had no backlog of untested SAEKs.  As of October of 2017, Baltimore County claimed a total of five (5) untested SAEKs.

148.   SAEKs were also regularly not tested for DNA evidence, meaning that DNA evidence of perpetrators was not added to the Combined DNA Index System ("CODIS"),[28] the National DNA Index System (NDIS), or any other law enforcement database.

---

[27] Md. Off. of Att'y Gen., Frosh, Brian E., *Statewide Accounting of Untested Sexual Assault Evidence Kits in the State of Maryland* (Jan. 2017), http://www.marylandattorneygeneral.gov/Reports/Rape_Kit_Report.pdf.

[28] CODIS is a system of national, state, and local databases managed by the FBI that allows crime laboratory personnel across the country to compare DNA profiles from known criminal offenders (and arrestees where applicable) with biological evidence from crime scenes.  CODIS has proven crucial to solving crimes in which the offender's identity is unknown.  CODIS can match crimes to each other, thereby identifying serial offenders.

149.    Instead, Defendant BCPD purports to "test" SAFE kits when they are merely assigned a "Lab Case" number.

150.    Even by its own definition, in 2016, Defendant BCPD reported to the Attorney General of Maryland that it had 197 untested and thirty-four (34) anonymous SAEKs.[29]

151.    In response to a March 2018 survey, BCPD prepared an inventory showing approximately 125 untested SAEKs.  This number is false.

152.    Although Defendant Shellenberger admits that "DNA evidence is an invaluable law enforcement tool that brings violent offenders to justice," his action reflected an intent to destroy such evidence.

153.    Defendant Shellenberger prides himself on having taken on "the ACLU and the criminal defense bar to help pass Governor O'Malley's DNA bill" that he claims "will enable the police to collect more DNA samples much sooner in the process so that violent offenders can be taken off the street before they strike."

154.    In 2008, Defendant Shellenberger praised a pathologist who, in the 1970s, had the foresight to set aside physical evidence as someone who "cared enough and had enough foresight to preserve the evidence so that science could catch up with him."

155.    In reality, Defendant Shellenberger strongly opposes the use of DNA testing to stop rape and sexual assault of women, and encourages the prompt destruction of DNA evidence related to sexual assaults.

---

[29] Md. Off. of Att'y Gen., Frosh, Brian E., *Statewide Accounting of Untested Sexual Assault Evidence Kits in the State of Maryland* (Jan. 2017), http://www.marylandattorneygeneral.gov/Reports/Rape_Kit_Report.pdf.

156.    On December 16, 2016, Defendant Shellenberger sent a letter to every state legislator falsely stating certain DNA evidence contained in SAEKs was not eligible for entry in the National CODIS system.

157.    Defendant Shellenberger was lobbying against allocating money to test SAEKs and lobbying for sexual predators.

158.    On another occasion, Defendant Shellenberger claimed that it was that same, self-created lack of funds causing SAEKs to remain untested, saying "[s]end me the money and we can hire people to test these."

159.    Named Plaintiffs and the vast majority of Class Members were not told that their SAEKs would be destroyed, much less that they would be destroyed so quickly.

160.    Nor were Named Plaintiffs or Class Members told that the SAEKs would almost certainly not be tested or analyzed, or that the perpetrators' DNA would not be placed in a nationwide database to stop serial rapists.

161.    Named Plaintiffs Borkowski's and Hendler's SAEKs were, in response to the 2018 survey, counted as "tested."  Ms. Borkowski's and Ms. Hendler's SAEKs were not tested.

162.    Defendant BCPD does not even keep an integrated inventory of the SAEKs in its possession.

163.   Defendant Shellenberger has refused "to use [his] daytime forensic people[30] to test cases" in so called "Jane Doe" cases, because he "ha[s] a chance of going to court," and a "Jane Doe case, [has] no chance at going to court."

164.   The unnecessary and unexplained destruction of SAEKs reflects the County Defendants' willful indifference to sexual assault committed by men against women.

165.   Defendants' willful indifference to the constitutional and civil rights violations is a matter of public record.

D.   County, BCPD, And SAO Defendants Concealed Information from The Investigators, The F.B.I., And The Attorney General

166.   Because they were concealed by BCPD and the County, the 2016 Audit of unfounded cases did not include the review of reports of rape and sexual assault that had been coded as "cleared by exceptional circumstances" or "exceptional means."

167.   The 2016 Audit did not include reports of sexual assault that had been intentionally miscoded or otherwise concealed by other means.

168.   This miscoding was an inherent and intentional part of the manipulation and concealment by Defendants.  The authors of the Report relied upon Defendants. Defendants misled the authors.

169.   According to the F.B.I.'s UCR standards, to clear a case by "exceptional means," the police must have: identified the offender; gathered enough evidence to

---

[30] Defendant Shellenberger's statements are further evidence of the *ultra vires* and personal nature of his actions and policy making.  He refers to BCPD forensic employees as "his" and ignores the distinction between Defendant BCPD and himself/his staff.

support an arrest, make a charge, and deliver the offender for prosecution; and identified the suspect's exact location so that he could be taken into custody; but encountered a circumstance outside the control of law enforcement that prohibits the agency from arresting, charging, and prosecuting the offender.

170.   Circumstances that are "outside of the control of law enforcement" include: the death of the offender; the victim's refusal to cooperate with the prosecution after the offender has been identified; or the denial of extradition because the offender committed a crime in another jurisdiction and is being prosecuted for that offense.

171.   Defendant BCPD's Field Manual provides for a totally different procedure for an "exceptional clearance disposition" in the case of a reported rape or sexual assault.

172.   Defendant BCPD's Field Manual, which is an "order" issued pursuant to Defendant Johnson and Sheridan's authority, states that "Adult Ex-Clear" is appropriate when "an adult was not arrested, but was identified as a suspect and warrant/summons procedures were explained so the victim can file charges."

173.   Defendant BCPD's definition is inconsistent with the F.B.I.'s definition.

174.    More importantly, this self-serving policy puts the onus of prosecution on the female victim of the assault.[31]

175.   This practice of forcing women to prosecute their own cases, utilized for rapes and sexual assaults against women but not for other crimes, discriminatorily places an undue burden on female crime victims.

---

[31] Even this procedure is ignored.  *See, e.g.*, *infra*, regarding Ms. Borkowski's attempt to utilize the "warrant/summons procedures."

176.    Defendant BCPD's Field Manual provides for an "Other Ex-Clear" disposition only when a suspect was identified but not charged because the suspect is deceased, the State's Attorney will not pursue prosecution, or the case was closed by the Department of Social Services (DSS).

177.    The language in the Field Manual regarding the State's Attorney and DSS is inconsistent with the UCR's mandate, yet Defendant BCPD persists in submitting inaccurate data in order to reduce the number of reported sexual assaults in Baltimore County.

178.    Defendant BCPD has an entire unit of employees responsible solely for data and statistical analysis, purportedly in order to make its policing more efficient and effective.

179.    Instead, Defendant BCPD, acting in concert with the BCPD Defendants, the County Defendants, the University Defendants, and the SAO Defendants, corrupts the data to obtain more favorable statistical analyses, to the detriment of the female victims of rape and sexual assault.

180.    Since at least 2013, Baltimore County has engaged in a deceitful and discriminatory pattern and practice of "clearing" valid and credible reports of sexual assault against women under "exceptional circumstances," while ignoring the requirements of the F.B.I.'s UCR Program and the State's reporting program.

181.    This policy is applied with discriminatory intent with a particular animus towards women, specifically Named Plaintiffs and the Class.

E. "Suspicious Circumstances" – Defendants' Improper Use of The Self-Invented A46 Code to Conceal Reports of Rape And Sexual Assault

182.   Defendants the County, BCPD, Dever, Shellenberger, and Dillon, along with the BCPD and University Defendants, maintained, and still maintain, a policy and practice of recording or having other record credible reports of sexual assaults against women as merely reports of "suspicious circumstances."  The purpose is to conceal the level of sexual violence in Baltimore County and to protect their respective self-interests.

183.   This discriminatory practice deprived Named Plaintiffs and Class Members of their civil rights.

184.   This practice was not disclosed to the reviewers who conducted the 2016 Audit of Defendants' sexual assault investigative policies, procedures, and customs.

185.   The reason Defendants concealed this practice is because it is indefensible and inherently incriminating.

186.   Defendants Hrabowski, UMBC, University Police, and Dillon also make use of this code to avoid federal requirements to track and report on-campus crime.[32]

187.   Defendant UMBC, acting under Defendant Hrabowski's authority, claims that they are not required to report "unfounded" reports of rape in their Clery disclosures.

---

[32] For example, in an October 13, 2015, email, UMBC justified omitting Named Plaintiff Fegler's report of rape from its Clery reporting because "BCPD closed its investigation of the matter, defining it as a 'suspicious condition,' a classification not included in Clery Act reporting."

188.    Defendant Dillon, Defendant UMBC, and the University Defendants record as "unfounded" reports that are still "open" or coded as A46[33] by Defendant BCPD.

189.    The University Defendants' practice is reflected in the 2016 Campus Climate Survey on Sexual Assault, in which only sixty-two percent (62%) of respondents believed that UMBC would likely handle a report of sexual violence or sexual assault fairly.

190.    University Defendants, including Defendant Dillon, intentionally guide students to non-Clery resources to avoid disclosure.

191.    Defendant UMBC's, the County's, the University Defendants', the SOA Defendants', Defendant BCPD, and the BCPD Defendants' pattern and practice of coding reports of sexual assaults as merely "suspicious circumstances" or "suspicious conditions" is an attempt to avoid accountability for their unjustified refusal to investigate credible reports of sexual assault against women.

192.    Defendants Shellenberger and Dever were personally involved in crafting this unconstitutional practice and personally enforced and facilitated its implementation.

193.    Defendants BCPD and the BCPD Defendants' written policy of documenting reports when a "specific offense or victim cannot be substantiated . . . [by] using the offense code 'Suspicious Incident/Condition/Person/Vehicle'" is at odds with their actual practice of using the code as a hiding place for reports of sexual assault against women.

---

[33] "A46" is a non-UCR code used by Defendants to avoid counting credible reports of rape and sexual assault in statistics submitted to the UCR System.

194.    "Suspicious circumstances" and "suspicious condition" are not UCR categories.

195.    Because these are not UCR categories, hundreds of reports of sexual assault are coded "A46," and these reports are not reported to the F.B.I., disclosed in Clery Campus Crime Reports, or counted towards Baltimore County or UMBC's crime rates.

196.    When a report of sexual assault of a woman is misclassified as a "suspicious circumstance" or "suspicious condition" it is deliberately scuttled, which deprives the female victim the investigation that a male victim's report would receive.  This practice violates the equal protection doctrine.

197.    The assaults coded as "suspicious circumstances" are also hidden from any oversight by State or Federal organizations or private interest groups, such as MCASA.

198.    University (including Defendant Dillon) and County Defendants' pattern and practice of miscoding sexual assaults as "suspicious circumstances" or "unfounded" in order to avoid reporting and investigating reports of sexual assault, is a violation of equal protection as it intentionally discriminates against victims of crimes that disproportionately affect female victims, including Named Plaintiffs Frank, Fegler, and the Class.

F.    <u>County Defendants Promised Reforms, But Just Changed Methods of Misclassification</u>

199.    After the MCASA Report criticized existing practices, Defendants Baltimore County, Shellenberger, Johnson, and BCPD announced the reform of the existing unfair and discriminatory system of handling reports of sexual assaults.

200.   Defendants Shellenberger and Dever were personally involved in responding to the recommended reforms.

201.   Defendants Shellenberger and Dever then crafted new strategies to undermine the reforms.

202.   Despite announced reforms, Defendants continued deceptively miscoding reports of sexual assault in new ways, for the same end, depriving women of equal protection of the law, including Named Plaintiffs and the Class.

203.   Currently, Defendant BCPD, the BCPD Defendants, and the SAO Defendants miscode more reports of sexual assault as "cleared" due to "exceptional circumstances" to avoid dealing with the scrutiny of "unfounded" cases.

204.   The "new" pattern and practice is evident in BCPD's own statistics: while fewer reports of rape were deemed "unfounded," the number of arrests per report decreased slightly, though statistics show a recent dramatic rise in reports of rape and sexual assault without a corresponding rise in prosecutions.

205.   From 2013 to 2017, BCPD has made arrests in approximately twenty percent (20%) of those reported rapes which were properly recorded.[34]

206.   In 2014, BCPD made arrests in twenty-two (22%) of those reported rapes which were properly recorded.

_____

[34] These statistics are self-reported by Baltimore County.  The statistics exclude those attempted reports improperly recorded as "suspicious conditions."

207.    In 2017, after the "reforms" had taken effect, BCPD made arrests in eighteen percent (18%) of those reported rapes which were properly recorded.

208.    The State's Attorney's "agreement" that it would "make all final legal decisions in all sexual assault cases" has not raised the number of men arrested of or charged with sex crimes, relative to reports.

209.    There has been no follow-up review of the Defendants' practices, as Defendants are not subject to impartial review of their investigation/prosecution.

210.    Despite the provisions of the Field Manual, the facts contained in BCPD reports coded as "Ex-Clear" do not meet the UCR requirements for clearance due to exceptional circumstances, because "Ex-Clear" is used to hide uninvestigated reports.

211.    Instead of properly classifying women's reports of sexual assault and rape, BCPD and the BCPD Defendants have left an increasing number of cases "open" until after the reporting periods have ended.[35]

212.    Eighteen percent (18%) of reported (and properly recorded) rape from 2013 were still "open" when Defendants reported their statistics.  Eleven percent (11%) of the properly recorded reports of rape from 2014 were still "open."  Twenty percent (20%) of those properly recorded reports of rape from 2015 were still open.

213.    For 2016, the year the Buzzfeed article was released, twenty-nine percent (29%) of those properly recorded reports of rape were still open.

---

[35] Baltimore County also has not re-opened any cases from 2013-2016, but has done so for 2017.

214.    In 2017, the year the purported reforms took effect, forty-two percent (42%) of those properly recorded reports of rape were still open.

215.    If Defendants were leaving cases "open" in order to investigate and complete them, the percentage of 2016 rapes cleared by arrest would have gone up as more were investigated.  This has not happened.

216.    Instead, nothing substantive changed.  In every year from 2013 to 2017, the total number of reports of rape classified as "unfounded," "exceptionally cleared," or "open" varied only between seventy-six percent (76%) and eighty-one percent (81%).

217.    Defendants, instead of classifying reports as unfounded or cleared by exceptional circumstances, have redirected their manipulation by leaving cases open.[36]

218.    Defendants' scheme, instead of instituting meaningful reforms, was to avoid the negative publicity of "unfounded" cases, while not investigating, arresting, or prosecuting any differently.

G.    Police Misconduct And The Unlawful Conspiracy with Baltimore County State's Attorney's Office

219.    Baltimore County Police officers, specifically the Detectives in the SVT, engage in a pattern and practice of discouraging victims from pursuing reports of sexual assaults.

220.    For example, some victims are encouraged not to submit to medical examination after a reported sexual assault, or to forego a police investigation.

---

[36] This is, of course, in addition to the unknown number of cases coded as "suspicious circumstances," which are not recorded as crimes.

221.    In one specific instance, Ms. Hendler was intimidated by Defendants into signing a waiver requesting that an investigation not be performed, even though her SAFE paperwork indicates that she wanted an immediate investigation.

222.    If the BCPD Defendants and/or Defendants Dever and Shellenberger were not interested in investigating a report, the detective would "explain" the SAFE[37] exam to the victim in the most unappealing and discouraging way possible.

223.    In other instances, the BCPD Defendants tell female victims a SAFE would be a "waste of time."

224.    Female victims were often informed by BCPD Defendants that, while they could receive a SAFE, it would not be tested.

225.    BCPD Defendants routinely refused to test, or even take, female victims' clothing.

226.    As a result, victims would frequently decline the exam, giving the BCPD Defendants and other County Defendants an excuse to discontinue any investigation with the "non-cooperative" victim.

227.    Victims, including Named Plaintiff Frank and many members of the Class, still endured a painful exam, but were never informed that the evidence would be maliciously destroyed in as little as ninety (90) days.

---

[37] A SAFE exam includes invasive vaginal and rectal probing, swabbing, and examination with photographs of a victim's breasts and genitals.

228.    Defendants, including SAO Defendants, BCPD Defendants, and Defendant BCPD, intentionally withheld this information from Plaintiffs.[38]

229.    On multiple occasions, female victims of sexual assault, including minors, were told by BCPD Defendants that hopefully they had "learned a lesson" about drinking.

230.    In several cases, where a female victim consented to sexual activities with one man, but not another, BCPD Defendants informed the female victims that they had consented to sexual activities with their assailants merely by consenting to have sex at all.

231.    Detectives, including the BCPD Defendants, told female victims that their assault would be all "over social media," and that "everyone will know" if the female victim pursued charges.

232.    BCPD and County Defendants did not tell victims that they would not investigate a report of sexual assault if the SAFE exam was not completed within five (5) days of the assault.

233.    Female victims report Defendant Brady yelling at them on the phone if they questioned why their cases were ignored.

234.    Records reflect that County Defendants used self-created "lack of evidence" as pretextual justification to later refuse to investigate a report for insufficient physical evidence.

---

[38] Defendants likely also withheld this information from GBMC and the FNEs who performed the SAFEs.

235. For example, Defendant Dever has publicly and privately stated that she does not consider a female victim's testimony alone to be sufficient "evidence" for a conviction. Defendant Dever has stated that she could not prosecute Ms. Frank's assailant because he would "present equally credible testimony that this [her assault] was consensual."

236. Defendant Dever made this credibility determination without having spoken with, or seeking any statement from, the assailant.

237. County Defendants also discourage women from reporting sexual assault by ignoring evidence of physical resistance, falsely telling victims that evidence of resistance is required, and falsely claiming that their testimony is insufficient for a conviction.

238. Defendants Burrows and Tomas routinely tell victims that it is "hard to prove sex was not consensual," even when the victim was injured as a result of the assault.

239. The SAO Defendants unlawfully exercised control and influence over certain BCPD Defendants, namely the SVT.

240. The SAO Defendants used this control and influence to reduce the number of reports of rape and sexual assault. The SAO Defendants abused their positions and public trust.

241. As part of an intentional effort to conceal the level of sexual assaults in Baltimore County, Defendant BCPD, the BCPD Defendants, and the SAO Defendants set out to make reporting and pursuing investigation of rapes and sexual assaults as unpleasant as possible, and they succeeded.

242.    Defendant Shellenberger testified before a Maryland House of Delegates committee that he had "dismissed[39] more rape cases in my career than any of you have ever seen."

243.    These policies and practices are unlawful violations of Named Plaintiffs' and the Class' civil rights in that they violate applicable standards, deceive and intimidate victims, and create a false impression as to the nature and extent of sexual assaults in Baltimore County and disproportionately affect women.

  H.    Defendants Practice Misleading Victims Regarding The Elements of Sexual Assault to Decrease Reporting

244.    Defendants intentionally misled the Class by falsely telling them that the sexual assault that the Class Member reported did not meet the elements of a crime.

245.    For example, Defendant Dever has consistently lied to victims regarding the elements of "incapacity" as part of her personal effort to dissuade victims or their families from pursuing charges.

246.    Defendant Dever has stated that a victim must be "passed out behind a dumpster" to be incapacitated.

247.    Time and time again, Defendants have used the legally outdated "force" and "resistance" standard, despite Maryland cases from as far back as the 1960's abrogating such requirements.[40]

---

[39] Presumably, Defendant Shellenberger means *nolle prossed*.

[40] Recent cases, such as *State v. Mayers*, 417 Md. 449 (2010), continue to uphold these clearly established elements.

<u>NAMED PLAINTIFFS</u>

I.    <u>Plaintiff Marcella Fegler</u>

248.   On August 25, 2014, Marcella Fegler attended a party.

249.   At that party were also four (4) members of the UMBC basketball team, who Ms. Fegler knew personally and considered to be her friends.

250.   Ms. Fegler consumed several alcoholic beverages.

251.   Ms. Fegler woke up the next morning with no memory of the events after consuming the beverages.

252.   Ms. Fegler did not know where she was or how she got there.

253.   Two (2) of her assailants reassured Ms. Fegler that nothing had happened that night.

254.   Ms. Fegler was accidentally informed, two (2) months later, that the four (4) members of the UMBC basketball team had sexually assaulted her after the party.

255.   Specifically, she was told that the assailants had "run[] a train on her and pass[ed] her around."

256.   Defendant UMBC expelled two of assailants, who had admitted to Ms. Fegler, in an attempt to avoid an investigation, that they had taken advantage of her.

257.   Defendant UMBC refused to hold accountable the assailants who did not admit that they raped Ms. Fegler.

258.   Even with these admissions, Defendant BCPD performed little to no investigation.

259.   Defendant BCPD only interviewed three (3) of the four (4) assailants.

260.    Defendant Tomas dismissed Ms. Fegler's assault, informing her that "in order for some of the sex acts," which Ms. Fegler could not recall "to be performed, she would have had to be conscious to participate."

261.    Defendant Tomas offered to testify, on behalf of the assailants, that the assailants were "not involved as alleged."

262.    Defendant Tomas conspired with UMBC officials to allow the assailants to escape punishment.

263.    Defendant Dever also refused to follow appropriate investigative procedures.

264.    Despite promising a fresh review of sexual assault cases such as Ms. Fegler's, Defendants did not re-open or otherwise further investigate her case.

   II.    Plaintiff Katelyn Frank

265.    In the fall of 2015, after graduating from a Catholic high school, eighteen-year-old Katelyn Frank arrived at UMBC, as a freshman.

266.    Ms. Frank lived in an on-campus dormitory, the "Patapsco" dorm.

267.    On September 10, 2015, a fellow UMBC student lured Ms. Frank to his dorm room and raped her.

268.    Ms. Frank has a memory of bleeding, in her assailant's bathroom after the rape.

269.    Ms. Frank's assailant received a package of pills that day, which he could not explain.

270.    Ms. Frank later tested positive for Valium.

271.    Defendant UMBC had credible evidence that her assailant had assaulted other students in the same dormitory.  Defendant UMBC did not investigate those crimes.

A. <u>Ms. Frank's Discriminatory Treatment During Title IX Proceedings</u>

272.   Ms. Frank reported the assault to Rina Rhyne.[41]

273.   On September 14, 2015, Ms. Frank submitted to a SAFE exam at GBMC.

274.   The FNE found extensive bruising on Ms. Frank that was a result of the rape four (4) days earlier.

275.   The Forensic Nurse Examiner ("FNE") who performed the exam reported the assault to BCPD,[42] who in turn recorded it as a "suspicious circumstance," not as a rape.

276.   Defendant BCPD assigned the report an incident number.  Inexplicably, no Incident Report was created.

277.   On October 7, 2015, with Ms. Rhyne's support, Ms. Frank reported the assault to Defendant Dillon, in person and in writing.

278.   Defendant Dillon improperly persuaded Ms. Frank not to "report" her assault to the police, notwithstanding that she had just done so.

279.   Defendants Dillon and University Police have a practice of dissuading female victims of rape and sexual assault from making police reports.

280.   Defendant Dillon told Ms. Frank and her mother that the "administrative method" was "faster and easier," "more victim friendly," and was "easier to prove."

---

[41]  Ms. Rhyne has since left UMBC and now works as the Deputy Title IX Coordinator at Goucher College.

[42] The complainant of a crime need not be the victim.

281.    By failing to report the assault to BCPD, Defendant Dillon violated UMBC's Memorandum of Understanding with BCPD, which requires BCPD, not the University Police, to investigate all reports of first and second-degree sexual assault.

282.    Defendant Dillon also failed to make a record of Ms. Frank's unambiguous report of sexual assault.  Defendant Dillon's intent was to conceal and diminish the incident.

283.    Defendant Dillon convinced Ms. Frank to handle the matter "administratively."

284.    This is procedurally impossible.  The incident had been reported, and Defendant Dillon is a sworn police officer with various reporting duties.

285.    Defendant Dillon's (and Defendant UMBC, Defendant University Police, and University Defendants) obligations under the Clery Act are to maintain a public log of all crimes reported to them or of which they are aware.  The UCR requires that agencies accurately report reports of crime.

286.    The "reported" but unrecorded sexual assault did not appear in UMBC's Clery reporting statistics.[43]

287.    Ms. Rhyne stated that she was concerned that Defendant Dillon was violating the University Police's policy regarding reports of sexual assault and the MOU with BCPD.[44]

_____

[43] While there is no private cause of action in the Clery Act, a police officer's self-serving refusal to create a record of a violent sexual assault generates an inference of malice.

[44] Ms. Rhyne disputes this allegation.

288.    Defendant Dillon brushed off Ms. Rhyne's concern, stating that the incident was not sufficiently serious to report to BCPD.

289.    Defendant Dillon misused the MOU, in concert with the SAO Defendants, University Defendants, Defendant BCPD, and the BCPD Defendants, to subvert and circumvent the intent of the MOU and to deliberately deprive Ms. Frank of her civil rights.

290.    In doing so, Defendant Dillon was not acting as an agent of the State of Maryland, though he used and abused his position to give that appearance.

291.    Even if Defendant Dillon was acting in an official capacity, he was acting as an agent of Defendant Baltimore County, exercising and abusing powers pursuant to the MOU with Defendant BCPD.

292.    Ms. Frank chose to "delay reporting" the rape to BCPD due to Defendant Dillon's and UMBC's promises of a fair investigation and Defendant UMBC's stated policies.

293.    A "delayed report" means that the victim may request a police investigation at a later date.  Ms. Frank's later request was made on May 28, 2016, but was improperly handled.  *See infra.*

294.    "Delayed report" is actually a misnomer.  A delayed report is a report, but is kept anonymous until the victim decides to reveal her identity to BCPD.

295.    Defendant Dillon and the University Defendants required Ms. Frank to sign a waiver stating that she was delaying reporting the incident to law enforcement, even though she had already reported the incident to Defendant Dillon, a police officer.

296.    Defendant Dillon refused to begin the Title IX process until Ms. Frank elected, in writing, not to "delay" reporting to the police.

297.    The assault was classified by Defendant BCPD, again, as a "suspicious circumstance," despite Ms. Frank's unequivocal allegation of sexual assault.

298.    Ms. Frank's SAEK results were never tested or analyzed for relevant evidence, or to help identify serial sexual offenders.

299.    The DNA evidence contained therein was never forwarded to CODIS or NDIS, databases maintained by the F.B.I.[45]

300.    No one told Ms. Frank that the evidence she provided through a painful and intrusive examination would be destroyed.

301.    A 2018 accounting of SAEKs performed by BCPD for the Attorney General's Office shows that Ms. Frank's kit was destroyed.

302.    In addition to objective evidence of sexual assault, Ms. Frank provided credible evidence to Defendant BCPD, the SAO Defendants, and Defendant UMBC that she had been drugged.

303.    Stephanie Lazarus, the UMBC Title IX Coordinator tasked with supervising the investigation refused to fulfill her designated responsibilities.  She did not investigate the drugging or assign anyone to do so.

---

[45] While Defendant Shellenberger has claimed that, where "there's no issue about who the [assailant] is, then DNA doesn't really contribute anything," DNA information entered into CODIS and NDIS can be used to solve other rapes and sexual assaults committed by known assailants, against female victims who were not able to identify their assailant.

304.    Instead, UMBC paid Defendant Hunton, an attorney specializing in defending colleges and universities from allegations of sexual misconduct, to investigate and prepare the Title IX Draft Report and Final Report.

305.    Hiring an attorney who defends against claims of sexual misconduct made by women against men further demonstrates Defendant UMBC's institutionalized gender bias.

306.    On October 16, 2015, Defendant Hunton scheduled Ms. Frank's initial investigative interview for October 20, 2015, but did not specify a time.

307.    At 5:42 a.m. on October 20, 2015, Defendant Hunton emailed Ms. Frank to tell her that her interview was scheduled for 9:00 that morning.

308.    At 5:42 a.m. Ms. Frank was sleeping and did not receive the message.

309.    Ms. Frank was awakened at 9:08 a.m. by Defendant Hunton's phone call informing Ms. Frank that she was "late" to an interview that had been scheduled three (3) hours before.

310.    Ms. Frank rushed across campus to attend the interview, and was not able to have her choice of support person (her mother) at the impromptu interview.

311.    This fact is intentionally misrepresented by Defendant Hunton's Draft Report and Final Report.

312.    Instead, Ms. Frank's suitemate came, but was not permitted to be in the room because Defendant Hunton inexplicably invoked a sequestration rule that does not apply in a Title IX context.

313.   Incredibly, Defendant Hunton then chose not to interview the suitemate Defendant Hunton had excluded.

314.   Defendant Hunton instructed Ms. Frank not to attempt to retrieve certain text messages, as Defendant Hunton would not consider them as evidence.

315.   Defendant Hunton then found in her reports that Ms. Frank had spoliated the text messages that Defendant Hunton instructed Ms. Frank not to recover.  Defendant Hunton deliberately skewed the process to reach a pre-ordained result, a result that would relieve Defendant UMBC of any responsibility to discipline the assailant.

316.   Ms. Frank was not provided with the Title IX Draft Report when it was issued. Instead, Ms. Frank had to inquire why she had not been provided with a copy.

317.   Ms. Frank was informed that Defendant UMBC had deliberately and condescendingly chosen to withhold the Draft Report, in violation of its obligations, so as not to "overwhelm" Ms. Frank during finals.

318.   Defendant UMBC's acts had the opposite effect: Ms. Frank suffered from severe anxiety and other physical and emotional distress because she knew the Draft Report should have been issued but did not know why she had been denied access.

319.   The Draft Report erroneously exonerated the assailant of all reported acts of misconduct.  The Draft Report concluded that, while the assailants "pills were not [z]inc supplements," as he claimed, "[t]he evidence fails to suggest that Mr. Thomas drugged Ms. Frank."

320.   Ms. Frank was given no more than one (1) week, immediately after finals and during the Winter Break, to respond to the Draft Report.

321.    Because UMBC was closed for Winter Break, Ms. Frank did not have access to on-campus resources.

322.    Ms. Frank responded to the Draft Report and raised numerous procedural and evidentiary issues.

323.    The only substantive changes between the Draft and Final Reports were further denigrations of Ms. Frank's character.

324.    For example, Defendant Hunton stated that Ms. Frank's disagreements with the Draft Report damaged Ms. Frank's credibility.

325.    The UMBC Board of Review accepted the recommendation contained in the Final Report.

326.    The recommendation contained in the Final Report was the result Defendant UMBC had hired Defendant Hunton to obtain.

327.    Ms. Frank appealed the decision, because University Defendants and Defendant Hunton utilized double-hearsay character evidence and a defense attorney to draft the reports.

328.    Ms. Frank's appeal was wrongfully denied.

329.    Defendant UMBC's scheme to control and determine the outcome was successful.

B.   Ms. Frank's Discriminatory Treatment by Baltimore County Defendants

330.    After the completion of the flawed UMBC investigation, Ms. Frank again reported the sexual assault to the Baltimore County Police.

331.   Ms. Frank went to the Catonsville Precinct of BCPD to report the sexual assault.

332.   Ms. Frank was forced to wait for hours while Defendant Timothy Lee, a BCPD officer, arrived to take her statement.

333.   Defendant Lee was obviously and overtly uninterested in taking Ms. Frank's report.

334.   Defendant Lee required Ms. Frank to give an account of the sexual assault, her only sexual experience at that time, in a crowded lobby full of strangers.

335.   Even so, Ms. Frank gave Defendant BCPD a detailed description of rape in the first degree, rape in the second degree, sexual assault in all degrees, and simple assault.

336.   Defendant Lee drove the half mile from the Catonsville precinct to the UMBC Police Department.

337.   When Defendant Lee returned, he informed Ms. Frank that the University had no record of the assault, even though Ms. Frank had given it to him.

338.   This was surprising to Ms. Frank, as she had copies of the records from the Title IX investigation.  Ms. Frank also had her email to Defendant Dillon reporting the crime.

339.   Ms. Frank's rape had been reported three (3) times, once to Defendant Dillon, once to Defendant BCPD through the SAFE process, and once to Defendant Lee.  None of these reports was recorded as a rape.

340.    Consistent with BCPD's practice of concealing sexual assault, Defendant Lee intentionally and wrongfully misclassified Ms. Frank's rape as a "suspicious condition," and it was closed with a "non-criminal disposition," all without informing Ms. Frank.

341.    Defendants Shellenberger, Dever, Lee, Montgomery, and Dillon acted together to make a thrice reported rape "go away."

342.    Defendant Dever has stated that, to prosecute a sexual assault she "need[s] more than just [the victim's] credible testimony because the suspect will present equally credible testimony at trial that this was consensual and [the victim] was not incapacitated."

343.    This statement is untrue.  In Maryland, a victim's testimony alone is sufficient evidence for a conviction.  Case after case supports this obvious conclusion.

344.    When Ms. Frank's mother, distressed by Ms. Dever's casual attitude, requested more information regarding the investigation, Defendant Dever forwarded the email to Defendant Montgomery and wrote "Hahaha!  Her response from my being so nice."

345.    Defendant Montgomery followed Defendant Dever's distasteful email with a pretextual note to the investigative file blaming Ms. Frank for not providing enough information to justify an investigation.

346.    Defendants Montgomery and Dever acted to coverup the real reason for any lack of evidence: Defendants' unreasonable policies regarding the destruction of SAEKs.

347.    County Defendants would not have acted with such deliberate indifference if an allegation of assault was made by a man.

348.    The Prison Rape Elimination Act ("PREA") requires Defendants to treat prison rape, which disproportionately affects men, seriously.

349.    The BCPD field manual reflects this disparity by dedicating ten (10) pages to the PREA, but only two (2) pages to rape and sexual assault outside of prison.

350.    Ms. Frank is but one of hundreds, possibly thousands, of women who suffered this violation of the equal protection doctrine due to Defendants' wanton, reckless, willfully indifferent, and malicious actions.

 III.    Plaintiff Kaila Noland

351.    On March 30, 2016, Kaila Noland was sexually assaulted in Baltimore County.

352.    It is undisputed that Ms. Noland told her assailant, who was her lab partner at UMBC, "wait," and "we shouldn't be doing this."

353.    Ms. Noland's assailant responded, "you know you want it," and proceeded to sexually assault her.

354.    Ms. Noland reported her assault to UMBC.

355.    As a result of the assault, Ms. Noland, a UMBC student, left her laboratory position at the UMBC campus, for a position at the University of Maryland, Baltimore ("UMB") campus.

356.    Defendant UMBC again paid Defendant Hunton, an attorney specializing in defending against from allegations of sexual misconduct, to investigate and prepare the Title IX Draft Report and Final Report.  Defendant UMBC had great confidence in Defendant Hunton's ability to absolve UMBC of any responsibility to discipline Ms. Noland's assailant.

357.    Even Defendant Hunton concluded, based on Ms. Noland's assailant's own statements, that Ms. Noland was sexually assaulted on March 30, 2016.  Defendant Hunton did not credit Ms. Noland's statements, despite the assailant's acknowledgment that he had sexually assaulted Ms. Noland.

358.    Defendant Hunton recommended that UMBC not expel Ms. Noland's assailant.

359.    Based on that recommendation, UMBC imposed one counseling session for Ms. Noland's assailant.

360.    Defendant Hunton further recommended that UMBC "use the circumstances giving rise to this complaint to tailor training and awareness programs."

361.    Defendant Hunton was referencing the DOJ Office of Civil Rights, which has been investigating UMBC for Title IX violations since 2016.

362.    Defendant Hunton essentially reduced Ms. Noland's sexual assault to a "learning experience" for her assailant.

363.    Although the University Defendants and Defendant Hunton were aware that Ms. Noland had been sexually assaulted, they did not report the assault to the police or suggest that Ms. Noland do so.  Instead, Defendant Hunton and the University Defendants concealed the sexual assault.

IV.    Plaintiffs Anna Borkowski And Annemarie Hendler

364.    On October 19, 2017, Towson University student Anna Borkowski and Annemarie Hendler, a female classmate, joined three (3) UMBC students at a local Towson bar.  All three (3) men were members of UMBC's Conference Championship-winning baseball team.

365.    At approximately 1:00 a.m. on 20th of October 2017, the three (3) men went with Ms. Borkowski and Ms. Hendler to Ms. Hendler's nearby apartment.

366.    The three (3) men encouraged Ms. Borkowski and her friend to drink from a bottle of vodka and wine.

367.    The men pretended to drink, but did not.

368.    According to the men, they secretly poured the contents of the bottle of vodka over the apartment's balcony, apparently in an attempt to conceal their surreptitious drugging of Ms. Borkowski and Ms. Hendler.

369.    There was no record of any attempt to investigate the destruction of evidence. The men are adamant that they disclosed the dumping to Defendants Burrows and Tomas and Defendant BCPD, but it does not appear in police notes or any police report.

370.    After drinking the vodka, Ms. Borkowski and Ms. Hendler became disoriented and blacked or passed out.

371.    In the early morning hours of October 20, 2017, Ms. Borkowski and Ms. Hendler were gang-raped and repeatedly assaulted, in series, by the three (3) men.

372.    Due to her incapacitation, Ms. Borkowski was unable to consent to the sexual assault.

373.    Due to her incapacitation, Ms. Borkowski does not remember the entire assault, but she has horrific fragmentary memories of waking up while being sexually assaulted by combinations of the three (3) men.

374.    At the same time, Ms. Borkowski witnessed Ms. Hendler, then unconscious or semi-conscious, being raped by one (1) of the men, and then by another.

375.    Ms. Borkowski was, by any definition, incapacitated and incapable of giving

consent, as she could not and did not agree to or otherwise comprehend at the time the

nature or consequences of the sexual acts.

376.    Ms. Hendler was unconscious or semi-conscious and unable to apprise the

nature and consequences of the sexual acts.

377.    That same day, upon regaining consciousness, Ms. Borkowski and Ms.

Hendler were both in intense pain and realized they had been raped.  The women reported

the assaults to the Towson University Police Department ("TUPD") police.  Pursuant to

TUPD's Memorandum of Understanding with BCPD, the women were transported to

Greater Baltimore Medical Center ("GMBC") for examination and treatment.

378.    A SAFE Exam performed at GBMC confirmed that Ms. Borkowski was

suffering "injuries consistent with sexual assault," specifically vaginal tearing.

379.    Ms. Hendler was suffering from bleeding and soreness.

380.    Ms. Borkowski and Ms. Hendler understood the forensic value of the painful

and invasive exam.

381.    Ms. Borkowski and Ms. Hendler submitted to the exams to provide objective

evidence of an assault, and to assist Defendant BCPD, the BCPD Defendants, and the

SAO Defendants in capturing and prosecuting their rapists.

382.    Ms. Hendler requested an immediate police investigation.

383.    Defendants Tomas and Burrows intimidated Ms. Hendler with offensive and

demeaning questions, and pressured her, while she was still intoxicated, to sign a waiver

declining further investigation.

384.    The police report does not mention Ms. Hendler's desire for a police investigation, which she demanded eighteen (18) minutes after signing a waiver she could not understand, or Defendants' tactics in coercing her to "waive" her rights.

385.    Ms. Borkowski signed a statement confirming that she "request[ed] a [SAFE] and Law Enforcement report and investigation."

386.    Ms. Borkowski and Ms. Hendler were both reassured that Defendant "Baltimore County Police Department [would] be contacted by hospital personnel via 911 to immediately initiate an investigation."

387.    Neither Ms. Hendler nor Ms. Borkowski knew that Defendants' interest was in concealing, not investigating or prosecuting, the crime.  Had she known, she never would have submitted to the exam or allowed her genetic material to be taken by a state agent.

   A.  Defendants' Bogus Investigation of A Closed Case

388.    Just after midnight on October 21, 2017, less than twenty-four (24) hours after the assault, Ms. Borkowski's and Ms. Hendler's case was inexplicably closed and cleared by "exceptional circumstances."

389.    Despite BCPD general orders requiring a notation reflecting a clearance in the investigative file, the file does not contain one.

390.    A date-stamped copy of the original version of the Investigative Report shows that the investigation was closed and faxed to TUPD at 5:47 a.m. on October 21, less than twenty-four (24) hours after the report was made.

391.    In violation of its own 2016 "reforms," and contrary to Ms. Borkowski's and Ms. Hendler's civil rights, Defendant BCPD and the BCPD Defendants did not

investigate the allegations, interview victims, or review the evidence before clearing the report.  Instead, the Defendants deliberately buried the complaints to obscure and conceal viable allegations of criminal conduct.  In short, the Defendant conspired to conceal criminal conduct, both their own and the assailants'.

392.    Even though the case was apparently closed, Detective Hummel performed a single investigatory act: On October 31, eleven (11) days after the assault, she visited the apartment building where the assault occurred and requested video.

393.    Detective Hummel reported that important surveillance footage was not available.

394.    Detective Hummel was either ill-informed or untruthful.  Detective Burrows informed Annemarie Hendler that Detective Burrows had viewed the surveillance footage from the building.

395.    Detective Tomas had requested and received surveillance footage from the same building in a previous investigation.

396.    Valuable evidence was lost, concealed, or intentionally spoliated.

397.    For unknown reasons, Detective Hummel was transferred out of the SVT several days later on Defendant Dever's orders, notwithstanding Defendant Dever's lack of authority to make BCPD personnel decisions.

398.    Sometime later, Defendant Burrows noted that the report was coded as "open" or "open suspended."  Contrary to BCPD General Orders, there is no supplement in the file that indicates that the case disposition had changed.

399.   Defendant Burrow's note in the BCPD Investigative File closing the investigation was a ruse to conceal the fact that the case was wrongfully closed on October 21, 2017, and never properly investigated.

400.   The Investigative File shows that neither Defendant BCPD nor the BCPD Defendants ever visited the crime scene or collected any evidence.

401.   Other than visiting the building, not the apartment, where the assaults occurred, BCPD performed no investigation.

402.   Defendants Burrows and Tomas, and Officer Himes all told Ms. Hendler that the crime scene had been, or would be, investigated.  This was untrue.

403.   Defendant BCPD apparently did not subpoena the surveillance tapes from the bar or the apartment building, though it appears that Defendants Tomas and Burrows viewed surveillance footage but omitted their observations from the Investigation File.

404.   Defendant Dever has even referenced the contents of the surveillance tape, but that tape is not part of the official file she would have reviewed.

405.   Blood stains on the bed were ignored.

406.   The suspicious bottle of vodka was never tested.

407.   Defendant BCPD performed no analysis of the SAEKs related to the assaults.

408.   No DNA evidence was submitted to CODIS or any other database.

409.   Defendant BCPD and the BCPD Defendants assured Ms. Borkowski that "even though it may not seem as though it is being worked on," she could "trust that it is and will be thoroughly investigated."  This was untrue.

410.   Ms. Borkowski's case was not "thoroughly investigated."

411.    Defendant BCPD did not attempt to interview any of Ms. Borkowski's friends who were present for part of the evening.

412.    The "investigation" remained dormant or non-existent for weeks.

413.    On November 14, 2017, under pressure from Defendant Fox to close the case, Defendant Burrows scheduled interviews with the three (3) men.

   B.   BCPD Conducts Pretextual Interviews to Justify The Decision That Had
        Already Been Made

414.    On November 15, 2017 Defendants Tomas and Burrows interviewed the three (3) men, together, at a Chik-fil-A.

415.    Interviewing multiple suspects together is part of Defendant BCPD's and the SAO Defendants' pattern and practice of giving male perpetrators of sexual assault every possible advantage during the investigation, and then refusing to prosecute after ruining any possible case by allowing the male perpetrators to "get their story straight."

416.    The interview of multiple suspects in a group is contrary to all standards of law enforcement procedure.  Yet, it is one method used by the BCPD Defendants and the SAO Defendants to close out claims of sexual assault.

417.    All three (3) men admitted to having simultaneously engaged in sexual acts with Ms. Borkowski and Ms. Hendler while the women were extremely intoxicated.

418.    None of the three (3) men offered an explanation for Ms. Borkowski's or Ms. Hendler's injuries.

419.    The men said they did not understand what the issue was.

420.    They claimed that the assault was consensual, despite Ms. Borkowski and Ms. Hendler's obvious incapacity to consent, and both women's physical injuries.

421.    Despite the opportunity to be interviewed together, the men's accounts were inconsistent, and became more inconsistent and implausible over time.

422.    Defendants Burrows and Tomas credited these completely implausible, contradictory accounts over Ms. Borkowski and Ms. Hendler's consistent, reasonable accounts.  Defendants Burrows and Tomas did so, not out of any discretion, but out of a refusal to exercise their discretion, in order to deliberately and wrongfully eliminate and conceal a report of sexual assault.

423.    Despite the admission that they engaged in injury-causing sexual activity with Ms. Borkowski and Ms. Hendler, Defendant Dever, refused to charge any of the three men with a crime.[46]

424.    Defendant Dever's stated rationale for not bringing charges was that "the boys had to know it was a crime."[47]

425.    Defendant Dever stated she believed Ms. Borkowski simply "woke up regretting a consensual encounter."

---

[46] When Ms. Borkowski later swore out charges, Defendant Dever purported to "dismiss" the charges on March 23, 2018, instead of exercising her discretion to enter a *nolle prosequi* and face public accountability.  The matters are currently on appeal.

[47] The assailants were men, not "boys."  Defendant Dever's infantilizing language serves to absolve men of responsibility for their actions.  This is also an inaccurate statement of the law.

426.    Defendant Dever is legally responsible for making non-discriminatory charging decisions pursuant to the Fourteenth Amendment to the U.S. Constitution.

427.    While Defendant Dever has prosecutorial discretion, she is not permitted to intentionally discriminate against a protected class – women − as is alleged in this Complaint.  Defendant Dever is also not permitted to intentionally obscure or conceal a criminal act or interfere with the administration of justice.

428.    Defendant Dever is also prohibited from maliciously refusing to perform investigations into sexual assaults against women, and then using that as a basis to exercise purported "discretion."  Defendant Dever's wrongful acts are not an exercise of discretion, but are an effort to conceal criminal conduct, to the detriment of women.

429.    Defendant Dever refused to proceed, despite acknowledging (to Ms. Borkowski) that she "believed" that Ms. Borkowski had been raped and knowing that Defendant BCPD had determined that there was probable cause for an arrest and charges.

430.    Defendant Dever claimed that she was ethically prohibited from bringing charges, despite having probable cause to bring charges.  To the contrary, Defendant Dever not only violated the law, but also violated a standard of ethics and morality that is the foundation of her sworn duty as a prosecutor.

431.    Defendant Shellenberger has publicly stated that, often, he believes "an unwanted sex act occurred, but does not meet the definition of a crime."

432.    Defendant Dever has defined "incapacity" for female victims of sexual assault as "passed out behind a dumpster."

433.   Defendants Dever, Tomas, Burrows, and Shellenberger simply accepted the men's explanation: that two intoxicated women had consented to injurious multiple-partner sex with three (3) men.  Based on this contrived narrative, Defendants refused to proceed with a meaningful investigation.  This was not a matter of discretion, but a refusal to exercise discretion in order to cover up sexual assaults against women in Baltimore County.

434.   The evidence of non-consensual sex, including that Ms. Hendler has minimal to no recollection of the events, Ms. Hendler was seen being raped while unconscious, and Ms. Borkowski suffered vaginal tearing, was ignored.

435.   Ms. Hendler and Ms. Borkowski are two (2) of many examples of Defendant Dever's past (and continuing) pattern of intentional, unconstitutional deception of female victims of sexual assault regarding the legal distinction between incapacity and helplessness, or consent and rape.  The deception is part of a pattern and practice of denying civil rights for the protection and advancement of Defendants' personal agendas.

436.   According to Defendants Dever, Tomas and Burrows, Ms. Borkowski's and Ms. Hendler's report "did not meet the elements for a crime."

437.   Although she acknowledged that she "believed" Ms. Borkowski was the victim of a sexual assault, Defendant Dever has expressed her belief that no crime occurred, the very definition of "unfounded," per the UCR.

438.   Specifically, Defendant Dever claims that she "determined that the facts and evidence in the case did not meet the elements of rape under the Maryland Law CR§ 3-304."

439.    In direct contradiction to Defendant Dever's statement, Defendant Burrows expressly stated that Ms. Borkowski's report was "not unfounded."

440.    While it might be reasonable to assume that Defendant Burrows is merely incompetent, the context indicates that she was acting with malice.

441.    Defendant Burrows subsequently coded the disposition of Ms. Borkowski's investigation as "cleared due to exceptional circumstances."[48]

442.    It appears that the case has now been re-opened for the purpose of investigating Ms. Borkowski, though the file does not reflect when or by whom.

443.    The F.B.I. is unambiguous.  To clear by "exceptional circumstances," Defendant BCPD and the BCPD Defendants must acknowledge that a crime has taken place, that County Defendants have probable cause to arrest a suspect, and that the authorities are unable to effect the arrest or otherwise prosecute the offender.

444.    The inability to locate, identify and arrest of Ms. Borkowski's assailants was not a factor in Ms. Borkowski's investigation, nor was it applicable to the hundreds of other legitimate reports of sexual assault suffered by the Class that have been "ex cleared" by BCPD and the BCPD Defendants and the SAO Defendants, acting *ultra vires* and pursuant to an unconstitutional policy.

---

[48] It appears from the records that the entry reflecting the change was fraudulent, and it was recoded as both "open suspended" and "Adult Ex-Clear."  *See supra*.

C.  Subsequent Discriminatory Treatment of Ms. Borkowski − Including Criminal Acts by Defendants Shellenberger, Dever, Burrows, Tomas, And Dorfler

   i.   The First Applications for Statements of Charges

445.   Defendant BCPD and the BCPD Defendants, along with Defendant Dever, acknowledged that there was probable cause to arrest and charge the assailants with second degree rape.

446.   On March 14, 2018, Ms. Borkowski exercised her rights pursuant to section 2-607 of the Courts and Judicial Proceedings Article of the Maryland Code.

447.   Section 2-607 provides that "[a]n individual may file an application for a statement of charges with a District Court Commissioner."

448.   The Commissioner is then tasked with examining the affidavit and issuing a statement of charges or, in the absence of probable cause, denying the application.

449.   Ms. Borkowski submitted sworn applications for statements of charges with District Court Commissioner John Robey.  Commissioner Robey's duty was to examine the affidavits for the probable cause to issue a summons.  Probable cause had already been affirmed by Defendant BCPD, BCPD Defendants, and Defendant Dever when those Defendants cleared the case by "exceptional circumstances."

450.   After Ms. Borkowski submitted sworn affidavits and applications, Commissioner Robey demanded that Ms. Borkowski wait in the hallway.

451.   With Ms. Borkowski safely out of earshot, Commissioner Robey contacted Defendants Montgomery and Dever.

452.    Defendants Montgomery and Dever improperly instructed Commissioner Robey to deny the applications for statements of charges.  Any reasonable officer or attorney would know, and Defendants Dever and Montgomery did know, that this was unlawful interference with a neutral magistrate.

453.    Defendants Montgomery and Dever's instruction contradicted their joint acknowledgement of probable cause, indicating that they were acting with a malicious intent to frustrate the administration of justice and to deny Ms. Borkowski her civil rights.

454.    Commissioner Robey, in dereliction of his duties to make an independent inquiry, complied with County Defendants' unlawful instructions.

455.    The denied applications were forwarded to Baltimore County Administrative Commissioner Whitney Wisniewski.

ii.    The Second Applications for Statements of Charges

456.    Because Commissioner Robey's denial was the result of improper and unlawful influence and clear legal error, Ms. Borkowski made a second attempt to submit applications for statements of charges.

457.    On March 20, 2018, Ms. Borkowski submitted sworn applications for statements of charges against the three (3) men in the District Court for Baltimore County, in Towson.

458.    Ms. Borkowski's applications were reviewed by Managing Commissioner Colleen Ellingson.[49]  Commissioner Ellingson was fully aware of the previous applications and the State's Attorney's Office's and BCPD's unlawful interference with Ms. Borkowski's rights of fair administration of the District Court Commissioner system.

459.    After carefully reviewing the sworn statements, Managing Commissioner Ellingson charged all three (3) of the men with first degree rape, second degree sexual assault, third degree sexual offense, second degree assault, fourth degree sexual contact, and perverted practice.

460.    The summonses were sent out the next day, to be served on the three (3) assailants.

461.    A trial date was set for May 5, 2018.

      iii.    <u>County Defendants' Immediate Unlawful Interference with The Summonses</u>

462.    The next morning, March 21, 2018, Defendant Burrows was monitoring CaseSearch, specifically for any activity related to Ms. Borkowski.

463.    Defendant Burrows learned that Ms. Borkowski had submitted an application for a statement of charges, without Defendant BCPD's or Defendants Shellenberger and Dever's unlawful and discriminatory interference.

---

[49] Commissioner Ellingson has served at the Judicial College as an instructor for other Commissioners and, as Managing Commissioner, currently oversees the training of new Commissioners.  She is the authority on District Court Commissioners' duties.

464.    An online docket entry confirmed that lawful summonses had been properly issued for each of the three (3) men.

465.    A summons issued by a District Court Commissioner may only be recalled by a judicial officer.

466.    The summonses had yet to be served.

467.    No preliminary hearing date was set.

468.    Ms. Borkowski received a subpoena to testify, as a witness, dated March 21, 2018.

469.    Defendant Burrows contacted the Baltimore County police officer in charge of serving the summonses and instructed him not to serve the three (3) men.  This was a clear violation of and interference with the Commissioner's authority; Defendant Burrows knew this when she acted.  The effect of this violation was to protect male perpetrators of sexual assault at the expense of their female victims.

470.    Defendant Burrows knew that her instructions unlawfully interfered with Ms. Borkowski's civil rights.  Defendant Burrows's interference was an unethical and illegal act that defied logical explanation and reflects personal animus.

471.    Detective Burrows acted on illegal, *ultra vires* orders from Defendants Dever and Shellenberger.

472.    Defendant Burrows admitted that her superiors were "asking a lot of questions" regarding the unlawful activity.

473.    On March 22, 2018,[50] Defendant Burrows raced to the District Courthouse as soon as it opened to obtain a copy of Ms. Borkowski's previously-denied Applications for Statements of Charges.

474.    Defendant Burrows' report gives no reason for her urgent trip.  The background and circumstances establish a reasonable inference of animus and malice, as her "investigation" of Ms. Borkowski was far more vigorous than her "investigation" of the three (3) men.

475.    The County Defendants were now investigating and monitoring Ms. Borkowski for exercising her rights, instead of the three (3) assailants that Defendant BCPD claimed to be able to arrest and charge.

476.    This discriminatory application of the law and interference with a citizen's civil rights were sufficiently clear and unequivocal as to impute knowledge by Defendants of their wrongful acts.

477.    Defendants then embarked on a plan to harass and intimidate Ms. Borkowski.

478.    Defendant Burrows requested a subpoena, and Defendant Dever issued a grand jury subpoena to "investigate" Ms. Borkowski for lawful exercise of her rights.[51]

479.    Defendant Burrows unlawfully served the subpoena on Administrative Commissioner Wisniewski, via email, on March 22, at 11:48 a.m.

---

[50] The courthouse had been closed on March 21, 2018, due to the weather.

[51] This is an abuse of subpoena power.  *See, e.g.*, *In re Special Investigation No. 185*, 293 Md. 652 (1982).

480.   According to notes that were unlawfully concealed and withheld for months by Defendants Burrows and Tomas, the BCPD Defendants acted on direct verbal orders from Defendants Shellenberger, Dever, and Fox.

481.   Defendant Burrows also interfered with Ms. Borkowski's rights of free expression and access to the courts, and with the administration of justice, by convincing Commissioner Wisniewski[52] to "sen[d] out a department-wide email instructing Commissioners not to act if they receive[d] any further applications" from Ms. Borkowski, and further "instructed Commissioners to forward [to her] any applications if submitted."  These instructions were issued at the behest of Defendants Shellenberger, Dever, Fox, and Burrows, and Tomas.

482.   The conspiracy was in furtherance of the County's, BCPD's, and Defendant Sheridan's policy to conceal reports of sexual assault, but was also a result of Defendants Shellenberger, Dever, and Fox's direct personal involvement.

　　　　iv.　Defendants' Illegal Conspiracy to Silence Ms. Borkowski

483.   Defendant Shellenberger illegally ordered Defendant Dever to instruct Commissioner Wisniewski "not to file charges" relating to Ms. Borkowski.

484.   Defendants Burrows and Tomas, acting on the obviously illegal, *ultra vires* orders from Defendants Dever and Shellenberger, and in conspiracy with them, denied Ms. Borkowski access to the courts, in violation of her civil rights.

---

[52] Commissioner Wisniewski's husband, Detective Edward Wisniewski, is or was a Baltimore County police officer.

485.    Defendants Shellenberger, Dever, Fox, Burrows, and Tomas knew that what they were doing was illegal.

486.    Defendants Shellenberger, Dever, and Fox illegally ordered Defendants Burrows and Tomas to "to tell Ms. Borkowski that she has to stop bringing these additional charges or they will file criminal abuse of process charges against her."

487.    The State's Attorney and his delegees also have no authority over Defendants Burrows and Tomas, nor over Commissioner Wisniewski, let alone to order them to act in contravention of Federal and State witness intimidation laws or judicial oaths.

488.    Thus, the order was an unlawful order given in an unlawful manner to achieve an unlawful purpose.

489.    Defendants Shellenberger and Dever were acting in their personal capacities at the time of the Constitutional deprivations and related crimes.

490.    Without going through proper law enforcement channels, Defendants Dever and Shellenberger specifically instructed Defendants Burrows and Tomas, accompanied, in a show of force, by uniformed, armed Patrol Officer Defendant Dorfler,[53] to go to Ms. Borkowski's home in Baltimore City, where she lived with her grandparents.

491.    The purpose of the excursion was unlawful and unconstitutional intimidation, outside of the Defendants' jurisdiction.

492.    These Defendants have no police powers in Baltimore City.

---

[53] According to Defendant Burrows's notes, sending an openly armed patrol officer as part of the scheme to harass and intimidate Ms. Borkowski was Defendants Shellenberger and Dever's idea.

493.   These Defendants have no investigatory powers in Baltimore City.

494.   Defendants Shellenberger, Dever, and Fox specifically ordered Defendants Burrows and Tomas to tell Ms. Borkowski to "stop going to [the] Comm[issioner]" or face "criminal charges."

495.   Defendants Burrows, Tomas, and Dorfler knew this was an illegal order but proceeded to carry it out based on their animus and malice towards female victims of sexual assault, and as part of an active conspiracy to suppress and manipulate the reporting of sexual assault in Baltimore County.

496.   When the trio of officers arrived at Ms. Borkowski's Baltimore City residence, Ms. Borkowski's grandmother answered the door.

497.   At that time, Ms. Borkowski was volunteering at a local nursing home.

498.   Defendant Burrows demanded to know the location of the nursing home and what time Ms. Borkowski would return home.

499.   Ms. Borkowski's grandmother referred the officers to Ms. Borkowski's attorney.

500.   Defendants' video of the incident shows Defendant Burrows pretending that she did not know Ms. Borkowski was represented by counsel.  Defendant Burrows' previously-withheld notes reflect prior knowledge that Ms. Borkowski was represented.

501.   Acting on "orders" from Defendants Shellenberger, Dever, and Fox, and ignoring that Ms. Borkowski was represented by counsel, Defendants Burrows and Tomas contacted Ms. Borkowski directly on her cell phone.  Ms. Borkowski had provided her cell phone number as part of the rape investigation.

502.   Defendants Burrows and Tomas demanded to know her location.

503.   Defendants Burrows and Tomas' notes reflect that they had also unlawfully obtained a copy of Ms. Borkowski's Towson class schedule, without a warrant or subpoena, in violation of federal educational privacy laws and the Fourth Amendment.

504.   When Ms. Borkowski's attorney learned of the illegal harassment and intimidation, he offered to make Ms. Borkowski available to Defendants Tomas and Burrows that afternoon, in his office.

505.   Defendant Tomas agreed and stated that Defendant Dever also wanted to attend the meeting.

506.   After Defendants Tomas and Burrows conferred with their co-conspirators, Defendants Dever, Shellenberger, and Fox, Defendants Burrows and Tomas were ordered not to meet with Ms. Borkowski because "Scott [Shellenberger] said not to go b[e]c[ause] of attorney."

507.   These Defendants recognized that their efforts to intimidate a female witness and victim of sexual assault, and the general conspiracy to suppress the civil rights of women who reported sexual assaults, would be exposed to legal scrutiny.

   D.   Unlawful Dismissal of The Charges Against The Defendants

508.   The next day, March 23, 2018, Defendant Dever purported to file a "Motion to Dismiss" without a certificate of service, in the criminal actions against the assailants.

509.   The Motion was not "filed" with the Clerk, but was sent via email, in violation of the Maryland Rules.

510.    As a result, the Motion was either never made part of the file or has been removed from the file.

511.    Defendant Dever also directed the court clerk to place the criminal cases on the preliminary hearing docket for the same day.

512.    A proper preliminary hearing was not scheduled, and Defendant Dever did not intend to conduct one.  Defendant Dever intentionally short-circuited the legal process in order to deny Ms. Borkowski her civil rights.

513.    Defendant Dever also performed these unlawful acts for the assailants' benefit, because the assailants' (and therefore UMBC's) baseball schedule was adversely affected by the criminal charges.

   E.   The Involvement And Conspiracy of Defendants to Unlawfully Deny Ms. Borkowski Her Civil Rights

514.    Defendant UMBC also conspired with Defendant Dever to unlawfully dismiss the charges.  Throughout the process, Defendant Dever was in constant communication with Bobbie Hoye, Esquire, Title IX Administrator for UMBC and attorney for UMBC.

515.    These communications were part of Defendants' pattern and practice of concealing sexual assaults.

516.    Defendant UMBC's intervention was also related to an "away" baseball game in which (1) one or more of the assailants was scheduled to play for UMBC.

517.   At 1:00 p.m., the District Court for Baltimore County called the Criminal Defendants' cases and dismissed them.[54]

518.   Ms. Borkowski was not contacted regarding the "hearing" or the dismissal.[55]

519.   Defendant Dever, purporting to act on behalf of the State, then moved to expunge the Criminal Defendants' records, something she lacks the legal capacity to do.

520.   In moving to expunge, Defendant Dever was acting *ultra vires*, and is not entitled immunity.

521.   In Maryland, assault cases may only be dismissed with the victim's consent and the court's approval, neither of which Defendant Dever requested or received.

522.   The Defendants intentionally deprived Ms. Borkowski of her access to the courts, of her due process rights, and of her equal protection rights.

523.   Defendants Burrows and Tomas's notes and emails reflect that they participated in the conspiracy to deprive Ms. Borkowski of her federally protected rights.

524.   The carefully orchestrated scheme by Defendants, including Defendants Baltimore County, BCPD, UMBC, and the BCPD and SAO Defendants, reflects

---

[54] The State's Attorney's Office has since mischaracterized this as either as a preliminary hearing and entry of a *nolle prosequi*, despite not doing either of these things.  The charges are listed as having been "Dismissed" on March 23, 2018.  The matter is on appeal.

[55] Defendant Dever's actions relating to the (non)prosecution of the assailants is privileged but show her personal involvement in the effort to deny Ms. Borkowski her civil rights.

Defendants' malice towards Ms. Borkowski and other similarly situated victims of sexual assault, including the Class.

525.    In court filings, County Defendants now claim that Defendant "Dever dismissed the charges because she did not believe there was probable cause sufficient to proceed any further in th[e] case[s]."[56]  This same filing indicated that Ms. Borkowski was the "Defendant."

526.    This statement is contradicted by Defendant Dever's consultation with Defendant Burrows, and their joint acknowledgement of sufficient probable cause for arrest and charges.

527.    The orchestrated scheme to deprive Ms. Borkowski, the other Named Plaintiffs, and similarly situated victims, of their federally-protected rights was a part of Defendants' overall plan to illegally intimidate sexual assault victims, to suppress and destroy incriminating evidence of sexual assault, to manipulate the constitutionally protected rights of citizens to due process, and to falsely portray the extent of sexual assaults in Baltimore County.

<u>CLASS PLAINTIFFS</u>

528.    At all times relevant to the facts set forth herein, Named Plaintiffs and the members of the Class have been and are being continuously harmed by Defendants' ongoing unconstitutional policies.

---

[56] While the filing is signed by Robyn Coffin, who is not a defendant in this lawsuit, it was drafted by Defendant Dever and a law clerk.

529.   At all times relevant hereto on and on each day that passes, Named Plaintiffs and the members of the Class sustain a new injury as a result of Defendants' unconstitutional policies and conduct.

530.   Named Plaintiffs and the members of the Class have suffered emotional distress and psychological damage as a result of Defendants' ongoing conduct.  The conduct adversely affects each and every member of the class.

531.   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Named Plaintiffs bring this class action on behalf of themselves and the Class, including the Subclasses.

532.   The exact number of the Class and each Subclass is not presently known, but upon information and belief, the Class includes potentially thousands of women who have been subjected to the same or similar treatment as described in this Complaint. Given the Defendants' pattern and practice of manipulating and destroying evidence, the identification of every appropriate Class Member is problematic, and likely impossible without information known only to Defendants.

533.   Therefore, under Federal Rule of Civil Procedure 23(a)(1), the Class and each Subclass are so numerous that joinder of individual members in this action is impracticable.  All members of the Class and each of the Subclasses are known to Defendants, and were subject to Defendants' unlawful activities.

534.   There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class and of each of the Subclasses that will generate common answers and will drive resolution of this action.  The relief sought is

common to the entire Class, as all members of the Class are victims of Defendants'

unconstitutional conduct. Accordingly, pursuant to Federal Rule of Civil Procedure

23(a)(2), there are questions of law and fact common to the Class.

535.   Named Plaintiffs' claims are typical of the Class they represent pursuant to

Federal Rule of Civil Procedure 23(a)(3) because Named Plaintiffs claim that Defendants

violated the rights held by the Class under the Fourteenth Amendment to the United

States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1985.  There is no conflict

between Plaintiffs and any other putative Class Members with respect to this action.

536.   Named Plaintiffs are adequate representatives of the Class and each Subclass

pursuant to Federal Rule of Civil Procedure 23(a)(4).  The interests of the Named

Plaintiffs do not conflict with the interests of the Class and Subclasses that they seek to

represent, and Named Plaintiffs will fairly and adequately represent the Class and

Subclasses.

537.   Plaintiffs intend to prosecute this action vigorously, and are capable of doing

so.  Therefore, Named Plaintiffs should be appointed representatives of the Class and the

Subclasses.

538.   This action is properly maintainable as a class action pursuant to Federal Rule

of Civil Procedure 23(b)(a)(A) or 23(b)(1)(B) because the prosecution of separate actions

by individual members of the Class or Subclasses would create a risk of inconsistent or

varying adjudications with respect to individual members of the Class or Subclasses that,

as a practical matter, would be dispositive of the interests of other Class or Subclass

Members not party to the adjudication, or would substantially impair or impede the

ability of other Class or Subclass Members to protect their interests, or would establish incompatible standards of conduct and results for Defendants.

539.   This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

540.   This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclasses predominate over individual questions for the members of the Class and Subclasses, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

541.   The questions of law or fact common to the Class include:

    a.   Whether the policies were implemented by Defendants;

    b.   Whether Defendants' actions, patterns of behavior, history of decision- making, and departures from normal procedures in the treatment of female victims of rape and sexual assault indicate ongoing, intentional discrimination against the Class on the basis of gender;

    c.   Whether the Defendants' policies constitute policies or customs that violated constitutionally protected rights of the Class under 42 U.S.C. §§ 1983, 1985, and 1986, and 20 U.S.C. § 1681 and the Fourth Amendment; and

d.   Whether the Defendants implemented the policies with deliberate indifference to the civil and constitutional rights of the Class.

542.   This action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

543.   Named Plaintiffs have retained counsel for themselves and the Class and Subclasses that are experienced and recognized as knowledgeable, capable counsel who have carried out their duties.

544.   Named Plaintiffs' experiences are representative of victims of sexual assault in Baltimore County, Maryland, in that they were subjected to unfair, discriminatory practices which were designed to minimize acknowledgement of sexual assaults in Baltimore County.

545.   Named Plaintiffs' experiences are representative of victims of sexual assault by UMBC students.

546.   Named Plaintiffs' experiences are representative of individuals who file complaints with UMBC for student misconduct and sexual assault.

547.   The class of women who have had similar experiences to Named Plaintiffs' is clearly defined.

548.   Members of the Class have been harmed by Defendants in the same way as Named Plaintiffs.

<u>The State's Attorney Defendants Are Not Immune to This Suit For Damages And
Injunctive Relief</u>

549.    SAO Defendants' acts specified more fully above have demonstrated malice,
deliberate indifference, and recklessness.

550.    Each of the SAO Defendants knowingly broke the law in order to deprive
Named Plaintiffs and members of the Class of their federally-protected rights.

551.    SAO Defendants' unlawful, unconstitutional, and *ultra vires* policies and
procedures were enacted to carry out SAO's Defendants' discriminatory purposes.

552.    Defendants Shellenberger and Dever do not enjoy prosecutorial immunity
because their tortious and illegal acts were carried out in their investigative and personal
capacities.

553.    The tortious acts in this Complaint are the result of gross negligence and
malice, and are not intimately related to the judicial phase of a criminal proceeding.

554.    For example, unlawfully ordering BCPD defendants to commit unlawful acts
for improper purposes is not "judicial" in character and are not related to a criminal
proceeding.

555.    The SAO Defendants routinely fail to take the steps necessary to develop
sexual assault cases properly so that informed and fair prosecutorial assessments can be
made.  The failure is deliberate.  The SAO Defendants routinely manipulate, conceal, or
destroy evidence of sexual assaults in order to diminish the statistical reporting of such
criminal activity in Baltimore County.

556.    As a result, the SAO Defendants have intentionally hampered and circumvented their own ability to exercise prosecutorial discretion, and are not entitled to immunity.

<u>Limitations Are Tolled or Otherwise Inapplicable for Class Members And Named Plaintiffs</u>

557.    The facts related to Defendants' policies and conduct that impacted and discriminated against Named Plaintiffs and the Class were fraudulently concealed from and/or inherently undiscoverable to Named Plaintiffs and the Class.

558.    In 2016, Defendant Johnson, on behalf of the County and Defendant BCPD promised to "take a fresh look to ensure that the investigation was handled properly and that justice was done."

559.    This "fresh look" never occurred, and any attempts were subverted by Defendants Sheridan and Shellenberger.

560.    The very purpose of the violations was, in part, to conceal the violations.

561.    The discriminatory acts were serial and systemic violations that manifested themselves over a long period of time, including the present day.

562.    More specifically, the failure of Defendants to re-investigate, as promised, has occurred within the statute of limitations.

563.    Thus, the discovery rule, fraudulent concealment, and equitable tolling principles apply to any applicable limitations period.

COUNT I:
Violations of 42 U.S.C. §1983
Violation of Equal Protection
By All Plaintiffs And Class Members
Against All Defendants

564.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

565.    At all relevant times herein, Defendants acted under color of law.

566.    At all relevant times herein, Defendants followed written and/or unwritten policies, and thus afforded less protection to female victims of sexual assault than to victims of other crimes, including the Named Plaintiffs and members of the Class and each of the Subclasses.

567.    As described more fully herein, Defendants have policies, practices, and/or customs that:

a.   Fail to implement and/or ignore proper training and supervision of government employees handling sexual assault cases.

b.   Allocate more resources to other violent crimes than to sexual assaults against female victims

c.   Fail to submit and/or timely test SAEKs;

d.   Misrepresent to victims and to the Attorney General's Office that SAEK's were tested by using a disingenuous definition of testing;

e.   Prioritize the submission and/or testing of forensic evidence from other violent crimes over SAEKs;

f.  Ignore or refuse to use SAEK results to prevent additional rapes and sexual assaults;

g.  Knowingly omit from communications with victims of sexual assault that it is unlikely their SAEKs will be timely tested and that an investigation will not be completed in the absence of those results;

h.  Fail to arrest and charge known perpetrators of sexual assault against female victims;

i.  Disproportionately dismiss cases or refuse to investigate or proceed with sexual assault cases when the victim is female;

j.  Refuse to treat female victims' testimony as adequate evidence regarding lack of consent while improperly emphasizing or focusing on contrived concerns about lack of DNA credibility, when such concerns are not applied to other violent crimes, like robbery, non-sexual assault, homicide, or sexual assaults committed against male victims;

k.  Intentionally and/or knowingly subject women to invasive collection of DNA with  actual or constructive knowledge that the process is a painful sham because such DNA will not be used to apprehend or  prosecute their attackers;

l.  Subject female victims and other women to future assaults by known perpetrators  by failing to act on, investigate, or prosecute prior sexual assaults against women;

m.  Disproportionately refuse to investigate, process, or prosecute in cases involving  sexual assault against female victims without DNA evidence;

n. Treat sexual assault cases involving female victims with less urgency and importance than that afforded to other types of violent crimes;

o. Inadequately staff the investigation, processing, and prosecutions of sexual assault cases involving female victims;

p. Treat female victims of sexual assault with less respect and devote less attention to their cases than to cases involving male victims, as applied to both sexual assaults and other crimes;

q. Intimidate and harass victims of sexual assault through illegal means, to discourage and conceal the reporting of sexual assault crimes;

r. Illegal use of law enforcement powers to intimidate female victims of sexual assault;

s. Allow male assailants to prey on other victims, without concern for criminal responsibility; and

t. Expose the female residents and visitors of Baltimore County to violent criminal conduct by manipulating and suppressing the reporting of sexual assaults and the collection of evidence.

568. The injuries to the Named Plaintiffs, the Class, and each of the Subclasses are the result of the unconstitutional policies and *ultra vires* actions on the part of Defendants.

569. Defendants acted with a discriminatory motive in pursuing the policies.

570. In addition, Named Plaintiffs, the Class, and each of the Subclasses assert a claim of class-based discrimination based on sex.

571.   Defendants have established illegal policies that provide less protection to female rape victims than to other victims of assault.

572.   Defendants' illegal policies are sex and gender-based and their adverse effects reflect invidious sex and gender-based discrimination.

573.   Defendants' illegal policies, which discriminate against victims of sexual assault, adversely affect women.

574.   Defendants Johnson, Sheridan, and Brady had actual and constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of an unconstitutional deprivation of rights for female citizens like the Plaintiff.

575.   Defendants Johnson, Sheridan, and Brady's responses to that knowledge was so inadequate that it is *de facto* deliberate indifference to and tacit authorization of the offensive practices.

576.   There is an affirmative causal link between Defendants Johnson, Sheridan and Brady's inaction and the particular constitutional injuries suffered by Plaintiffs.

<u>COUNT II:</u>
<u>Violations of 42 U.S.C. §1983</u>
<u>Deprivation of First Amendment Rights</u>
<u>By Anna Borkowski</u>
<u>Against Defendants Baltimore County, Baltimore County Police Department,</u>
<u>Shellenberger, Dever, Fox, Montgomery, Tomas, Burrows, Johnson, And Sheridan</u>

577.   This Count incorporates the remainder of this Complaint as if set forth fully herein.

578.   Defendants Shellenberger, Dever, Fox, Burrows, Tomas and Montgomery acted under the color of State law, granted by their official positions.

579.   Ms. Borkowski's right to present sworn testimony to a Maryland District Court Commissioner is protected speech under the First Amendment.

580.   Defendants are state actors who abused, in their personal capacities, the color of State law granted by their official positions to deprive Ms. Borkowski of her civil rights.

581.   Defendants violated Ms. Borkowski's First Amendment right to free speech, in that she has the right to be free from retaliation by a public official for the exercise of her right.

582.   Defendants' retaliatory actions adversely affected Ms. Borkowski's constitutionally protected speech in that she was intimidated from testifying.

583.   Defendants also interfered with Ms. Borkowski's access to the courts.

584.   There is a direct relationship between Ms. Borkowski's speech and the Defendants' retaliatory action.  Defendants admit the nexus in police reports and emails.

585.   Defendants were aware that their actions violated a clearly established right. Even though Defendant Shellenberger believes that "[w]itness intimidation is a cancer on the criminal justice system," he personally orchestrated and directed the intimidation of Ms. Borkowski.

586.   As a result of Defendants' actions, Ms. Borkowski has suffered emotional and physical injury, including anxiety, fear and distrust of authority figures.

587.    As a result of Defendants' actions, Ms. Borkowski's family has been harassed and retaliated against in that Ms. Borkowski's sister was fired from her internship.  SAO Defendants also unlawfully used the Baltimore County police to intimidate Ms. Borkowski's grandparents in Baltimore City.

588.    The County, Defendant BCPD, and the Supervisory Defendants failed to train and/or supervise remaining Defendants in the proper conduct of an investigation.

COUNT III:
Violations of 42 U.S.C. §1985
By Anna Borkowski
Against Defendants Baltimore County, Baltimore County Police Department,
Shellenberger, Dever, Fox, Montgomery, Tomas, Lane, Brady, Dorfler, And Burrows

589.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

590.    Defendants violated 42 U.S.C. § 1985 by deterring, by force, intimidation, or threat, a party or witness in any court of the United States, namely Ms. Borkowski, from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully.

591.    Defendants Shellenberger and Dever conspired with Defendant Fox and Defendants Tomas and Burrows to intimidate Ms. Borkowski from giving testimony before a Maryland District Court Commissioner.

592.    Extensive documentation of Defendants' illegal conduct reflects Defendants agreement to violate Ms. Borkowski's constitutional rights.

593.    A contemporary account of Defendant Dever's statements reflect that Defendants' conspiracy was to arrest Ms. Borkowski and/or charge her with "criminal

charges," notwithstanding Defendant Dever's acknowledgement that Ms. Borkowski was the victim of sexual assault.

594.    Defendants Shellenberger and Dever conspired to abuse their subpoena power to deprive Ms. Borkowski of a Constitutionally protected right.

595.    Defendants also acted to deprive Ms. Borkowski of her right to provide testimony to a District Court Commissioner *i.e.,* her access to the courts.

596.    Defendants were motivated by an invidiously discriminatory animus towards Ms. Borkowski as a female victim of sexual assault and their self-serving desire to artificially deflate the number of reports of sexual assault and inflate the clearance rate in Baltimore County.

597.    As part of their plan to abuse Ms. Borkowski's civil rights, Defendants conspired to go out of their lawful jurisdiction and on to another's property for the purpose of depriving Ms. Borkowski of equal protection under the law and her right to free expression under the First Amendment.

598.    Defendants intended to create, and created, a realistic threat of arrest that was calculated to instill fear in Ms. Borkowski, and to discourage her from seeking judicial intervention.

599.    Defendants' acts were part of a broader conspiracy to prevent and hinder Ms. Borkowski, and other female victims of sexual assault, including members of the Class, from enjoying equal protection under the law.

600.   Ms. Borkowski was harmed by Defendants' acts of concealment and intimidation in furtherance of the conspiracy in that she suffers from anxiety, sleep loss, intrusive thoughts, fear, and other physical and mental injuries.

601.   Defendants knew or should have known that their actions would deprive Ms. Borkowski of her civil rights and cause her harm.

602.   Defendants intended to deprive Ms. Borkowski of her civil rights, and did so.

603.   As a result of County Defendants' actions, Ms. Borkowski has suffered emotional and physical injury, including anxiety, fear and distrust of authority figures.

604.   As a result of County Defendants' actions, Ms. Borkowski's family has been harassed and subject to retaliation.

COUNT IV:
Violations of 42 U.S.C. §1983
Deprivation of Equal Protection
Retaliation Against Ms. Borkowski's Family
Deprivation of Familial Relations
By Anna Borkowski
Against Defendants Baltimore County, Baltimore County Police Department,
Shellenberger, Dever, Richardson, And Fox

605.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

606.   On April 18, 2018, Emily Borkowski, Anna Borkowski's sister, was accepted into the internship program at the Baltimore County State's Attorney's Office's Domestic Violence Section.

607.    Defendant Fox admitted, in an email to Defendants Dever and Ms. Coffin, to having "stalked" Anna Borkowski to ferret out any connection between Anna and Emily Borkowski.

608.    Defendants Shellenberger, Dever, Richards, Fox, and Ms. Coffin further retaliated against Ms. Borkowski by firing Ms. Borkowski's sister, Emily Borkowski, from her internship with the Baltimore County State's Attorney's Office.

609.    On May 11, 2018, Emily Borkowski was fired.

610.    Defendants admitted that the retaliatory firing was in response to a purported accusation of "misconduct" made by Ms. Borkowski's attorney in a court filing.[57]

611.    Emily Borkowski's firing was a retaliatory, unjustified act, undertaken intentionally and maliciously to punish and further intimidate Ms. Borkowski for attempting to assert her right to free speech.

612.    Defendants knew or should have known that the firing would interfere with Ms. Borkowski's civil rights.

613.    Defendants intended that the firing would interfere with Ms. Borkowski's civil rights.

---

[57] The reference is to a filing in the District for Baltimore County that noted procedural irregularities in the assailants' District Court cases.  Ms. Borkowski has not yet filed a complaint with Bar Counsel against Defendants Shellenberger and Dever.

<u>COUNT V:</u>
<u>Violations of 42 U.S.C. §1983</u>
<u>Deprivation of Equal Protection</u>
<u>By Anna Borkowski</u>
<u>Against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Dorfler, Lane, And</u>
<u>Montgomery</u>

614.    This Count incorporates the remainder of this Complaint as if set forth fully

herein.

615.    Defendants subjected Ms. Borkowski to a deprivation of her right to equal

protection under the law.

616.    Defendants subjected Ms. Borkowski to a deprivation of her right to equal

protection in that the investigation of her sexual assault demonstrated deliberate

indifference to crimes against her as a woman.  The investigation was not carried out with

the same vigor and zeal as the investigation of other crimes.  The investigation was

carried out with the specific intent of obstructing and denying Ms. Borkowski's civil

rights.

617.    Even the non-crime of going to a District Court Commissioner was more

zealously "investigated" than the horrific gang rape.

618.    One result of such discriminatory practices is to allow criminal conduct by

male assailants against female victims to go unpunished.

619.    The purpose and effect of this deprivation is to deny women equal protection

of the laws, in that women are disproportionately the victims of sexual assault.

620.    Defendants knew or should have known that they were violating Ms.

Borkowski's civil rights and exposing her and other members of the Class to an additional

risk of sexual assault by ignoring and illegally manipulating valid complaints.

COUNT VI
Violations of 42 U.S.C. §1983
By Katelyn Frank
Against Defendants Board of Regents, UMBC, UMBC Police Department, And Dillon

621.    This count incorporates by reference the remainder of this Complaint as if set

forth fully herein.

622.    It is unlawful for a law enforcement officer to dissuade a victim from filing a

police report.  It is witness intimidation by an authority figure.

623.    Defendants Board of Regents and UMBC failed to adequately train or

supervise Defendant Dillon.

624.    Defendant Dillon attempted to, and did, persuade Ms. Frank not to pursue a

criminal investigation of her assailant.  The purpose was to avoid a complaint of sexual

assault involving Defendant UMBC.

625.    As a result of Defendant Dillon's acts, Ms. Frank did not report her rape

directly to the police until after the police had destroyed her SAEK.

626.    Defendant Dever stated that the delay, caused by Defendant Dillon, rendered

the case un-prosecutable.

627.    Ms. Frank has, and had, a right to equal protection under the law, without

regards to her gender.

628.   Defendants' actions and inactions denied Ms. Frank of her right to equal protection under the law.

629.   Defendants acted to ensure that female victims of sexual assault were less likely to have their cases investigated than victims of other crimes.

COUNT VII<br>
Violations of 42 U.S.C. §1985<br>
Conspiracy to Obstruct Justice<br>
By Katelyn Frank<br>
Against Defendants UMBC, University Police, Dillon, Baltimore County Police Department, Lee, Lane, Shellenberger, And Dever

630.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

631.   Defendants conspired to coerce Ms. Frank into not reporting her sexual assault to the police, so that Defendants could improve their crime statistics.

632.   In fact, Ms. Frank reported her sexual assault to the police, but was told by Defendants that she had not.

633.   The purpose of this deception was to allow the SAEK to be destroyed before Ms. Frank could officially request a police investigation.

634.   Victims of other serious crimes do not have to request police investigations to preserve evidence.

635.   The result of Defendants' conspiracy was to deny Ms. Frank, and similarly situated female victims of sexual assault generally, their right to equal protection.

COUNT VIII:
Violations of 42 U.S.C. §1986
By Anna Borkowski, Annemarie Hendler, Katelyn Frank, And Members of The Class
Against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Montgomery, Lane,
Sheridan, And Dorfler

636.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

637.    Any of the Defendant conspirators to the civil rights violations alleged in this Complaint could have stopped the conspiracy at any time, but refused to.

638.    Any of the Defendant conspirators could have stopped their illegal actions, but did not.

639.    Any of the Defendant conspirators could have informed the appropriate government oversight or even the news media of the manipulation and deception, but did not.

640.    Defendant Dorfler did not intervene to stop an obviously unlawful exercise of power.  Instead, Defendant Dorfler participated in it.

641.    Defendant Burrows acknowledges that Defendants were ordered, illegally and outside of their chain of command, to commit an illegal act for an illegal purpose.

642.    Defendant Burrows could, and should, have refused to follow the unlawful orders, but she did not.

643.    Defendants Tomas and Burrows unlawfully refused to disclose their notes pursuant to MPIA requests, for the purpose of a cover-up of the conspiracy.

644.     Defendant Sheridan failed to monitor BCPD officers, or to stop the obviously illegal scheme of manipulation, intimidation, and deception being carried out by and with BCPD officers.

645.     Actions by any of these Defendants to interrupt the scheme would have stopped, or at least lessened the harm caused by, the conspiracy.

646.     Defendants' conduct violated clearly established statutory rights.  Any reasonable officer would have known that Defendants' actions would violate those rights.

COUNT IX:
Violations of 20 U.S.C. § 1681
Discrimination/Deprivation of Educational Access
By Katelyn Frank
Against Defendants Hrabowski, Board of Regents, UMBC, Hunton, University Police,
And Dillon

647.     This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

648.     Federal law provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

649.     The law is an expression of the Equal Protection doctrine embodied in the United States Constitution.

650.     Defendants Board of Regents, UMBC, and University Police receive federal financial assistance.  Defendant Hunton receives payment from UMBC consisting, in part, of federal funding that has passed through UMBC.

651.    Defendant Hrabowski exercises his discretion to approve or disapprove UMBC policies.

652.    Defendant Hrabowski tacitly authorized and was deliberately indifferent to the improper and deficient investigations UMBC conducted relating to allegations of rape or other sexual assault.

653.    Defendants were deliberately indifferent to Ms. Frank's rape in that they assigned a biased investigator to pantomime an investigation into the misconduct complaint made by Ms. Frank.

654.    Defendants created a hostile environment in which Ms. Frank could not study or learn.

655.    Defendants allowed Ms. Frank's assailant back on to campus during the flawed investigation, causing her fear and anguish.

656.    In deliberate indifference of UMBC's stated policies, Ms. Frank was not properly notified of her assailant's return.

657.    As a result, Ms. Frank suffered severe emotional injury, a decline in academic performance, and lost tuition.

<u>COUNT X:</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Erroneous Outcome</u>
<u>By Katelyn Frank</u>
<u>Against Defendants Hrabowski, Hunton, the Board of Regents, And UMBC</u>

658.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

659.    The investigation conducted by Defendants Hunton and UMBC was rife with procedural and other irregularities, which cast significant doubt on the accuracy of the outcome.  The irregularities were part of an intentional effort to manipulate the outcome and conceal complaints of sexual assault.

660.    Ms. Frank was denied the opportunity to attempt to recover her text messages, while Defendant Hunton accepted and credited incomplete, selectively-deleted, text messages offered by the assailant.

661.    Ms. Frank's interview was scheduled when no normal college student would be awake, *i.e.*, at 5:42 a.m., for approximately three (3) hours later.

662.    Contrary to UMBC's policies, Ms. Frank was denied the opportunity to have her chosen support person, her mother, present.

663.    Contrary to UMBC's policies, Ms. Frank was denied the opportunity to have her second-choice support person, her suitemate, present.

664.    Defendant Hunton claimed that Ms. Frank's suitemate was a witness, and must be excluded from Ms. Frank's interview.  Then, after the interview, Defendant Hunton revealed that the suitemate was not a material witness, and her "testimony was not likely to change the findings of [the] investigation."

665.    Ms. Frank's suitemate was never interviewed.  There was no "testimony."

666.    The assailant, on the other hand, was permitted to have two support persons, of his choice, present at his interview.

667.    Defendant Hunton then mischaracterized Ms. Frank's statements in her initial interview and elsewhere.

668. Defendant Hunton avoided asking relevant questions at Ms. Frank's initial interview, in order to avoid receiving information incriminating Ms. Frank's assailant.

669. Defendant Hunton then drew an adverse inference against Ms. Frank when Ms. Frank pointed out these deficiencies in her response to the Draft Report.

670. Defendant Hunton refused to draw an adverse inference against the assailant, who selectively deleted incriminating text messages.

671. Defendants Hunton and the University were motivated by a desire to minimize UMBC's Clery Act reporting.

672. UMBC did not report Ms. Frank's report of rape.  Ms. Frank's report of rape was erroneously classified a "suspicious circumstance," not a report of a crime.

673. Falsely deflating the number of sexual assaults victims have attempted to report has a disproportionate impact on women, who are more often the victims of sexual assault.

674. The manipulation by Defendant Hunton, Defendant UMBC, and the University Defendants created a false impression that the campus was relatively free of sexual assaults on women.

675. Defendant Hunton allowed and encouraged Ms. Frank's roommate's mother to make statements to Defendant Hunton regarding the roommate's supposed (and entirely uncorroborated) belief that Ms. Frank "brought it on herself."

676. Defendant Hunton denied Ms. Frank any opportunity to cross examine the roommate or the mother regarding these purported statements.

677.    Defendant Hunton's reliance on the subjective, uncorroborated, uninvestigated statements by Ms. Frank's roommate's mother reflects an antiquated and discriminatory view of women that is antithetical to an objective and proper Title IX investigation.

678.    Defendant Hunton's other subjective inferences also violated Ms. Frank's right to an objective and accurate Title IX investigation.  For example, Defendant Hunton took Ms. Frank's roommate's refusal to cooperate in the investigation as proof that she would give testimony that was unfavorable to Ms. Frank.

679.    The investigation into Ms. Frank's complaint was procedurally and substantively flawed to a degree that denied Ms. Frank her rights under Title IX.

680.    The intentional shortcoming and manipulations attributable to Defendant Hunton were accepted and ratified by the University Defendants without any effort to evaluate her efficacy as the fact-finder.

681.    The procedural flaws and manipulation led to an adverse and erroneous outcome.

682.     The particular circumstances of University Defendants investigation, including the pre-ordained conclusions of Defendant Hunton, indicate that gender bias was a motivating factor behind the erroneous finding.

COUNT XI:
Violations of 20 U.S.C. § 1681
Failure to Prevent Sexual Harassment
By Katelyn Frank
Against Defendants Hrabowski, Board of Regents, UMBC, And University Police

683.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

684.    Ms. Frank's assailant had previously sexually assaulted others.

685.    Defendants knew or should have known that the assailant represented a continuing danger to Ms. Frank and to others.

686.    Any reasonable person knowing what Defendants knew or should have known would have known of the danger presented by Ms. Frank's assailant.

687.    Any reasonable person knowing what Defendants knew or should have known would have confronted the danger presented by Ms. Frank's assailant.

688.    Defendants failed to take any action to remove or otherwise modify that danger.

689.    This failure was part of a deliberate pattern and practice of not addressing dangerous sexual assault risks at UMBC, in violation of Title IX.

690.    Defendant Hrabowski authorized and/or was deliberately indifferent to the failure of UMBC to ensure that female students were protected from known sexual predators on campus.  Defendant Hrabowski failed to train and supervise his subordinates and employees in proper policies and procedures.

COUNT XII:
Violations of 20 U.S.C. § 1681
Denial of Educational Opportunities
By Anna Borkowski And Katelyn Frank
Against Defendants Board of Regents, Hrabowski, Hunton, UMBC, And University
Police

691.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

692.    Ms. Frank was a student at UMBC at the time of her assault.

693.   Ms. Borkowski was a former student and planned to apply to a UMBC program for a master's in social work.

694.   After being assaulted, and the subsequent investigation, Ms. Frank suffered severe educational setbacks.

695.   Ms. Frank lost at least one year of educational time.

696.   Ms. Frank now attends a community college.

697.   Both before and after her tenure at UMBC, Ms. Frank had been, and now continues to be, an exceptional student.

698.   Ms. Frank was unable to continue her education at UMBC after the University Defendants' tortious and discriminatory behavior.

699.   Ms. Borkowski is understandably unwilling to apply to UMBC after the discriminatory and tortious manner in which UMBC handled her report.

700.   Ms. Frank and Ms. Borkowski have been denied educational opportunities due to Defendants' discriminatory actions and inactions, a denial that results from Defendants' gender-based discrimination.

COUNT XIII:<br>
Violations of 20 U.S.C. § 1681<br>
Discrimination/Deprivation of Educational Access<br>
By Anna Borkowski And Annemarie Hendler<br>
Against Defendants Hrabowski, Board of Regents, And UMBC

701.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

702.   Federal law provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial

assistance."  20 U.S.C. § 1681(a).

703.    The law is an expression of the Equal Protection doctrine embodied in the

United States Constitution.

704.    Defendants Board of Regents and UMBC receive federal financial assistance.

705.    Defendant Hrabowski's salary is paid, in part, with funds obtained from federal

financial assistance.

706.    Ms. Borkowski reported her rape, as well as the rape of Ms. Hendler, to

Defendant UMBC on December 5, 2018.

707.    Defendants were deliberately indifferent to Ms. Borkowski and Ms. Hendler's

rape's in that they conducted only a sham investigation into the misconduct complaint

made by Ms. Borkowski.

708.    Defendants misapplied their self-created Title IX Policies and Procedures.

709.    Defendants' Title IX Policies and Procedures sets forth a sixty (60) day time

frame for resolving Title IX complaints.

710.    Defendants did not release a draft of their Title IX report until July 24, 2018,

232 days after Ms. Borkowski's initial complaint to UMBC, and 172 days after UMBC's

policies call for the entire process to be resolved.

711.    Defendants did not issue an official extension before issuing their Draft Report.

712.    Defendant UMBC still has not released a Final Report, or set a date for a Board of Review hearing, both necessary steps in UMBC's Title IX process.[58]

713.    Defendants accepted unsworn, unbelievable sexual history and character evidence from Ms. Borkowski's ex-boyfriend, a teammate of her assailants.

714.    Defendants did not allow Ms. Borkowski an opportunity to challenge this obviously fabricated evidence.

715.    Defendants ignored the assailants' admissions that they had violated certain UMBC's Policy on Sexual Misconduct.

716.    Defendants have refused to enforce a no-contact order entered against Ms. Borkowski's assailants.

717.    Both Ms. Borkowski and Ms. Hendler have suffered emotional and physical distress, including anxiety, fear and distrust of authority figures.

718.    Ms. Borkowski is understandably unwilling to apply to UMBC, as a result of Defendants' treatment.

719.    Both Ms. Borkowski and Ms. Hendler's studies have suffered as a result of Defendants' treatment.

720.    Ms. Borkowski and Ms. Hendler have suffered deprivations of educational access as a result of Defendants' discrimination based on their gender.

---

[58] While some of this delay is due to extensions given after the Draft Report was issued, based on multiple parties' requests, those extensions do not affect the 172 day delay just to issue a Draft Report.

COUNT XIV
Violations of the Fourth Amendment
Unreasonable Search And Seizure
By Anna Borkowski, Annemarie Hendler, Katelyn Frank, and the Invasive Testing
Subclass
Against Defendants Baltimore County, BCPD, Sheridan, and Johnson

721.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

722.    The Fourth Amendment guarantees the Plaintiffs the right to be free from unlawful searches and seizures.

723.    A physical examination by a state agent is unlawful absent informed consent or probable cause.

724.    An individual can consent to a search or seizure if the totality of the circumstances and that individual's acts indicate that she consented to the intrusion.

725.    Under Maryland law, it is unlawful to conduct a medical procedure on a person unless that person gives their informed consent to the procedure.

726.    Informed consent requires that the person be informed of what the procedure entails and any material risks or dangers, whether inherent in or collateral to the procedure.

727.    In their capacity as FNE's, GBMC's employees are acting as agents for Baltimore County.

728.    The collection of evidence pursuant to a SAFE exam is not medical treatment for the benefit of a patient; it is an investigatory medical procedure for the benefit of the state.

729.   It is a "search," subject to the reasonability requirements articulated in the Fourth Amendment.

730.   GBMC and its employees, in their capacity as agents of Baltimore County and Defendant BCPD, receive government funding to conduct the investigatory procedures.

731.   For the purpose of a Fourth Amendment analysis, the FNE's actions, as they relate to the investigatory procedures, are attributable to the State.

732.   BCPD Defendants participated in the investigatory searches of Plaintiffs by instructing GBMC and the FNEs to perform them or to refrain from performing them.

733.   BCPD Defendants knew that the "consent" form was inadequate to allow the female victims of sexual assault to give informed consent to the procedure.

734.   BCPD Defendants failed to disclose that the SAEKs would be destroyed without being used to solve any crimes, including the victims' assaults.

735.   No police officer or FNE could believe that, without the informed consent of a patient, a medical professional could lawfully perform such a procedure.

736.   When conducting the forensic procedures, GBMC and its employees are not acting for a reason that is independent of an investigative or administrative governmental purpose.  They are acting on behalf of the BCPD Defendants and Baltimore County Defendants.

737.   Even if GBMC and its employees were motivated by benevolent medical ideals, their actions, undertaken on behalf of Defendant BCPD and the BCPD Defendants, in deceiving and misinforming victims and performing intrusive searches

without informed consent constitute medical battery and an unlawful search prohibited by the Fourth Amendment.

738.    Defendants Johnson, Sheridan, and Shellenberger personally participated in crafting the unlawful policies followed by BCPD Defendants and the GBMC employees.

739.    Defendants Johnson and Sheridan tacitly authorized and were deliberately indifferent to the ongoing Fourth Amendment violations detailed in this count.

<u>COUNT XV</u>
<u>Violations of 42 U.S.C. §1985</u>
<u>By Marcella Fegler And Katelyn Frank</u>
<u>Against Defendants BCPD, Dever, Shellenberger, Fox, Tomas, Burrows, Dillon, Brady,</u>
<u>Montgomery, And Sheridan</u>

740.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

741.    Defendants promised to review reports of sexual assault, including Ms. Fegler's and Ms. Frank's, to determine if they were viable.

742.    Defendants' promises part of were a belated promise to restore the due course of justice for female victims of sexual assault in Baltimore County.

743.    Instead of providing accurate reports, Defendants provided only those reports coded as "unfounded," not those reports of sexual assault misclassified by other means.

744.    Defendants conspired together to ensure that only the "unfounded" reports would be turned over.

745.    Defendants thus conspired, for the purpose of impeding, hindering, obstructing, and defeating, the due course of justice in Baltimore County, with the intent

to deny female citizens and residents of Baltimore County the equal protection of the laws.

746.    Defendant Dillon, in particular, aided the conspiracy by failing to accurately report sexual assaults at UMBC, and by falsifying data reported pursuant to the Clery Act.

747.    The SAO Defendants aided the conspiracy by instructing law enforcement officers to misclassify reports.

748.    Defendant BCPD and the BCPD Defendants aided the conspiracy by misclassifying reports.

749.    All Defendants aided the conspiracy by failing to disclose that many reports of sexual assault by men against women had been classified as "suspicious conditions," or not properly recorded, and were therefore not being provided for review.

750.    Due to Defendants' conspiracy, Ms. Fegler's and Ms. Frank's cases were not given a full review, but instead were manipulated to conceal the extent of sexual assault in Baltimore County.

751.    Due to Defendants' conspiracy, Ms. Fegler and Ms. Frank were deprived of their rights to equal protection under the law.

<u>COUNT XVI</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Discrimination/Deprivation of Educational Access</u>
<u>By Marcella Fegler</u>
<u>Against Defendants UMBC, Board of Regents, Hrabowski, And University Police</u>

752.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

753.    Federal law provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

754.    The law is an expression of the Equal Protection doctrine embodied in the United States Constitution.

755.    Defendants Board of Regents and UMBC receive federal financial assistance.

756.    Defendant Hrabowski's salary is paid, in part, with funds obtained from federal financial assistance.

757.    Defendants were deliberately indifferent to Ms. Fegler's rape in that they conducted a sham investigation of the sexual assault complaint made by Ms. Fegler.

758.    Despite this indifference, based solely on the assailants' confessions, Defendants determined that Ms. Fegler was sexually assaulted, without her consent, by two (2) of the four (4) assailants.

759.    Defendants only concluded that Ms. Noland was sexually assaulted because there was no alternative narrative, however implausible, to credit.

760.    The assailants who did not admit to the sexual assault, no matter how implausible their accounts, were absolved without further investigation, despite a months-long cover-up and lies of commission and omission by the assailants to Ms. Fegler about her assault.

761.    Because two (2) of her assailants were still on campus, Ms. Fegler was forced to leave UMBC.

762.    As a result, Ms. Fegler suffered, and continues to suffer, severe emotional and physical injuries, a decline in academic performance, and lost tuition.

<u>COUNT XVII</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Discrimination/Deprivation of Educational Access</u>
<u>By Kaila Noland</u>
<u>Against Defendants UMBC, Board of Regents, Hunton, Hrabowski, Dillon, And</u>
<u>University Police</u>

763.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

764.    Federal law provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

765.    The law is an expression of the Equal Protection doctrine embodied in the United States Constitution.

766.    Defendants Board of Regents, UMBC, and University Police receive federal financial assistance.  Defendant Hunton receives payment from UMBC consisting, in part, of federal funding that has passed through UMBC.

767.    Defendant Hrabowski exercises his discretion to approve or disapprove UMBC policies.

768.    Defendant Hrabowski tacitly authorized and was deliberately indifferent to the improper and deficient investigations UMBC conducted relating to allegations of rape or other sexual assault.

769.    Defendants were deliberately indifferent to Ms. Noland's rape in that they assigned a biased investigator to pantomime an investigation into the sexual assault complaint made by Ms. Noland.

770.    Despite this indifference, based solely on the assailant's confession, Defendants determined that Ms. Noland was sexually assaulted.

771.    Defendants only concluded that Ms. Noland was sexually assaulted because there was no alternative narrative, however implausible, to credit.

772.    Instead of her assailant being banned from campus, Ms. Noland was forced to leave her laboratory job for another campus.

773.    Ms. Noland's assailant was not expelled or banned from campus, but instead given a single counseling session.

774.    Defendants' decision to act with more concern for the assailant's concerns than Ms. Noland's was discriminatory and based on Ms. Noland's gender.

<u>COUNT XVIII</u>
<u>Violations of 42 U.S.C. §1985</u>
<u>Conspiracy to Obstruct Justice</u>
<u>By All Plaintiffs And Class Members</u>
<u>Against All Defendants</u>

775.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

776.    All Defendants were part of a broader scheme, as alleged herein, to deny female victims of sexual assault of their civil rights.

777.   As part of this broader scheme, Defendants conspired to purpose of impede, hinder, obstruct, and defeat, the due course of justice in Baltimore County, by intimidating witnesses and female victims of sexual assault,

778.   As part of this broader scheme, Defendants prevented female victims of rape and sexual assault from enforcing their rights under the United States Constitution and the laws of the United States and the State of Maryland.

779.   As part of this broader scheme, Defendants denied female victims of rape and sexual assault their right to equal protection under the law.

780.   Plaintiffs have suffered damages as a result.

COUNT XIX
Violations of 42 U.S.C. §1986
By All Plaintiffs And Class Members
Against All Defendants

781.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

782.   Any Defendant or Defendants could have stopped or lessened the broader scheme, as alleged herein.

783.   All Defendants neglected and/or refused to prevent, or aid in the preventing, of the broader scheme.

784.   Plaintiffs have suffered damages which Defendants could have prevented.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Honorable Court:

a)   Certify this action as a class action under Rule 23;

- 119 -

b)  Enter judgment finding Defendants jointly and severally liable for monetary damages, including punitive damages;

c)  Enjoin Defendants from engaging in unconstitutional and illegal practices abridging Plaintiffs' and other's civil rights and denying Plaintiffs and other's educational opportunities;

d)  Award to Named Plaintiffs reasonable costs and attorney's fees; and

e)  Grant such other relief as this Court shall determine is just and proper.

<u>Prayer for Jury Trial</u>

Pursuant to Rule 38, Plaintiffs demand a trial by jury on all issues so triable.

<u>        /S/ Rignal W. Baldwin V        </u>
Rignal W. Baldwin V
Federal Bar No.: 30136
Stephen C. Rigg
Federal Bar No.: 19891
BaldwinLaw, LLC
111 South Calvert Street
Suite 1805
Baltimore, Maryland 21202
Telephone: (410) 385-5695
Facsimile: (443) 703-7772
*Attorney for Plaintiffs,*
*Anna Borkowski and Katelyn Frank*