IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANNA BORKOWSKI, et al.

          v.                  :   Civil Action No. DKC 18-2809

BALTIMORE COUNTY, MARYLAND,
et al.

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights class action are Defendants' motions to dismiss the second amended complaint (ECF Nos. 26; 29; 45; 46), and Defendants' motions to seal (ECF Nos. 28 & 48).

Plaintiffs Anna Borkowski, Katelyn Frank, Marcella Fegler, Annemarie Hendler, and Kaila Noland ("named Plaintiffs"), on their own behalf and on behalf of those similarly situated ("class Plaintiffs"), bring suit against twenty-two Defendants alleging twenty counts related to Defendants' handling of Plaintiffs' sexual assault or rape investigations. (ECF No. 21). Plaintiffs allege that all Defendants, or combinations thereof, infringed upon their rights in violation of (1) 42 U.S.C. § 1983, civil action for deprivation of equal protection and first amendment rights; (2) 42 U.S.C. § 1985, conspiracy to interfere with civil rights; (3) 42 U.S.C. § 1986, action for neglect to prevent conspiracy to interfere with civil rights; (4) 20 U.S.C. § 1681,

sex discrimination, failure to prevent sexual harassment, deprivation of educational rights, and erroneous outcome; and (5) the Fourth Amendment to the United States Constitution, unreasonable search and seizure.

The Defendants filed motions to dismiss in four groups: (1) Defendants University of Maryland Baltimore County ("UMBC" or the "University"), the Board of Regents of the University System of Maryland ("Board of Regents"), the UMBC Police Department ("UMBCPD") (collectively, "Institutional Defendants"), Dr. Freeman Hrabowski, Mark Sparks, and Paul Dillon (all collectively, "University Defendants"); (2) Defendant Bernadette Hunton; (3) Defendants Nicholas Tomas, Kristin Burrows, Kimberly Montgomery, Morrow Lane, Rosemary Brady, Paul Dorfler, and Timothy Lee ("Officer Defendants"), James Johnson and Terrence Sheridan ("Supervisory Officer Defendants"), Baltimore County, and the Baltimore County Police Department ("BCPD") (all collectively, "County Defendants"); and (4) Defendants Scott Shellenberger, Lisa Dever, Bonnie Fox, and Krystin Richardson ("State's Attorney Defendants"). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6.

## I.  Factual Background

Unless otherwise noted, the facts outlined here are set forth in the complaint and construed in the light most favorable to Plaintiffs.  Plaintiffs allege that all Defendants adopted "discriminatory policies and/or [exhibited] deliberate indifference [] to artificially lower the number of recorded reports of rape and sexual assault in Baltimore County and on the UMBC campus." (ECF No. 21, at 24).  Plaintiffs further state that "Defendants followed written and/or unwritten policies, and . . . afforded less protection to female victims of sexual assault than to victims of other crimes." (*Id.*, at 99).

### A.  Marcella Fegler

Plaintiffs allege that "[o]n August 25, 2014, Marcella Fegler was raped by four members of the UMBC basketball team." (ECF Nos. 53, at 11; 21, at 56-57).  "Defendant UMBC expelled two of [her] assailants, who had both admitted . . . that they had taken advantage of her." (ECF No. 21, at 56).  "Defendant UMBC refused to hold accountable the assailants who did not admit that they raped Ms. Fegler." (*Id.*).

Defendant Tomas, a BCPD officer, later investigated Ms. Fegler's rape and "offered to testify, on behalf of the assailants,

that the assailants were 'not involved as alleged.'" (ECF Nos. 21, at 57; 53, at 11). "Defendant Tomas dismissed Ms. Fegler's assault, informing her that 'in order for some of the sex acts,' which Ms. Fegler could not recall 'to be performed, she would have had to be conscious to participate.'" (ECF Nos. 21, at 57; 51, at 12).

### B. Katelyn Frank

Plaintiff Frank alleges that she was raped by "a fellow UMBC student" on September 10, 2015. (ECF No. 21, at 57). Ms. Frank reported her rape and obtained a Sexual Assault Forensic Exam ("SAFE") at Greater Baltimore Medical Center ("GBMC"). (ECF Nos. 21, at 9; 53, at 12). Plaintiff Frank states that Defendant Dillon, a BCPD officer, dissuaded her from making a police report by telling "Ms. Frank and her mother that the 'administrative method' was 'faster and easier,' 'more victim friendly,' and [] 'easier to prove.'" (ECF No. 21, at 59). Defendant Hunton conducted a Title IX investigation. Defendant Hunton is a private attorney hired by UMBC "to investigate and prepare [] Title IX Draft Report[s] and Final Report[s]." (ECF No. 21, at 62). Defendant Hunton determined, by a preponderance of the evidence, that Plaintiff Frank was not sexually assaulted. Plaintiff Frank

then reported the sexual assault directly to the "Catonsville Precinct of BCPD[.]" (ECF No. 21, at 65). Defendant Lee, a BCPD officer, took Plaintiff Frank's statement. (*Id.*, at 65-66). Defendant Lee then drove to the UMBCPD to follow up on Plaintiff Frank's allegations. (*Id.* at 66). "When Defendant Lee returned, he informed Ms. Frank that the University had no record of the assault, even though" "she had copies of the records from the Title IX investigation . . . [and] her email to Defendant Dillon reporting the crime." (*Id.*). Defendant Lee classified "Ms. Frank's rape as a 'suspicious condition,' and it was closed with a 'non-criminal disposition[.]'" (*Id.*). Plaintiff Frank alleges that when she "followed up with prosecutors[,]" Defendant Dever, the assistant state's attorney and chief of the sex offense and child abuse division of the State's Attorney's Office, "stated that, to prosecute a sexual assault she 'need[s] more than just [the victim's] credible testimony because the suspect will present equally credible testimony at trial that this was consensual and [the victim] was not incapacitated.'" (*Id.*, at 67; ECF No. 53, at 12). Plaintiff Frank further alleges that when her "mother . . . requested more information regarding the investigation, Defendant Dever forwarded the email to Defendant Montgomery[, a BCPD

detective assigned to the special victims team,] and wrote 'Hahaha! Her response from my being so nice.'" (ECF No. 21, at 67).

### C.   Kaila Noland

"On March 30, 2016, Kaila Noland was sexually assaulted" by "her lab partner at UMBC[.]" (ECF No. 21, at 68). "Ms. Noland reported her assault to UMBC." (*Id.*). Defendant Hunton investigated the sexual assault and concluded "that Ms. Noland was sexually assaulted[.]" (*Id.*). "Defendant Hunton recommended that UMBC not expel Ms. Noland's assailant." (*Id.*, at 69). "Based on that recommendation, UMBC imposed one 'counseling session' as a penalty for Ms. Noland's assailant." (*Id.*). Plaintiffs allege that, as a result of the sexual assault and investigation, "Ms. Noland was forced to leave her laboratory job for another campus." (*Id.*, at 130).

### D.   Anna Borkowski and Annemarie Hendler

Plaintiffs Borkowski and Hendler, both students at Towson University, allege that on "October 20, 2017, three members of Defendant UMBC's baseball team raped" them. (ECF Nos. 53, at 13; 21, at 69-70). "The women reported the assaults to the Towson University Police Department ('TUPD')" the same day. (ECF No. 21, at 71). "[T]he women were transported to [GBMC] for examination

and treatment." (*Id.*). Ms. Borkowski and Ms. Hendler also reported their sexual assaults to Defendant UMBC. UMBC investigated the reports according to Title IX procedures and determined that no violation of their sexual assault policy had occurred. (*Id.*, at 121-22; ECF No. 53, at 13).

"On March 14, 2018, Ms. Borkowski exercised her rights pursuant to [§] 2-607 of the Courts and Judicial Proceedings Article of the Maryland Code." (ECF No. 21, at 80). "Section 2-607 provides that '[a]n individual may file an application for a statement of charges with a District Court Commissioner.'" (*Id.*). "The Commissioner is then tasked with examining the affidavit and issuing a statement of charges or, in the absence of probable cause, denying the application." (*Id.*, at 81). "Ms. Borkowski submitted sworn applications for statements of charges with District Court Commissioner John Robey." (*Id.*). Plaintiffs allege that Defendants Dever and Montgomery "improperly directed Commissioner Robey to deny the applications for statements of charges." (*Id.*).

"Ms. Borkowski sought again to avail herself of a neutral judicial officer, Managing Commissioner Colleen Ellingson, who charged Ms. Borkowski's assailants with 'first degree rape, second

degree sexual assault, third degree sexual offense, second degree assault, fourth degree sexual contact, and perverted practice.'" (ECF Nos. 51, at 13; 21, at 82). "The summonses were sent out the next day, to be served on the three (3) assailants." (ECF No. 21, at 82). "The summonses have yet to be served[,]" however. (*Id.*, at 83). Instead, Plaintiffs allege that Defendant Kristin Burrows, a BCPD detective assigned to the special victims team, "contacted the Baltimore County police officer in charge of serving the summonses and instructed him not to serve the three [] men." (*Id.*). "Ms. Borkowski received a subpoena to testify dated March 21, 2018." (*Id.*). Plaintiffs further state that Baltimore County Administrative Commissioner Whitney "Wisniewski [] 'sen[t] out a department-wide email instructing Commissioners not to act if they receive[] any further applications' from Ms. Borkowski, and further 'instructed Commissioners to forward [to her] any applications if submitted.'" (*Id.*, at 85). Plaintiffs allege that "[t]hese instructions were issued at the behest of [State's Attorney] Defendants Shellenberger, Dever, [and] Fox, [and Officer Defendants] Burrows and Tomas." (*Id.*). Plaintiffs further state that "Defendants Shellenberger, Dever, and Fox [] ordered Defendants Burrows and Tomas [] 'to tell Ms. Borkowski that she

has to stop bringing these additional charges or they will file criminal abuse of process charges against her[]'" and "to 'stop going to [the] Comm[issioner]' or she w[ill] face 'criminal charges.'" (*Id.*, at 86-87). Plaintiffs allege that "three [] officers arrived at Ms. Borkowski's Baltimore City residence," but she was not home. (*Id.*, at 87). "Defendants Burrows and Tomas [then] contacted Ms. Borkowski directly on her cell phone[,]" which she "had provided. . . as part of the rape investigation." (*Id.*, at 88). "When Ms. Borkowski's attorney learned of" this contact, "he offered to make Ms. Borkowski available to Defendants Tomas and Burrows that afternoon, in his office." (*Id.*). Plaintiffs assert that "[a]fter Defendants Tomas and Burrows conferred with . . . Defendants Dever, Shellenberger, and Fox, Defendants Burrows and Tomas were ordered not to meet with Ms. Borkowski because [the state's attorney for Baltimore County,] 'Scott [Shellenberger,] said not to go b[e]c[ause] of attorney.'" (*Id.*, at 88-89). Plaintiffs state that "[t]he next day, March 23, 2018, Defendant Dever . . . file[d] a 'Motion to Dismiss,' [via email] without a certificate of service, in the criminal actions against the assailants." (*Id.*, at 89).

"On April 18, 2018, Emily Borkowski, Anna Borkowski's sister, was accepted into the internship program at the Baltimore County State's Attorney's Office's Domestic Violence Section." (*Id.*, at 107). Plaintiff Borkowski alleges that "Defendant Fox admitted, in an email to Defendant[] Dever . . . , to having 'stalked' Anna Borkowski to ferret out any connection between Anna and Emily Borkowski." (*Id.*). "On May 11, 2018, Emily Borkowski was fired." (*Id.*). The second amended complaint states that "Defendants admitted that the retaliatory firing was in response to a purported accusation of 'misconduct' made by Anna Borkowski's attorney in a [state] court filing." (*Id.*). Further facts will be discussed as relevant to the various legal issues.

## II. Procedural Background

Plaintiffs commenced this action by filing a complaint on September 10, 2018. (ECF No. 1). Plaintiffs then filed an amended complaint on October 17, 2018 (ECF No. 5) and a second amended complaint on December 7, 2018 (ECF No. 21). Defendants filed four separate motions to dismiss the second amended complaint — Defendant Hunton on January 11, 2019 (ECF No. 26); State's Attorney Defendants on January 14, 2019 (ECF No. 29); County Defendants on February 7, 2019 (ECF No. 45); and University Defendants on

February 7, 2019 (ECF No. 46). Plaintiffs responded in opposition to each motion to dismiss — to Defendant Hunton on March 11, 2019 (ECF No. 49); to County Defendants on April 1, 2019 (ECF No. 51); to State's Attorney Defendants on April 1, 2019 (ECF No. 52); and to University Defendants on April 1, 2019 (ECF No. 53). Defendants replied — Defendant Hunton on March 25, 2019 (ECF No. 50); University Defendants on May 30, 2019 (ECF No. 63); State's Attorney Defendants on May 31, 2019 (ECF No. 64); and County Defendants on May 31, 2019 (ECF No. 65). Defendant Hunton and University Defendants filed motions to seal exhibits containing sensitive information on January 11, 2019 (ECF No. 28), and February 7, 2019 (ECF No. 48).

All individual Defendants are being sued both in their individual and official capacities. (ECF No. 21, at 18). The complaint alleges the following twenty counts: (Count I) Equal protection violations under 42 U.S.C. § 1983 by all Plaintiffs against all Defendants; (Count II) deprivation of first amendment rights under 42 U.S.C. § 1983 by Plaintiff Borkowski and class Plaintiffs against Defendants Baltimore County, BCPD, Montgomery, Tomas, Burrows, Dorfler, Johnson, Sheridan, and State's Attorney Defendants; (Count III) conspiracy to interfere with civil rights

under 42 U.S.C. § 1985 by Plaintiff Borkowski against Defendants Baltimore County, BCPD, Shellenberger, Dever, Fox, Montgomery, Tomas, Lane, Brady, Dorfler, and Burrows; (Count IV) deprivation of equal protection and retaliation against Ms. Borkowski's family under 42 U.S.C. § 1983 by Plaintiff Borkowski against Defendants Baltimore County, BCPD, and State's Attorney Defendants; (Count V) deprivation of equal protection under 42 U.S.C. § 1983 by Plaintiff Borkowski against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Dorfler, Lane, and Montgomery; (Count VI) deprivation of equal protection under 42 U.S.C. § 1983 by Plaintiff Frank against Defendants Baltimore County, BCPD, Dever, Shellenberger, Montgomery, Sparks, Hrabowski, Hunton, and Dillon; (Count VII) conspiracy to obstruct justice under 42 U.S.C. § 1985 by Plaintiff Frank against Defendants Baltimore County, BCPD, Hrabowski, Sparks, Dillon, Johnson, Lee, Lane, Shellenberger, and Dever; (Count VIII) action for neglect to prevent conspiracy to obstruct justice under 42 U.S.C. § 1986 by Plaintiffs Borkowski, Hendler, Frank, and class Plaintiffs against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Montgomery, Johnson, Lane, Sheridan, and Dorfler; (Count IX) sex discrimination and deprivation of educational access under 20 U.S.C. § 1681 by Plaintiff Frank

against Defendants Board of Regents, UMBC, and UMBCPD; (Count X) erroneous outcome under 20 U.S.C. § 1681 by Plaintiff Frank against Defendants Board of Regents and UMBC; (Count XI) failure to prevent sexual harassment under 20 U.S.C. § 1681 by Plaintiff Frank against Defendants Board of Regents, UMBC, and UMBCPD; (Count XII) denial of educational opportunities under 20 U.S.C. § 1681 by Plaintiffs Borkowski and Frank against Defendants Board of Regents, UMBC, and UMBCPD; (Count XIII) sex discrimination and deprivation of educational access under 20 U.S.C. § 1681 by Plaintiffs Borkowski and Hendler against Defendants Board of Regents and UMBC; (Count XIV) unreasonable search and seizure in violation of the Fourth Amendment by Plaintiffs Borkowski, Hendler, Frank, and the "Invasive Testing Subclass" against Defendants Baltimore County, BCPD, Sheridan, Johnson, and State's Attorney Defendants; (Count XV) conspiracy to interfere with civil rights under 42 U.S.C. § 1985 by Plaintiffs Fegler, Frank, and class Plaintiffs against Defendants BCPD, Dever, Shellenberger, Fox, Hrabowski, Tomas, Burrows, Dillon, Brady, Montgomery, Sparks, and Sheridan; (Count XVI) sex discrimination and deprivation of educational access under 20 U.S.C. § 1681 by Plaintiff Fegler against Defendants UMBC, Board of Regents, and UMBCPD; (Count XVII) sex discrimination and

13

deprivation of educational access under 20 U.S.C. § 1681 by Plaintiff Noland against Defendants UMBC, Board of Regents, and UMBCPD; (Count XVIII) conspiracy to obstruct justice under 42 U.S.C. § 1985 by all Plaintiffs and class members against all Defendants; (Count XIX) action for neglect to prevent conspiracy to obstruct justice under 42 U.S.C. § 1986 by all Plaintiffs and class members against all Defendants; and (Count XX) deprivation of equal protection under 42 U.S.C. § 1983 by Plaintiff Noland against Defendants Hrabowski and Hunton.

Plaintiffs seek class certification under Fed.R.Civ.P. 23; an entry of judgment finding Defendants jointly and severally liable for monetary and punitive damages; an order enjoining Defendants from "engaging in unconstitutional and illegal practices abridging Plaintiffs' and other[]s['] civil rights and denying Plaintiffs['] and other[]s['] educational opportunities[;]" and an award "to Named Plaintiffs [of] reasonable costs and attorney[]s['] fees[.]" (ECF No. 21, at 133-134).

## III. Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In evaluating the complaint, unsupported

legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"In deciding a Rule 12(b)(6) motion, the court will consider the facts stated in the complaint and the documents attached to the complaint." *Abadian v. Lee*, 117 F.Supp.2d 481, 485 (D.Md. 2000). The court may also consider documents referred to in the complaint and relied upon by plaintiff in bringing the action." *Id.* (citing *Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748,

749 (D.Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998)). When doing so, the court need not convert a Rule 12(b)(6) motion to dismiss to one for summary judgment so long as it does not consider matters "outside the pleadings." *See* Fed.R.Civ.P. 12(d) ("If, on a [12(b)(6) motion to dismiss], matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998)(citing Rule 12(d)); *Luy v. Balt. Police Dep't*, 326 F.Supp.2d 682, 688 (D.Md. 2004) ("The court may consider a document submitted by the defendant in support of a motion to dismiss, however, '[if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'") (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)).

University Defendants attached thirty-three exhibits, Defendant Hunton attached four exhibits, and County Defendants attached nine exhibits, to their respective motions or papers. Plaintiffs do not challenge the authenticity of any attached documents. Only those exhibits that are integral to and relied on in the second amended complaint will be considered. Thus, UMBC's

policies, investigation reports and adjudications of the various sexual assault allegations filed by Plaintiffs with UMBC, and UMBC's Clery Reports may properly be considered. The remaining exhibits will be excluded from consideration.

## IV.  Analysis

Plaintiffs' verbose complaint, Defendants' multiple motions to dismiss, and the parties' papers, excluding exhibits, total over five hundred pages. In this wealth of words, the parties argue past each other and fail directly to address some of the central issues in this case. The sheer volume of factual allegations and legal issues likely contributes to this confusion. As will be seen, Plaintiffs, at best, have masked meritorious allegations by the overambitious pleading, and, at worst, have simply failed to state any viable claim. The complaint will be dismissed, albeit without prejudice, and Plaintiffs will have 21 days to file a more focused, perhaps modest, third amended complaint.

### A.  Group Pleadings

Plaintiffs bring three claims on behalf of all Plaintiffs against all twenty-two Defendants. These claims are Count I, equal protection violations under 42 U.S.C. § 1983; Count XVIII,

conspiracy to obstruct justice under 42 U.S.C. § 1985; and Count XIX, action for neglect to prevent conspiracy to obstruct justice under 42 U.S.C. § 1986. Defendants argue that "[t]hese Counts constitute improper 'group pleading' or 'shotgun pleading' that do not meet federal pleading requirements." (ECF No. 45-1, at 51). Plaintiffs argue that Counts I, XVIII, and XIX were pleaded as "all Plaintiffs" against "all Defendants" because these claims "are the only way [to] state claims for a conspiracy, in which all Defendants participated, which harmed all Plaintiffs." (ECF No. 53, at 14). Plaintiffs do not address the fact that Count I is not a conspiracy claim.

Defendants are correct to question Plaintiffs' group pleading. Judge Titus explained the fault of group pleading in *Proctor v. Metro. Money Store Corp.*, 579 F.Supp.2d 724, 744 (D.Md. 2008):

> At best, such pleading amounts to a conclusory allegation that . . . [each Defendant] [was] somehow responsible for the wrongful conduct[.] At worst, the repeated refrain that all three individuals committed each and every act must be read as an allegation that *one of the three* did each act, an assertion that amounts to speculation and which is deficient under [*Bell Atl. Corp. v.* ] *Twombly*[, 550 U.S. 544 (2007)].

18

Regardless, even if Plaintiffs were able to assign specific names responsible for these allegations, Plaintiffs have not sufficiently pleaded a claim for conspiracy under these counts. In Count I, all Plaintiffs allege that all Defendants violated 42 U.S.C. § 1983 because "Defendants followed written and/or unwritten policies, and thus afforded less protection to female victims of sexual assault than to victims of other crimes." (ECF No. 21, at 99). In Count XVIII, Plaintiffs allege that "[a]ll Defendants were part of a broader scheme, as alleged herein, to deny female victims of sexual assault their civil rights." (*Id.*, at 130). When alleging a § 1985 conspiracy, "the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy. . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Williams v. Cheesecake Factory Rests., Inc.*, No. 15-cv-3700-ELH, 2016 WL 54799, at *3 (D.Md. Jan. 5, 2016) (quoting *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011)). Lastly, in Count XIX, Plaintiffs state that "[a]ny Defendant or Defendants could have stopped or lessened the broader scheme, as alleged herein." (ECF No. 21, at 131). The remainder

of each count lodges accusatory and bald accusations that do not squarely support a conspiracy amongst the twenty-two Defendants.[1] "Such an approach falls short of that which is required to overcome a motion to dismiss." *Thomas v. Maryland*, No. 17-cv-1739-GJH, 2017 WL 6547733, at *6 (D.Md. Dec. 20, 2017). Accordingly, Counts I, XVIII, and XIX will be dismissed, and those counts will not further be discussed.

### B. The Baltimore County Police Department

Defendants argue that the Baltimore County Police department should be dismissed as a Defendant. (ECF No. 45-1, at 18). Plaintiffs do not contest this point. "[T]he Baltimore County Police Department . . . [is not] *sui juris*. The Police Department is simply an agency of Baltimore County[.]" *James v. Frederick Cty. Pub. Schs.*, 441 F.Supp.2d 755, 758 (D.Md. 2006) (quoting *Strebeck v. Balt. Cty. Police Dep't*, No. 05-cv-2580-JFM, 2005 WL 2897932, at *1 (D.Md. Oct. 17, 2005)). Accordingly, Defendant

---

[1] Plaintiffs cite *Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y. 2013) as an example of a successful group pleading. In *Floyd*, however, no Defendant moved to dismiss for improper group pleading, and the claim against all Defendants was voluntarily dropped before trial. (*See* ECF No. 65, at 14-15).

Baltimore County Police Department will be dismissed as a Defendant.

## C. Eleventh Amendment Immunity[2]

The Eleventh Amendment bars suits in federal court for monetary damages against a state or state officials acting in their official capacity. *Ballenger v. Owens*, 352 F.3d 842, 844–45 (4th Cir. 2003); *Lewis v. Bd. of Educ. of Talbot Cty.*, 262 F.Supp.2d 608, 612 (D.Md. 2003). Three exceptions exist to a state's sovereign immunity. First, a state may waive its immunity and consent to suit in federal court. *Green v. Mansour*, 474 U.S. 64, 68 (1985). Although the State of Maryland has waived its sovereign immunity for certain types of actions brought in state court pursuant to the Maryland Tort Claims Act, *see* MD. CODE, State Gov't § 12–104, it has not waived its Eleventh Amendment immunity for actions brought in federal court, *see* MD. CODE, State Gov't § 12–103(2). Second, immunity does not bar a suit against a state

---

[2] The United States Court of Appeals for the Fourth Circuit has not decided whether sovereign immunity is grounds for dismissal failure to state a claim under Rule 12(b)(6) or for lack of subject matter jurisdiction under Rule 12(b)(1). Judges in this district favor analysis under Rule 12(b)(1) because immunity "functions 'as a block on the exercise of that jurisdiction.'" *Gross v. Morgan State Univ.*, 308 F.Supp.3d 861, 865 (D.Md. 2018) (quoting *Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir. 1995)).

official when a plaintiff is seeking prospective relief to end a continuing violation. *Ex Parte Young*, 209 U.S. 123, 155–56, 159 (1908). Finally, Congress may validly abrogate a state's Eleventh Amendment immunity, but it has not done so here. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).

### 1. University Defendants

The University Defendants state that Defendants UMBC, Board of Regents, and UMBCPD are "immune from claims made pursuant to 42 U.S.C. §§ 1983, 1985, and 1986" and that "the individual Defendants[, Hrabowski, Sparks, and Dillon,] are immune from suit in their official capacities." (ECF No. 46-1, at 21–23). Plaintiffs argue that "[t]he State of Maryland has waived any claim to Eleventh Amendment immunity" as to any University Defendant that is not the "University System of Maryland[.]" (ECF No. 53, at 15-16).

"[T]he University of Maryland is 'an arm of the State partaking of the State's Eleventh Amendment immunity.'" *Bickley v. Univ. of Md.*, 527 F.Supp. 174, 181 (D.Md. 1981) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Similarly, individuals sued in their official capacity as state agents are entitled to the same immunity. As a general matter,

the Eleventh Amendment "does not bar suits for damages against state officers, so long as those officers are sued in their individual capacities." *Sales v. Grant*, 224 F.3d 293, 297 (4th Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66, (1985).

Determining whether an entity is synonymous with the state is not always an easy endeavor. The nature of the entity and its relationship with the state are critical to a determination of the entity's sovereign immunity under the Eleventh Amendment. The primary factor to be considered is whether a judgment against the governmental entity would be paid from the state's treasury. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Generally, if the judgment would be paid from the state treasury, the inquiry is at an end. *Id.* at 49. If the judgment would not be paid from the state treasury, the factors to be considered in determining whether suit against the entity would nonetheless be an affront to the State's "sovereign dignity" are "(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns — whether local or statewide — with which the entity is involved; and (3) the manner in which State law

treats the entity." *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001). If the judgment would not be paid from the state treasury, the "sovereign dignity" factors may sufficiently tie the entity to the state so that suit against the entity would amount to suit against the state. *Id.*

The University Defendants assert that Defendants UMBC, Board of Regents, and UMBCPD are immune from suit because "Congress has not abrogated States' Eleventh Amendment immunity in connection with U.S.C. §§ 1983, 1985, and 1986[]" and that "Maryland has not waived Eleventh [Amendment] Immunity for claims against its public universities." (ECF No. 46-1, at 21–22). As for the individual Defendants, the University Defendants argue that "[t]o the extent Plaintiffs are alleging that the Individual Defendants are liable in their official capacities, the claims are barred by Eleventh Amendment immunity." (*Id.* at 22). Defendants argue that immunity is proper because "State employees share in the State's immunity from being sued in federal court because a suit against the state officials acting in their official capacities is a suit against the State." (*Id.*) (internal quotation marks omitted). Defendants also state that they are not "persons" under § 1983. (*Id.*). Plaintiffs counter, arguing that these Defendants have consented

to be sued and Defendant UMBCPD is not a state agency for Eleventh Amendment purposes. (ECF No. 53, at 16-17). Plaintiffs do not directly counter Defendants' arguments as to the individual Defendants, and only state that "even if they were entitled to immunity for acts undertaken in their official capacities, they are being sued in their individual capacities as well." (ECF No. 53, at 17). Plaintiffs argue that suit is proper because "Defendants were not acting within the scope of their employment[.]" (*Id.*).

The Board of Regents and UMBC, as a constituent institution of the University System of Maryland, are considered instrumentalities of the State for immunity purposes. *See, e.g.*, MD. CODE, Educ. § 12-102(a)(1)-(3) (The University System of Maryland is "an instrumentality of the State" and "an independent unit of State government."); MD. CODE, Educ. § 12-101(b)(6)(ii) (UMBC is one of the "constituent institutions" of the University System of Maryland). Individual Defendants Hrabowski, Sparks, and Dillon are similarly entitled to Eleventh Amendment immunity to the extent they are being sued in their official capacities. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-102 (1984). Plaintiffs argue that UMBCPD is not a State agency

entitled to Eleventh Amendment immunity because it "is an entirely local actor (limited to a small area within Baltimore County)" and that there "is no statute [] creating a 'UMBC-Police Department[.]'" (ECF No. 53, at 17). Defendants argue that UMBCPD is "a unit of UMBC that is entitled to partake in UMBC's immunity." (ECF No. 63, at 8 n.2). According to the second amended complaint, UMBCPD is "a security force maintained by Defendant UMBC[]" and subject to the "supervisory power" of the UMBC President. (ECF No. 21, at 17). Thus, even if UMBCPD is not an instrumentality of the state, the degree of control UMBC wields over it entitles it to immunity.

Accordingly, Defendants UMBC, BOR, UMBCPD and the individual University Defendants in their official capacities will be dismissed.

### 2. State's Attorney Defendants

As discussed above, individuals sued in their official capacity as state agents are entitled to Eleventh Amendment immunity. A State's Attorney is, by definition, a "State Official." MD. CODE, Gen. Provisions § 5-101(ll)(5) ("'State official' means. . . a State's Attorney[.]"); *see also* MD. CODE, State Gov't § 12-101(a)(8) ("'State personnel' means. . . a State's

Attorney of a county or Baltimore City, or an employee of an office of a State's Attorney[.]"). Plaintiffs' arguments to the contrary — that State's Attorneys only act locally, "Maryland has not obligated itself to reimburse State's Attorneys for lawsuits against them[,]" or that "Maryland does not expressly consider State's Attorneys and their employees arms of the State" — lack proper support and do not overcome this definitional hurdle. (ECF No. 52, at 13-16). Accordingly, the State's Attorney Defendants in their official capacities will be dismissed.

### D. Absolute Prosecutorial Immunity

The State's Attorney Defendants argue that they are "entitled to absolute immunity from suit for the plaintiffs' claims that they engaged in unlawful behavior, because the decision regarding whom to prosecute is a core function of their roles as advocates for the State." (ECF No. 29-1, at 8). Plaintiffs insist that the State's Attorney Defendants' actions were "*ultra vires*, outside of the law, and they are not entitled to . . . protection[.]" (ECF No. 52, at 17). Plaintiffs specifically allege the following conduct as outside the realm of prosecutorial immunity: "[d]estroying evidence, threatening victims, and extra-territorial

intimidation[.]" (*Id.*, at 18). The State's Attorney Defendants do not respond to Plaintiffs' argument against absolute immunity.

"[P]rosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process[.]'" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)) (internal citations omitted). To determine whether particular actions warrant absolute immunity, as opposed to only qualified immunity, courts apply a "functional approach." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). This approach "looks to 'the nature of the function performed, not the identity of the actor who performed it[.]'" *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486-87.

The State's Attorney Defendants fall short of showing that their actions were prosecutorial in nature. These Defendants merely argue that all of their actions "relate to the exercise of a prosecutor's judgment about which cases to prosecute and against which individuals," and make no effort to differentiate the nature of the functions performed. (ECF No. 29, at 10). Thus, they have not established that they are entitled to absolute prosecutorial immunity.

### E. Qualified Immunity

The County Defendants and the State's Attorney Defendants argue that they are entitled to qualified immunity. (*See* ECF Nos. 45-1, at 25–30; 29-1, at 12–16). Qualified immunity is an affirmative defense to § 1983 claims that "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Assessing qualified immunity requires a multi-step analysis with shifting burdens of proof. "[T]he defendant bears the initial burden of demonstrating that the conduct of which the plaintiff complains

falls within the scope of the defendant's duties." *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (citation and internal quotation marks omitted). Once the defendant properly asserts qualified immunity, "[t]he plaintiff bears the burden of proof on the . . . question [of] whether a constitutional violation occurred." *Id.* at 377. If the plaintiff meets this burden, the defendant then bears the burden of proof on the question of whether the right in question was clearly established at the time of the alleged misconduct. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703-06 (4th Cir. 2018). As will be discussed, Plaintiffs have not met their burden.

### F. 42 U.S.C. § 1983

Plaintiffs allege five remaining claims predicated under 42 U.S.C. § 1983. These claims are: Count II, deprivation of first amendment rights by Plaintiff Borkowski and class Plaintiffs against Defendants Baltimore County, Montgomery, Tomas, Burrows, Dorfler, Johnson, Sheridan, and the State's Attorney Defendants in their individual capacities; Count IV, deprivation of equal protection and retaliation against Ms. Borkowski's family by Plaintiff Borkowski against Defendants Baltimore County and the State's Attorney Defendants in their individual capacities; Count

V, deprivation of equal protection by Plaintiff Borkowski against Defendants Shellenberger, Dever, and Fox in their individual capacities, as well as Defendants Burrows, Tomas, Dorfler, Lane, and Montgomery; Count VI, deprivation of equal protection by Plaintiff Frank against Defendants Dever and Shellenberger in their individual capacities, Baltimore County, Montgomery, Sparks, Hrabowski, Hunton, and Dillon; and Count XX, deprivation of equal protection by Plaintiff Noland against Defendants Hrabowski and Hunton.

As succinctly stated by Judge Hollander:

> To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823, 132 S.Ct. 112, 181 L.Ed.2d 37 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips*

> *v. Pitt Cty. Mem['l] Hosp.*, 572 F.3d 176, 180
> (4th Cir. 2009) (citing *Lugar v. Edmondson Oil
> Co.*, 457 U.S. 922, 929, 102 S.Ct. 2744, 73
> L.Ed.2d 482 (1982)).

*Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278-ELH, 2018 WL 3539819, at *19 (D.Md. July 23, 2018).

"Section 1983 also requires a showing of personal fault based upon a defendant's own conduct." *Id.* at 20 (citing *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights).

### 1. Equal Protection

Plaintiffs allege in Counts V, VI, and XX that Defendants' "acts . . . prevent[ed] [Plaintiffs] . . . from enjoying equal protection under the law." (*See, e.g.*, ECF No. 21, at 106). Defendants argue that Plaintiffs' equal protection claims must fail because "there is no class 'similarly situated' to these Plaintiffs and" a discriminatory purpose "is absent in this case[.]" (*See, e.g.*, ECF No. 45-1, at 28, 49).

"To succeed on an equal protection claim, a plaintiff must . . . demonstrate that [s]he has been treated differently from others

with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* Courts apply different tiers of scrutiny depending on the classification the law makes. *See id.* at 654-55. Gender-based classifications are subject to intermediate scrutiny, meaning that "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976).

Plaintiffs allege the following with regard to an equal protection claim under the enumerated counts:[3]

> Defendants followed written and/or unwritten policies, and thus afforded less protection to female victims of sexual assault than to victims of other crimes.
>
> . . .
>
> [Defendants] [t]reat sexual assault cases involving female victims with less urgency and

---

[3] Although Count I will be dismissed as an improper group pleading, the factual allegations set forth will still be considered for this equal protection analysis.

importance than that afforded to other types of violent crimes[.]

. . .

[Defendants] [i]nadequately staff the investigation, processing, and prosecutions of sexual assault cases involving female victims[.]

. . .

[Defendants] [t]reat female victims of sexual assault with less respect and devote less attention to their cases than to cases involving male victims, as applied to both sexual assaults and other crimes;

. . .

[Defendants] [i]ntimidate and harass victims of sexual assault through illegal means, to discourage and conceal the reporting of sexual assault crimes[.]

. . .

Defendants subjected Ms. Borkowski to a deprivation of her right to equal protection in that the investigation of her sexual assault demonstrated deliberate indifference to crimes against her as a woman. The investigation was not carried out with the same vigor and zeal as the investigation of other crimes. The investigation was carried out with the specific intent of obstructing and denying Ms. Borkowski's civil rights, as part of their broader scheme to suppress the number of viable complaints of sexual assault in Baltimore County.

. . .

> Defendants acted to ensure that female victims
> of sexual assault were less likely to have
> their cases investigated than victims of other
> crimes.

. . .

> The [investigative] irregularities were part
> of an intentional effort by Defendants Hunton
> and UMBC to manipulate the outcome and conceal
> complaints of sexual assault, to the benefit
> of Defendant UMBC.

. . .

> The particular circumstances of Defendant
> UMBC's investigation, including the pre-
> ordained conclusions crafted by Defendant
> Hunton, indicate that gender bias was a
> motivating factor behind the erroneous
> findings.

(ECF No. 21, at 99-102, 108, 110-11, 133).

Here, Plaintiffs fail to provide any sufficient, non-conclusory, allegations that they were treated differently than similarly situated individuals. Notably, Plaintiffs do not allege any facts to support an inference that the investigative processes were the result of gender discrimination. Further, Plaintiffs fail to identify a discriminatory intent on behalf of any Defendant. "Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a

discrimination claim." *Haywood v. Locke*, 387 F.App'x 355, 359 (4th Cir. 2010); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (same). "Proof of. . . discriminatory intent or purpose[,]" however, "is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229, 239 (1976). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Under this standard, it is appropriate to look behind the stated reasons for state action into circumstantial evidence to find proof of discriminatory motivation, including:

- a decision's historical background "if it reveals a series of official actions taken for invidious purposes;"

- "[t]he specific sequence of events leading up to the challenged decision;"

- "[d]epartures from the normal procedural sequence;"

36

> • "[s]ubstantive departures . . . particularly
> if the factors usually considered important by
> the decisionmaker strongly favor a decision
> contrary to the one reached;" and,
>
> • "[t]he legislative or administrative history
> . . . especially where there are contemporary
> statements by members of the decisionmaking
> body, minutes of its meetings, or reports."

*Arlington Heights*, 429 U.S. at 267-68.

"While it is true that discriminatory impact, if shown, may be probative (though not dispositive) on the issue of intent . . . [Plaintiffs'] statistical evidence in this case is not . . . probative of discriminatory impact." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 823 (4th Cir. 1995). For example, the second amended complaint states that between 2009 and 2014, 34% of reports of rape and sexual assault were classified as unfounded. (ECF No. 21, at 26). Plaintiffs go on to state how this data is a "statistical impossibility" and shows that "Defendants were engaged in improper practices." (*Id.*, at 27). Plaintiffs further allege that "female victims of sexual assault [are] less likely to have their cases investigated than victims of other crimes." (*Id.*, at 111). Plaintiffs do not, however, provide how many of those reports were made by female victims opposed to male victims, the gender percentages as to victims of other crimes, or any other

useful comparison.    Plaintiffs do not directly address their deficiencies of discriminatory evidence but rather state that "91% of sexual assault victims are women[]" and that "Defendants' outdated, hostile attitudes towards women, women's roles, and women's sexuality were the underlying causes of Defendants' unconstitutional behavior." (ECF No. 51, at 22).    Further, Plaintiffs do not allege, in a non-conclusory manner, a history of invidious decision-making, departures from the normal sequence, substantive departures, or contemporary statements that reveal a discriminatory motive.    Plaintiffs evidence, at best, supports their theory of Defendants' actions:  Defendants "manipulate crime data to avoid investigating (and making public) reports of rape and sexual assault" (ECF No. 21, at 21) because "[a]ll Defendants have or had professional, personal, or political self-interests in statistics that reflect a low crime rate in Baltimore County" (*id.*, at 22).  Plaintiffs state that these motives stem from "internal and external pressure to lower reports of sexual assault crimes and to maintain high 'clearance rates' in their jurisdictions, precincts, and areas of responsibility."    (*Id.*).    "The underreporting enhanced their professional standing and furthered their personal self-interests." (*Id.*).  If true, these allegations

38

are troubling, but fail to state a discriminatory purpose. Plaintiffs' gender discrimination claims more aptly fit a disparate impact theory, which is not viable under § 1983. *Ricci v. DeStefano*, 557 U.S. 557, 627 (2009) (The "equal protection doctrine is of limited utility. The Equal Protection Clause . . . prohibits only intentional discrimination; it does not have a disparate-impact component."). Thus, Plaintiffs have failed sufficiently to plead an equal protection claim. Accordingly, Counts V, VI, and XX will be dismissed.[4]

### 2. First Amendment Claims

Plaintiff Borkowski and class Plaintiffs allege that the State's Attorney Defendants and Defendants Baltimore County, Montgomery, Tomas, Burrows, Dorfler, Johnson, and Sheridan deprived them of their first amendment rights. Specifically, Plaintiffs allege that those Defendants interfered with "Ms. Borkowski's right to present sworn testimony to a Maryland District Court Commissioner[,]" that "she has the right to be free from retaliation by a public official for the exercise of her rights[,]"

---

[4] Defendant Hunton's briefing oversimplifies the state actor issue. Regardless, the outcome of the equal protection analysis in this case obviates the need to determine her status as a state actor.

and that "Defendants' retaliatory actions adversely affected Ms. Borkowski and other [c]lass [m]embers' constitutionally protected speech in that they were intimidated from testifying." (ECF No. 21, at 102-03). The complaint does not outline, in count II, precisely what Ms. Borkowski contends were the retaliatory actions, or by which Defendant. As outlined above, the second amended complaint, beginning at paragraph 459, recited the allegations beginning when Ms. Borkowski filed an application for a statement of charges with a District Court Commissioner on March 14, 2018. She includes only some of the Defendants by name: Defendants Montgomery, Dever, Burrows, Tomas, Shellenberger, and Fox.

The State's Attorney Defendants argue that "Ms. Borkowski cannot assert a federal claim against the [State's Attorney] Defendants for failing to investigate or prosecute her case or for dismissing the charges that she successfully filed (on March 21, 2018)[]" and that "Ms. Borkowski's conduct in filing successive applications for charges is not 'protected speech' under the First Amendment[]" and "may rise to the level of harassment." (ECF No. 64, at 9). The County Defendants similarly argue that Plaintiff Borkowski cannot assert a claim "to compel a criminal investigation

or prosecution[]" and that "[f]iling successive applications for charges is not 'protected speech' . . . [but] is harassment." (ECF No. 45-1, at 30-31).

The parties, again, fail to address each other's arguments or provide a proper legal framework to analyze this first amendment issue. Defendants argue that "no federal appellate court . . . has recognized that there is a federally enforceable right for the victim to have criminal charges investigated at all, let alone with vigor or competence." (ECF No. 29-1, at 14) (quoting *Walker v. Schmoke*, 962 F.Supp. 732, 733 (D.Md. 1997)). Plaintiffs ignore Defendants' arguments and reference *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984), arguing that "Defendants' conduct, directed at Ms. Borkowski and otherwise, was . . . clearly calculated to have a chilling effect on women who might avail themselves of their right to speak about their sexual assaults." (ECF No. 52, at 29). They claim to have "plausibly stated a claim that female sexual assault victims of reasonable firmness will be unwilling to speak out against these Defendants and their tactics." *Id.*

"A cognizable First Amendment retaliation claim requires a plaintiff to show: (1) 'that [plaintiff's] speech was protected';

(2) 'defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech'; and (3) 'a causal relationship exists between [plaintiff's] speech and the defendant's retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685–86 (4th Cir. 2000)).

Filing an application for a statement of charges likely is protected by the First Amendment, either under the petition or the speech clause. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 382 (2011); *Lane v. Franks*, 573 U.S. 228, 238-39 (2014). Certainly, whatever actions were taken by Defendants as a result of the filing of the applications were "caused" by the filing. The second element is more problematic in this circumstance. Judge Hazel has summarized the case law:

> [T]he key inquiry is "whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *The Balt[.] Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006)(citation omitted.) This determination is an objective one, and a plaintiff "need not actually be deprived of . . . First Amendment rights in order to establish First Amendment retaliation." *Garcia* [*v. Montgomery Cty., Maryland*, 145 F.Supp.3d 492 (D.Md. 2015)] at 515 (quoting *Constantine v. Rectors & Visitors*

> *of George Mason Univ.*, 411 F.3d 474, 500 (4th
> Cir. 2005).  The Fourth Circuit has described
> this process as a "fact intensive inquiry,"
> instructing district courts to focus on four
> factors: "[1] the status of the speaker, [2]
> the status of the retaliator, [3] the
> relationship between the speaker and the
> retaliator, and [4] the nature of the
> retaliatory acts." *Suarez*, 202 F.3d 676 at
> 686.

*Kimberlin v. Frey*, No. 13-cv-3059-GJH, 2017 WL 3141909 *9 (D.Md.
July 21, 2017).

The second amended complaint lacks sufficient precision in
Count II to allow it to proceed in its present form.  For example,
some of the Defendants who are sued in this count are not even
mentioned in the fact section related to the filing of applications
for statement of charges.  Furthermore, to the extent that a
prosecutor has discretion to decide how to handle charges, actions
relating to those decisions would not adversely affect the
protected speech.  Here, however, the allegations concerning some
of the Defendants' conduct appear to go beyond simply declining to
investigate or pursue charges, such as visiting Ms. Borkowski's
home and threatening criminal action against her if she did not
desist.  Whether Plaintiff Borkowski's successive filing of
charges constitutes harassment cannot be determined based on the

allegations in the complaint. MD. CODE, Crim. Law § 3-803(a) defines harassment: "A person may not . . . *maliciously* engage in a course of conduct that alarms or seriously annoys the other[] (1) with the intent to harass, alarm, or annoy the other; (2) after receiving a reasonable warning or request to stop by or on behalf of the other; and (3) without a legal purpose." (emphasis added).

Plaintiffs also allege that Defendants Baltimore County, Johnson, and Sheridan "failed to train and/or supervise . . . Defendants in the proper conduct of an investigation and were deliberately indifferent to their subordinates' violations of women[]s['] rights." (ECF No. 21, at 104). Defendants argue that "Plaintiffs do not plead sufficient facts to support supervisory liability under [§] 1983." (ECF No. 45-1, at 40).

Section 1983 imposes liability on "[e]very person who . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights[.]" 42 U.S.C. § 1983. The statute requires a showing of personal fault, whether based upon the defendant's own conduct or another's conduct, in executing the defendant's policies or customs. *See Monell v. Dep't of Social Servs. Of City of N.Y.*, 436 U.S. 658, 690 (1978); *Vinnedge*, 550 F.2d at 928 (requiring an affirmative showing that the official

44

charged acted personally in the deprivation of the plaintiff's rights). Moreover, an individual cannot be held liable under 42 U.S.C. § 1983 under a theory of respondeat superior. *See Monell*, 436 U.S. at 690; *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).

In a § 1983 proceeding, supervisory officials may be held culpable based on "'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Claims premised on supervisory liability must be supported with evidence that: (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;" (2) "the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury

45

suffered by the plaintiff." *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

To state a § 1983 claim against a county, a plaintiff must allege that the action at issue was one that "executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[]" or that represents informal governmental "custom." *Monell*, 436 U.S. at 690-91. Counties and other local governments cannot be held liable under § 1983 for injuries inflicted by their employees or agents based on the theory of respondeat superior – that is, "for an injury inflicted solely by its employees or agents." *Id.* at 694; *see Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). "Section 1983 plaintiffs seeking to impose liability on a municipality must, therefore, adequately *plead and prove* the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) (emphasis added) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1387-88 (4th Cir. 1987)); *see City of*

*Canton v. Harris*, 489 U.S. 378, 385 (1989); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

The Fourth Circuit has cautioned that while "[t]he substantive requirements for proof of municipal liability are stringent[,]" "[§] 1983 claims are not subject to a heightened pleading standard paralleling the rigors of proof demanded on the merits." *Jordan by Jordan*, 15 F.3d at 338 (citations and internal quotation marks omitted). Instead, "a [§] 1983 plaintiff seeking to impose municipal liability must satisfy only the usual requirements of notice pleading specified by the Federal Rules." *Id.* at 339. Consequently, although *Monell* does not impose heightened pleading requirements above the basic "short and plain statement" requirement of Rule 8(a), Plaintiffs still must adequately allege a County policy or custom that proximately caused the deprivation of their rights. *Id.* at 338; *see Peters v. City of Mount Rainier*, No. 14-cv-00955-GJH, 2014 WL 4855032, at *4 (D.Md. Sept. 29, 2014).

The first Supervisory Officer Defendant, James Johnson, was the Chief of Police from May 31, 2007 to January 31, 2017. (*See* ECF No. 21, at 15). On September 9, 2016, Defendant Johnson received an order from the County Executive to review how the BCPD

handles reports of rape that were marked "unfounded." (*Id.*, at 30). Defendant Johnson directed this review to occur. (*Id.*). Defendant Johnson also pledged to take a fresh look at unspecified investigations from 2013, 2014, and 2015 that were marked as "unfounded." (*Id.*). This "fresh look" never occurred. (*Id.*). Plaintiffs allege that Defendants Johnson, BCPD, and Sheridan, at the direction of State's Attorney Defendants Shellenberger and Dever, ordered the destruction of SAEKs within 90 days of collection prior to a change in the retention law in 2017. (*Id.*, at 36-37). "On January 9, 2017, Chief Johnson publicly voiced his support for SAEK reform and a commitment to ensuring that victims of sexual assault were treated with dignity." (*Id.*, at 31). "Two days later, Chief Johnson was fired." (*Id.*).

The second Supervisory Officer Defendant, Terrence Sheridan, has been the Chief of Police since January 31, 2017. (*Id.*, at 15). Defendant Sheridan, along with Defendant Johnson and others, directed the destruction of SAEKs within 90 days, before the retention law changed. (*Id.*, at 36-37). Defendant Sheridan responded to a 2016 audit by the Maryland Coalition Against Sexual Assault by announcing reforms in the handling of sexual assault reports. (*Id.*, at 31, 47). Plaintiffs further allege that

Defendant Sheridan acted to support the strategies of the State's Attorney's Office to undermine these reforms. (*Id.*, at 48). Defendant Sheridan, along with Defendant Shellenberger, "subverted" former Commissioner Johnson's promise in 2016 to "take a fresh look" at unspecified investigations from 2013, 2014, and 2015 that had been marked as "unfounded." (*Id.*, at 30, 98).

As to Baltimore County, Plaintiffs allege that "Defendant BCPD's Field Manual, which is an 'order' issued pursuant to Defendant Johnson and Sheridan's authority, . . . provides for a totally different procedure for an 'exceptional clearance disposition' in the case of a reported rape or sexual assault," and that the "ex-clear" disposition was used "to conceal viable reports of sexual assault against women." (ECF Nos. 21, at 42; 51, at 15).

Plaintiffs' claims of supervisory liability do not withstand Defendants' motions to dismiss. Plaintiffs make no specific allegations that Defendants Johnson and Sheridan had knowledge of the BCPD officers' conduct. Plaintiffs do not argue that Defendants Johnson and Sheridan had any specific response to the BCPD officers' conduct. Plaintiffs do not show how Defendants Johnson and Sheridan's failure to respond resulted in Plaintiffs'

injuries.  Finally, Plaintiffs do not plead or prove that the field manual proximately caused the deprivation of their rights. Accordingly, Plaintiffs have failed to state a claim in Count II for failure to train and/or supervise as to Defendants Johnson, Sheridan, and Baltimore County.  Count II will be dismissed.

Plaintiff Borkowski also brings Count IV against Defendant Baltimore County and the State's Attorney Defendants for "deprivation of equal protection retaliation against Ms. Borkowski's family" resulting in a "deprivation of familial relations."  (ECF No. 21, at 106).  Plaintiff Borkowski argues that "Emily Borkowski's firing [from the State's Attorney's Office] was a retaliatory, unjustified act, undertaken intentionally and maliciously to punish and further intimidate [Plaintiff] Borkowski for attempting to assert her right to free speech." (*Id.*, at 107).

The State's Attorney Defendants argue that "[Plaintiff] Borkowski lacks standing to sue for any alleged damages that her sister may have suffered."  (ECF No. 64, at 9).  The County Defendants similarly argue that Plaintiff Borkowski lacks standing to sue on behalf of her sister's firing.  (ECF No. 45-1, at 31-32).  Defendants are correct that Plaintiff Borkowski lacks

standing to collect damages on behalf of her sister's firing. The Fourth Circuit analyzed an analogous case in *Smith v. Frye*, 488 F.3d 263 (4th Cir. 2007). In *Smith*, the plaintiff brought a § 1983 claim alleging that his mother was fired in retaliation for the plaintiff's running for county clerk. *See id.* at 265-66. The Fourth Circuit held that "[a]llowing [a relative] to collect for emotional damages and humiliation resulting from [a family member's] discharge from her employment casts the net of possible [§ 1983] liability too broadly." *Id.* at 273-74. "[T]herefore, . . . such emotional distress is insufficient as an Article III injury in fact." *Id.* at 274. Here too, Plaintiff Borkowski lacks a sufficient injury in fact to bring suit predicated on her sister's firing. Accordingly, Count IV will be dismissed.

### G. 42 U.S.C. § 1985

Plaintiffs bring Counts III, VII, and XV under 42 U.S.C. § 1985. Although not specified by subsection, these counts appear to allege violations of subsection two.[5] (*See* ECF No. 21, at 104

---

[5] If these claims are predicated under subsection three, Plaintiffs have failed to state a claim. To state a claim under 42 U.S.C. § 1985(3) a plaintiff must set forth the following:

("Count III. . . Defendants violated 42 U.S.C. § 1985 by deterring, by force, intimidation, or threat, . . . Ms. Borkowski, from attending . . . court, or from testifying[.]"); *id.*, at 111 ("Count VII. . . Defendants conspired to coerce Ms. Frank into not reporting her sexual assault to the police[.]"); *id.*, at 126 ("Count XV. . . Defendants thus conspired, for the purpose of impeding, hindering, obstructing, and defeating, the due course of justice in Baltimore County")). Defendants argue that "Plaintiff[s'] conspiracy-based counts . . . each fail to state a claim upon which relief can be granted[.]" (ECF No. 45-1, at 35).

---

(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).

*Soc'y Without A Name*, 655 F.3d at 346. In addition, the plaintiff "must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights." *Poe*, 47 F.3d at 1377 (internal quotation marks omitted). As discussed above, Plaintiffs fail to state an equal protection claim and further fail to allege a meeting of the minds to show conspiracy.

52

"[P]laintiffs alleging unlawful intent in conspiracy claims under § 1985 . . . [must] plead specific facts in a nonconclusory fashion to survive a motion to dismiss." *Poe*, 47 F.3d at 1377 (quoting *Gooden v. Howard Cty.*, 954 F.2d 960, 969-70 (4th Cir. 1992) (en banc)). Section 1985(2) is divided into two separate clauses. The first clause applies if two or more persons:

> conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror;

18 U.S.C. § 1985(2). The second clause of § 1985(2) applies when two or more persons:

> conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws[.]

53

"There are significant differences in the conduct covered by the two clauses. In the first clause of 1985(2), the 'court of the United States' refers only to federal courts, as defined in 28 U.S.C. § 451, and does not include state courts." *Kimberlin v. Hunton & Williams LLP*, No. 15-cv-723-GJH, 2, at *5 (D.Md. Mar. 29, 2016), *aff'd*, 671 F.App'x 127 (4th Cir. 2016); *see Kush v. Rutledge*, 460 U.S. 719, 724-25 (1983); *Bloch v. Mountain Mission Sch.*, 1988 WL 45433, at *1 (4th Cir. 1988) ("the first half of § 1985(2), . . . prohibits two or more persons from conspiring to deter by force, intimidation, or threat, any party or witness from attending or testifying truthfully in a federal court."). "On the other hand, the second part of § 1985(2) applies to state courts and requires an allegation of class-based animus." *Hunton & Williams LLP*, 2016 WL 1270982, at *5 (internal citations omitted); *see Kush*, 460 U.S. at 726 (holding that "[t]he language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some. . . class-based, invidiously discriminatory animus behind the conspirators' action.") (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (emphasis in original)). Plaintiffs appear to rely on the second clause of § 1985(2) because the second amended complaint makes only

reference to Maryland state courts. (*See, e.g.*, ECF No. 21, at 104) ("Defendants . . . conspired . . . to intimidate Ms. Borkowski from giving testimony before a Maryland District Court Commissioner.").

A claim under the second clause of § 1985(2) will not survive a motion to dismiss without a sufficient allegation of class-based animus. As discussed above, Plaintiffs fail to state an equal protection claim. Accordingly, Counts III, VII, and XV will be dismissed.

Count VIII will similarly be dismissed. Viability of a § 1986 claim is based on the antecedent § 1985 claim. If the § 1985 claim is dismissed, the § 1986 claim also fails. *Buschi v. Kirven*, 775 F.2d 1240, 1243 (4th Cir. 1985); *Sellner v. Panagoulis*, 565 F.Supp. 238, 249 (D.Md. 1982) ("[S]ection 1986. . . 'merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985.'") (quoting *Williams v. St. Joseph Hosp.*, 629 F.2d 448, 452 (7th Cir. 1980)), aff'd, 796 F.2d 474 (4th Cir. 1986).

**H. Fourth Amendment**

Plaintiffs bring Count XIV against Defendants Baltimore County, Sheridan, Johnson, Shellenberger, Dever, Fox, and Richardson for unreasonable search and seizure in violation of the

Fourth Amendment to the United States Constitution.  This claim is predicated upon the allegedly unlawful SAFE exams conducted by GBMC.  The County Defendants argue that this claim should be dismissed because "the 'searches' at issue were both consented to and reasonable."  (ECF No. 45-1, at 32).  The State's Attorney Defendants argue that Plaintiffs cannot prove a violation of informed consent.  (ECF No. 29-1, at 21-22).  Plaintiffs do not respond to the State's Attorney Defendants' arguments.

The Fourth Amendment provides, in pertinent part, "[t]he right of the people to be secure in their persons [and] houses . . . against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. Amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Id.*

Plaintiffs allege that (1) "Defendant BCPD deceived the subjects of the 'searches,' nullifying consent" (ECF No. 51, at 28); (2) "'[c]onsent' obtained without informing victims 'that the SAEKs would be destroyed without being used to solve any crimes, including the victims assaults,' is no consent at all" (ECF Nos. 51, at 28-29; 21, at 124); and (3) the consent forms were "inadequate to allow the female victims of sexual assault to give informed consent to the procedure" (ECF No. 21, at 124). Plaintiffs do not provide the contents of the GBMC consent forms. Plaintiffs do not bring suit against any GBMC individual or entity, but allege that "performing intrusive searches without informed consent constitute[s] medical battery[.]" (*Id.*, at 124–25).

According to the second amended complaint, the Plaintiffs signed consent forms authorizing GBMC to perform the SAFE exams and collect the SAEK evidence. (*See id.*, at 58, 71, 124). The Fourth Circuit has explained that voluntary consent to a search by medical professionals turns on whether the consenters "understood that the request was not being made by medical personnel for medical purposes, but rather by agents of law enforcement for purposes of crime detection." *Ferguson v. City of Charleston*, 308 F.3d 380, 397 (4th Cir. 2002). Plaintiffs do not allege that they

understood the SAFE exams were conducted by medical personnel for medical purposes, rather than for crime detection. The fact that some SAEK evidence was destroyed after the examinations occurred does not obviate the consent given when they were conducted. Further, Plaintiffs do not allege that any individual Defendant played any role in the creation of GBMC's consent forms. All further allegations in the second amended complaint as to Defendants vitiating Plaintiffs' consent are conclusory and fail to state a claim under Fed.R.Civ.P. 12(b)(6). Accordingly, Count XIV will be dismissed.

## I.  20 U.S.C. § 1681

### 1.  Sex discrimination

#### a.  Plaintiffs Fegler, Frank, and Noland

In Counts IX, XVI, and XVII, Plaintiffs allege that Defendants Board of Regents, UMBC, and UMBCPD were deliberately indifferent to Plaintiffs Fegler's, Frank's, and Noland's sexual assault complaints in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*

The Fourth Circuit recently analyzed a university's potential liability under Title IX for student-on-student harassment:

Title IX is what is known as Spending Clause legislation, applying to schools and educational programs that receive federal funds[.] Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in a federally funded program. *Id*. Given that statutory structure, the Court held in *Davis* [*v. Monroe County Board of Education*, 526 U.S. 629 (1999)], a school could be liable in damages for student-on-student sexual harassment only if it was "deliberately indifferent" to known acts of such harassment. 526 U.S. at 642, 649.

The Court started with the well-established rule that recipients of federal funds must have adequate notice that they may be liable for certain conduct before a private damages action will be allowed. *Id*. at 640. It followed, the Court concluded, that schools may not be held liable under Title IX for the misconduct of their *students*, but only for their "*own* decision to remain idle in the face of known student-on-student harassment," *id*. at 641 (emphasis in original)—"intentional conduct that violates the clear terms of the statute," *id*. at 642. A negligent failure to learn of or react to its students' independent actions, in other words, will not subject a school to liability, but "deliberate indifference to known acts of harassment" will. *Id*. at 642–43.

*S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 75 (4th Cir. 2016) (emphasis in original). In another recent case, the Fourth Circuit concluded that plaintiffs sufficiently alleged

59

a university's deliberate indifference to sexual harassment. *Feminist Majority Found.*, 911 F.3d at 689. The allegations here lack the specificity and force of the *Feminist Majority Foundation* complaint, which "portray[ed] repeated instances of. . . students targeting and harassing [plaintiffs] with threats and other sex-based hostility[,]" "reported to the [u]niversity over many months" and responded to by the university merely "with two listening circles, a generic email, and by sending a campus police officer with a threatened student on one evening after particularly aggressive and targeted" messages. *Id.* at 689–691. In contrast, the entirety of Plaintiffs' deliberate indifference argument is re-stated here:

> Defendants were deliberately indifferent to Plaintiffs' suffering. "No reasonable official in [Defendants'] position would have believed doing nothing to reform [UMBC's] sexual harassment policies was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation." *Hill v. Cundiff*, 797 F.3d 948, 985 (11th Cir. 2015). Defendants did not work to reform their policies until they got sued, despite several news articles exposing their practices. Sec. Am. Compl. ¶¶ 44–46, 102–03. Defendants were deliberately indifferent.

60

(ECF No. 53, at 24). Defendants counter, arguing that they "were not deliberately indifferent to" any Plaintiff's "complaint of student-on-student sexual harassment." (ECF No. 46-1, at 34) (internal capitalizations omitted).

In Count IX, Plaintiffs allege that the Institutional Defendants were "deliberately indifferent to Ms. Frank's rape" because they hired "a biased investigator to pantomime an investigation into" Ms. Frank's complaint of sexual assault. (ECF No. 21 ¶ 681). The second amended complaint further states that after Plaintiff Frank filed her complaint of sexual assault, UMBC hired Defendant Hunton to investigate the complaint (*id.* ¶ 318), provided Plaintiff Frank an opportunity to participate in the investigation (*id.* ¶ 321), provided her with the final report (*id.* ¶¶ 337-38), held a hearing (*id.* ¶¶ 340), and provided her an opportunity to appeal the Board's decision (*id.* ¶ 343).

In Count XVI, Plaintiffs allege that the Institutional Defendants were "deliberately indifferent to Ms. Fegler's rape" because they "conducted [a] sham investigation of" Ms. Fegler's complaint of sexual assault. (*Id.* ¶ 791). Defendants state, and Plaintiffs do not dispute, that "[a]s evidenced by the facts alleged, and the documents from the investigatory file of the

61

complaint at issue, it is undisputed that UMBC conducted an investigation, held a hearing, and heard Ms. Fegler's appeal." (ECF No. 46-1, at 35).

In Count XVII, Plaintiffs allege that the Institutional Defendants were "deliberately indifferent to Ms. Noland's rape" because they "hired a biased investigator to pantomime an investigation" of Plaintiff Noland's complaint of sexual assault. (ECF No. 21 ¶ 803). After Plaintiff Noland filed her complaint of sexual assault, UMBC hired Defendant Hunton to investigate the complaint (*id.* ¶ 371), provided Plaintiff Noland an opportunity to participate in the investigation (*id.* ¶ 372), provided her with the investigator's final report (*id.* ¶¶ 371-74), and provided her notice of the resolution of her complaint (*id.* ¶ 374). "Defendant Hunton concluded . . . that Ms. Noland was sexually assaulted" and UMBC imposed sanctions upon the assailant, although he was not expelled. (*Id.*, at 68-69). Plaintiff Noland was provided an opportunity to appeal this decision. (ECF Nos. 21 ¶ 342; 26-5, at 22).

Although the process and results were not perfect, Plaintiffs have not met the bar for deliberate indifference. Plaintiffs' argument that withholding punishment from two out of the four

alleged assailants identified by Plaintiff Fegler was deliberately indifferent is not actionable under Title IX. "[I]t is not enough that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim." *S.B. ex rel. A.L.*, 819 F.3d at 77. Moreover, "if a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." *Davis*, 526 U.S. at 644. Plaintiffs Fegler, Frank, and Noland have not shown that they have been subject to further harassment after the alleged deliberate indifference.

Plaintiffs further argue that Defendant Hunton's investigative choices to credit evidence or testimony from anyone but Plaintiff Frank was retaliation. (ECF No. 53, at 23). These allegations are accusatory and lack support. Thus, any retaliation claim under Title IX fails to state a claim for relief under Fed.R.Civ.P. 12(b)(6). Accordingly, Counts IX, XVI, and XVII will be dismissed.

In addition, Defendants argue that:

> Ms. Fegler's Title IX claim in Count XVI is
> barred by the applicable three year statute of
> limitations. *See Doe v. Bd. of Educ. of Prince*

63

> *George's Cty.*, 888 F.Supp.2d 659, 663 (D.Md.
> 2012) (statute of limitations for Title IX
> claims follows the applicable state personal
> injury statute of limitations, which in
> Maryland is three years). The final
> adjudication of Ms. Fegler's complaint was
> issued in February 2015. The Plaintiffs'
> initial complaint in this matter, however, was
> not filed until September 2018. Thus, any
> claims related to UMBC's adjudication of Ms.
> Fegler's complaint are barred by limitations.

(ECF No. 46-1, at 36). Plaintiffs do not dispute this argument.[6]

Upon review, Defendants are correct. For this additional reason,

Count XVI will be dismissed.

### b. Plaintiffs Borkowski and Hendler

In Count XIII, Plaintiffs allege that the Institutional

Defendants "were deliberately indifferent to Ms. Borkowski and Ms.

Hendler's rape[]s" because the Defendants "conducted only a sham

investigation into" Ms. Borkowski's complaint of sexual

misconduct. (ECF No. 21 ¶ 737). Defendants argue that, "because

Ms. Borkowski and Ms. Hendler are both students of Towson

University and not UMBC, they have no standing to make a Title IX

---

[6] The statute of limitations is an affirmative defense that must be pled and proven by a defendant. It is only cognizable on a motion to dismiss if the defense plainly appears on the face of the complaint.

gender discrimination claim against the Institutional Defendants."
(ECF No. 46-1, at 40).

Title IX prohibits discrimination on the basis of sex in "any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The Supreme Court of the United States has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. "[B]ecause the harassment must occur 'under' 'the operations of' a funding recipient, *see* 20 U.S.C. § 1681(a); § 1687 (defining 'program or activity'), the harassment must take place in a context subject to the school district's control[.]" *Id.* at 645. A recipient's damages liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs." *Id.* Thus, "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and

objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits *provided by the school*." *Id.* at 650 (emphasis added).

Plaintiffs do not address their deficiencies under *Davis*, but rather argue that they have met the "constitutional requirement[s] placed on the federal courts to ensure that the courts only hear 'Cases' and 'Controversies.'" (ECF No. 53, at 24) (internal citation omitted). The second amended complaint states that "Ms. Borkowski was a former student and planned to apply to a UMBC program for a master's in social work." (ECF No. 21 ¶ 722). This future intent, however, is not sufficient to support a current deprivation of an education program or activity. Thus, Plaintiffs Borkowski and Hendler cannot properly bring a claim for gender discrimination under Title IX against an institution which did not deprive them of any educational program or activity. Accordingly, Count XIII will be dismissed.

For these same reasons, Plaintiff Borkowski cannot state a claim for denial of educational opportunities under Title IX. Accordingly, Count XII will be dismissed as to Plaintiff Borkowski.

## 2. Erroneous Outcome

In Count X, Plaintiffs assert an "erroneous outcome" claim based on gender discrimination under Title IX due to the allegedly biased investigation of Defendant Hunton into Plaintiff Frank's complaint of sexual assault against Defendants Board of Regents and UMBC. Defendants argue that "Plaintiffs fail to plausibly allege the elements of an erroneous outcome claim" because "Plaintiffs cite no procedural violations that caused 'a procedurally or otherwise flawed proceeding' to reach an 'erroneous outcome.'" (ECF No. 46-1, at 38). Plaintiffs fail to respond to Defendants' erroneous outcome argument.

Judge Bredar detailed this district's preferred legal standard to evaluate erroneous outcome claims:

> To assess whether a school's disciplinary proceedings produced an erroneous outcome in violation of Title IX, courts typically apply a framework first introduced in *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2$^d$ Cir. 1994). *See, e.g., Mallory v. Ohio Univ.*, 76 Fed.App[']x. 634, 638-41 (6th Cir. 2003) (citing favorably to *Yusuf*); *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 961-62 (4th Cir. 1997) (same), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *9-10 (W.D.Va. Aug. 5, 2015) (same). In an erroneous outcome case, "the claim is that the plaintiff was

innocent and wrongly found to have committed an offense" on the basis of gender bias. *Yusuf*, 35 F.3d at 715.

> To state a claim for erroneous outcome discrimination, a plaintiff must allege (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* To satisfy the third element, a plaintiff must do more than merely rely on "a conclusory allegation of gender discrimination. . . ." *Id.* Sufficiently particularized allegations of gender discrimination "might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

*Doe v. Salisbury Univ.*, 123 F.Supp.3d 748, 765–66 (D.Md. 2015). Although erroneous outcome claims typically involve a plaintiff claiming innocence who was wrongly found to have committed an offense, an analysis will still be undertaken here.

Plaintiff Frank falls far short of pleading an erroneous outcome claim. Plaintiff Frank's only allegations of a flawed proceeding stems from Defendant Hunton's credibility determinations. Plaintiff Frank does not identify any procedural irregularities regarding the Institutional Defendants named under Count X. Further, Plaintiff Frank does not allege any statements

68

by members of the disciplinary tribunal or patterns of decision-making that may lend to a proper inference of gender discrimination. Accordingly, Count X will be dismissed.

### 3. Denial of Educational Opportunities

Count XII alleges a denial of educational opportunity by Plaintiff Frank against Defendants Board of Regents, UMBC, and UMBCPD. Plaintiff Frank states that, after the alleged assault, she "lost one year of educational time" and "now attends a community college." (ECF No. 21, at 120). Defendants argue that this claim is "duplicative of Plaintiffs' claims of Title IX discrimination based on Ms. Frank's . . . allegations of student-on-student harassment[.]" (ECF No. 46-1, at 42). Plaintiffs argue that these claims are not duplicative, and state factual differences listed under each Count, but fail to provide any relevant legal citation or standard to analyze a deprivation of educational opportunities under Title IX. (*See* ECF No. 53, at 28). It is unfortunate that "Ms. Frank suffered severe educational setbacks," but without a sufficient claim of discrimination under Title IX, this ancillary count fails to state a claim as well. Accordingly, Count XII will be dismissed.

### 4.    Failure to Prevent Sexual Harassment

In Count XI, Plaintiffs allege that UMBC knew that Ms. Frank's alleged assailant had previously "sexually assaulted others." (ECF No. 21 ¶ 713).  Defendants correctly point out, however, that Plaintiffs do not allege any details as to when the alleged assaults occurred, whom the assailant assaulted, the nature of the assaults, or who at UMBC knew about such alleged assaults. Plaintiffs do not contest these pleading deficiencies.   These allegations fall far short of proper pleading.  Thus, Count XI fails to state a claim upon which relief can be granted.

### V.    Motions to Seal

Defendant Hunton filed a consent motion to file two exhibits under seal on January 11, 2019.  (ECF No. 28).   The University Defendants similarly filed an unopposed motion to seal eleven exhibits on February 7, 2019.  (ECF No. 48).   All exhibits Defendants seek to seal contain intimately personal information. Defendants have provided proposed redactions where feasible and seek to seal exhibits entirely where sensitive information pervades the documents.   Thus, the requirements of Local Rule 105.11 are satisfied.   Accordingly, the motions to seal will be granted.

## VI. Class Certification

Class certification will not be addressed at this time. "[A]nalysis of class compliance with Rule 23 is not appropriately undertaken on a motion to dismiss, but should be addressed in a motion pursuant to Rule 23(c)(1)(A)." *Popoola v. Md-Individual Practice Ass'n, Inc.*, 230 F.R.D. 424, 433 (D.Md. 2005) (citing 7B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1798, at 226–27 & n.23 (3$^d$ ed. 2005) (citing cases)).

## VII. Conclusion

For the foregoing reasons, the motions to seal filed by Defendant Hunton and the University Defendants will be granted, and the motions to dismiss filed by Defendant Hunton, the University Defendants, the County Defendants, and the State's Attorney Defendants will be granted. Some of the defects in Plaintiffs' second amended complaint cannot be remedied, and Plaintiffs have already amended twice, but it is not entirely clear that a more modest, focused, complaint would be futile. Accordingly, they will be granted time to file a further amendment. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
