IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANNA BORKOWSKI, | * | |
| and | * | |
| ANNEMARIE HENDLER, | * | |
| and | * | |
| KATELYN FRANK, | * | |
| and | * | |
| MARCELLA FEGLER, | * | |
| and | * | |
| KAILA NOLAND, | * | |
| and | * | |
| OTHERS SIMILARLY SITUATED, | * | |
| Plaintiffs, | * | Civil Action No.:   1:18-cv2809 |
| v. | * | |
| BALTIMORE COUNTY, MARYLAND, | * | |
| and | * | |
| | * | |
| FREEMAN HRABOWSKI III, | * | |
| and | * | |
| UNIVERSITY OF MARYLAND, BALTIMORE COUNTY, | * | |
| | * | |
| and | | |

LISA DEVER,                                   *

    and                   *

SCOTT SHELLENBERGER,                          *

    and                   *

BONNIE FOX,                                   *

    and                   *

JAMES JOHNSON,                                *

    and                   *

TERRENCE SHERIDAN,                            *

    and                   *

NICHOLAS TOMAS,                               *

    and                   *

KRISTIN BURROWS,                              *

    and                   *

KIMBERLY Montgomery,                          *

    and                   *

ROSEMARIE BRADY,                              *

    and                   *

PAUL DORFLER                                  *

    and                   *

TIMOTHY LEE                          *

    and                             *

PAUL DILLON,                         *

    and                             *

MARK SPARKS,                         *

    and                             *

BERNADETTE HUNTON,                   *

    Defendants.                     *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## THIRD AMENDED COMPLAINT

Plaintiffs Anna Borkowski, Annemarie Hendler, Katelyn Frank, Marcella Fegler, and Kaila Noland ("Named Plaintiffs"), on their own behalf and on behalf of those similarly situated (the "Class"), by and through their attorney, Rignal W. Baldwin V and BaldwinLaw LLC, bring this suit against Baltimore County, Maryland, the University of Maryland, Baltimore County ("UMBC"), the University of Maryland, Baltimore County Police Department ("UMBC Police")[1], Scott Shellenberger, Lisa Dever, Bonnie Fox, Nicholas Tomas, Kristin Burrows, Rosemarie Brady, Timothy Lee, Paul Dorfler, Paul Dillon, Mark Sparks, Bernadette Hunton, Freeman Hrabowski III, James Johnson, and Terrence Sheridan.

---

[1] Due to the number of parties and acronyms and the complicated nature of the case, Plaintiffs have included a glossary, which is attached as Exhibit A and incorporated herein by reference.

<u>Preface</u>

<u>Unfair Treatment Of Female Victims Of Sexual Assault In Baltimore County</u>

1.   Baltimore County's pattern and practice of discriminatory treatment towards female victims is reflected in its internal records, most of which remain undisclosed despite two (2) years of Maryland Public Information Act ("MPIA") requests.  To the extent that those records have been disclosed, there is clear pattern of not just failing to investigate and, when appropriate, prosecute, but also a pattern of invidious discrimination against female complainants.  As set forth herein, and as reflected by exhibits attached hereto, that pattern includes witness intimidation and destruction of evidence.

2.   For the period between 2016 and 2017, forty-four percent (44%) of reports of rape and sexual assault were classified as reports of non-crimes.  Thirty-six percent (36%) of the reports of rape and sexual assault in Baltimore County, handled by the Special Victims Team ("SVT"), were classified as "unfounded" or "suspicious circumstances."

3.   In Baltimore County, nine (9%) of sexual assault victims are male, while ninety-one percent (91%) of sexual assault victims are female.  Fewer than one third of sexual assaults are reported to police. In 2018, 1107 sexual assaults were reported to BCPD.  Of those 1107, 696 cases were properly coded and treated as sexual assaults.

4.   Of the sexual assaults that were properly coded by Baltimore County, fewer than fifteen percent (15%) result in an arrest.  Only ten percent (10%) are referred to prosecutors for charges.  Only 5.4% of those referred to prosecutors are charged with a crime and less than five percent (5%) result in conviction of a sex crime.

<u>Plaintiffs</u>

<u>Named Plaintiffs Anna Borkowski, Annemarie Hendler, Katelyn Frank, Marcella Fegler, And Kaila Noland</u>

5.   Named Plaintiff Anna Borkowski is a resident of Maryland, a former UMBC student, and former prospective UMBC student.

6.   Named Plaintiff Annemarie Hendler is a resident of Maryland, a former UMBC student, and a current Towson University student.

7.   Named Plaintiff Katelyn Frank is a resident of Maryland and a former UMBC student.

8.   Named Plaintiff Marcella Fegler is a resident of Maryland and a former UMBC student.

9.    Named Plaintiff Kalia Noland is a resident of Maryland and a former University of Maryland ("UMD") student who was assigned to UMBC.

10.  All Named Plaintiffs are putative class representatives.

<u>Class Plaintiffs</u>

11.  Named Plaintiffs bring this class action on behalf of all female victims of rape or sexual assault in Baltimore County, Maryland. These women reported their assault; underwent invasive testing in the preparation of a Sexual Assault Evidence Kit ("SAEK"); were denied educational access on the basis of their gender in connection with a report or attempted report of rape or sexual assault; and, were improperly dissuaded, coerced, intimidated, or otherwise impeded from reporting or pursuing a rape or sexual assault complaint because of Defendants' sympathy to men accused of sexual assault and

antipathy against women reporting it. These women were adversely affected by the Defendants' policies (collectively, the "Class" or "Class Members").

Subclasses

12. The Class may be divided into the following subclasses (collectively, the "Subclasses"):

13. All adult women raped or sexually assaulted in Baltimore County, who reported their assault to Baltimore County authorities and were adversely impacted by Baltimore County's unconstitutional policies (the "Baltimore County Reported Rape/Assault Subclass").

14. All adult women raped or sexually assaulted in Baltimore County, who reported their assault to the UMBC Police Department and were adversely impacted by Defendants' unconstitutional policies (the "University Police Reported Rape/Assault Subclass").

15. All adult women raped or sexually assaulted in Baltimore County, who underwent invasive searches for the preparation of a SAEK, and were adversely impacted by Defendants' unconstitutional policies (the "Invasive Searches Subclass").

16. All adult women denied educational access based on gender as a result of UMBC's policies (the "Title IX subclass").

## Defendants

### Baltimore County

17.  Defendant Baltimore County (sometimes the "County") is a political subdivision of Maryland.  Defendant Baltimore County is responsible for the training, policies, procedures, and actions of Baltimore County Police Department ("BCPD") and its employees.

### The State's Attorney Defendants

18.  The State's Attorney Defendants are Scott Shellenberger, Lisa Dever, and Bonnie Fox.

19.  Defendant Scott Shellenberger is the State's Attorney for Baltimore County.

20. As State's Attorney, Scott Shellenberger is limited to prosecuting cases in the District and Circuit Courts of Baltimore County.

21.  Defendant Shellenberger is elected by Baltimore County residents.

22.  Defendant Shellenberger's $10,000 budget is provided by the Baltimore County Council and paid through Baltimore County taxes.  Ex. 13.

23.  Defendant Shellenberger has no state-wide powers.

24.  Defendant Lisa Dever is an Assistant State's Attorney and the Chief of the Sex Offense and Child Abuse Division ("SOCAD") of the Baltimore County State's Attorney's Office.

25. Defendant Dever is not a "State Official" in that her position is not provided for in the Maryland Constitution.

26. As an Assistant State's Attorney, she is limited to prosecuting cases in the District and Circuit Courts of Baltimore County.

27. Defendant Dever is appointed by the current State's Attorney.

28. There is no state statute providing for Defendant Dever's compensation.

29. Defendant Dever's salary is subject to the approval of the Baltimore County Executive and the Baltimore County Council.

30. Defendant Dever has no state-wide powers.

31. Defendant Bonnie Fox is an "Investigator" for the SOCAD of the Baltimore County State's Attorney's Office and reports directly to Defendant Dever.

The Baltimore County Police Department Defendants

32. The Baltimore County Police Department Defendants ("BCPD Defendants") are individuals who were or are employed by Defendant Baltimore County and are sued in their individual and official capacities.

33. Defendants Nicholas Tomas, Kristin Burrows, and Kimberly Montgomery are BCPD Detectives assigned to the Special Victims Team ("SVT").

Baltimore County Police Department Supervisory And Policymaker Defendants

34. The Baltimore County Police Department Supervisory and Policymaker Defendants ("BCPD Supervisory/Policymaker Defendants") are or were individuals responsible for policies, training, discipline, and supervision of BCPD employees, specifically members of the SVT and Forensic Services Section ("FSS").

35. All BCPD employees designated in this lawsuit are collectively "BCPD Defendants," or "Baltimore County Defendants."

36. Defendant James Johnson is a former Chief of the BCPD.  He was responsible for BCPD policies, training, discipline, and supervision from May 31, 2007 to January 31, 2017.

37. Defendant Terrence Sheridan is a former Chief of the BCPD.  He was responsible for the policies, training, discipline, and supervision of the BCPD from January 31, 2017, to June 16, 2019.

38. Lieutenant Michael Peterson was the head of the SVT from 2004 to 2018 and was a supervisor and policymaker for the BCPD.

39. Defendant Rosemarie Brady is a former BCPD Sergeant Detective and was a supervisor and policymaker for the BCPD.

UMBC And The UMBC Defendants

40. Defendant UMBC is an educational institution that receives federal funding in the form of grants and financial assistance.

41. Defendant Freeman Hrabowski is the President of Defendant UMBC.  He is ultimately responsible and accountable for policies, rules, and regulations adopted by Defendant UMBC.

42. Defendant Bernadette Hunton was a contractor or subcontractor for Defendant UMBC.  She was retained to investigate Ms. Frank's, Ms. Noland's, and other Class Members' complaints of sexual misconduct.

43. Defendant UMBC Police Department ("Defendant UMBC Police") is a police force of limited local jurisdiction, and signatory to a Memorandum of Understanding that further limits its enforcement powers.  Ex. 27.

44. Defendant UMBC Police has no statewide authority and any judgement against it should be paid from its own budget.

## The UMBC Police Defendants

45. The UMBC Police Department Defendants ("UMBC Police Defendants") are or were the individuals responsible for the creation, promulgation, and enforcement of the rules and regulations of Defendant UMBC Police.

46. Defendant Mark Sparks was the Chief of the UMBC Police Department from August 2, 2010 until June 30, 2018.  Defendant Sparks was responsible for the training, supervision, and decision-making of the UMBC Police Department.

47. Defendant Paul Dillon is the current Chief and former Deputy Chief of Defendant UMBC Police Department.  He is responsible for the training, supervision, and decision-making of the UMBC Police Department.

48. Robert Jagoe is the accreditation manager and Clery Act reporter for Defendant UMBC Police and Defendant UMBC and has wide-ranging policy and supervisory powers.  Ex. 29.

49. All of the UMBC Police Defendants are Policymakers and Supervisors.

## Official And Personal Capacity

50. For the purpose of this lawsuit, when sued in their individual capacities, Defendants Dillon, Sparks, Johnson, Sheridan, Jagoe, Brady, and Peterson are all "Supervisory Defendants."  When sued in their official capacities, these Defendants are "Policymaker Defendants."

## State's Attorney Defendants

51. Defendant Shellenberger is sued in his personal capacity only.

52. Defendants Dever and Fox are sued in their personal and official capacities as *de facto* Baltimore County employees.

UMBC and UMBC Police Defendants

53. UMBC Defendants Hrabowski, Sparks, Dillon, and Jagoe are sued in their personal capacities.

Jurisdiction And Venue

54.    The claims arise from Defendants' violations of 42 U.S.C. §§1983, 1985, and 1986; and 20 U.S.C. §1681.

55.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, as this case involves claims "arising under the Constitution, laws, or treaties of the United States."

56.    Jurisdiction pursuant to 28 U.S.C. §1343 is proper as this case seeks to "redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

57.    Jurisdiction is proper pursuant to 28 U.S.C. §1367 over all state law claims, as any state law claims form part of the same case or controversy as claims otherwise falling under this Court's original jurisdiction.

58.    Jurisdiction is also proper pursuant to 42 U.S.C. § 1988.

Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as "a substantial part of the events or omissions giving rise to the claim occurred" in Maryland

Background

Actual Knowledge of BCPD's Unconstitutional Treatment Of Female Victims Of
Sexual Assault

59.     In 2012, the command staff at BCPD raised concerns regarding the SVT's
investigation of sex crimes. Ex. 1.

60.     On information and belief, the "concerns" related to widespread abusive
behavior by SVT Detectives towards female victims of sexual assault.

61.     On information and belief, Chief Johnson, Lieutenant Peterson, and Sergeant
Brady were aware of the concerns of abusive behavior.

62.     In October of 2015, a Baltimore Post Examiner article outlined the failure of
UMBC and BCPD to appropriately respond to the rape of Plaintiff Marcella Fegler.  Ex.
Q.

63.     On September 8, 2016, the website "Buzzfeed" reported that SVT Detectives
were refusing to investigate credible claims of sexual assault in Baltimore County.  Ex. 2.

64.     On or about September 9, 2016, County Executive Kevin Kamenetz ordered
Defendant Johnson to review how Defendant Baltimore County handles reports of rape
the County deemed "unfounded."

65.     Defendant Johnson also directed Defendant Baltimore County to have the
Criminal Investigation Bureau ("CIB") re-examine all "unfounded" rape cases from 2013,
2014, and 2015. Ex. 3.

66.     Neither review happened.

67. Defendant Johnson, on behalf of Defendant Baltimore County, also pledged to "take a fresh look to ensure that the investigation[s] were handled properly and that justice was done." Ex. 5.

68. The "fresh look" never happened.

Plaintiffs Fegler and Frank relied on Defendant Johnson's promise of a "re-examination." It never occurred.

The 2016-2017 Audit

69. On October 19, 2016, County Executive Kamenetz ordered an independent Audit of Baltimore County's procedures relating to reports of rape and sexual assault. Ex. 4.

70. The purpose of the 2016 Audit was to identify systemic concerns regarding policies and procedures relating to sexual assault. Ex. 5.

71. The scope of the 2016 Audit was limited to purportedly "unfounded" reports of rape that occurred from 2013 to 2015, a total of 124 reports.

72. It is noteworthy that the actual number of unfounded reports was far higher.

73. On information and belief, and early draft of the Audit report was circulated to the Policymaking/Supervisory Defendants in January of 2017, with a final version provided in February of 2017. Ex. 5.

74. Despite the limited scope of the Audit, and the suspect nature of the information provided to the Auditors by Defendants, the Report concluded that the Audit "clearly demonstrated the deficiencies in and interpretation of Maryland's sexual assault

statutes" by Defendant Baltimore County, the BCPD Defendants, and Defendants Shellenberger and Dever.

75.    The Report specifically criticized Defendant Baltimore County's "inadequate investigation into the victim's ability to resist or appraise the circumstances" in cases where the victim was intoxicated. Ex. 5.

76.    The Report criticized the lack of "[c]ommunication between sex crimes detectives and the Baltimore County State's Attorney's Office," noting that "communication with prosecutors is particularly important in cases involving interpretations of the law on force and in cases involving 'mentally incapacitated individuals' under Criminal Law §3-301(c)," (*i.e.,* all of the Named Plaintiffs and hundreds of members of the Class). Ex. 5.

77.    For example, Defendant Baltimore County intentionally misinformed female victims of the elements of sexual assault crimes to convince those female victims, including Class Members, that no crime had occurred. Ex. 5.

78.    After the Maryland Coalition Against Sexual Assault ("MCASA") Report criticized existing practices, Defendants Baltimore County, Shellenberger, and Sheridan, announced the reform of the existing unfair and discriminatory system of handling reports of sexual assaults. Ex. 4.

79.    On February 8, 2016, County Executive Kamenetz released the Report and announced the implementation of certain reforms by the BCPD.  Ex. 4.

80.    The announced reforms were aimed at improving the investigation of reports of sexual assault and ending the biased treatment of female victims.

81.     Defendants Shellenberger and Dever were personally involved in responding to the recommended reforms.  Ex. 5.

82.     Due to Supervisory Defendants' personal bias, related indifference, and subsequent failure to train, supervise, or discipline their subordinates, the agreed to reforms were ignored or subverted.

83.     Specifically, Defendant Baltimore County's Field Manual now requires that "[a]n Incident Report…be made on all calls . . . of sexual assault."  Ex. 4.

84.     The requirement is regularly ignored and unenforced by the Policymaking/Supervisory Defendants responsible for its implementation.

85.     Contrary to orders in the Field Manual, incident reports related to sexual assault were either not completed or were coded in a way to make female victims' complaints of sexual assault appear to be non-sex crime reports.

86.     These deliberate failures were part of a systematic and intentional custom, pattern, and practice of Baltimore County for which the final Policymaker Defendants are responsible.

87.     Baltimore County promised to have an SVT Detective (rather than a patrol officer) interview all victims and suspects in any reported "Sexual Crime."

88.     This did not happen.

89.     Baltimore County refused to implement the 2017 accountability reforms.

90.     Baltimore County also failed to keep its promise to consult with Prosecutors to increase arrests and charging.

91.     All of the foregoing failures, by Defendant Baltimore County and the Policymaking/Supervisory Defendants were intended to continue the pattern and practice of underreporting complaints of sexual assault.

92.     On January 31, 2017, County Executive Kamenetz appointed Terrence Sheridan to replace Chief Johnson.

93.     In 2019, County Executive Johnny Olszewski appointed a Sexual Assault Investigations Task Force ("SAITF").

The SAITF Finds That Nothing Has Changed

94.     In 2019, the SAITF released a Report of Findings and Recommendations.  Ex. 52.

95.     The Report found that police and prosecutors were deficient in interactions and investigations involving victims with disabilities or mental health concerns and that those deficiencies likely impacted investigations and charging decisions.

96.     Similar challenges were also noted in police and prosecutors' interviews with and investigations involving victims under the age of sixteen (16).

97.     The Report also found that delayed reporting by sexual assault victims rarely resulted in prosecution.

98.     Despite recent changes clarifying that resistance on the part of the victim is no longer required to meet the definition of rape, some case files reviewed, detectives and prosecutors questioned lack of resistance.

99.     The Report noted that training and education about victim responses to trauma was lacking and would benefit all system partners.

100.    In response to the 2017 Audit, the SAITF made several recommendations.

101.    The SAITF recommended that BCPD personnel receive intensive training in the following areas: responding to victims with mental illness and cognitive disabilities, trauma-informed interviewing skills, and investigating cases involving intoxicated victims.

102.    The Report also stressed the importance of increasing and documenting communications between sex crimes detectives and the SAO.

Effects of Supervisory Indifference and Biased Customs

103.    As a result of the increased expertise and requirements applicable to reports of sexual assault, arrest rates for rape and sexual assault should have risen.

104.    Instead, arrest rates remained stagnant.

105.    Cases handled by SVT have arrest rates of between four percent (4%) and six percent (6%).

106.    Conviction rates are also exceptionally low.

107.    They are low because, according to Defendant Dever, her office "has different policies for prosecuting some crimes than policies for prosecuting rape cases. When they [the SAO] try criminal cases for robbery, *et cetera*, there's a different standard. They just need probable cause to prosecute the case. But for rape cases, they need evidence that proves the rape occurred beyond a reasonable doubt."

108.    Baltimore County has failed to implement proper policies or to train, supervise, or discipline those responsible for carrying out those policies.  This failure is intended to

continue a pattern and practice of intimidation and destruction of evidence, for the express purpose of discriminating against female victims of sexual assault.

109.    A policy and custom of deliberate refusal to investigate sexual assault crimes against female victims led to the non-prosecution of rapes and sexual assaults before, and after, the Audit.  This deliberate internal failure is attributable to the Policymaker Defendants, and Defendants Shellenberger and Dever who exercised Policymaking and Supervisory authority over the SVT and FSS, unlawfully.

110.    Records reflect that the Baltimore County and State's Attorney Defendants used a self-created "lack of evidence" standard as a pretextual justification to later refuse to investigate a report for insufficient physical evidence.  This policy is a reflection of all Defendants' preferential treatment of male suspects over female victims.

111.    The stagnant arrest rates stood in contrast with a sharp rise in the number of reports of rapes and sexual assaults.

112.    Reports rose from 100 in 2013 to 346 in 2018.  This was not the case in other, non-gender related crimes, which fell by comparison.  Nor was there any comparable County of City that experienced this phenomenon.

SVT Detectives' Misconduct And Gender Bias

113.    The SVT has no standard operating procedure or specialized/formalized training.  Ex. 28.

114.    As part of an informal policy or custom, Defendants Burrows, Tomas, and other SVT Detectives routinely tell victims that it is "hard to prove sex was not consensual," even when the victim was physically injured as a result of the assault.  Other

frequent comments are, "it's your fault", "you rode him", and "[you] didn't fight to the best of your ability."

115.   It is not a policy of BCPD to tell victims of burglaries or attempted murder that their allegations are hard to prove.

116.   As part of an intentional effort to protect male suspects of sexual assault in Baltimore County, the Defendants set out to make reporting and pursuing investigation of rapes and sexual assaults as unpleasant and difficult for female victims as possible.

117.   It is an unwritten policy for SVT Detectives to "explain" the Sexual Assault Forensic Examination ("SAFE") to victims in the most unappealing way possible, for the purpose of dissuading victims from pursuing their complaints.

118.   As a result of the intentional interference, victims would frequently decline the exam.

119.   Baltimore County and State's Attorney Defendants used the victims' decision as an excuse to discontinue any investigation with the "non-cooperative" victim.

120.   SVT Detectives routinely refuse to test, or even take, female victims' clothing or other biological evidence.

121.   Female victims of sexual assault, including minors, are frequently told by SVT Detectives that they had "hopefully learned a lesson" about drinking, *i.e.,* that rape was a natural consequence of the victims' irresponsible behavior. This intimidation reflects BCPD and Policymaking Defendants' bias against women who report sexual assault.

122.   In several instances, where female victims consented to sexual activities with one man but not another, BCPD Defendants informed the female victims that they had

consented to sexual activities with all their assailants merely by consenting to sexual activity with one.

123.    SVT Detectives, including BCPD Defendants, further intimidated female victims by telling them that their assault would be all "over social media," and that "everyone will know" if the female victim pursued criminal action.

124.    In the face of the 2013 concerns and 2016 Audit, Defendants Johnson, Sheridan, Peterson, and Brady were aware of these practices and customs and were, at best, willfully indifferent in their failure to train and supervise their subordinates and to promulgate or enforce appropriate policies.

125.    These Defendants also failed to implement the policies that were in place in a consistent and non-discriminatory manner.

126.    Baltimore County's intentional case attrition strategies (acts calculated to persuade victims to refuse to pursue their cases), unlawful misclassification, miscoding, and other manipulative practices favor male suspects at the expense of female victims.

127.    SVT Detectives are still permitted to destroy evidence without consulting the Department of Law.  Ex. 16.  Destruction of SAEK kits is specifically intended to deny female victims of sexual assault their legal rights, and to favor the male perpetrators.

128.    Such mistreatment included threats of criminal prosecution if the victim pursued a criminal complaint.

129.    Baltimore County does not use these practices of intimidation and abuse in their approach to handling other crimes, crimes that do not disproportionately affect women.

130.    Defendants Baltimore County and the BCPD Supervisory and Policymaker Defendants implement a policy and practice of dissuading female victims of rape and sexual assault from making "official" reports.

131.    By contrast to these activities, crimes that do not disproportionately affect women are not under-investigated or misreported, nor are the investigators of those crimes improperly trained, supervised, or disciplined.

132.    Baltimore County And State Attorney's Wrongful Treatment Of SAFEs And SAEKs

133.    Federal law requires that a woman reporting sexual assault to law enforcement receive a SAFE at no charge.

134.    A SAFE can last up to four hours; it involves a victim's genitals being prodded, swabbed, and photographed, as well as pubic hair combing and other invasive procedures.

135.    SAFEs in Baltimore County are usually performed by a Greater Baltimore Medical Center ("GBMC") Forensic Nurse Examiner ("FNE").

136.    Currently, in Baltimore County, SAFE examinees must sign a State waiver releasing the results of the exam to Maryland's Department of Health and Mental Hygiene, BCPD, and the State's Attorney, should the victim "elect" to report the sexual assault to the police and "elect" to cooperate with a prosecutor.  Ex. 7.

137.    The waiver is not explained to the victims, who are often in severe distress and sometimes intoxicated.

138.   The waivers do not inform the examinee that there is no medical value of the SAFE. Ex. 7.

139.   A SAFE results in the creation of evidence, called a "Sexual Assault Examination Kit" ("SAEK").  An SAEK is half the size of a shoe box and does not require refrigeration.

140.   SVT Detectives have sole discretion over whether a SAEK is tested but do not inform victims of that fact.

141.   Defendants Dever and Shellenberger wrongfully interfere with that determination by working with SVT Detectives to limit SAEK testing and promoting the willful destruction of this critical evidence.

142.   As a result, between 2010 and 2018, Baltimore County and BCPD Defendants willfully destroyed the SAEKs of over 650 women in the Class.

143.   Defendants, including the BCPD Defendants, did so at the direction of the Supervisory Defendants and Defendants Shellenberger and Dever, who were acting outside of their lawful authority, with the tacit or express approval of BCPD Supervisory/Policymaking Defendants.

144.   The unnecessary and expansive destruction of SAEKs, without any plausible rationale, and while preserving other evidence, reflects the County and SAO Defendants' bias against women who report sexual assault.[2]

---

[2] Baltimore County has sometimes claimed that finances constrained the evidence capacity.  BCPD has a budget of two billion.

145.    No such bias is shown when compared to the crimes of simple or aggravated assault, as shown by BCPD evidence retention policies.

146.    There was no valid governmental purpose served by destroying the SAEKs. To the contrary, the purpose was to artificially lower the prosecution of sex crimes against female victims in Baltimore County

SAEK Statistics for Baltimore County Indicate Bias Against Female Victims of Sexual Assault

147.    Of the 1,032 SAEKs collected between 2010 and 2018, only 614 SAEKs remain.

148.     Of all the SAEKs collected between 2010 and 2018, approximately forty percent (40%) have been destroyed.[3]

149.    Of the SAEKs collected, only thirteen percent (13%) were tested for the presence of DNA.

150.     Of all the SAEKs collected, only 0.035 percent (0.035%) were uploaded into CODIS/NDIS

151.    In contract, between 2016 and 2017, fifty-four percent (54%) of property crimes and thirty-three percent (33%) of violent, non-sex crimes were tested and submitted to CODIS compared to the eight percent (8%) for sexual assault.

---

[3] During that time period, Baltimore County destroyed an additional 217 SEAK's collected prior to 2010.  The total number destroyed in this period is 655.

152.    Until recently, Defendant Baltimore County, the BCPD Defendants, and the SAO Defendants had no public written policy on the retention of SAEKs.

153.    Baltimore County, however, had been instructed to keep the SAEKs indefinitely.  Ex. 12.

154.    This policy was disregarded, though the letter is deceptively mentioned in Baltimore County's latest evidence retention policy.  Ex. 41.

155.    It was with tacit approval from BCPD Policymaking Defendants that this policy was ignored.

156.    The BCPD Defendants worked with Defendants Shellenberger and Dever, over the course of several years, to carry out a policy that destroyed SAEKs while safeguarding evidence in other crimes.

157.    SAFE examinees were not informed of the SAEK's destruction, in contrast to other non-sexual assault evidence where victims received a notice letter if evidence was to be destroyed.

158.    Sex-crime detectives in Baltimore County have the unique ability to order biological evidence destroyed, but no other group of detectives are permitted to do this, and no other evidence relating to investigations and prosecutions is subject to such discretion.  Ex. 42.

159.    The Baltimore County retention period for SAEKs is still shorter than that for burglaries.  Ex. 43.

160.    On October 7, 2016, a new state law guaranteed the preservation of SAEKs for 20 years.  Ex. 14.

161.    In response to the new law, Defendant Baltimore County actively concealed what forensic evidence was in its custody.

162.    In 2016, Baltimore County stated that, in 2015, it "collected and submitted" 22 DNA samples from sexual assault crimes for analysis in 2015.  Ex. 44.

163.    In 2016, Baltimore County reported to the Attorney General of Maryland that it had 197 untested SAEKs in inventory.

164.    In reality, for that time period, BCPD had at least 260 untested SAEKs, even though Baltimore County had destroyed nearly 1,000 untested SAEKs from the past decade.

165.    As of December 31, 2017, BCPD claimed to have 310 untested SAEKs, of which only five were "awaiting testing."  Ex. 45.

166.    At that time, Baltimore County had 254 untested SAEKs.

167.    After years of misleading the public and the Office of the Attorney General ("OAG"), Baltimore County was forced to admit to the OAG that it has 844 SAEKs in inventory as of early 2018.

168.    The policy and custom of unnecessary destruction of SAEKs reflect the County and SAO Defendants' bias against women who report sexual assault, as evidence from non-gender-based crimes is not destroyed at this rate.

169.    No such bias is shown when compared to the crimes of simple or aggravated assault, shown by BCPD evidence retention policies.

## BCPD Training And Supervision Failures

### BCPD Coding

170.    Baltimore County would routinely classify credible reports of sexual assault as "unfounded," without conducting any investigation of the report, *i.e.,* no interviews, no collection of evidence, no substantive police work, even when their own records reflected that a sexual assault likely occurred.

171.    In 2015, when Defendant Baltimore County finally implemented a 2011 change in the Uniform Crime Reporting ("UCR") definition of "rape," thirty-eight percent (38%) of the total increase in reported rapes or sexual assaults in Maryland came from Baltimore County, yet Baltimore County contains less than fourteen percent (14%) of the Maryland population.

172.    This is because the County had, for years, concealed reports of rape in a lesser category of crimes called "Part II Crimes" to avoid public scrutiny of its policies.

### "Unfounded" Coding

173.    According to County policy, a report of sexual assault may be classified as "unfounded" when "the incident did not occur" (*i.e.,* a false or baseless report), or "the incident was determined to have occurred in another jurisdiction."  Ex. 47.

174.    In 2013, Baltimore County and BCPD Defendants classified forty-three percent (43%) of reports of rape and sexual assault in Baltimore County as "unfounded." When a woman reported a rape or sexual assault to the BCPD, forty-three percent (43%) of the time the victim was told that no crime occurred, or that the reporting party was determined to be untruthful.

175.    Between 2009 and 2014, thirty-four percent (34%) of reports of rape and sexual assault in Baltimore County were classified as unfounded.  The national average during that period was seven percent (7%).

176.    In 2015 and 2016, the number of rape reports classified as unfounded in Baltimore County was approximately eighteen percent (18%).

177.    In 2018, after receiving a public records request regarding "unfounded" case reports, BCPD reclassified dozens of "unfounded" cases as "open," an acknowledgement of improper coding practices.

178.    The victims in these cases were never informed and, in an attempt to conceal biased policy, no investigative work was done as a result of the reclassification.  Thus "unfounded" and "open" remain a distinction without deference.

179.    The striking and implausible discrepancy between Baltimore County coding and the national average reflects the collective effects of the Defendants to conceal sexual assault crimes against female victims.

"Exceptional Clearance" Miscoding

180.    BCPD's Field Manual provides that "[t]he refusal of the victim to cooperate or failure of the State's Attorney's Office to prosecute does not unfound a legitimate offense."

181.    The County also uses "exceptional clearance" to make it appear that investigations had been resolved when they had simply been abandoned.

182.   Defendant Baltimore County's Police Field Manual provides the procedure for "exceptional clearance disposition" that is facially discriminatory to women who report rape or sexual assault.

183.   BCPD's Field Manual, which is an "order" issued pursuant to Defendant Johnson and Sheridan's authority, states that "Adult Ex-Clear" is appropriate in a sexual assault case when "an adult was not arrested, but was identified as a suspect and warrant/summons procedures were explained so the victim can file charges."

184.   BCPD's definition is inconsistent with the FBI's definition and is a reflection of its discrimination of female victims, as it appears nowhere else.

185.   Ms. Borkowski's case would not have been closed but for BCPD's policy and/or custom of exceptional clearance that applies uniquely to sexual assault, the manual is what allowed the police to ignore her complaint.

<u>A46 Miscoding</u>

186.   Defendants Baltimore County, Dever, Shellenberger, and Dillon, along with the BCPD Defendants and University Defendants, maintained, and still maintain, a policy and practice of recording or having other credible reports of sexual assaults against women recorded as merely reports of "suspicious circumstances" or code "A46."

187.   The "A46" practice concealed those Defendant's refusal to investigate the credible reports of crimes by male suspects, against female victims, including Named Plaintiffs and Class Members.  The practice discriminates in favor of male suspects over female victims.

188.   This discriminatory "A46" practice does not apply to reports of other crimes.

189.   In 2018, according to an internal SVT database, 52 of the 294 cases handled by SVT were ignored as "suspicious conditions."

190.   The "A46" practice also was concealed from those who conducted the 2016 Audit of Defendants' sexual assault investigative policies, procedures, and customs.

191.   Baltimore County's written policy of documenting reports when a "specific offense or victim cannot be substantiated . . . [by] using the offense code 'Suspicious Incident/Condition/Person/Vehicle'" is at odds with their actual practice of using the code to shield male perpetrators of sexual assault from investigation.

192.   "Delayed reports" or reports of rape and sexual assault, those made five (5) days or more days after the assault, are routinely marked "A46."  This coding ends the investigation, as noted by the SAITF.

193.   When a woman's report of sexual assault is misclassified as a "suspicious circumstance" or "suspicious condition," it deprives the female victim of the type of investigation a male crime victim's report would receive under similar circumstances. This practice directly discriminates against similarly situated female victims of crime and reflects gender bias.

194.   The Supervisory/Policymaking Defendants not only had actual knowledge of this practice, they encouraged it, and it caused injury to Ms. Frank and Members of the Class.

Miscoding Reports as "Open"

195.    For 2015, the year prior to the Buzzfeed article's release, twenty-three percent (23%) of those properly recorded reports of rape were coded as "open," per Baltimore County's reports to UCR.

196.    For 2017, the year the purported reforms took effect, thirty-four percent (34%) of those recorded reports of rape are coded as "open," per UCR.

197.    Defendants, instead of classifying reports as unfounded or cleared by exceptional circumstances, redirected their manipulation by leaving cases "open."

198.    Currently, Defendant Baltimore County, the BCPD Defendants, and Defendants Shellenberger and Dever conspire to miscode more reports of sexual assault as "cleared" due to "exceptional circumstances" to avoid dealing with the scrutiny of "unfounded" cases.

199.    The "new" pattern and practice is evident in BCPD's own statistics.  While fewer reports of rape were deemed "unfounded," the number of arrests per report decreased slightly.

200.    Eighteen percent (18%) of the reported (and recorded) rapes from 2013 were still "open" when Defendants reported their statistics.  Eleven percent (11%) of the properly recorded reports of rape from 2014 were still open.  Twenty percent (20%) of those properly recorded reports of rape from 2015 were still open.

201.    Baltimore County Defendants' scheme was to avoid the negative publicity of "unfounded" cases and simply coding them as either "A46" or "exceptionally cleared"

instead of instituting meaningful reforms, and to continue its concealment of a pattern and practice that disproportionately impacts female victims of crime.

202.    Baltimore County failed to address BCPD Defendants' underlying bias against female victims and for that reason, policies and customs relating to investigations, arrests and prosecution remain the same.

Other BCPD Policies

203.    As part of the pattern and practice to diminish the prosecution of male perpetrators of sexual assault crimes, BCPD used its own "Confidential Release Authorization" that the Baltimore County Defendants encouraged female victims to sign. Ex. 6.

204.    This waiver is facially discriminatory and was only used for investigations of rape or sexual assault.

Named Plaintiffs And Class Members Were Not Told That Their SAEKs Would Be Destroyed Without Testing

205.    Victims' SAEKs were regularly destroyed without uploading DNA evidence into the Combined DNA Index System ("CODIS") or National DNA Index System ("NDIS").

206.    CODIS is a system of national, state, and local databases managed by the FBI that allows crime laboratory personnel across the country to compare DNA profiles from known criminal offenders (and arrestees where applicable) with biological evidence from crime scenes.

207.    CODIS has proven crucial to solving crimes in which the offender's identity is unknown.  CODIS can match a known suspect from one case to an unknown suspect in another, thereby identifying serial offenders.

208.    According to its own inventory, between 2010 and 2018, Baltimore County has only uploaded 37 DNA profiles relating to sexual assault.

209.    This information was concealed from the public.

210.    According to Defendant Shellenberger, "DNA evidence is an invaluable law enforcement tool that brings violent offenders to justice."

211.    In spite of this belief and because of his invidious bias against women reporting sexual assault, he secretly thwarted testing of SAEKs of female victims and was an integral part of Defendants' efforts to mislead the public.  More importantly, this concealment and the destruction of SAEKs without advising the victims/examinees left female victims with the false impression that their complaints were being actively investigated.

212.    Defendant BCPD routinely conducts tests on biological evidence when investigating burglaries, thefts, and shopliftings.

213.    In contrast, BCPD conducted relatively few tests while investigating sexual assaults and/or rapes of female victims.

214.    By participating in this pattern and practice of concealment, Defendant Shellenberger acted outside his legal authority in interfering with Baltimore County Policy.

215.   Defendant Shellenberger openly opposed the use of DNA testing to deter the rape and sexual assault of women.

216.   Between 2010 and 2018, in over sixty-nine percent (69%) of untested SAEKs, Baltimore County cited State's Attorney Office policy as the reason for not testing.

217.   On December 16, 2016, Defendant Shellenberger sent a letter to every state delegate falsely stating certain DNA evidence contained in SAEKs was not eligible for entry in the National CODIS system.  Ex. 36. The purpose was to continue his pattern and practice of obstructing the investigation and prosecution of sexual assault complaints.

218.   Defendants Shellenberger and Dever prevented CODIS uploads in rape cases, but not other cases.

219.   Between 2017 and 2018, ninety-two percent (92%) of DNA profiles tested and uploaded to CODIS by Baltimore County were for non-sex crimes, while over 800 SAEKs languished.

220.   Less than two percent (2%) of SAEKs added to the official inventory from 2016-2018 have been uploaded to CODIS.

221.   Due to their bias against women who report sexual assault, Defendants Shellenberger, Dever, and Baltimore County Supervisory and Policymaking Defendants used Federal Funds to test and upload DNA relating to property crimes, but not sexual assault or rape committed against female victims.

222.   BCPD and SAO Defendants knew in advance of SAEK collection that the results would be ignored, concealed, or destroyed.  County and State Attorney Defendants concealed from victims the fact that the SAEKs would never be tested or

analyzed, or that the perpetrators' DNA would not be placed in a nationwide database to stop serial rapists.

223.    For example, in 2018, Plaintiffs Borkowski's and Hendler's SAEKs were falsely counted as "tested," but were not.  When they inquired as to the status of their SAEKs, the response also implied that the SAEKs had been tested.  Ex. 8.  The response was false and misleading.

224.    When Katelyn Frank inquired about the status of her SAEK, she was told that she would receive timely notice if there was a confirmed match.  Ex. 9.

225.    In fact, it had already been destroyed as a result of Baltimore County, the Policymakers/Supervisory Defendants, and Defendant Shellenberger's biased evidence destruction policy.

226.    Defendant Shellenberger's public refusal "to use [his] daytime forensic people to test cases" in "Jane Doe" cases, because a "Jane Doe case, [has] no chance at going to court," is flatly contradicted by the fact that CODIS uploads result in an arrest seventy percent (70%) of the time.

227.    Despite that fact, Defendant Shellenberger claims that when "there's no issue about who the [assailant] is, then DNA doesn't really contribute anything."

228.    Defendant Shellenberger's claims were made with the knowledge that DNA information entered into CODIS and NDIS can be used to solve other rapes and sexual assaults committed by known assailants against female victims who were not able to identify their assailant.

229.   Defendant Shellenberger's statements are further evidence of the *ultra vires* and personal, non-official nature of his actions and policymaking.  He refers to BCPD forensic employees as "his" and ignores the distinction between Defendant Baltimore County and himself/his staff.

230.   His actions in this regard are in his personal capacity and unrelated to any prosecutorial or administrative function, let alone any legitimate government interest.

231.   Defendant Baltimore County, BCPD Defendant's, and Shellenberger and Dever's hostility against the Constitutional and civil rights of female sexual assault victims to be treated equally under the law is reflected in their absolute refusal to meaningfully change their discriminatory practices.

<u>State's Attorney Defendants Intentionally Discriminated Against Female Victims of Sexual Assault</u>

232.   SOCAD has no written policies relating to prosecution of rape.

233.   When asked to adopt written policies, the SAO refused, stating "a decision on whether or not to adopt written policies cannot be addressed without knowing there would be sufficient funding and staffing to accomplish this objective also. This cannot be accomplished until at least some period after the next budget is submitted."

234.   Defendant Shellenberger, as part of an unlawful conspiracy with the SVT Detectives, intentionally enforced a "non-law," falsely requiring evidence of force or "resistance" to establish rape, a requirement which has not existed since the 1960's.

235.   Defendants Shellenberger and Dever secretly limited testing of SAEKs and its use as evidence, despite lacking any legal authority to do so.

236.    Defendant Shellenberger avoids the use of DNA testing and sharing to deter the rape and sexual assault of women, and encourages the early destruction of DNA evidence related to sexual assaults.  His bias against female victims could not be clearer.

237.    Defendants Shellenberger and Dever also discourage women from reporting sexual assault by ignoring evidence of physical resistance, or, falsely telling victims that evidence of resistance is required.

238.    Defendants Shellenberger and Dever, acting in their personal capacities, used this control and influence to reduce the number of men held accountable for rape and sexual assault.

239.    Defendant Shellenberger intentionally misled the Named Plaintiffs and the Class Members by falsely telling them that the sexual assault that they reported did not meet the elements of a crime.

240.    Time and time again, Defendants Shellenberger and Dever have used the legally outdated "force" and "resistance" standards, despite 80 years of precedent abrogating such requirements.

241.    Defendant Shellenberger's and Dever's personal acts of deceit disproportionately affected women and violated their rights to equal protection of the law and directly harmed Named Plaintiffs and Class Members.

242.    Men were not told by Defendants Shellenberger and Dever that they had to resist burglaries, robberies, or assaults.

243.    In 2017, Defendant Shellenberger agreed to use a tracking sheet for SAO cases but failed to do so.

244.    Not only did he fail to do so, his office rabidly protects these accountability forms from disclosure, even in redacted form.  Ex. 10.

245.    Defendants Shellenberger and Dever intentionally ignored the fact that in Maryland, a victim's testimony alone is sufficient evidence for a conviction, because they did not want to convict.

Defendant Lisa Dever

246.    The BCPD SAEK inventory is rife with references to Defendant Dever as a reason why a SAEK should not be tested.

247.    Defendant Dever has publicly and privately stated that she does not consider a female victim's testimony alone to be sufficient evidence for a conviction.  Dever stated that an assailant that "present[s] equally credible testimony that this [her assault] was consensual," makes a case non-prosecutable.

248.    She is articulating Defendant Baltimore County's and her own policy.

249.    Defendant Dever makes her credibility determination without having spoken with or seeking any statement from the assailant and finds men vastly more credible than women.

250.    Defendant Dever also discourages women from reporting sexual assault by ignoring evidence of physical resistance, falsely telling victims that evidence of resistance is required.

251.    Defendant Dever, acting in her personal capacity, used *ultra vires* control and influence to reduce the number of men held accountable for rape and sexual assault.

252.    Defendant Dever intentionally misled the Named Plaintiffs and the Class Members by falsely telling them that the sexual assault that they reported did not meet the elements of a crime.

253.    For example, Defendant Dever has consistently lied to victims regarding the elements of "incapacity" as part of her personal effort to dissuade victims or their families from pursuing charges, and to protect male suspects.

254.    Defendant Dever has, for example, stated that a victim must be "passed out behind a dumpster" to be incapacitated.

255.    Victims of other serious crimes, whose victims are not predominately female, do not have to request police investigations to preserve evidence, yet Defendant Dever insists that female victims of sexual assault must request police investigations to preserve evidence.

256.    The State's Attorney Office's Unlawful Interference in BCPD's SVT Defendants Shellenberger and Dever have no authority over employees of the Baltimore County Police Department.

257.    SVT Detectives would often call Defendants Shellenberger or Dever from the emergency room to ask if they should proceed with an investigation.  To this day, the State's Attorney Defendants have an unlawful influence over police investigations and the use of forensic evidence.

258.    Defendants Shellenberger and Dever directly, personally, and unlawfully participated in the BCPD's manipulation of investigative procedures and dispositions, and the allocation of resources, despite lacking any State or other authority to do so.

259.    Defendants Shellenberger and Dever directly, personally, and unlawfully made *ultra vires* policy decisions on behalf of the BCPD, especially the "Special Victims Team" ("SVT"), including destroying evidence.

260.    Defendants Shellenberger and Dever had no authority to make those decisions, which directly harmed Named Plaintiffs and the Class Members.

261.    Defendants Shellenberger and Dever performed all these acts in their personal capacities, including intimidation of female complainants and the fraudulent concealment of assailants' criminal conduct.

262.    Defendants Shellenberger and Dever, acting in concert with the County Defendants, and Defendants Dillon, Sparks, and Jagoe, enforced an animus based, antiquated, sexist, and unlawful version of Maryland law regarding rape and sexual assault, all for the specific purpose of artificially reducing the number of investigations and prosecutions of sexual assault complaints by female victims in Baltimore County.

The Unconstitutional Procedures Used By The SAO Defendants And The BCPD Defendants

263.    Baltimore County Police Detectives in the SVT engage in a pattern and practice and custom of discouraging victims from pursuing reports of sexual assaults. Ex. 15.

264.    The strategy is one of "case attrition," and is a result of Defendants' predisposition to deny women who report sexual assault their right to equal access to investigative and prosecutorial obligations of the Defendants.

265.   Case attrition includes victims who are encouraged not to submit to a forensic medical examination, and/or to forego a police investigation.

266.   Defendant Dever has clearly articulated the SAO's discriminatory policy.  She has stated that SAO defendants, as a policy, do not consider a female victim's testimony alone to be sufficient "evidence" for a conviction.

267.   Dever's statement is a reflection of her belief that women who report sexual assault are less credible than men who are accused of committing it.

268.   These policies and practices disproportionately affect women and are designed to do so.  They are a direct result of Supervisory and Policymaker Defendants' failures to properly train, supervise, or discipline their employees and failure to implement appropriate policies and result from individual Defendants' bias against women who report sexual assault, directly harming Named Plaintiffs and Class Members.

UMBC's Persistent And Unlawful Customs And Practices Regarding Rape

269.   On October 13, 2015, the Baltimore Post Examiner published an article that detailed UMBC's failure to record valid reports of rape and sexual assault on campus.

270.   UMBC and the University Police are required by law to make accurate public reports of crimes committed on or near UMBC's campus.  See, e.g., 20 U.S.C. § 1092 (f), the "Clery Act."

271.   Defendants UMBC and the University Police are required to prove that a sexual assault did not occur before determining that the complaint is "unfounded."

272.    Defendants UMBC and the University Police Defendants have intentionally failed to make accurate public reports of crimes of sexual assault, in order to conceal these crimes and shield male perpetrators from prosecution.

273.    By diverting reports of rape and sexual assault to non-police entities at UMBC, Defendants Dillon and Sparks created the illusion that the assaults did not occur and ensured that the suspects received minimal attention.

274.    Most of these reports therefore never underwent a formal Title IX investigation.

275.    The University Police Supervisors/Policymakers, Defendants Sparks, Dillon, and Jagoe, were willfully indifferent in their failure to train and supervise their subordinates and to promulgate or enforce appropriate policies to prevent violations of the Clery Act, Title IX, rapes, and sexual assaults.

276.    The University Police Supervisors also failed to implement the policies that were in place in a consistent and non-discriminatory manner.  These failures directly harmed Named Plaintiffs and Class Members.

277.    Defendant UMBC also claims that they are not required to report "unfounded" or A46 reports of rape in their Clery disclosures but make no effort to comply with the Clery requirements of a thorough investigation prior to "unfounding" a report.

278.    Defendants Dillon, UMBC, and the University Defendants record as "unfounded" reports that are still "open" or coded as "A46" by Baltimore County to shield male suspects from accountability.  This occurred in Plaintiffs Fegler and Frank's cases.

279.    University and County Defendants' pattern and practice of miscoding sexual assaults as "suspicious circumstances" or "unfounded" in order to avoid reporting and investigating reports of sexual assault, or encouraging others to do so, is a violation of equal protection as it intentionally discriminates against female victims for the benefit of male perpetrators.

280.    Defendant UMBC has not expelled a student for a sexual misconduct violation in over six (6) years.  Ex. 37.

281.    For a University with an annual enrollment of approximately 13,000 students, the inference of disparate treatment relating to female victims of sexual assault is unequivocal.

282.    Either there is no sexual assault at UMBC, or Defendant UMBC is indifferent to the complaints of female sexual assault victims, or UMBC wishes to conceal incidents of sexual assault, or UMBC wishes to protect male suspects.

Defendant UMBC's "perfect record" is a reflection of endemic gender bias.

283.    The manner in which UMBC conceals sexual assaults involves a process that ensures the complaint eventual reaches a dead-end.  University Defendants, including Defendant Dillon, intentionally direct female sexual assault victims, including Plaintiff Frank, to confidential resources to avoid disclosure of the sexual assaults, or to others to avoid UCR requirements.  The University Defendants refer to these confidential resources as "non-Clery."

284.    The practice of protection and concealment was known to and implemented by individual UMBC Defendants.  Defendants Hrabowski, Sparks, Dillon, and Johnson

failed to properly train, supervise, and discipline their subordinates and these practices have survived for years.

285.   Defendant Hrabowski's indifference is reflected by his response to a reporter's question regarding the extremely low rate of police reporting by students, and whether that bothered him. Defendant Hrabowski responded "Absolutely not. Please quote me saying that. Absolutely not."

<u>The State's Attorney Defendants Are Not Immune To This Suit</u>

286.   Defendants Shellenberger, Dever, and Fox's acts reflect malice, deliberate indifference, and gender bias.  These acts are beyond the scope of prosecutorial discretion and activities normally associated with prosecutorial function.

287.   SAO Defendants' unlawful, unconstitutional, and *ultra vires* policies and procedures were enacted to carry out SAO Defendants' discriminatory purposes, specifically to artificially reduce the number of sexual assaults in Baltimore County by concealing and destroying evidence, and by the intimidation of female complainants.

288.   Illegal acts, such as witness intimidation, were carried out in Defendants Shellenberger and Dever's investigative and personal capacities.

289.   The unconstitutional acts in this Complaint are the result of gross negligence, malice, and illegal bias.  They are not are not intimately related to the judicial phase of a criminal proceeding.

290.   For example, unlawfully ordering BCPD defendants to commit unlawful acts for improper purposes is not "judicial" in character and are not related to a criminal

proceeding.  These acts included the intimidation of female complainants and the destruction of evidence.

291.    The SAO Defendants' failure to take the steps necessary to develop sexual assault cases properly, is deliberate.  Acting *ultra vires*, the Defendants Shellenberger and Dever routinely manipulate, conceal, and destroy evidence of sexual assaults.

292.    As a result, Defendant Shellenberger and Defendant Dever's unlawful acts do not constitute "prosecutorial discretion," and they are not entitled to prosecutorial immunity.

Limitations Are Tolled

293.    The facts related to Defendants' policies and conduct that discriminated against Named Plaintiffs and the Class were fraudulently concealed from and/or inherently undiscoverable to Named Plaintiffs and the Class.

294.    For example, on September 9, 2016, Defendant Johnson, on behalf of the County and Defendant Baltimore County promised to "take a fresh look to ensure that the investigation was handled properly and that justice was done."  Ex. 3.

295.    This assurance was false, the "fresh look" never occurred, and any attempts were subverted by Defendants Sheridan, Shellenberger, and Dever and the BCPD Policymaker and Supervisory Defendants.

296.    The discriminatory acts were serial and systemic violations that manifested themselves over an extended period of time and continue through the present day.

297.    The failure of Defendants to re-investigate, as promised, has occurred within the statute of limitations.

298.    Thus, the discovery rule, fraudulent concealment, and equitable tolling principles apply to any applicable limitations period.

<u>Plaintiffs Borkowski and Hendler's Standing</u>

299.    Plaintiffs Borkowski and Hendler both filed complaints pursuant to Defendant UMBC's Title IX Policy.

300.    They did not file student disciplinary complaints; their complaints were specific to Title IX.

301.    Defendant UMBC accepted both complaints as Title IX complaints.  Ex. 40.

302.    The penalties outlined in the Notice of Investigation were exclusive to Title IX. Ex. 39.

303.    Both devoted hundreds of hours of attorney and personal time pursuant to Defendant UMBC's Title IX process.

304.    It was not until November 5, 2018, nearly a year after filing the initial complaint, that UMBC informed them that they had to "clarify" the status of the parties. Ex. 38.

305.    This was nearly two months after Plaintiffs Borkowski and Hendler filed suit.

306.    Prior to that, Ms. Borkowski and Ms. Hendler submitted thousands of pages of written work and exhibits as part of the UMBC Title IX process.

307.    Ms. Borkowski moved to intervene in a lawsuit, without objection from counsel for UMBC, brought by the Title IX Respondents, to enjoin UMBC from enforcing Title IX.  Ex. 46.

308.    Plaintiffs have relied on UMBC's representations, and acceptance of them as Title IX complainants to their own detriment, great expense, and great effort.  If UMBC was using its "denial of opportunity" process, it cannot change its mind at this time.

Class Plaintiffs

309.    At all times relevant to the facts set forth herein, Named Plaintiffs and the members of the Class have been and are being continuously harmed by Defendants' ongoing unconstitutional policies.

310.    At all times relevant hereto on and on each day that passes, Named Plaintiffs and the members of the Class sustain a new injury as a result of Defendants' unconstitutional policies and conduct.

311.    Named Plaintiffs and the members of the Class have suffered emotional distress and psychological damage as a result of Defendants' ongoing conduct.  The conduct adversely affects each and every member of the class.

312.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Named Plaintiffs bring this class action on behalf of themselves and the Class, including the Subclasses.

313.    The exact number of the Class and each Subclass is not presently known, but upon information and belief, the Class includes potentially thousands of women who have been subjected to the same or similar treatment as described in this Complaint. Given the Defendants' pattern and practice of manipulating and destroying evidence, the identification of every appropriate Class Member is problematic, and likely impossible without information known only to Defendants.

314.    Therefore, under Federal Rule of Civil Procedure 23(a)(1), the Class and each Subclass are so numerous that joinder of individual members in this action is impracticable.  All members of the Class and each of the Subclasses are known to Defendants and were subject to Defendants' unlawful activities.  Since these activities involve concealment and destruction of evidence, Defendants have contributed to the difficulty in identifying Class Members.

315.    There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class and of each of the Subclasses that will generate common answers and will drive resolution of this action.  The relief sought is common to the entire Class, as all members of the Class are victims of Defendants' unconstitutional conduct.  Accordingly, pursuant to Federal Rule of Civil Procedure 23(a)(2), there are questions of law and fact common to the Class.

316.    Named Plaintiffs' claims are typical of the Class they represent, pursuant to Federal Rule of Civil Procedure 23(a)(3), because Named Plaintiffs claim that Defendants violated the rights held by the Class under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1985, 42 U.S.C. §1986, and Title IX.  There is no conflict between Plaintiffs and any other putative Class Members with respect to this action.

317.    Named Plaintiffs are adequate representatives of the Class and each Subclass pursuant to Federal Rule of Civil Procedure 23(a)(4).  The interests of the Named Plaintiffs do not conflict with the interests of the Class and Subclasses that they seek to

represent, and Named Plaintiffs will fairly and adequately represent the Class and Subclasses.

318.    Plaintiffs intend to prosecute this action vigorously and are capable of doing so.  Therefore, Named Plaintiffs should be appointed representatives of the Class and the Subclasses.

319.    This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(a)(A) or 23(b)(1)(B) because the prosecution of separate actions by individual members of the Class or Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class or Subclasses that, as a practical matter, would be dispositive of the interests of other Class or Subclass Members not party to the adjudication, or would substantially impair or impede the ability of other Class or Subclass Members to protect their interests, or would establish incompatible standards of conduct and results for Defendants.

320.    This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

321.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclasses predominate over individual questions for the members of the Class and

Subclasses, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

322.    The questions of law or fact common to the Class include:

A.  Whether the policies were implemented by Defendants;

B.  Whether Defendants' actions, patterns of behavior, history of decision-making, and departures from established procedures in the treatment of female victims of rape and sexual assault indicate ongoing, intentional discrimination against the Class on the basis of gender;

C.   Whether the Defendants' policies constitute policies or customs that violated constitutionally protected rights of the Class under 42 U.S.C. §§ 1983, 1985, and 1986, 20 U.S.C. § 1681, and the Fourth and Fourteenth Amendments; and

D.  Whether the Defendants implemented the policies with deliberate indifference to the civil and constitutional rights of the Class.

323.    This action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

324.    Named Plaintiffs have retained counsel for themselves and the Class and Subclasses that are experienced and recognized as knowledgeable, capable counsel who have carried out their duties.

325.    Named Plaintiffs' experiences are representative of victims of sexual assault in Baltimore County, Maryland, in that they were subjected to unfair, discriminatory practices that were designed to minimize acknowledgement of sexual assaults in Baltimore County.

326.    For the purposes of the Title IX Subclass, Named Plaintiffs' experiences are representative of victims of sexual assault by UMBC students.

327.    For the purposes of the Title IX Subclass, Named Plaintiffs' experiences are representative of individuals who file complaints with UMBC of sexual misconduct and sexual assault.

328.    The class of women who have had similar experiences to Named Plaintiffs' is clearly defined.

329.    Members of the Class have been harmed by Defendants in the same way as Named Plaintiffs.

<u>COUNT I:</u>
<u>Violations of 42 U.S.C. §1983</u>
<u>Violation Of Equal Protection Claim</u>
<u>By All Plaintiffs And Class Members</u>
<u>Against Defendant Baltimore County, BCPD Policymaker Defendants And Supervisory Defendants</u>

330.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

331.    It was the policy of Baltimore County Police Department to ignore complaints of sexual assault by women against men.

332.    At all relevant times herein, Defendant Baltimore County followed written and/or unwritten policies that afforded less protection to female victims of sexual assault than to victims of other crimes.  The unprotected female victims included the Named Plaintiffs and members of the Class and each of the Subclasses.

<u>Written Regulations</u>

333.    This biased policy is reflected by Baltimore County's written regulations, promulgated by BCPD.

334.    Baltimore County has a policy regarding retention of evidence that disfavors female victims of sexual assault.  Exs. #174, #175, #176.

335.    Baltimore County's policy regarding exceptional clearance disfavors female victims of sexual assault.

336.    Baltimore County's policy regarding coding reports as "Suspicious Circumstances" disfavors female victims of sexual assault.

<u>Affirmative Acts</u>

337.    The affirmative decisions of policymaking officials Johnson, Brady, Peterson, and Sheridan reflect the unconstitutional policies of Baltimore County.

338.    Johnson, Sheridan, and Defendant Baltimore County allocated more resources to less serious crimes than to sexual assaults against female victims.  The indifference towards female victims of sexual assaults was intentional with the specific purpose of favoring male suspects over female victims to the detriment of the Named Plaintiffs and the Class.

339.    Specifically, the SVT is woefully understaffed and staffed with biased detectives.  The lack of proper staffing is related to and the result of the deliberate effort of the defendants to reduce the investigation and prosecution of sexual assault crimes against women.

340.    Baltimore County refuses to treat female victims' testimony as adequate evidence regarding lack of consent while improperly emphasizing or focusing on contrived concerns about lack of DNA credibility, when such concerns are not applied to other violent or non-violent crimes, like robbery, non-sexual assault, homicide, or sexual assaults committed against males or equally gendered groups.

341.    The arrest, exceptional clearance, and unfounded rates of sexual assault complaints compared to other assault complaints reflect this bias.

342.    In sexual assault cases, 21% of reports ended in arrest, 35% are exceptionally cleared, and 26% are "unfounded."

343.    In contrast, for assault without a sexual component, 44% of reports ended in arrest, 30% are exceptionally cleared and only 0.5% are unfounded.

344.    Baltimore County falsely persists in requiring proof of resistance, even though that is not a legal requirement. Ex. 52, p. 6. The custom is intended to deliberately discourage female complainants and to artificially reduce the number of investigations and prosecutions related to sexual assault crimes involving female victims, out of bias and sympathy for male suspects.

345.    Baltimore County and the Supervisory/Policymaking Defendants intentionally and/or knowingly subject women to invasive collection of DNA with actual or

constructive knowledge that the process is a painful sham because the DNA will not be used to apprehend or prosecute their attackers.

346.   Baltimore County prioritizes the submission and/or testing of forensic evidence from other, non-violent, crimes over SAEKs.

347.   Specifically, over 92% of testing and CODIS uploads were for non-sexual assault crimes, despite the fact that Baltimore County has close to 1,000 SAEK's in inventory.

348.   Baltimore County treats sexual assault cases involving female victims with less urgency and attention than that afforded to other types of violent crimes.

349.   Specifically, 54% of DNA testing related to non-violent property crimes, 33% to violent, non-sex crimes, and only 8% to rape and/or sexual assault.

350.   Baltimore County treats female victims of sexual assault with less respect and devote less attention to their cases than other crimes, thousands of pages of police reports reflect this fact.

351.   Of the 103 uploads to CODIS from the official SAEK inventory, 75% of uploads resulted in a positive identification of the suspect, yet Baltimore County refuses to test SAEK's in the same manner as it does for property crimes.

352.   Defendants Brady and Peterson intimidated and misled victims of sexual assault through illegal means, such as the use of "False Reports" charges when a victim insists on prosecution.

353.   SVT were responsible for a disproportionate number of false report charges considering their size.  Of the approximately 200 cases handled by SVT a year, SVT was

responsible for five (5) to 10 percent of the total number of false reports for the entire department, with thousands and thousands of cases per year.

Omissions

354.    Baltimore County failed to implement and/or ignore proper training, supervision, or discipline of government employees handling sexual assault cases.

355.    Baltimore County disproportionately dismisses cases or refuses to investigate or proceed with sexual assault cases when the victim is female;

356.    Baltimore County disproportionately refuses to investigate, process, or prosecute in cases involving sexual assault against female victims without DNA evidence.

357.    Baltimore County fails to submit and/or timely test SAEKs, and directs the destruction of SAEKs before or during a criminal investigation.

358.    Baltimore County inadequately staffs the investigation, processing, and prosecutions of sexual assault cases involving female victims, with the express purpose of minimizing the extent of investigation and prosecution.

359.    Condonation by Baltimore County of Policymaker's Actions and Omissions

 Baltimore County has had a persistent and widespread practice of ignoring and suppressing reports of rape and sexual assault.

360.    The duration and frequency of this practice is hundreds of times a year for at least six (6) years.

361.    The duration and frequency indicate that Baltimore County Policymakers had actual or constructive knowledge of the conduct and failed to correct it due to their deliberate indifference.

362.    The extent of Baltimore County Police misconduct was widespread and flagrant, including the use of officers by the SAO to travel outside their jurisdiction to personally intimidate and discourage plaintiff Borkowski from pursuing a criminal complaint.

363.    For example, Baltimore County misrepresented to the Attorney General's Office how many SAEKS it had, and how many SAEK's were tested.

364.    Clear Pattern Shown By Police Investigative Files

365.    Defendant Baltimore County had actual and constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of an unconstitutional deprivation of rights for female citizens like the Plaintiffs.

366.    A clear pattern of prior incidents involving SVT Detectives establish that Baltimore County has a custom or policy of encouraging SVT Detectives to ignore, suppress, and conceal reports of rape or sexual assault.

367.    The practices were so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law.

368.    In addition, Named Plaintiffs, the Class, and each of the Subclasses assert a claim of class-based discrimination based on sex

369.    Defendants' illegal policies are sex and gender-based and their adverse effects reflect invidious sex and gender-based discrimination.

370.   Defendants' illegal policies, which discriminate against victims of sexual assault, adversely affect women.

371.   Defendant Baltimore County's response to that knowledge was so inadequate and misleading that it is de facto deliberate indifference to and tacit authorization of the unlawful practices.  For example, the assurances of new and more effective investigative and prosecutorial policies after the 2016 Audit, were patently false, and made with the purpose of misleading the public.

372.   There is an affirmative causal link between Defendants' inaction, false assurance, concealment, witness intimidation, and the constitutional injuries suffered by Plaintiffs.

COUNT II:
Violations Of 42 U.S.C. §1983
Deprivation Of First Amendment Rights And Petition
By Anna Borkowski
Against Defendants Shellenberger, Dever, Fox, Montgomery, Tomas, And Burrows

373.   This Count incorporates the remainder of this Complaint as if set forth fully herein.

374.   Baltimore County and the BCPD Defendants acknowledged that there was probable cause to arrest and charge Ms. Borkowski's assailants with second degree rape.

375.   Section 2-607 of the Courts and Judicial Proceedings Article of the Maryland Code provides that "[a]n individual may file an application for a statement of charges with a District Court Commissioner."

376.     On March 14, 2018, Ms. Borkowski exercised her rights pursuant to section 2-607 of the Courts and Judicial Proceedings Article of the Maryland Code by filing a statement of charges.

377.     Ms. Borkowski submitted sworn applications for statements of charges with District Court Commissioner John Robey.

378.     Commissioner Robey's duty was to examine the affidavit for probable cause and approve or deny the application.

379.     Probable cause had already been affirmed by Baltimore County and the BCPD Defendants when those Defendants cleared the case by "exceptional circumstances."

380.     The First Application For Statements Of Charges, And Obstruction Of And Inference In The Judicial Process

381.     After Ms. Borkowski submitted sworn affidavits and applications, Commissioner Robey demanded that Ms. Borkowski wait in the hallway.

382.     Commissioner Robey improperly contacted Defendants Montgomery and Dever.

383.     Defendants Montgomery and Dever improperly directed Commissioner Robey to deny the applications for statements of charges.

384.     Defendants Montgomery and Dever's instructions were unlawful, and were a result of their bias against female victims of sexual assault, like Ms. Borkowski, who persist in pursuing accountability for male perpetrators of sexual assault.

385.     Their actions indicate that they were acting with a malicious intent to obstruct the administration of justice and to deny Ms. Borkowski her civil rights.

386.    Commissioner Robey complied with Defendant Dever's and Montgomery's unlawful instructions and denied the applications for statements of charges.

387.    The denied applications were forwarded to Baltimore County Administrative Commissioner Whitney Wisniewski.

The Second Applications For Statements Of Charges

388.    Because Commissioner Robey's denial was the result of unlawful influence, Ms. Borkowski made a second attempt to submit applications for statements of charges.

389.    On March 20, 2018, Ms. Borkowski submitted sworn applications for statements of charges against the three men in the District Court for Baltimore County, in Towson.

390.    Ms. Borkowski's applications were reviewed by Managing Commissioner Colleen Ellingson.

391.    Commissioner Ellingson was fully aware of the previous applications and the State's Attorney's Office's and BCPD's unlawful interference with Ms. Borkowski's rights of fair administration of the District Court Commissioner system.

392.    After carefully reviewing the sworn statements, Managing Commissioner Ellingson charged all three of the men with first degree rape, second degree sexual assault, third degree sexual offense, second degree assault, fourth degree sexual contact, and perverted practice.

393.    Summonses were issued for service on the three men.

394.    A trial date was set for May 5, 2018, and Ms. Borkowski received a summons to testify.

395.   Defendants' Unlawful Interference With The Summonses

396.   The next morning, March 21, 2018, Defendant Burrows learned that Ms. Borkowski had applied for statements of charges.

397.   A summons issued by a District Court Commissioner may only be recalled by a judicial officer.

398.   The summonses had yet to be served.

399.   Defendant Burrows spoke with Defendant's Shellenberger and Dever. Ex. 17.

400.   Defendant Burrows contacted the Baltimore County police officer in charge of serving the summonses and instructed him not to serve them.

401.   Defendant Burrows, acting on instruction from Defendants Shellenberger, Dever, and Fox then intercepted the summons.  Ex. 18.

402.   In interfering with a lawfully issued summons, Detective Burrows acted on illegal, ultra vires orders from Defendants Dever, Shellenberger, and Fox.

403.   Defendant Burrows knew that the instructions to interfere with a subpoena unlawfully interfered with Ms. Borkowski's civil rights.

404.   Defendant Burrows's interference with lawful process was an illegal act that defies logical explanation and reflects her personal animus.

405.   Defendant Burrows' report gives no reason for her urgency.  The background and circumstances establish a reasonable inference of bias and malice, as her "investigation" of Ms. Borkowski was far more vigorous than her investigation of the three men who had raped Ms. Borkowski and Ms. Hendler.

406.   Defendant Burrows admitted that her superiors were "asking a lot of questions" regarding her unlawful acts. Ex. 18.

407.   On March 22, 2018,  Defendant Burrows attempted to obtain a copy of Ms. Borkowski's previously denied Applications for Statements of Charges.

408.   Defendants were now investigating Ms. Borkowski.

409.   Defendants pursue an intimidation campaign against Ms. Borkowski to prevent her from proceeding with her complaint.

410.   Defendants Shellenberger, Dever, Fox, Burrows, and Tomas, jointly developed an illegal plan to harass and intimidate Ms. Borkowski.

411.   At the request of Defendant Burrows, Defendants Dever and Fox issued a subpoena to harass Ms. Borkowski for lawful exercise of her rights.

412.   Defendant Burrows unlawfully served the subpoena on Administrative Commissioner Wisniewski, via email, on March 22, at 11:48 a.m.

413.   According to notes that were unlawfully concealed and withheld for months by Defendants Burrows and Tomas, they acted on direct verbal orders from Defendants Shellenberger, Dever, and Fox.  Ex. 11.

414.   Defendant Burrows also interfered with Ms. Borkowski's rights of free expression, petition, and access to the courts (and generally with the administration of justice) by convincing Commissioner Wisniewski to "sen[d] out a department-wide email instructing Commissioners not to act if they receive[d] any further applications" from Ms. Borkowski, and further "instructed Commissioners to forward [to her] any applications if submitted." Ex. 22.

415.    Ms. Borkowski is now disallowed from filing an application for a statement of charges for any reason.

416.    These instructions were issued at the behest of Defendants Shellenberger, Dever, Fox, and Burrows, and Tomas.

417.    The conspiracy was undertaken in furtherance of Baltimore County's and Defendants Petersen and Sheridan's policy to conceal reports of sexual assault, but was also a result of Defendants Shellenberger, Dever, and Fox's direct personal involvement.

<u>Defendants' Illegal Conspiracy To Deny Ms. Borkowski Of Her Right To Speech, Petition, And Access To The Courts</u>

418.    Defendant Shellenberger illegally ordered Defendant Dever to instruct Commissioner Wisniewski "not to file charges" relating to Ms. Borkowski's applications. Ex. 25.  Such an order is beyond the scope of persecutorial discretion. It is illegal interference with the Judicial Process.

419.    Defendant Dever sent the letter to Commissioner Wisniewski on March 23, 2018.  Ex. 23.

420.    Defendants Shellenberger, Dever, and Fox illegally ordered Defendants Burrows and Tomas to "to tell Ms. Borkowski that she has to stop bringing these additional charges or they will file criminal abuse of process charges against her." Ex. 48.

421.    Defendants Burrows and Tomas, acting on the illegal, ultra vires orders from Defendants Dever and Shellenberger, and in conspiracy with them, successfully denied Ms. Borkowski access to the courts, free expression, and petition, in violation of her civil rights.

422.    Defendants Shellenberger, Dever, Fox, Burrows, and Tomas knew that what they were doing was illegal, and when confronted by Ms. Borkowski's attorney, discontinued their illegal activities.

423.    The Dever, Shellenberger And Fox's Actions Were Undertaken In Their Personal Capacity

424.    The State's Attorney and his delegees have no lawful authority over BCPD Defendants Burrows, Tomas, or Dorfler.

425.    The order to act in contravention of Federal and State witness intimidation laws or judicial oaths was an unlawful order given in an unlawful manner to achieve an unlawful purpose.

426.    Defendants Shellenberger and Dever were acting in their personal capacities at the time of the Constitutional deprivations and related crimes.

427.    Without the knowledge of the BCPD Chief of Police, Defendants Dever and Shellenberger then exceeded the scope of their duties and circumvented the BCPD chain of command. They specifically instructed Defendants Burrows and Tomas to go to Ms. Borkowski's home in Baltimore City with Officer Dorfler, beyond the jurisdiction of SAO and BCPD Defendants, where she lived with her grandparents.

428.    According to Defendant Burrows, sending an armed patrol officer into Baltimore City to confront Ms. Borkowski was Defendant Shellenberger's and Defendant Dever's idea.

429.    Defendants Shellenberger, Dever, and Fox specifically ordered Defendants Burrows and Tomas to tell Ms. Borkowski to "stop going to [the] Comm[issioner]" or she would face "criminal charges."

430.    Dever told the three rapists' attorney, Ronald Schwartz, of these activities.

431.    In return, she received a "thanks a million" email from the rapists' attorney.

432.    The purpose was unlawful and unconstitutional intimidation of Ms. Borkowski, beyond the scope of SAO and BCPD legal authority, and outside of the Defendants' jurisdiction.

433.    Thereafter, Defendant Tomas repeatedly called and intimidated Ms. Borkowski.

434.    Defendants Burrows and Tomas knew this was an illegal order that circumvented the BCPD chain of command but proceeded to carry out Defendants Dever and Shellenburger's personal request based on their animus and malice towards female victims of sexual assault.

435.    When the two Detectives and armed patrol officer, Defendant Dorfler, arrived at Ms. Borkowski's Baltimore City residence, Ms. Borkowski's grandmother answered the door.

436.    At that time, Ms. Borkowski was volunteering at a local nursing home. Defendant Burrows demanded to know the location of the nursing home and what time Ms. Borkowski would return home.

437.    Ms. Borkowski's grandmother referred the officers to Ms. Borkowski's attorney.

- 63 -

438.    A video of the incident shows Defendant Burrows pretending that she did not know Ms. Borkowski was represented by counsel.

439.    Defendant Burrows' previously withheld notes reflect prior knowledge that Ms. Borkowski was represented.

440.    Acting on orders from Defendants Shellenberger, Dever and Fox, Defendants Burrows and Tomas contacted Ms. Borkowski directly on her cell phone.

441.    Defendants Burrows and Tomas demanded to know her location.

442.    Defendants Burrows and Tomas' notes reflect that they had also unlawfully obtained a copy of Ms. Borkowski's Towson class schedule, without a warrant or subpoena, in violation of the Fourth Amendment.  Ex. 24.

Ms. Borkowski Resists The Intimidation

443.    Ms. Borkowski's attorney learned of the illegal harassment and intimidation, and offered to make Ms. Borkowski available to Defendants Tomas and Burrows.

444.    After Defendants Tomas and Burrows conferred with their co-conspirators, Defendants Dever, Shellenberger, and Fox, Defendants Burrows and Tomas were ordered not to meet with Ms. Borkowski because "Scott [Shellenberger] said not to go b[e]c[ause] of attorney."

445.    These Defendants recognized that their efforts to intimidate a female witness and victim of sexual assault, and the general conspiracy of deceit to suppress the civil rights of women who reported sexual assaults, was no longer confidential and would be exposed to legal scrutiny.

446.   Defendants Shellenberger, Dever, Fox, Burrows, Tomas and Montgomery acted under the color of State law, granted by their official positions, to deprive Ms. Borkowski of her civil rights.

447.   Ms. Borkowski's right to present sworn testimony to a Maryland District Court Commissioner is protected speech under the First Amendment, as is her right to petition the government.

448.   Defendants violated Ms. Borkowski's First Amendment right to free speech in two ways.

First, she has the right to be free from retaliation by a public official for the exercise of her rights.

449.   Second, they prevailed on the District Court Commissioner to reject future applications.

450.   Defendants interfered with Ms. Borkowski's access to the courts in that she may no longer file papers without undue scrutiny.

451.   There is a direct relationship between Ms. Borkowski's speech and the Defendants' retaliatory action.

452.   Defendants were aware that their actions violated a clearly established right.

453.   Defendant Shellenberger, the mastermind of the ill-conceived plan, stated that "[w]itness intimidation is a cancer on the criminal justice system."

454.   Knowing this, he still personally orchestrated and directed the intimidation of Ms. Borkowski.

455.    As a result of Defendants' actions, Ms. Borkowski has suffered emotional and physical injury, including anxiety, fear and distrust of authority figures.

<u>COUNT III:</u>
<u>Violations of 42 U.S.C. §1985(2)</u>
<u>Conspiracy to Deprive Civil Rights</u>
<u>By Anna Borkowski</u>
<u>Against Defendants Baltimore County, Shellenberger, Dever, Fox, Tomas, Burrows, And Dorfler</u>

456.    This Count incorporates the remainder of this Complaint as if set forth fully herein.

457.    Defendants violated 42 U.S.C. § 1985(2) by preventing Ms. Borkowski, from attending and testifying freely, fully, and truthfully, in a judicial proceeding.

458.    Defendants Shellenberger and Dever conspired with Defendant Fox and Defendants Tomas and Burrows to intimidate Ms. Borkowski from giving testimony before a Maryland District Court Commissioner.

459.    Additionally, Defendant Burrows and Dever conspired and acted to prevent Ms. Borkowski from filing criminal charges as permitted by Maryland law.

460.    A contemporary account of Defendant Dever's statements reflect that Defendants' conspiracy was to arrest Ms. Borkowski and/or charge her with "criminal charges," notwithstanding Defendant Dever's acknowledgement that Ms. Borkowski was the victim of sexual assault.  Ex. 19.

461.    Defendants Shellenberger and Dever conspired to abuse subpoena power to deprive Ms. Borkowski of a Constitutionally protected right by intimidation and threat of arrest, i.e., use of force.

462.    Ms. Borkowski self-advocacy threatened Defendants' desire to protect male suspects from allegations of sexual assault.

463.    Defendant Dever even conspired with Ronald Schwartz, Esquire, to provide his three (3) clients with a "thanks a million" result.

464.    As part of their conspiracy, Defendants conspired to go out of their lawful jurisdiction and beyond their legal authority for the purpose of depriving Ms. Borkowski of equal protection under the law and her right to free expression under the First Amendment.

465.    Defendants exceeded their authority by unlawfully obtaining Ms. Borkowski's class schedule.  Ex. 24.

466.    Defendants intended to create, and created, a realistic threat of arrest that was calculated to instill fear in Ms. Borkowski, and to discourage her from exercising her rights.  Ex. 17.

467.    Defendants Shellenberger and Dever exceeded their prosecutorial authority when they commanded Burrows, Tomas or Dorfler to intimidate Ms. Borkowski by going into Baltimore City and threatening her with arrest if she persisted with her complaint.

468.    Ms. Borkowski was harmed by Defendants' acts of intimidation in furtherance of the conspiracy in that she suffers from anxiety, sleep loss, intrusive thoughts, fear, and other physical and mental injuries.

469.    Defendants knew or should have known that their actions would deprive Ms. Borkowski of her rights and cause her harm, as that was the point of the conspiracy.

COUNT IV:
Violations of 42 U.S.C. §1983
Deprivation of Equal Protection
By Anna Borkowski and Members of the Class
Against Defendants Shellenberger, Dever, Fox, Burrows, And Tomas

470.    This Count incorporates the remainder of this Complaint as if set forth fully herein.  The following details for the Borkowski and Hendler sexual assaults were known to the Defendants when they sought to obstruct Judicial Process.

471.    On October 19, 2017, Towson University student Anna Borkowski and Annemarie Hendler, a female classmate, joined three (3) UMBC students at a local Towson bar.  All three (3) men were members of UMBC's baseball team.

472.    At approximately 1:00 a.m. on October 20, 2017, the three (3) men went with Ms. Borkowski and Ms. Hendler to Ms. Hendler's apartment.

473.    The three men encouraged Ms. Borkowski and Ms. Hendler to drink from a bottle of vodka and wine.

474.    The men admitted that they pretended to drink but did not.

475.    Almost immediately after drinking the vodka, Ms. Borkowski and Ms. Hendler became disoriented and blacked/passed out.

476.    According to the men, they secretly poured the contents of the bottle of vodka over the apartment's balcony.

477.    In the early morning hours of October 20, 2017, Ms. Borkowski and Ms. Hendler were gang-raped and repeatedly assaulted, in series, by the three (3) men.

478.     Due to her incapacity, Ms. Borkowski was unable to consent to the sexual assault.

479.     Due to her incapacitation, Ms. Borkowski does not remember the entire assault, but she has fragmentary memories of the assault.

480.     At the same time, Ms. Borkowski witnessed Ms. Hendler, then unconscious or semi-conscious, being raped by one of the men, and then by another.

481.     Ms. Hendler was unconscious or semi-conscious, with a BAC of approximately 3.0, and unable to apprise the nature and consequences of the sexual acts.

482.     Ms. Borkowski was, by any definition, incapacitated and incapable of giving consent, as she could not and did not agree to or otherwise comprehend at the time, nature, or consequences of the sexual acts.

483.     Around 9:00 a.m. upon regaining consciousness, Ms. Borkowski and Ms. Hendler were both in intense pain and realized they had been raped.  The women reported the assaults to the Towson University Police Department ("TUPD") police and were transported to Greater Baltimore Medical Center ("GMBC") for examination and treatment.

484.     A SAFE Exam performed at GBMC confirmed that Ms. Borkowski was suffering "injuries consistent with sexual assault," specifically vaginal tearing.

485.     Ms. Hendler was suffering from bleeding, soreness, swelling, and abrasions.

486.     Ms. Borkowski and Ms. Hendler both requested immediate police investigations.

487.    At 7:00 pm, Ms. Hendler still had a Blood Alcohol Concentration of 0.085 --
legally intoxicated.  Ex. 49.

488.    Defendants Tomas and Burrows then intimidated Ms. Hendler with offensive
and demeaning questions, and pressured her, while she was still intoxicated, to sign a
waiver declining further investigation.

489.    Their words and actions reflect their bias against female victims of sexual
assault, as asking a victim of a robbery or assault to sign a waiver in a hospital is
unthinkable.  Their subsequent actions after Ms. Borkowski filed a criminal complaint
underscore their bias and determination to protect the male assailants at the expense of
Ms. Borkowski.

490.    The police report does not mention Ms. Hendler's request for a police
investigation, which she made eighteen minutes after signing the waiver that she did not
understand.  Ex. 50.

491.    Ms. Borkowski signed a statement confirming that she "request[ed] a [SAFE]
and Law Enforcement report and investigation."

492.    This fact was omitted from the SVT's synopsis of the crime, along with Ms.
Hendler's request.

493.    Ms. Borkowski and Ms. Hendler were both reassured that by an agent of
Baltimore County that "Baltimore County Police Department [would] be contacted by
hospital personnel via 911 to immediately initiate an investigation."

494.    Neither Ms. Hendler nor Ms. Borkowski knew that the BCPD Defendants and the Defendants Shellenberger and Dever's interest was in protecting, not prosecuting, the men accused of the crime (i.e., Dever's communications with their attorney.)

495.    Had Ms. Borkowski or Ms. Hendler known of Defendants' intent and ability to conceal the complaints, they never would have submitted to the intrusive exam or allowed their genetic material to be taken by a state agent.

496.    Nor were they informed that the purpose of it

497.    Defendants' concealment vitiates any consent given.

BCPD's "Investigation" of A Closed Case

498.    Just after midnight on October 21, 2017, less than twenty-four (24) hours after the assault, Ms. Borkowski's and Ms. Hendler's case was inexplicably closed and cleared by "exceptional circumstances."

499.    A date-stamped copy of the original version of the Investigative Report shows that the investigation was closed and faxed to TUPD at 5:47 a.m. on October 21, less than twenty-four hours after the report was made.

500.    In violation of BCPD policy, requiring a notation reflecting a clearance in the investigative file, the file does not contain one.  These omissions were a part of the efforts to conceal the event.

501.    Even though the case was apparently "closed" Detective Hummel, eleven days after the assault, visited the apartment building where the assault occurred and requested video surveillance tapes.

502.    Detective Hummel then falsely reported that important surveillance footage was not available.

503.    Defendant Burrows then informed Annemarie Hendler that Detective Burrows had viewed the surveillance footage from the building.

504.    Detective Tomas had previously requested and received surveillance footage from the same building in a previous investigation.  Ex. 20.

505.    Valuable evidence was ignored, lost, concealed, or intentionally spoliated by Baltimore County and the BCPD Defendants.

506.    There is no record of any effort by Defendants Burrows or Tomas to investigate the destruction of evidence. Instead, the destruction was concealed.

507.    The men are adamant that they disclosed the dumping of the alcohol to Defendants Burrows and Tomas and Defendant Baltimore County, but it does not appear in police notes or any police report.  Ex. 30.

508.    Detective Hummel was transferred out of the SVT several days later, on Defendant Dever's orders.

509.    On information and belief, Detective Hummel was transferred on Defendant Dever's orders because she wanted to investigate Ms. Borkowski's allegations.

510.    Sometime later, Defendant Burrows noted that the report was coded as "open" or "open suspended."  Contrary to BCPD General Orders, there is no supplement in the file that indicates that the case disposition had changed.

511.    On information and belief, Defendant Burrow's note in the BCPD Investigative File closing the investigation was a ruse to conceal the fact that the case was wrongfully closed on October 21, 2017, and never properly investigated.

512.    The Investigative File shows that neither Defendant Baltimore County nor the BCPD Defendants ever visited the crime scene or collected any evidence, despite telling Ms. Hendler otherwise, i.e., the Defendants lied to her.

513.    According to Detective notes, other than visiting the building, not the apartment, where the assaults occurred, BCPD performed no investigation.

514.    Defendants Burrows, Hummel, Tomas, and Officer Himes all told Ms. Hendler that the crime scene had been, and would be, investigated.  This was untrue or concealed from Ms. Borkowski and Ms. Hendler, i.e., The Defendants lied to them.

515.    Defendant Baltimore County failed to subpoena the surveillance tapes from the bar or the apartment building.

516.    On information and belief, Defendants Tomas and Burrows viewed surveillance footage but omitted or deleted this fact and other observations from the Investigation File, i.e., they concealed critical evidence.

517.    Defendant Dever has even referenced the contents of the surveillance tape, but that tape is not part of the official file she would have reviewed, i.e., Defendant Dever lied.

518.    Blood stains on the bed were ignored, i.e., Defendants concealed critical evidence.

519.    The suspicious bottle of vodka was never tested, or if it was, no record was made, i.e., Defendants ignored potentially critical evidence.

520.    Defendant Baltimore County performed no analysis of the SAEKs related to the assaults.

521.    No DNA evidence was submitted to CODIS, NDIS, or any other database.

522.    Defendant Baltimore County did not attempt to interview any of Ms. Borkowski's acquaintances who were present for part of the evening.

523.    Baltimore County assured Ms. Borkowski that "even though it may not seem as though it [the investigation] is being worked on," she could "trust that it is and will be thoroughly investigated."  Ex. 26, i.e., Defendants lied.

524.    The "investigation" was a ruse, with the obvious intent to exculpate the three (3) UMBC baseball players at the expense of Ms. Borkowski and Ms. Hendler.

525.    On November 14, 2017, under pressure from Defendant Fox to close the case, Defendant Burrows scheduled a joint interview of the three (3) men who had assaulted Ms. Borkowski and Ms. Hendler.  Ex. 31.

<u>Burrows And Tomas Conduct Pretextual Interviews to Justify the Decision That Had Already Been Made</u>

526.    On November 15, 2017 Defendants Tomas and Burrows interviewed the three (3) men, together, at a Chick-fil-A.

527.    The interview of multiple suspects in a group is contrary to all standards of law enforcement procedure.  Yet, it is one of the methods used by the County Defendants and

the SAO Defendants to discredit women who make rape reports, and to allow multiple suspects to get their story straight.

528.    Interviewing multiple suspects together, contrary to law enforcement practices, is part of Baltimore County, Dever, and Shellenberger's pattern and practice of providing male perpetrators of sexual assault every possible advantage to discredit complainants and absolve themselves during the investigation.

529.    Defendants then refuse to prosecute after ruining any possible case by allowing the male perpetrators to "get their story straight."  It is a reflection of bias against women who report sexual assault, and bias towards their male assailants.

530.    At the interview, the three (3) men admitted to having simultaneously engaged in sexual acts with Ms. Borkowski and Ms. Hendler while the women were extremely intoxicated.

531.    None of the three men offered an explanation for Ms. Borkowski's or Ms. Hendler's injuries, because they were not asked.

532.    One of the men said he did not understand what the issue was.

533.    They claimed that the assault was consensual, despite Ms. Borkowski and Ms. Hendler's obvious incapacity to consent, and their physical injuries.

534.    Despite the opportunity to be interviewed together, the men's accounts were inconsistent, and became more inconsistent and implausible over time.

535.    Defendants Burrows, Tomas, and Dever credited these completely implausible, contradictory accounts over Ms. Borkowski and Ms. Hendler's consistent, reasonable accounts.  The reason is that the decision to exculpate the three (3) UMBC baseball

players at the expense of their female victims had been made before any of the sham investigative activities.

536.   Defendants Burrows, Tomas, and Dever did so, not as an exercise of discretion, but because they were guided by an underlying bias towards male suspects and against female victims.  This was part of the overall scheme to protect UMBC and to diminish the number of reported sexual assaults in Baltimore County.

537.   Despite the admission that they engaged in injury-causing sexual activity with Ms. Borkowski and Ms. Hendler, Defendant Dever refused to charge any of the three (3) men with a crime.

538.   Defendant Dever's stated rationale for not bringing charges was that "the boys had to know it was a crime."

539.   Defendant Dever stated she believed Ms. Borkowski simply "woke up regretting a consensual encounter."

540.   Defendant Dever has clearly articulated the SAO's policy.  SAO Defendants do not consider a female victim's testimony alone to be sufficient "evidence" for a conviction.  Dever stated that an assailant that "present[s] equally credible testimony that this [her assault] was consensual," makes a case non-prosecutable.

541.   Defendants Dever and Shellenberger make this credibility determination without having spoken with, or seeking any statement from, the male assailant.  Consistently favoring an unknown male suspect bias against women.

542.   This policy is not prosecutorial discretion but, when considered in the context of Defendant Shellenberger and Dever's egregious conduct towards Ms. Borkowski, is an

inherent part of their pattern and practice to deprive female sexual assault victims of their Constitutional right to an unobstructed Judicial Process.

543.   Defendant Dever is duty-bound to make non-discriminatory charging decisions pursuant to the Fourteenth Amendment to the U.S. Constitution.

544.   While Defendant Dever has prosecutorial discretion, she is not permitted to intentionally discriminate against a protected class – women − as is alleged in this Complaint.  Defendant Dever is also prohibited from intentionally obscuring or concealing a criminal act or interfering with the administration of justice.  In short, neither she no Defendant Shellenberger have the prosecutorial discretion to lie to victims, destroy evidence, intimidate witnesses, or to interfere with the Constitutional right to file a criminal complaint.

545.   Defendant Dever recently told a non-plaintiff victim that her office has policies for prosecuting some certain crimes and different policies for prosecuting rape cases.

546.   According to Defendant Dever, when the SAO prosecutes criminal cases that do not have a sexual component, "We just need probable cause to prosecute the case. But for rape cases, we need evidence that proves the rape occurred beyond a reasonable doubt."  Defendant Dever defined "incapacity" for female victims of sexual assault as "passed out behind a dumpster."  Ex. 33.

547.   The "policy" dovetails with the abuse of female complainants, the protection of male suspects, and the overall scheme to diminish the number of sexual assault crimes in Baltimore County.

548.    Defendant Dever's specific wrongful acts as described herein are not an exercise of discretion, but an effort to conceal criminal conduct and to obstruct access of female sexual assault complainants to the Judicial Process.

549.    Defendant Dever refused to proceed, despite acknowledging (to Ms. Borkowski) that she "believed" that Ms. Borkowski had been raped and knowing that Defendant Baltimore County had determined that there was probable cause for an arrest and charges.

550.    She not only failed to pursue the matter, she did everything possible to make it go away, including intimidation of the victim.

551.    Defendant Dever violated the law.

552.    Ms. Hendler and Ms. Borkowski are two of many examples of Defendant Dever's past (and continuing) pattern of an intentional and unconstitutional deception of female victims of sexual assault regarding the legal distinction between incapacity and helplessness, or consent and rape.  The deception is part of a pattern and practice of discrimination against women motivated by bias towards male suspects of sexual assault and a scheme to demonstrate an implausible number of sexual assault victims in Baltimore County.

553.    In direct contradiction to Defendant Dever's statement, Defendant Burrows expressly stated that Ms. Borkowski's report was "not unfounded."

554.   But Defendant Burrows nonetheless disposed of Ms. Borkowski's complaint as "cleared due to exceptional circumstances."4

555.   The FBI standard is unambiguous.  To clear by "exceptional circumstances" (i.e., "Ex-Clear") the BCPD Defendants must acknowledge that a crime has taken place, that there is probable cause to arrest a suspect, and that the authorities are unable to effect the arrest or otherwise prosecute the offender.

556.   The inability to locate, identify and arrest of Ms. Borkowski's assailants was not a factor in Ms. Borkowski's investigation, nor was it applicable to the hundreds of other legitimate reports of sexual assault suffered by the Class that have been "Ex-cleared" by Baltimore County and the BCPD Defendants and the SAO Defendants.

557.   Defendants, acting in their individual capacities, subjected Ms. Borkowski to a deprivation of her right to equal protection under the law.

558.   Ms. Borkowski has a right to be free from government bias or disfavor based on her gender, unless it serves an important governmental interest.  Defendants acted solely out of self-interest.

559.   Defendants subjected Ms. Borkowski to a deprivation of her right to equal protection in that the investigation of her sexual assault was pretextual, based not on the merits of her complaint, but on the fact that she is a female complainant of sexual assault.

---

4 It appears from the records that the entry reflecting the change was fraudulent, and it was recoded as both "open suspended" and "Adult Ex-Clear."  *See supra.*

560.    Defendants knew that they were violating Ms. Borkowski and Hendler's civil rights by mistreating them because of their gender.  They did so by exceeding the scope of their respective official capacities.

561.    Subsequent Discriminatory Treatment of Ms. Borkowski, And Criminal Acts by Defendants Shellenberger, Dever, Burrows, Tomas, And Dorfler

562.    The First Applications for Statements of Charges and UMBC's Participation in a Conspiracy to Deny Ms. Borkowski Her Civil Rights

563.    Defendants Dever and Burrows also conspired with Bobbie Hoye, Esquire, of UMBC, and Ronald Schwartz, Esquire to unlawfully dismiss the charges, lawfully issued, against the three (3) men.

564.    Throughout the process, Defendant Dever was in constant communication with Ms. Hoye, the Title IX Administrator and attorney for UMBC, and Mr. Schwartz.  Ex. 32, 21.

565.    UMBC's intervention was motivated by an "away" baseball game in which one or more of the assailants was scheduled to play for UMBC.
At 1:00 p.m., the District Court for Baltimore County called the Criminal Defendants' cases and dismissed them.

566.    Ms. Borkowski was not contacted regarding the hearing or the dismissal.

567.    Defendant Dever, purporting to act on behalf of the State, then moved to immediately expunge the Criminal Defendants' records, something she lacks the legal capacity to do.

568.   Defendants intentionally deprived Ms. Borkowski of her access to the courts, of her due process rights, and of her equal protection rights.

569.   The conspiracy by Defendants, including Defendants Baltimore County reflects Defendants' malice towards and bias against Ms. Borkowski and other similarly situated victims of sexual assault.

<u>COUNT V:</u>
<u>Violations of 42 U.S.C. §1986 – Neglect to Prevent Conspiracy</u>
<u>By Anna Borkowski</u>
<u>Against Defendants Shellenberger, Dever, Fox, Burrows, Tomas, Montgomery, And Dorfler</u>

570.   This Count incorporates the remainder of this Complaint as if set forth fully herein.

571.   Any of the Defendant conspirators to the civil rights violations alleged in this Complaint could have stopped the conspiracy to intimidate Ms. Borkowski at any time, but refused to.

572.   Any of the Defendant conspirators could have stopped their illegal actions (traveling out of jurisdiction to threaten Ms. Borkowski with prosecution for a non-existent crime) but did not.

573.   Any of the Defendant conspirators could have informed the appropriate government oversight or even the news media of the illegal and unconscionable manipulation and deception.  They did not.

574.   Defendant Burrows acknowledges that Defendants were ordered, illegally and outside of their chain of command, to commit an illegal act for an illegal purpose.

575.    Defendant Burrows could, and should, have refused to follow unlawful orders, but did not.  Instead, she remained an active participant in a conspiracy to deprive Ms. Borkowski of her Constitutional rights.

576.    Defendants Tomas and Burrows unlawfully concealed their notes from lawful MPIA requests, for the purpose of hiding the conspiracy and thereby triggering an internal investigation that uncovered their deceit.

577.    Actions by any of these Defendants to interrupt the scheme would have stopped, or at least lessened, the harm caused by the conspiracy.

578.    Defendants' conduct violated clearly established statutory rights.  Any reasonable officer would have known that Defendants' actions would violate those rights.

579.    Any reasonable officer, including Defendant Dorfler, would have known that the misuse of Baltimore County police powers by Defendants Shellenberger and Dever, including witness intimidation via BCPD personnel and destruction of evidence, was illegal.

<u>COUNT VI</u>
<u>Violations of 42 U.S.C. §1983</u>
<u>Deprivations of Equal Protection</u>
<u>By Katelyn Frank</u>
<u>Against Defendants Baltimore County, Dever, Shellenberger, Montgomery, Lee, Sparks, Hrabowski, Hunton, And Dillon</u>

580.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

581.    On, May 5, 2016, Ms. Frank went to the Catonsville Precinct of BCPD to report a sexual assault.

582.    Ms. Frank waited for hours before Defendant Timothy Lee, a BCPD patrol officer, arrived to take her statement.

583.    Defendant Lee was overtly uninterested in taking Ms. Frank's report.

584.    Defendant Lee required Ms. Frank to give an account of the sexual assault, her only sexual experience at that time, in a crowded lobby full of strangers.

585.    Ms. Frank gave the BCPD officer a detailed description of rape in the first degree, rape in the second degree, sexual assault in all degrees, and simple assault.

586.    Defendant Lee ignored the description, and the bulk of Defendant Lee's report is a result of his subsequent meeting with UMBC Police.

587.    In fact, he marked Ms. Frank's report "unfounded," though it was later fraudulently recoded.

588.    Defendant Lee drove the half mile from the Catonsville precinct to the UMBC Police Department.

589.    When Defendant Lee returned, he informed Ms. Frank that the University had no record of the assault, even though Ms. Frank had just handed the report to him.

590.    Ms. Frank also had her email to Defendant Dillon reporting the crime.  Both were provided to Defendant Lee.

591.    Defendant Dillon had a stilted email to Defendant Peterson, making a record of the assault.

592.    Consistent with BCPD's practice of ignoring sexual assault, Defendant Lee wrongfully "unfounded" Ms. Frank's rape report before changing it to "suspicious

condition," and closing the complaint with a "non-criminal disposition," all without informing Ms. Frank, and all without an investigation of the allegation.

593.   On information and belief, this was done by or with Defendant Montgomery.

594.   Ms. Frank's rape had been reported three (3) times, once to Defendant Dillon, once to Baltimore County through the SAFE process, and once to Defendant Lee.  None of these reports was recorded as a rape.

595.   When Ms. Frank's mother, distressed by Defendant Dever's casual attitude, requested more information regarding the investigation, Defendant Dever forwarded the email to Defendant Montgomery and wrote "Hahaha!  Her response from my being so nice." Ex. 34.

596.   Defendant Dever's comments raise, at minimum, an inference of bias, as well as malice.

597.   Conspiring with Defendant Dever, Defendant Montgomery placed a pretextual note to the investigative file blaming Ms. Frank for not providing enough information to justify an investigation.  Ex. 35.

598.   Defendants Montgomery and Dever acted to cover up the real reason for any lack of evidence:  Defendants' gender-based discriminatory policies regarding reports of rape.

599.   Ms. Frank is but one of hundreds, possibly thousands, of women who suffered this violation of the equal protection rights due to Defendants' deliberate indifference and bias against women who report sexual assault, as well as the policy to obstruct, intimidate, and deceive complainants.

600.   It was unlawful for Defendant Dillon to dissuade Ms. Frank by manipulation and intimidation from filing a police report.  It is witness intimidation by an authority figure.

601.   Defendants Sparks and Hrabowski failed to adequately train, supervise, or discipline Defendant Dillon and their other subordinates.

602.   Defendants Baltimore County and BCPD failed to exercise their supervisory authority regarding reports of rape and sexual assault, pursuant to the MOU.  Ex. 27.

603.   Defendant Dillon, acting under color of state law, attempted to, and did, persuade Ms. Frank not to pursue a criminal investigation of her assailant.

604.   Defendant Hunton, acting under color of state law, acted to deprive Ms. Frank of her right to equal protection based on her gender.

605.   As a result of Defendant Dillon acts, Ms. Frank did not report her rape directly to the Baltimore County Police until after the police had destroyed her SAEK.

606.   Defendant Dever stated that the delay, caused by Defendant Dillon, acting on behalf of Defendants Hrabowski and Sparks, rendered the case un-prosecutable.

607.   Defendant Hrabowski failed to train and supervise his subordinates and employees in proper policies and procedures and/or allowed or instructed them to act unlawfully.

608.   Defendants Dever and Shellenberger obstructed and refused to allow a proper investigation into Ms. Frank's report.

609.   Ms. Frank has, and had, a right to equal protection under the law, without regard to her gender.

610.    These Defendants' acts and omissions, undertaken under color of law, denied Ms. Frank of her right to equal protection under the law to be treated as equally credible as a man.

611.    Defendants acted to ensure that female victims of sexual assault were less likely to have their cases investigated than victims of other crimes.

COUNT VII
Violations of 42 U.S.C. §1985(2)
Conspiracy to Obstruct Justice
By Katelyn Frank
Against Defendants Dillon, Lee, and Jagoe

612.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

613.    Defendants Dillon and Jagoe conspired with Defendant Lee to block Ms. Frank's report of sexual assault to the police.

614.    Ms. Frank reported her sexual assault to the UMBC police but was told by Officer Lee that she had not.

615.    Defendant Jagoe was tasked with covering up reports of rape and sexual assault by Defendant Dillon.

616.    The purpose of the deception was to further dissuade Ms. Frank from filing a report with BCPD.

617.    The result of Defendant Dillon's conspiracy with Defendant Jagoe was to deny Ms. Frank, and similarly situated female victims of sexual assault generally, their right to equal protection.

618.   Not such denial would have occurred if she were a male crime victim, as Defendants' bias against female complainants of sexual assault would not have guided them.

619.   As a result of the ordeal, Ms. Frank suffers anxiety, sleep loss, intrusive thoughts, fear, and other physical and mental injuries.

COUNT VIII
Violations of 20 U.S.C. § 1681
Discrimination/Deprivation of Educational Access
By Katelyn Frank
Against Defendant UMBC

620.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein

621.   Federal law provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

622.   The law is an expression of the Equal Protection doctrine embodied in the United States Constitution.

623.   Defendant UMBC receives federal financial assistance.

In the fall of 2015, eighteen-year-old Katelyn Frank arrived at UMBC's on-campus dormitory, as a freshman.

624.   On September 10, 2015, an older UMBC student lured Ms. Frank to his dorm room, drugged, and raped her.

625.    Ms. Frank has a post-assault memory of bleeding in her assailant's bathroom.

626.    Ms. Frank later tested positive for Valium, which she never knowingly took.

627.    Defendant UMBC had credible evidence that her assailant had assaulted other students in the same dormitory.

628.    Defendant UMBC did not investigate any those alleged incidents.

629.    Ms. Frank reported the assault to Rina Rhyne.

630.    On September 14, 2015, Ms. Frank submitted to a SAFE exam at GBMC.

631.    The Forensic Nurse Examiner ("FNE") found extensive bruising on Ms. Frank, determined to be a result of the rape four (4) days earlier.

632.    Laura Clary, the FNE who performed the exam reported the assault to Baltimore County, who in turn recorded it as a "suspicious circumstance," not as a rape.

633.    There was no police report after Ms. Clary notified the BCPD.

634.    BCPD merely assigned the report an incident number.

635.    On October 7, 2015, Ms. Frank reported the assault to Defendant Dillon, in person and followed up with a statement in writing. Ex. 19.

636.    Defendant Dillon then improperly persuaded Ms. Frank not to "report" her assault to the police, notwithstanding that she had just done so.

637.    Defendant Dillon has a practice of dissuading female victims of rape and sexual assault from making police reports.  The purpose is to minimize the complaints of sexual assault against male UMBC students, at the expense of the complainants.

638.    By Defendant Dillon's own count, of the many women who report sexual assault, only one per year "files" a police report.

639.    Defendant Dillon told Ms. Frank the "administrative method" was "faster and easier," "more victim friendly," and was "easier to prove."

640.    By failing to report the assault to Baltimore County, Defendant Dillon violated UMBC's Memorandum of Understanding ("MOU") with BCPD, which requires BCPD, not the University Police, to investigate all reports of first and second-degree sexual assault.  Ex. 27.

641.    Defendant Dillon also failed to make a police record of Ms. Frank's unambiguous report of sexual assault, in violation of UMBC Clery Act Obligations.

642.    The University Defendants' obligations under the Clery Act are to maintain a public log of all crimes reported to them or of which they are aware.  Defendants Dillon, Jagoe, and UMBC do not do so.

643.    The "reported" but unrecorded sexual assault did not appear in UMBC's Clery reporting statistics until this lawsuit was filed.

644.    Ms. Rhyne stated that she was concerned that Defendant Dillon was violating the University Police's policy regarding reports of sexual assault and the MOU with BCPD.

645.    Defendant Dillon ignored Ms. Rhyne's concern.

646.    Defendant Dillon refused to issue the required "campus alert" of the reported crime.

647.    Defendant Dillon required Ms. Frank to sign a statement falsely stating that she was "delaying" reporting the incident to law enforcement, even though she had just reported the incident to Defendant Dillon, a sworn police officer.

648.   Defendant Dillon refused to initiate a mandatory Title IX process or take steps to ensure her safety until Ms. Frank signed the statement.

649.   Ms. Frank's SAEK, held by Baltimore County, was never tested or analyzed for relevant evidence, never uploaded to CODIS, and was destroyed in violation of written policy, without notice, on December 1, 2016.

650.   In addition to objective evidence of sexual assault, Ms. Frank provided credible evidence to Baltimore County, Defendant Dever, Defendant Montgomery, and Defendant UMBC she had been drugged, including a hair sample test.

651.   Stephanie Lazarus, the Defendant UMBC's since-removed Title IX Coordinator, did not investigate the drugging, or assign anyone to do so.

652.   Instead, UMBC paid Defendant Hunton, an attorney specializing in defending colleges and universities from allegations of misconduct, to investigate and prepare the Title IX Draft Report and Final Report.  In the course of her investigation, Defendant Hunton provided Ms. Frank with advice as to what she should and should not do.

653.   After being assaulted, and the subsequent investigation, Ms. Frank suffered severe educational setbacks.

654.   Ms. Frank lost at least one year of educational time.

655.   Ms. Frank left to attend a community college.

656.   Ms. Frank was unable to continue her education at UMBC after the University Defendants' tortious, unconstitutional, and discriminatory behavior.

657.   As a result, Ms. Frank suffered severe emotional injury, a decline in academic performance, and lost tuition.

COUNT IX:
Violations of 20 U.S.C. § 1681
Erroneous Outcome
By Katelyn Frank
Against Defendant UMBC

658.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

659.    The investigation conducted by Defendants Hunton and UMBC was rife with procedural and other irregularities, which cast significant doubt on the accuracy of the outcome.

660.    At 5:42 a.m. on October 20, 2015, while Ms. Frank was asleep, Defendant Hunton emailed Ms. Frank to tell her that her interview was scheduled for 9:00 a.m. that morning.

661.    Ms. Frank was awakened at 9:08 a.m. by Defendant Hunton's phone call informing Ms. Frank that she was "late" to an interview that had been scheduled three (3) hours before.

662.    Ms. Frank rushed across campus to attend the interview, and was not able to have her choice of support person as she was entitled have in attendance.

663.    Despite Ms. Frank's pleas, these facts were intentionally misrepresented by Defendant Hunton's Draft Report and Final Report.

664.    Ms. Frank's suitemate came to the meeting but was not permitted to be in the room, notwithstanding Ms. Frank's procedural right to have a witness or representative present.

665. Defendant Hunton instructed Ms. Frank not to attempt to retrieve text messages that Ms. Frank thought were relevant.

666. Defendant Hunton then found in her reports that Ms. Frank had spoliated the text messages, i.e., the text messages Defendant Hunton instructed Ms. Frank not to recover.

667. It is obvious from the process, Draft Report, and Final Report that Defendant Hunton deliberately skewed the process to reach a pre-ordained result. In doing so, she engaged in multiple acts constituting a conflict of interest.

668. This result was intended to relieve her client, Defendant UMBC, of any responsibility to discipline the assailant.

669. Defendant UMBC inexplicably withheld the Draft Report from Ms. Frank.

670. For days, Ms. Frank suffered from severe anxiety and other physical and emotional distress because she knew the Draft Report should have been issued.

671. The Draft Report erroneously exonerated the assailant of all reported acts of misconduct, despite finding that the assailant lied about the illegal drugs involved in the report.

672. Ms. Frank was given only seven (7) days, immediately after finals, to respond to the Draft Report.

673. Ms. Frank responded to the Draft Report and raised numerous procedural and evidentiary issues.

674. The only substantive changes between the Draft and Final Reports were further denigrations of Ms. Frank's character.

675.    For example, Defendant Hunton stated that Ms. Frank's disagreements with the

Draft Report damaged Ms. Frank's credibility.

UMBC's Board of Review accepted the recommendation of their attorney in her Final

Report.

676.    The recommendation contained in the Final Report was the result Defendant

UMBC's improper and unethical conduct by their attorney, all undertaken with the

deliberate intent to absolve the assailant (and UMBC) at the expense of Ms. Frank.

677.    Ms. Frank appealed the decision.

678.    Ms. Frank's appeal was wrongfully denied.

679.    Defendant UMBC's predetermined outcome was achieved.

680.    Defendants allowed Ms. Frank's assailant back on to campus during the flawed

investigation, causing her fear and anguish.

681.    In contradiction of UMBC's stated policies, Ms. Frank was not properly

notified of her assailant's return.

682.    Ms. Frank was denied the opportunity to attempt to recover her text messages,

while Defendant Hunton, on behalf of Defendant UMBC, accepted and credited

incomplete, selectively deleted, text messages offered by the assailant.

683.    Departing from UMBC's policies, Ms. Hunton denied Ms. Frank the

opportunity to have her chosen support person, her mother, present. This procedural

irregularity was raised, but ignored by Defendant UMBC.

684.    Departing from UMBC's policies, Ms. Hunton denied Ms. Frank the

opportunity to have her second-choice support person, her suitemate, present.

685.    The assailant, on the other hand, was permitted to have two support persons, of his choice, present at his interview, including a paid legal professional.

686.    In her draft report, Defendant Hunton deliberately mischaracterized Ms. Frank's statements in her initial interview and elsewhere in order to exculpate the assailant (and UMBC).

687.    Defendant Hunton departed from normal procedure by refusing to ask relevant questions at Ms. Frank's initial interview.

688.    Defendant Hunton then drew an adverse inference against Ms. Frank when Ms. Frank pointed out these deficiencies in her response to the Draft Report.

689.    Defendant Hunton refused to draw an adverse inference against the assailant, who selectively deleted incriminating text messages.

690.    Defendants Hunton's deceit and the conduct of the University were motivated by a desire to minimize complaints of gender discrimination, and to protect UMBC (Defendant Hunton's clients) at the expense of Ms. Frank and other women.

691.    Defendant UMBC did not report Ms. Frank's report of rape in its Clery Act disclosure.  Ms. Frank's report of rape was misclassified a "suspicious circumstance," not a report of a crime.  This contradicts UMBC's later contention that Ms. Frank never reported to Police.

692.    Defendant Hunton allowed and credited statements that Ms. Frank "brought it [the rape] on herself."

693.    Defendant Hunton's self-serving reliance on the subjective, uncorroborated, uninvestigated statements reflects a departure from mandatory procedures and a

discriminatory view of women that is incompatible with Defendant UMBC's obligations pursuant to Title IX.

694.    Defendant Hunton's other biased inferences also violated Ms. Frank's rights, such as concluding that a witness's refusal to cooperate in the investigation was proof that she would give testimony that was unfavorable to Ms. Frank.

695.    The investigation into Ms. Frank's complaint was procedurally and substantively flawed to a degree that denied Ms. Frank her rights under Title IX.

696.    The intentional deviations from required procedures and manipulations by Defendant Hunton were accepted and ratified by Defendant UMBC without any effort to evaluate the efficacy and objectivity of her investigation and conclusions.

697.    The procedural flaws and manipulation led to an adverse and erroneous outcome.

698.    The particular circumstances of UMBC's investigation, including the pre-ordained conclusions of Defendant Hunton, indicate protection of UMBC via gender bias was a motivating factor behind the erroneous finding.

699.    As a result, Ms. Frank suffered severe emotional injury, a decline in academic performance, and lost tuition.

<u>COUNT X:</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Failure to Prevent Sexual Harassment</u>
<u>By Katelyn Frank</u>
<u>Against Defendant UMBC</u>

700.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

701.    Another student told Ms. Frank that her assailant had previously sexually assaulted others.

702.    On information and belief, the fellow female student reported Ms. Frank's assailant for sexual assault the previous year.

703.    Defendants knew or should have known that the assailant represented a continuing danger to Ms. Frank and to others.  Had Defendant Hunton conducted an objective and complete investigation, this critical fact would have been disclosed (assuming UMBC retained records of reported assaults).

704.    Any reasonable person knowing what Defendants knew or should have known would have appreciated the reasonably foreseeable danger presented by Ms. Frank's assailant.

705.    Any reasonable person knowing what Defendants knew or should have known would have confronted the danger presented by Ms. Frank's assailant in order to protect Ms. Frank's civil rights and to protect other female UMBC students and members of the general public from a greater risk of sexual assault.

706.    Defendant failed to take any action to remove or otherwise reduce that danger.

707.    This failure was part of a deliberate pattern and practice of not addressing dangerous sexual assault risks at UMBC, in violation of Title IX.  Defendant UMBC deliberately concealed the risk of sexual assaults on female students.

708.    Defendant UMBC's stated policies provided by its leadership was intended to ensure that female students were protected from known sexual predators on campus.  The leadership failed to apply, or deliberately ignored these procedural safeguards.

709.    As a result, Ms. Frank suffered severe emotional injury, a decline in academic performance, and lost tuition.

COUNT XI:
Violations of 20 U.S.C. § 1681
Discrimination/Deprivation of Educational Access
By Anna Borkowski And Annemarie Hendler
Against Defendant UMBC

710.    This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

711.    Ms. Borkowski and Ms. Hendler reported their rapes to Defendant UMBC on December 5, 2018.

712.    From inception, the complaints were treated as Title IX complaints. Defendants were deliberately indifferent to Ms. Borkowski and Ms. Hendler's rape's in that they conducted only a sham investigation into the misconduct complaint made by Ms. Borkowski.

713.    Defendants misapplied their self-created Title IX Policies and Procedures.

Defendants' Title IX Policies and Procedures sets forth a sixty (60) day time frame for resolving Title IX complaints.

714.    Defendants did not release a draft of their Title IX report until July 24, 2018, 232 days after Ms. Borkowski's initial complaint to UMBC, and 172 days after UMBC's policies call for the entire process to be resolved.

715.    Defendants did not issue an official extension before issuing their Draft Report.

716.    Defendants accepted unsworn, unsubstantiated sexual history and character evidence from Ms. Borkowski's ex-boyfriend, a teammate of her assailants.

717.    Defendants did not allow Ms. Borkowski an opportunity to challenge flawed and fabricated evidence.

718.    Defendants ignored the assailants' admissions that they had violated UMBC's Policy on Sexual Misconduct.

719.    Defendants have refused to enforce a no-contact order entered against Ms. Borkowski's assailants.

720.    Ms. Borkowski was interested in attending UMBC for graduate school but expressed reservations to Ms. Hoye.

721.    In response to Ms. Borkowski's concerns, Ms. Hoye, on behalf of Defendant UMBC, informed Ms. Borkowski that Ms. Hoye's "understanding is that the MSW and PhD graduate degree programs are available at the University's Baltimore campus."

722.    Ms. Borkowski is understandably unwilling to apply to UMBC after the discriminatory and tortious manner in which UMBC handled her report of sexual assault.

723.   Ms. Frank and Ms. Borkowski have been denied educational opportunities due to Defendants' discriminatory actions and inactions, a denial that results from Defendants' gender-based discrimination.

724.   Ms. Borkowski and Ms. Hendler have suffered deprivations of educational access as a result of Defendants' discrimination based on their gender.

725.   Defendant is estopped from denying that its chosen "exclusive administrative remedy" applies.

726.   As a result of Defendants' failure to follow established policies intended to protect students from discrimination, both Ms. Borkowski and Ms. Hendler have suffered emotional and physical distress, including anxiety, fear and distrust of authority figures.

COUNT XII
Violations of the Fourth Amendment
Unreasonable Search and Seizure
By Anna Borkowski, Annemarie Hendler, Katelyn Frank, and the Invasive Testing
Subclass
Against Defendants Baltimore County, Johnson, Sheridan, Peterson, Brady,
Shellenberger, and Dever

727.   This count incorporates by reference the remainder of this Complaint as if set forth fully herein.

728.   The Fourth Amendment guarantees the Plaintiffs the right to be free from unreasonable searches and seizures.

A physical examination by a state agent is unlawful absent informed consent or probable cause.

729.   An individual can consent to a search or seizure if the totality of the circumstances and that individual's acts indicate that she consented to the intrusion.

730.   Informed consent requires that the person be informed of what the procedure entails and any material risks or dangers, whether inherent in or collateral to the procedure.  Ex. 7.

731.   In their capacity as FNE's, GBMC's employees are acting as agents for Baltimore County.

732.   The collection of evidence pursuant to a SAFE exam is not medical treatment for the benefit of a patient; it is an investigatory medical procedure for the benefit of the State.

733.   SAFE subjects are not told this.

734.   It is a "search," subject to the reasonability requirements articulated in the Fourth Amendment.  SAFE subjects are not told this.

735.   GBMC and its employees, in their capacity as agents of Baltimore County and Defendant Baltimore County, receive state funding to conduct the investigatory procedures.

736.   For the purpose of a Fourth Amendment analysis, the FNE's actions, as they relate to the investigatory procedures, are attributable to the State.

737.   Baltimore County controlled the investigatory searches of Plaintiffs by instructing GBMC and the FNEs to perform them or to refrain from performing them.

738.   Baltimore County knew that the "consent" form was inadequate to allow the female victims of sexual assault to give informed consent to the procedure.

739. BCPD Defendants failed to disclose that the SAEKs would be destroyed without being used to solve any crimes, including the victims' assaults. Had the victims known this, they would not have consented.

740. Between 2010 and 2018 the County destroyed 655 SAEKs.

741. When conducting the forensic procedures, GBMC and its employees are not acting for a reason that is independent of an investigative or administrative governmental purpose.

742. They are acting on behalf of the County, the BCPD Defendants, the SAO Defendants, and Defendant Baltimore County.

743. Defendants Johnson, Sheridan, Peterson, Brady, Shellenberger, and Dever personally participated in crafting the unlawful policies followed by BCPD Defendants and the GBMC employees, resulting in unconstitutional and unlawful violations of female victims' civil rights.

744. The SAO Defendants exercised unlawful control over the GBMC employees who performed SAFEs. This control was part of the scheme to minimize the identification and prosecution of male suspects who committed sexual assaults against women.

745. Defendants' interference deceived and misinformed victims, who thought that a thorough investigation would be performed as a result of having endured a SAFE, and that the examination would be an initial piece of evidence in the prosecution of their assailants.

COUNT XIII
Violations of 20 U.S.C. § 1681
Discrimination/Deprivation of Educational Access and Deliberate Indifference
By Marcella Fegler
Against Defendant UMBC

746.    On August 25, 2014, Marcella Fegler attended a party near the UMBC Campus.

747.    At that party were also four (4) members of the UMBC baseball team, who Ms. Fegler knew personally.

748.    In the early morning hours of August 26, all four (4) men raped Ms. Fegler.

749.    Ms. Fegler had consumed a large quantity of alcohol.

750.    Ms. Fegler woke up the next morning with no memory of the events of the evening.

751.    Ms. Fegler did not know where she was or how she got there.

752.    Two (2) of her assailants reassured Ms. Fegler that "nothing had happened" the previous night.

753.    Two (2) months later, a fellow student told Ms. Fegler that the members of the UMBC basketball team had sexually assaulted her after the August 25 party while Ms. Fegler was incapacitated.

754.    Specifically, the student said that the assailants had "run[] a train on her and pass[ed] her around."

755.    Ms. Fegler had to endure the indignity of a student jury for her hearing instead of an actual disciplinary panel that is prescribed by UMBC.

756.    One of the students on the jury was in one of Ms. Fegler's classes.  The class had multiple athletes from different sports teams. During class, the athletes would yell slurs and insults directly towards Ms. Fegler.

757.    The harassment was so grave that Ms. Fegler stopped going to class and only showed up for exams.

758.    This class was a night class and she was terrified to walk across campus by herself.  One of the sanctioned students made threatening tweets such as "Yours is coming. You just wait."

759.    The school was aware of the harassment but did nothing.

760.    When Ms. Fegler parked her car on campus and was walking to her dorm. Two (2) basketball players, one of whom was one of the rapists started yelling "It's the fucking bitch" and "what are you going to do now."

761.    When Ms. Fegler used the study room or gym, she had to walk with her head down due to constant student harassment.

762.    Defendant was deliberately indifferent to Ms. Fegler's reports of rape in that they conducted a sham investigation of the sexual assault complaint made by Ms. Fegler and ignored and failed to stop repeated ongoing acts of post-assault harassment.

763.    Despite this indifference, based solely on the assailants' confessions, Defendants determined that Ms. Fegler was sexually assaulted by two of the four assailants, but did not expel them.

764.    Because two of her assailants were still on campus, and because of the harassment and retaliation she encountered Ms. Fegler was forced to leave UMBC.

765.    Even after Ms. Fegler transferred, one of the UMBC basketball players reached out to a basketball player on Ms. Fegler's new school saying to watch out for her, that she had faked a rape, and carried STD's.

766.    Ms. Fegler became very depressed.  She was in constant fear and cried constantly.

767.    Ms. Fegler's father would have to drive her to school and sit with her on the bench outside until class started.

768.    In Ms. Fegler's words, "I was 'that girl' on campus. I got bullied everywhere I went. I had to walk with my head down and constantly had to look over my back."

769.    As a result, Ms. Fegler suffered, and continues to suffer, severe emotional and physical injuries, a decline in academic performance, and lost tuition.


<u>COUNT XIV</u>
<u>Violations of 20 U.S.C. § 1681</u>
<u>Deprivation of Educational Access</u>
<u>By Kaila Noland</u>
<u>Against Defendant UMBC</u>


770.    On March 30, 2016, Kaila Noland was sexually assaulted in Baltimore County. Defendant UMBC does not dispute this fact.

771.    Ms. Noland's assailant told her, "you know you want it," and proceeded to sexually assault her.

772.    Ms. Noland reported her assault to UMBC on December 1, 2016.

773.    As a result of the assault, Ms. Noland, a UMD student, left her laboratory position at the Defendant UMBC's campus.

774.   Defendant UMBC paid Defendant Hunton to investigate and prepare the Title "IX Draft Report" and "Final Report."

775.   Defendant UMBC had confidence in Defendant Hunton's ability to absolve Defendant UMBC of any responsibility to discipline Ms. Noland's assailant, as Defendant Hunton's "investigations" never resulted in an expulsion or other discipline.

776.   In this case, even Defendant Hunton concluded, based on Ms. Noland's assailant's own statements, that Ms. Noland was sexually assaulted on March 30, 2016.

777.   Without explanation, Defendant Hunton recommended that UMBC not expel Ms. Noland's assailant.

778.   Based on that recommendation, UMBC imposed one "counseling session" as a penalty for Ms. Noland's assailant.

779.   Defendant Hunton further recommended that UMBC "use the circumstances giving rise to this complaint to tailor training and awareness programs."

780.   Defendant Hunton was referencing the DOJ Office of Civil Rights, which has been investigating UMBC for Title IX violations.

781.   Defendant Hunton and UMBC reduced Ms. Noland's life-changing sexual assault to a "learning experience" for her assailant.

782.   Although the University Defendants and Defendant Hunton were aware that Ms. Noland had been sexually assaulted, they did not report the assault to the police asrequired, nor was it recorded in publicly available Clery Statistics.

783.   Defendant UMBC receives federal financial assistance and provide education programs.

784.    Defendant UMBC was deliberately indifferent to Ms. Noland's reports of rape in that they assigned a biased investigator to pantomime an investigation into the sexual assault complaint made by Ms. Noland.

785.    Despite this indifference, based solely on the assailant's confession, Defendants determined that Ms. Noland was sexually assaulted.

786.    Defendant UMBC only concluded that Ms. Noland was sexually assaulted because there was no alternative narrative, however implausible, to credit.

787.    Instead of her assailant being banned from campus, Ms. Noland was forced to leave her laboratory job for another campus.

788.    Ms. Noland's assailant received a single counseling session and thereafter continued as a student in good standing.

789.    Defendants' decision to act with more concern for the assailant's benefit than to protect Ms. Noland's civil rights was self-serving, discriminatory and based on Ms. Noland's gender.  As with all instances of complaints by female students, UMBC undertook a pattern and practice of obtaining a sham investigation or, when totally implausible, some other approach that would conceal and diminish criminal activity by its male students.  The UMBC approach to sexual misconduct constituted a violation of female students' rights under Title IX, and a denial of educational access to Ms. Noland.

<u>COUNT V</u>
<u>Violations of 42 U.S.C. §1983</u>
<u>Deprivations of Equal Protection</u>
<u>By Marcela Fegler</u>
<u>Against Defendants Baltimore County, Dever, Shellenberger, Tomas, Burrows,</u>
<u>Hrabowski,</u>

790.    Marcela Fegler reported her rape to the Baltimore County Police.

791.    BCPD performed little to no investigation into the allegations, and focused on exonerating the assailants.

792.    Defendants Burrows and Tomas only interviewed three (3) of the four (4) assailants and colluded with David Gleason, Esquire, and other UMBC officials to prematurely end the investigation and exonerate the four (4) assailants.

793.    Defendant Tomas dismissed Ms. Fegler's assault, informing her that "in order for some of the sex acts," which Ms. Fegler could not recall, "to be performed, she would have had to be conscious to participate," revealing Tomas' bias against women in that he believes that if a woman is conscious, she must be consenting.

794.    Defendant Tomas even offered to testify, on behalf of the male assailants, that the assailants were "not involved as alleged," clearly a reflection of his invidious bias against women.  Ex. 51.

795.    Defendant UMBC publicly claimed to have expelled two of the assailants, who had both admitted to Ms. Fegler that they had raped her.

796.    The claim was false; the assailants were allowed to transfer to other schools without any adverse consequence.

797.    Despite twice promising a fresh review of sexual assault cases such as Ms. Fegler's, a promise that Ms. Fegler relied on, Defendant Baltimore County ignored the case.  This approach is systemic and an example of Defendants' overall scheme to exonerate male suspects at the expense of their female victims.

798.    Baltimore County did not review, re-open, or otherwise further investigate her case, which was never even classified as a sex crime.  This decision was concealed from her.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Honorable Court:

a) Certify this action as a class action under Rule 23;

b) Enter judgment finding Defendants jointly and severally liable for monetary damages, including punitive damages;

c) Enjoin Defendants from engaging in unconstitutional and illegal practices abridging Plaintiffs' and other's civil rights and denying Plaintiffs and other's educational opportunities;

d) Award to Named Plaintiffs reasonable costs and attorney's fees; and

e) Grant such other relief as this Court shall determine is just and proper.

### Prayer for Jury Trial

Pursuant to Rule 38, Plaintiffs demand a trial by jury on all issues so triable.

      /S/ Rignal W. Baldwin V
Rignal W. Baldwin V
Federal Bar No.: 30136
BaldwinLaw, LLC
111 South Calvert Street
Suite 1805
Baltimore, Maryland 21202
Telephone: (410) 385-5695
Facsimile: (443) 703-7772
*Attorney for Plaintiffs,*
*Anna Borkowski, Katelyn Frank, Marcella Fegler*
*Annemarie Hendler, and Kaila Noland*