IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANNA BORKOWSKI, et al.

      v.

                          :   Civil Action No. DKC 18-2809

BALTIMORE COUNTY, MARYLAND,
et al.

**MEMORANDUM OPINION**

In an ultimately unsuccessful fourth attempt to craft a class action complaint, Plaintiffs devote more than 100 pages, nearly 800 numbered paragraphs, and more than 50 exhibits, in an overbroad, unfocused recitation of conclusory allegations, some masquerading as "facts."  While Plaintiffs earnestly believe that the actions and "policies" of various authorities in Baltimore County and the University of Maryland, Baltimore County reveal a pattern of gender discrimination, their Third Amended Complaint fails to state a viable claim in all but one respect.

Presently pending and ready for resolution are four motions to dismiss filed by a Defendant or groups of Defendants: (1) Paul Dillon, Freeman Hrabowski, III, Mark Sparks, the University of Maryland, Baltimore County ("UMBC"), and the University of Maryland Baltimore County Police Department ("UMBCPD") (collectively "the University Defendants") (ECF No. 86); (2) Baltimore County Police Department ("BCPD"), Baltimore County,

Maryland, and current or former police officers Rosemarie Brady, Kristin Burrows, Paul Dorfler, James Johnson, Morrow Lane, Timothy Lee, Kimberly Montgomery, Terrence Sheridan, and Nicholas Tomas (collectively "the County Defendants") (ECF No. 88); (3) Scott Shellenberger, Lisa Dever and Bonnie Fox of the State's Attorney's Office ("SAO") (collectively "SAO Defendants") (ECF No. 89); and (4) Bernadette Hunton (ECF No. 90). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, three of the motions will be granted, and one will be granted in part and denied in part.

## I. Background

Unless otherwise noted, the facts outlined here are either set forth in the operative complaint[1] or evidenced by documents referenced and attached to the complaint. The facts are construed in the light most favorable to Plaintiffs.

The complaint revolves around the investigation and handling of four instances of alleged sexual assault made by five plaintiffs, Marcella Fegler ("Ms. Fegler"), Katelyn Frank ("Ms.

---

[1] The third amended complaint ("TAC") lists facts without a clear timeline or narrative. In addition, key facts contained in Plaintiffs' earlier complaints have been removed. A clearer chronology of the facts is recounted in some of Plaintiffs' oppositions. (ECF No. 96-1, at 7-12); (ECF No. 95-1, at 5-7); (ECF No. 97-1, at 6-10).

Frank"), Kaila Noland ("Ms. Noland"), Anna Borkowski ("Ms. Borkowski"), and Annemarie Hendler ("Ms. Hendler").

### A.  Anna Borkowski and Annemarie Hendler

Ms. Borkowski and Ms. Hendler are both residents of Maryland and former UMBC students.  Ms. Hendler now attends Towson University.  Both women state that, in the early morning hours of October 20, 2017, they were "gang-raped and repeatedly assaulted" by three men.  Upon regaining consciousness, both Plaintiffs were in intense pain and, realizing what had occurred, reported the assault to the Towson University Police Department. They were sent to the Greater Baltimore Medical Center ("GMBC") for examination and treatment.  At GMBC, a Sexual Assault Forensic Exam ("SAFE") exam was performed on Ms. Borkowski that showed "injuries consistent with sexual assault."  Ms. Hendler similarly suffered from bleeding, soreness, swelling and abrasions.  They both requested immediate police investigations.

They allege that they had to wait many hours after the assault before BCPD contacted them.  Ms. Hendler met with Detectives Tomas and Burrows and signed a waiver declining further investigation. She again requested an investigation, however, eighteen minutes later.  By midnight on October 21, 2017, Plaintiffs state, the case was "inexplicably closed and cleared by 'exceptional circumstances.'"  Plaintiffs further state that BCPD ignored major pieces of evidence such as blood stains on the bed and a suspicious

bottle of vodka.   According to the complaint, the Investigative File shows that BCPD officers never visited the crime scene or collected evidence there.    Further, witnesses were never interviewed and the Sexual Assault Examination Kits ("SAEK"), the sampling for which they consented, were never tested or entered into the police DNA database. After almost a month, in mid-November 2017, Detectives Borrows and Tomas conducted a joint interview of the three alleged assailants.   "Sometime later," Detective Burrows recorded the report as "open" or "open suspended."

On March 14, 2018, Ms. Borkowski submitted sworn affidavits and an application for statements of charges with District Court Commissioner John Robey.   Commissioner Robey then instructed her to wait in the hallway while he contacted Officer Montgomery and Mr. Dever.   Officer Montgomery and Mr. Dever directed Commissioner Robey to deny the application for statements of charges.   Commissioner Robey complied.   The denied applications were forwarded to Baltimore County Administrative Commissioner Whitney Wisniewski.

That same day, sensing a failure fully to investigate her claims, Ms. Borkowski applied for a statement of charges against her assailants with District Court Commissioner John Robey.   Her application was "swiftly" denied.   On March 20, 2018, Ms. Borkowski again applied for a statement of charges before Commissioner

4

Colleen Ellingson.    After reviewing Ms. Borkowski's sworn statement, Commissioner Ellingson charged all three men with several crimes including first degree rape.   On March 21, 2018, Detective Burrows learned that Ms. Borkowski had applied for these statements of charges.   She subsequently, at the behest of the SAO Defendants, reached out to the "BCPD officer in charge" of serving the summonses and told him not to serve them.   Detectives Burrows and Tomas also called Ms. Borkowski repeatedly and visited her Baltimore residence, and demanded of her grandmother to know where she was.   The detectives also obtained her Towson class schedule. (ECF No. 81-24).

Ms. Borkowski alleges that the Defendants interfered with her right to apply for statements of charges.   Specifically, the SAO Defendants ordered Detectives Burrows and Tomas to tell Ms. Borkowski to stop filing charges with the Commissioners or she would face criminal charges.   (ECF No. 81-48).   These efforts "effectively barred" Ms. Borkowski from applying for a statement of charges.    The SAO Defendants alerted the attorney for the assailants and UMBC's Title IX coordinator that the charges against the alleged assailants were dropped.   Ms. Borkowski, however, was not updated.   Defendant Dever also expunged the alleged assailants' criminal record, which Plaintiffs argue was *ultra vires*.

### B.   Marcella Fegler

Ms. Fegler is also a resident of Maryland and a former UMBC student.   On August 25, 2014, she went to a party near the UMBC campus where she encountered four members of the UMBC basketball[2] team whom she knew.   During the early morning of August 26, the players sexually assaulted her after she had consumed a large amount of alcohol.   She awoke with no memory of what had occurred. Two of the four players reassured her that "nothing had happened" the night before.   Two months later she learned from a fellow student that the players had sexually assaulted her while she was incapacitated.

Initially, Ms. Fegler raised her complaint about the incident to a student jury through the university's administrative proceedings.   Due to the student body's general awareness of these proceedings, Ms. Fegler was subject to harassment by fellow students, particularly student athletes.   She states that the school failed to protect her from such harassment.   Ultimately, two of the players admitted to assaulting her but the other two continued to deny the incident.   UMBC expelled the former but allowed the latter to remain in school.   Ms. Fegler then transferred out of UMBC to avoid the continued harassment and

---

[2] At some points in their TAC, Plaintiffs describe the assailants as being on the "baseball" team.   Other places, they are described as being on the "basketball" team.

contact with the two men still on campus.  She continued to be harassed after transferring because UMBC basketball players told a player at her new school to "watch out for her, that she had faked a rape, and carried STD's [sic]."

Ms. Fegler also reported her sexual assaults to BCPD.  Upon investigating, "Defendants Burrows and Tomas only interviewed three [] of the four [] assailants and "colluded" with counsel for the alleged assailants and "other UMBC officials" to "prematurely end the investigation and exonerate the four [] assailants." Officer Tomas stated that "in order for some of the sex acts," which Ms. Fegler could not remember, "to be performed, she would have had to be conscious to participate."  Officer Tomas also offered to testify on behalf of the accused to the effect that they "were not involved as alleged."  (ECF No. 81-51).  In 2017, the County and the BCPD twice promised a "fresh review of sexual assault cases" like Ms. Fegler's, but never re-opened her case. (ECF Nos. 81-3, at 1-5).

### C.  Katelyn Frank

Katelyn Frank is a resident of Maryland and a former UMBC student.  Ms. Frank began her freshman year at UMBC in the fall of 2015.  On September 10, 2015, Ms. Frank was drugged and raped by an upperclassman in a university dorm.  Ms. Frank first reported the assault to an employee at the UMBC health center.  Then, on September 14, 2015, Ms. Frank reported her rape at Greater

Baltimore Medical Center (GBMC) and underwent a SAFE.  The Forensic Nurse Examiner ("FNE") who examined Ms. Frank reported the assault to Baltimore County.  On October 7, 2015, Ms. Frank reported the assault to Defendant Paul Dillon, now chief, and former deputy chief of the UMBC Police Department, in person and followed up via email.  (ECF No. 81-19, at 1).  Ms. Frank states that Officer Dillon improperly dissuaded her from filing a formal police report by telling her that "the administrative method" was "faster and easier," "more victim friendly," and "easier to prove." Officer Dillon did not make a formal record of Ms. Frank's report of sexual assault, in violation of the Clery Act[3] and UMBC's Memorandum of Understanding ("MOU") with the BCPD.  (ECF No. 81-27, at 3).  At Officer Dillon's request, Ms. Frank signed a statement stating that she was delaying reporting the incident to law enforcement. UMBC retained a female attorney, Defendant Bernadette Hutton, to investigate the incident and prepare a Title IX Report.  Ms. Hutton met with Ms. Frank who produced a report finding that Ms. Frank was not sexually assaulted.

Ms. Frank then went to the Catonsville Precinct of the BCPD to report her sexual assault on May 5, 2016.  Defendant Timothy Lee, a BCPD patrol officer, took her statement. Ms. Frank provided officer Lee with a detailed description of her assault.  Officer

---

[3] The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f).

Lee then drove to UMBC and met with the UMBC Police to follow up on Ms. Frank's allegations.  Upon returning to the BCPD precinct, officer Lee told Ms. Frank that UMBC had no record of the assault "even though Ms. Frank had just handed the report to him." Officer Lee classified Ms. Frank's assault as a "suspicious condition" and closed it with a "non-criminal disposition."  When Ms. Frank's mother emailed the prosecutor's office to follow up on the status of the case, Defendant Lisa Dever forwarded the email to Defendant Kimberly Montgomery and wrote "Hahaha! Her response from my being so nice."  (ECF No. 81-34).  The complaint further alleges that, "[c]onspiring with Defendant Dever, Defendant Montgomery placed a pretextual note" in Ms. Frank's file stating that Ms. Frank did not provide enough information to justify an investigation.

On December 1, 2016, Ms. Frank's SAEK was destroyed without being tested or uploaded to Combined DNA Index System ("CODIS").[4]

Ms. Frank's assault resulted in educational setbacks, including leaving UMBC to attend community college.

---

[4] CODIS is a system of national, state, and local databases managed by the FBI that allows crime laboratory personnel across the country to compare DNA profiles from known criminal offenders (and arrestees where applicable) with biological evidence from crime scenes.

> **D.    Class Claims and Claims by All Plaintiffs**

Named Plaintiffs:

> bring this class action on behalf of all
> female victims of rape or sexual assault in
> Baltimore County, Maryland. These women
> reported their assault; underwent invasive
> testing in the preparation of a SAEK; were
> denied educational access on the basis of
> their gender in connection with a report or
> attempted report of rape or sexual assault;
> and, were improperly dissuaded, coerced,
> intimidated, or otherwise impeded from
> reporting or pursuing a rape or sexual assault
> complaint because of Defendants' sympathy to
> men accused of sexual assault and antipathy
> against women reporting it.

(ECF No. 81, ¶ 11).  The process described involves use of a SAFE.

A SAFE can last up to four hours and includes touching, swabbing,

and photographing a victim's genitals.  SAFE Examinees sign a

waiver authorizing "transmittal of a copy of all medical reports,

other information created, and evidence collected pursuant to the

examination to the Police Department of the jurisdiction where the

alleged crime took place, when and if [the victim] elect[s] to

report the alleged sexual assault to the police, and to the Office

of the State's Attorney of the jurisdiction, when and if [the

victim] elect[s] to cooperate with a prosecution of the alleged

sexual assault."  (ECF No. 81-7, at 1).  The SAFE results in the

creation of evidence known as a SAEK.

The TAC alleges that, between 2010 and 2018, 1,032 SAEKs were

collected.  Of the 1,032 collected, approximately thirteen percent

were tested for DNA and 0.035 percent were uploaded into CODIS.
SVT Detectives have discretion over whether a SAEK is tested.
Forty percent of the 1,032 SAEKs collected have been destroyed.
In contrast, "between 2016 and 2017, fifty-four percent (54%) of
property crimes and thirty-three percent (33%) of violent, non-
sex crimes were tested and submitted to CODIS." Non-sexual assault
victims receive a letter if evidence is to be destroyed. "SAFE
examinees were not informed of the SAEK's destruction." Plaintiffs
allege that this evidence demonstrates that County and SAO
Defendants are biased against woman who report sexual assault.

### E.   Procedural History

Plaintiffs filed their initial complaint on September 10,
2018, (ECF No. 1), an amended complaint on October 17, 2018 (ECF
No. 5), and a second amended complaint ("SAC") on December 7, 2018
(ECF No. 21). Separate motions to dismiss the SAC were filed, as
were motions to seal exhibits containing sensitive information.

On September 30, 2019, the court issued a Memorandum Opinion
granting the motions to dismiss and to seal. Plaintiffs were
granted leave to amend their complaint further. (ECF No. 67). On
December 4, 2019, Plaintiffs filed their Third Amended Complaint
("TAC"). (ECF No. 81). Once again, the Defendants filed motions
to dismiss in four groups, all on January 17, 2020. Oppositions
and replies have been filed.

11

II.   **Standard of Review**

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  But "[r]ule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n. 3 (2007).

In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### III. Analysis

Plaintiffs were directed in the previous opinion dismissing the SAC to file "a more focused, perhaps modest, third amended complaint." Despite that admonition, the TAC includes many of the same claims, albeit with factual enhancements. *Borkowski v. Balt. Cty., Md.*, 414 F.Supp.3d 788, 803 (D.Md. 2019). Plaintiffs' added factual support to many of their previously bald assertions still fail to cure the fatal deficiencies in all but one of their claims. With the new facts included in the Plaintiffs' TAC, however, one Plaintiff does state a plausible claim for Deprivation of First Amendment Rights (Count II). The other fourteen counts will be dismissed.

#### A.   Group Pleadings

The County Defendants argue that despite the previous "admonition against [] 'group pleading'" expressed in the court's opinion, *Borkowski*, 414 F.Supp.3d at 803, numerous group pleadings

13

remain in the TAC against Defendants, County Defendants, or the Special Victims Team ("SVT"). (ECF No. 88-1, at 24, 31, 44) (citing ECF No. 81, ¶¶ 462, 541, 542, 544, 548, 552, 792). The only claims dismissed in the SAC as group pleadings, however, were those by "all Plaintiffs" against "all Defendants," which included a conspiracy claim against *twenty-two* Defendants. *Borkowski*, 414 F.Supp.3d at 803. None of the paragraphs referred to by the County Defendants is pleaded in this way. In fact, they involve Ms. Borkowski and/or the purported class[5] making Equal Protection claims against Baltimore County, BCPD officers and SAO offcials, and a claim by Ms. Fegler against Baltimore County, these same SAO officials, and the UMBC President. These are not group pleadings and will not be barred as such.[6]

**B.  Sovereign Immunity**

An individual sued in his or her official capacity as a state agent is entitled to Eleventh Amendment Immunity. *Borkowski*, 414

---

[5] The TAC once again asserts allegations on behalf of a class and sub-class. It argues for certification pursuant to Fed.R.Civ.P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3). (ECF No. 81, ¶¶ 312-29). As with the SAC, "Class certification will not be addressed at this time." *Borkowski*, 414 F.Supp.3d. at 822 (citing *Popoola v. Md.-Indiv. Prac. Ass'n, Inc.*, 230 F.R.D. 424, 433 (D.Md. 2005)).

[6] The only count that arguably approaches a group pleading is Count I in alleging a claim by "all Plaintiffs and class members" against Defendants Baltimore County and the BCPD "Policy Makers" and "Supervisory Defendants." The County Defendants, however,

F.Supp.3d at 806.   Similarly, UMBC and UMBCPD are "immune from claims" under 42 U.S.C. §§ 1983, 1985, and 1986 as instruments of the state.   *Id.* at 804.   Therefore, individuals sued in their official capacity at UMBC are also state actors and protected in that role by sovereign immunity.   *Id.* at 805.   Plaintiffs purport to name SAO Defendants Dever and Fox in their "official capacities as *de facto* Baltimore County employees." (ECF No. 81, ¶ 52).   The SAO motion to dismiss, however, treats Mr. Dever and Ms. Fox solely as state employees throughout.   In response, Plaintiffs argue that the county, and not the state, is the "real party in interest" in that the County funds the SAO's operation under Maryland law.   (ECF No. 98-1, at 33-34) (citing *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989)).   Plaintiffs insist that this means the SAO Defendants are "not covered by Eleventh Amendment immunity" for conduct "outside of their classic law enforcement functions."   (ECF No. 98-1, at 34).   The SAO Defendants correctly argue that this point was already adjudicated in the previous opinion.   (ECF No. 89-1, at 10); (*see Borkowsk*, 414 F.Supp.3d at 806) (citing Md. Code 5-101(ll)(5) ("'State official' means . . . a State's Attorney[.]")).   Regardless, it has little to no bearing on the current litigation.   Insofar as

---

only cite to paragraphs in Counts III, IV and V as group pleadings, and so do not challenge Count I on this ground.

Plaintiffs mean that some of the conduct attributable to Mr. Dever, Mr. Shellenberger, and Ms. Fox is not protected by absolute prosecutorial immunity, they are correct, but the SAO Defendants do not dispute this.[7]  Nonetheless, the § 1983 claims can only proceed against them in their individual capacities, as the SAO is clearly an instrument of the state.  *See Borkowski*, 414 F.Supp.3d at 806.

Plaintiffs also seems to name UMBCPD Officers Dillon, Jagoe and Sparks in both their individual and official capacity in one section of their TAC, (ECF No. 81, ¶ 50),  but then confusingly also state that "UMBC Defendants Hrabowski, Sparks, Dillon and Jagoe are sued in their personal capacities." (*Id.*, ¶ 53).   In reading these two statements in harmony, it can be assumed that Officers Dillon, Jagoe and Sparks are named by Plaintiffs in both their individual and official capacity, while Dr. Hrabowski is sued *only* in his official capacity.  As it relates to both claims directly against UMBC and against individual UMBC and UMBCPD individuals in their official capacity, however, the University Defendants correctly state that "Plaintiffs do not allege any new facts that alter this court's prior application of Eleventh

---

[7] The SAO Defendants only claim prosecutorial immunity for their communications with the commissioners, implicitly conceding that their subsequent conduct with the BCPD is not part of their official prosecutorial function.  (ECF No. 89-1, at 17).

Amendment Immunity." (ECF No. 86-1, at 11).[8]  Counts II, III, IV,
V, VI, XII, XV as to Mr. Dever, Mr. Shellenberger and Ms. Fox, and
Counts VI, VII, and XV as they relate to Officers Sparks, Dillon
and Jagoe[9] in their official capacities will be dismissed.[10]

### C.   42 U.S.C. § 1983

Plaintiffs allege six counts under 42 U.S.C. § 1983.  Count
I alleges a violation of Equal Protection, by all Plaintiffs and
purported class Plaintiffs against Defendants James Johnson,
Terrence Sheridan, Michael Peterson, and Rosemarie Brady, ("BCPD

---

[8] The Eleventh Amendment immunity only bars suits for damages.
The only place that the TAC seeks injunctive and declaratory relief
is in relation to Plaintiffs' purported class claims under
Fed.R.Civ.P. 23(b)(2).  (ECF No. 81, ¶ 321).  The only purported
class or sub-classes named as Plaintiffs are in Counts I, IV and
XII which will be dismissed on other grounds.  Due to unfortunate
lack of attention to detail, Plaintiffs elsewhere in their
complaint include class action references.  For instance, the TAC
states that Ms. Frank brings her Count VII claim on behalf of
"similarly situated female victims of sexual assault generally,"
(ECF No. 81, ¶ 617), and Count XIV states, "The UMBC approach to
sexual misconduct constituted a violation of female students'
rights under Title IX" (*Id.*, ¶ 789), despite the fact that neither
count proports to be a class claim in its respective header.  These
two counts, however, will also be dismissed on other grounds.  The
surviving claims, therefore, do not seek injunctive relief.

[9] The University Defendants point out that Mr. Jagoe is
referenced throughout the complaint but is not actually a named
Defendant.  (ECF No. 86-1, at 4 n.2).

[10] Ms. Hunton devotes half of her own motion to dismiss to
arguing the question left open in the previous opinion as to
whether she is a state actor in this context.  *Borkowski*, 414
F.Supp.3d at 810 n. 4; (ECF No. 90-1, at 11-17).  She is only named
as a Defendant in Count VI, which will be dismissed for other
reasons discussed below.

Supervisory/Policymaker Defendants") and Baltimore County.   Count II alleges deprivation of First Amendment rights by Ms. Borkowski against Defendants Shellenberger, Dever, and Fox of the SAO, and Officers Montgomery, Tomas, and Borrows of the BCPD.   Count IV alleges a deprivation of Equal Protection by Ms. Borkowski and purported class Plaintiffs against these same SAO and BCPD Defendants.   Count VI claims deprivation of Equal Protection by Ms. Frank against Defendants Baltimore County, Dever, Shellenberger, Montgomery, Lee, Sparks, Hrabowski, Hunton, and Dillon.   Count XII asserts a Fourth Amendment claim against Defendants Baltimore County, Johnson, Sheridan, Peterson, Brady, Shellenberger, and Dever.   Count XV alleges a deprivation of Equal Protection by Ms. Fegler against Defendants Baltimore County, Dever, Shellenberger, Tomas, Burrows, Hrabowski.

As the Fourth Circuit has explained, "[t]o state a claim under § 1983, a plaintiff must allege that [s]he was deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *McDaniel v.* Baily, 710 Fed. Appx. 604, 605 (4th Cir. 2018) (citing Thomas *v. Salv. Army S. Terr.*, 841 F.3d 631, 637 (4th Cir. 2016) (internal quotation marks omitted)).   "The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement — and the analysis for each is identical." *Id.* (citing

*Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4ᵗʰ Cir. 2009)).

**1.    Equal Protection**

Plaintiffs allege in Counts I,[11] IV, VI and XV that they were denied Equal Protection under the law because of their status as female complainants of sexual assault. (*See, e.g.,* ECF No. 81, ¶¶ 557, 604).

The Equal Protection Clause of the Fourteenth Amendment declares that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430 at *13 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)). It bears repeating that "[t]o succeed on an equal

---

[11] The previous opinion criticized the SAC for "lack[ing] sufficient precision" in its naming of Defendants. *Borkowski*, 414 F.Supp.3d at 812. Count I of the TAC similarly lacks precision. It names a wide array of "policy makers" and supervisors at the BPCD but does not make clear what role, if any, these particular individuals had in actually shaping the "written and/or unwritten" "policy of Baltimore County Police Department to ignore complaints of sexual assault by women against men" with which Count I takes issue. (ECF No. 81, ¶¶ 331-32). The TAC baldly asserts that "[t]he affirmative decisions of policymaking officials Johnson, Brady, Peterson, and Sheridan reflect the unconstitutional policies of Baltimore County" and that Johnson and Sheridan allocate more resources to serious crimes than to sexual assault against female victims." (*Id.*, ¶¶ 337-38). Such imprecision will be ignored however, because these claims will be dismissed on other grounds.

protection claim, a plaintiff must . . . demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Borkowski*, 414 F.Supp.3d at 808 (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  While a "similarly situated comparator" is not an absolute requirement to succeed on an Equal Protection claim, *Bryand v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003), "[p]roof of . . . discriminatory intent or purpose *is* required to show a violation of the Equal Protection Clause of the Fourteenth Amendment."  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (emphasis added).

"Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Borkowski v. Balt. Cty., Md.*, 414 F.Supp.3d at 809 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (internal quotation marks omitted)). "While it is true that discriminatory impact, if shown, may be probative (though not dispositive) on the issue of intent... [Plaintiffs'] statistical evidence in this case is not... probative of discriminatory impact." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 823 (4th Cir. 1995).

"Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654.  Courts apply different levels of scrutiny depending on the kind of classification the law makes. *See id.,* at 654-55.  Where laws make gender-based classifications, they are subject to intermediate or "heightened" scrutiny that requires a showing that the gender-based classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to [achieving] those objectives." *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1683-84 (2017) (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

The Equal Protection claims in the TAC largely echo and build upon those in the SAC.  For example, as to Count I, Plaintiffs reiterate their central allegation verbatim: "Defendants followed written and/or unwritten policies, and thus afforded less protection to female victims of sexual assault than to victims of other crimes." (ECF No. 81, ¶ 332); *compare* (ECF No. 19-4, ¶ 582). Where the TAC adds significantly upon the old, however, is in arguing that County defendants purposefully committed substantially less resources to solving sexual assaults against female victims, and that their alleged indifference toward female victims was part of a concerted plan to favor male suspects over female victims. (ECF No. 81, ¶ 338).  In particular, as to Count

21

I, Plaintiffs allege that the SVT was staffed with "biased detectives" and support this assertion with numerous statistics purporting to show the chronic under investigation and prosecution of sexual assault claims through the mishandling of SAEK inventory, intimidation of victims, and an unwillingness of Baltimore County aggressively to prosecute sexual assault cases involving female victims. (*Id.*, ¶¶ 337-72).

Similarly, as to Ms. Fegler in Count XV, "BCPD performed little to no investigation into the allegations[] and focused on exonerating the assailants." (*Id.*, ¶ 791). In turn, Plaintiffs allege that Detectives Burrows and Tomas "colluded" with UMBC officials to end the investigation prematurely. (*Id.*, ¶ 792).

Plaintiffs also attach an audit of the SVT, the unit of which Ms. Burrows and Mr. Tomas are part, that supports their allegations that sexual assault claims have a relatively low prosecution/conviction rate and suggests that "some police and prosecutors continue to consider resistance (an antiquated gender-based norm) when pursuing investigations and prosecutions." (ECF No. 81-52, at 6-7).

In Count IV, Plaintiffs baldly assert that the "words and actions" of Officers Tomas and Burrows "reflect their bias against female victims of sexual assault" because they asked Ms. Hendler "offensive and demeaning questions, and pressured her, while she was still intoxicated." (ECF No. 81, ¶¶ 488-89). Similarly,

Plaintiffs argue that "Defendants Burrows, Tomas, and Dever . . . were guided by an underlying bias towards male suspects and against female victims." (*Id.*, ¶ 536). Within Count VI, they similarly allege that Officer Montgomery and Mr. Dever "covered up" the "real reason" behind their inability to find inculpatory evidence against Ms. Frank's alleged assailant: their "gender-based discriminatory policies regarding reports of rape." (*Id.*, ¶ 598). The TAC goes on to assert, "Ms. Frank is but one of hundreds, possibly thousands of women who suffered this violation of the equal protection rights due to Defendants' deliberate indifference and bias against women who report sexual assault." (*Id.*, ¶ 599). Lastly, as to Count XV,[12] Plaintiffs argue that Defendant Tomas' offer to testify for the accused men is "clearly a reflection of his invidious bias against women." (*Id.*, ¶ 794).

The TAC also newly alleges that the SVT detectives acted purposefully to intimate "[f]emale victims of sexual assault" in order to dissuade them from filling complaints. (ECF No. 81, ¶¶ 120-129). However, the closest these allegations come to showing gender bias is in generically arguing that "Baltimore County does not use these practices of intimidation and abuse in their approach to handling other crimes, crimes that do not *disproportionately affect women*." (*Id.*, ¶ 129) (emphasis added).

---

[12] In an obvious typographical error, Plaintiffs label this "Count V" instead of "Count XV." (*Id.*, ¶¶ 790-98).

Here, Plaintiffs fail to make a threshold showing of an Equal Protection violation against any named Plaintiffs or purported class members. Their repeated assertions of bias and discriminatory intent lack any specific factual support. While Plaintiffs posit that, in drastically and negatively impacting women, such policies *must* be animated by gender bias, nowhere do they state how the claims of similarly situated men (*i.e.* male victims of sexual assault) were treated differently. Plaintiffs therefore fail to plead facts that female sexual assault complainants, as a class, were treated any differently than those "similarly situated."[13]   Even where Plaintiffs allege by implication differences in how female and male sexual assault cases are pursued,[14] "Plaintiffs' gender discrimination claims more aptly fit a disparate impact theory, which is not viable under § 1983." *Borkowski*, 414 F.Supp. 3d at 810.   Plaintiffs fail to point to concrete evidence that these policies were created *because* they

---

[13] The County Defendants point out that nowhere do Plaintiffs' myriad statistics show either the arrest or conviction rates of "allegedly comparable crimes," how female victims of these other crimes receive different treatment than male victims, or how male sexual assault victims are treated differently. (ECF No. 88-1, at 31).

[14] For instance, Plaintiffs point to the use of the "suspicious circumstances" code by Defendants when dealing with female complainants. (ECF No. 81, ¶ 186).   It is unclear, however, whether this coding is *only* used with female complainants or simply used with them more often.   The TAC only notes it "disfavors" female victims of sexual assault. (*Id.*, ¶ 336).

adversely affected women, rather than in spite of that fact. Baldy asserting that Defendants' "purpose was to artificially lower the prosecution of sex crimes against female victims in Baltimore" is to equate a disparate impact theory with gender animus without any factual support. (ECF No. 81, ¶ 146). Accordingly, Counts I, IV, VI and XV will be dismissed.

### 2. First Amendment

Ms. Borkowski claims in Count II that Mr. Shellenberger, Mr. Dever and Ms. Fox of the SAO and Officers Tomas, Burrows and Montgomery of the BCPD jointly violated her First Amendment right to free speech in two ways. First, she asserts that they violated her "right to be free from retaliation by a public official for the exercise of her rights." Second, she argues that "they prevailed [upon] the District Court Commissioner to reject future applications." (*Id.*, ¶ 448-49). Plaintiffs argue that "Defendants Montgomery and Dever improperly directed Commissioner Robey to deny [Ms. Borkowski's] applications for statement of charges." (*Id.*, ¶ 383). Similarly, they allege that "Defendant Burrows [] interfered with Ms. Borkowski's rights . . . by convincing Commissioner Wisniewski" to send out a "department-wide email" instructing employees not to act on further applications from Ms. Borkowski. (*Id.*, ¶ 414).

#### a.   Prosecutorial Immunity

The SAO Defendants claim absolute immunity in relation to their letter to Commissioner Wisniewski.  (ECF No. 89-1, at 17) (referencing ECF No. 81-23).  In the letter, Ms. Dever acknowledged that the SAO cannot bind the Commissioner as a District Court official, but nevertheless advised the commissioner that the SAO was not going to pursue criminal charges absent new evidence. (*Id.*).  The SAO maintains that the decision not to prosecute the alleged assailants was within the its discretion.  (ECF No. 89-1, at 17).  Plaintiffs counter that discretion over the probable cause determinations rested instead with the district court commissioners. (ECF No. 98-1, at 29).

The SAO and The Maryland District Court Commissioner's Office are separate entities, each with discretion to perform separate aspects of the prosecution process and each may be shielded by absolute prosecutorial immunity for exercising that discretion. The previous opinion explains that, "[P]rosecutors are absolutely immune from liability under § 1983 for conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process[.]'"  *Borkowski*, 414 F.Supp.3d at 806 (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

Here, the SAO Defendants correctly argue that the letter conveying the SAO's decision not to prosecute is intimately

associated with the SAO's role in the judicial process.  (ECF No. 89-1, at 17).  "[T]o the extent that a prosecutor has discretion to decide how to handle charges, actions relating to those decisions would not adversely affect the protected speech." *Borkowski*, 414 F.Supp.3d at 812.  The allegedly improper discussion between Commissioner Robey, Officer Montgomery and Mr. Dever as to Ms. Borkowski's successive and duplicative filings, (ECF No. 81, ¶¶ 382-84), is an action related to SAO charging decisions.  Thus, it is similarly protected by absolute prosecutorial immunity.  (ECF No. 88-1, at 16).  Baldly asserting that Ms. Montgomery and Mr. Dever acted "with a malicious intent to obstruct the administration of justice" is not enough to change this fact.  (*Id.*, ¶ 385).  Count II, as it relates to interference with Ms. Borkowski's right to file a complaint with the Commissioner's office, will be dismissed.[15]

### b.  Qualified Immunity

Both the County and SAO Defendants argue that their efforts to prevent Ms. Borkowski from filing successive charges is protected by qualified immunity.  (ECF No. 88-1, at 20); (ECF No.

---

[15]  Moreover, the County Defendants point out that the allegations as to Ms. Montgomery in this Count are limited solely to her interactions with Commissioner Robey. She was not involved in the detectives' attempt to visit Ms. Borkowski's home. (ECF No. 88-1, at 16); (citing ECF No. 81, ¶¶ 382-87).  Count II, as to Ms. Montgomery, will be dismissed in its entirety.

27

89-1, at 11).  The previous opinion stated that, "[q]ualified immunity is an affirmative defense to § 1983 claims that 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  The two elements of the defense are whether a constitutional violation occurred and, if so, whether the right in question was clearly established at the time of the alleged misconduct.  The first question involves shifting burdens of proof.  The defendant bears the initial burden of showing that the alleged conduct falls within the scope of his or her duties.  *Id.* (citing *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007)).  Because Defendants have made this threshold showing, the burden of proof was shifted to Plaintiffs to show that "a constitutional violation has occurred." *Id.* (citing *Henry*, 501 F.3d at 377).  As to Count II, Plaintiffs have made that showing.

Ms. Borkowski's surviving First Amendment retaliation claim entails a lower bar than is required to prove an actual deprivation of a First Amendment right.  This portion of the complaint revolves around the SAO Defendants' message to Ms. Borkowski to stop going to the Commissioner or face charges and the efforts of Detectives

28

Burrows and Tomas to deliver this message by repeatedly calling Ms. Borkowski and showing up at her house.

The previous opinion states:

> A cognizable First Amendment retaliation claim requires a plaintiff to show: (1) 'that [plaintiff's] speech was protected'; (2) 'defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech'; and (3) 'a causal relationship exists between [plaintiff's] speech and the defendant's retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000)).

*Borkowski*, 414 F.Supp.3d at 811.  Defendants argue that Plaintiffs have failed to allege that Ms. Borkowski engaged in protected speech because her repeated attempts to file constituted harassment.  They next argue that their own conduct was itself protected speech and cannot adversely effect Plaintiff's speech. The County Defendants correctly point to *Suarez* 202 F.3d at 676, which states, "[t]he nature of the alleged retaliatory acts has particular significance where the public official's acts are in the *form of speech*." (ECF No. 88-1, at 17) (emphasis added).  Even the detectives' action of coming to her house can be looked at as pure speech in this context in that Ms. Borkowski objects to it as "intimidation" in the threatening message it conveyed to her. (ECF No. 81, ¶ 432).  When such alleged retaliatory speech is involved, courts must ask "whether [defendants'] speech was threatening,

coercive, or intimidating so as to intimidate that punishment, sanction or adverse regulatory action will imminently follow" so as to be actionable.  *Suarez*, 202 F.3d at 689.

As will be seen, Defendants' arguments as to the first two elements fail.

Defendants once again assert that the harassment carried out by Ms. Borkowski in her repeated filing is not protected speech. (ECF No. 89-1, at 13); (ECF No. 88-1, at 19).  Plaintiffs counter that sentiment by arguing that filing two applications for statement of charges cannot be considered harassment and that the supposed harassment here was in creating a "criminal record" for the alleged assailants and not directed to the courts.  (ECF No. 98-1, at 23-24).  Plaintiffs further argue that this is not the kind of "libel and intentional and reckless falsehoods" that prompted the court to announce that "baseless litigation is not immunized by the First Amendment right."  (ECF No. 96-1, at 34) (citing *McDonald v. Smith*, 472 U.S. 479 (1985)).

These arguments, on both sides, go to the merits of whether Ms. Borkowski's speech was harassment, and as before, "[w]hether [her] successive filing of charges constitutes harassment cannot be determined based on the allegations in the complaint." *Borkowski*, 414 F.Supp.3d at 812 (citing Md. Code., Crim. Law § 3-803(a)).  Viewed in the light most favorable to Plaintiffs, Ms. Borkowski's filings were not "maliciously" made "without a legal

purpose" nor were they made "after receiving a reasonable warning or request to stop," which would be necessary to constitute harassment. Md. Code., Crim. Law §3-803(a). Ms. Borkowski incorrectly claims that the harassment statute was meant to protect only the courts and not third parties. (ECF No. 98-1, at 24). The harassment statute was specifically designed "to help law enforcement agencies [] defuse ongoing feuds and longstanding disputes." (ECF No. 100, at 14 n. 4). The first element of a retaliation claim is satisfied here as, "[f]iling an application for a statement of charges likely is protected by the First Amendment, either under the petition or the speech clause." *Borkowski,* 414 F.Supp.3d at 812.

Unlike in the SAC, the additional allegations in the TAC satisfy the second element. *Cf. Borkowski*, 414 F.Supp.3d at 811. The SAO Defendants stress the failure to meet the second element of the *Tobey* test. They argue that the message they wished to convey to Ms. Borkowski did not adversely affect her by contending that their "actions did not have an adverse impact on [Ms. Borkowski's] desire or ability to have access to Maryland courts." (ECF No. 89-1, at 21). Whether an action is considered adverse in this context depends on "whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular

case." *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (citation omitted).

To prove retaliation, a plaintiff "need not actually be deprived of . . . [her] First Amendment rights." *Garcia v. Montgomery Cty., Md.*, 145 F.Supp.3d 492, 515 (D.Md. 2015). The alleged retaliatory conduct must simply be threatening enough to chill a person of ordinary firmness from exercising his or her rights, as mentioned. Beyond quoting the case as an authority on First Amendment retaliation, Plaintiffs highlight the factually intensive nature of this analysis in arguing that *Suarez* is "inapposite" to the facts at hand. (ECF No. 96-1, at 34). They argue that the speech of Defendants there was found not to be sufficiently threatening, because plaintiff was a commercial actor. Here, alternatively, they point out that Ms. Borkowski is a private individual and the Defendants are "armed government." (*Id.*).

Plaintiffs are correct insofar as context matters in judging whether an official's speech is threatening. In *Suarez*, the alleged threats were defamatory comments made by state attorneys general who were actively investigating the plaintiff company. 202 F.3d. at 689. Ultimately, the court found that the plaintiff failed to show that the comments could be construed as "intimating" that punishment, or adverse action would follow and thus failed to be retaliation. (*Id.*) But the plaintiff's status as a commercial

32

actor was not relied upon in *Suarez*.[16]    "Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a *threat, coercion, or intimidation* intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." (*Id.* at 687).

Plaintiffs claim that Mr. Shellenberger, Mr. Dever and Ms. Fox ordered Defendants Burrows and Tomas to tell Ms. Borkowski to "'stop going to [the Comm[issioner]' or she] would face 'criminal charges.'" (ECF No. 81, ¶ 429).  The County Defendants continue to treat this as a mere allegation of coordination, (ECF No. 88-1, at 18), but the SAO Defendants now admit that such a directive was issued in light of new evidence. (ECF No. 89-1, at 15) (citing ECF No. 81-17).[17]   They explain that to qualify as harassment, Ms. Borkowski needed to receive either a warning or a request that the activity cease.   (ECF No. 89-1, at 15).[18]   Thus, they admit, "Baltimore County police detectives were sent to talk to Plaintiff

---

[16] In fact, the court refers to the company plaintiff as a "private citizen" throughout. *See, e.g.*, *Suarez*, 202 F.3d at 688.

[17] This exhibit, a note pad belonging to Detectives Burrows and Tomas, says, "Scott . . . go talk to her . . . Lisa talking . . . not charging by – stop going to comm[.] -Civil law suit or worse criminal charges."

[18] Even if giving notice or a warning is an appropriate action, it could be carried out in an inappropriate manner, thus constituting retaliation.

Borkowski to tell her to stop going to the commissioner or she would risk facing a civil law suit [sic] or criminal charges." (*Id.*).  Plaintiffs also claim that Detective Burrows, acting on SAO orders, illegally intercepted a lawfully issued summons. (ECF No. 81, ¶¶ 397, 401-02) (citing ECF No. 81-18).[19] SAO Defendants implicitly concede that they reached out to the commissioner by arguing that Plaintiff's application for a "statement of charges does not entitle a person to have charges issued." (ECF No. 89-1, at 12).

Plaintiffs argue that Detective Tomas "repeatedly called and intimidated Ms. Borkowski."[20]  (ECF No. 81, ¶ 433).  Plaintiffs further state that "armed patrol officer" Dorfler and Detectives Burrows and Tomas arrived at Ms. Borkowski's Baltimore home. (*Id.,* ¶ 435).  When her grandmother answered the door, Defendant Burrows "demanded to know the location of the nursing home [where Plaintiff worked] and what time [she] would return home." (*Id.,* ¶ 436).  She also alleges that a video exists showing Officer Burrows "pretending that she did not know Ms. Borkowski was represented by counsel." (*Id.,* ¶ 438).  Acting on orders from the trio at the

---

[19] Plaintiffs do not state, however, that Ms. Borkowski knew of this at the time, as discussed more fully below.

[20] The Defendants repeatedly claim that the back and forth via cell phone and voice mail was totally innocuous and part of their routine investigatory work.  (ECF No. 89-1, at 15-6).  Such arguments go to the merits of whether these calls were, in fact, intimidating in nature and thus are not properly considered now.

SAO, Detectives Burrows and Tomas also contacted Ms. Borkowski directly on her cell phone and "demanded" to know where she was. (*Id.*, ¶¶ 440-41).

The SAO Defendants accept *Suarez* as the relevant authority, (ECF No. 100, at 15), as the previous opinion did, *Borkowski*, 414 F.Supp.3d at 811-12, and admit that they sent Detectives Burrows and Tomas to deliver a message to Plaintiff.  In contending that this "speech" cannot be retaliation, they fail to evaluate the facts in the light most favorable to Plaintiff.  Instead, the facts alleged can be construed to be exactly what *Suarez* prohibited: a threat intimating that punishment will imminently follow. Further, this speech combined with Defendants' other alleged conduct of repeatedly calling and showing up at Ms. Borkowski's house, makes out the kind of threat that would adversely affect a citizen's First Amendment rights by dissuading a person from exercising those rights.

The County Defendants argue that because Plaintiffs admit that Ms. Borkowski wasn't home when the detectives arrived, the complaint fails to allege the intimidating message was ever delivered. (ECF No. 88-1, at 18).  In their opposition to the SAO motion to dismiss, Plaintiffs assert the TAC shows Ms. Borkowski "knew" that the detectives were looking for her to discuss her statement of charges in going to grandmother's house and calling her repeatedly. (ECF No. 96-1, at 37).  The TAC is not entirely

clear on this front, but, viewed in a plaintiff-friendly light, it can be inferred that Ms. Borkowski's grandmother would have conveyed to her granddaughter that the police arrived earlier that day looking for her, as well as communicated the contents of their questioning.

Plaintiffs also argue that the fact that Detectives Burrows and Tomas obtained Ms. Borkowski's Towson class schedule violated the Fourth Amendment. (ECF No. 81, ¶ 442) (citing 81-24). This allegation does not state an actual Fourth Amendment violation but may be relevant to whether there was a concerted plan to intimidate Ms. Borkowski from continuing to engage in protected activity (filing a complaint).[21]   Plaintiffs also point to notes that reveal that Officer Burrows knew that Ms. Borkowski was represented by an attorney prior to attempting to make direct contact with her. (*Id.*, ¶ 439).   Having police show up at one's house and pose demanding questions to one's grandmother as to one's whereabouts,

---

[21] Even under the expansive view of privacy expressed in *Carpenter v. United States*, 138 S.Ct. 2206, 2219 (2018), Ms. Borkowski only has a "reasonable expectation of privacy in the *whole* of [her] physical movements." (emphasis added)).   Obtaining her class schedule is not analogous to a systematic tracking of the entirety of her movement but is more akin to tracking "public movement 'voluntarily conveyed to anyone who wanted to look.'" *Id.* at 2219-20 (citing *U.S. v. Knotts*, 460 U.S. 276, 281 (1983). Further, Ms. Borkowski has undoubtedly voluntarily shared her schedule with school administrators, thus defeating any reasonable expectation of privacy in her schedule under traditional principles.   *Id.* at 2220 (citing *Smith v. Maryland*, 442 U.S. 735, 745 (1979)).

receiving repeated calls as to the same, and attempting to track one down while in class would collectively chill a person of ordinary firmness from attempting to refile a criminal complaint. Lastly, it was only after Ms. Borkowski's counsel inserted himself into this situation by offering "to make Ms. Borkowski available to Defendants" that Mr. Shellenberger ordered his fellow SAO officials and Detectives Burrows and Tomas to cease their conduct. (*Id.*, ¶ 444) ("Scott [Schellenberger] said not to go b[e]c[ause] of attorney.") (citing ECF No. 81-25).[22]  These allegations support a plausible inference that the SAO Defendants only ordered the officers to back off once they realized their illegally intimidating tactics would be discovered by her attorney.  Thus, Ms. Borkowski states a claim for First Amendment retaliation in violation of 42 U.S.C. § 1985.

While the "intercept[ion]" by Detective Burrows of the summonses from the District Commissioner before they were issued might constitute intimidation when paired with her other conduct, there is no evidence in the complaint that Ms. Borkowski knew of this recall at the time.  (*Id.*, ¶401).  In fact, Plaintiffs point to Exhibit 18 of the TAC in support of this allegation, but this merely shows a text message from Detective Burrows to a colleague asking to inform her when the summons came in.  (ECF No. 81-18).

---

[22] A note to that effect appears on the Officer's note pad. (ECF No. 81-25).

Similarly, the TAC also appends email conversations between Mr. Dever and Commissioner Wisniewski as to Ms. Borkowski's successive filing, but it does not actually mention the fact that the summons was halted. (ECF Nos. 81-22, 81-23). Instead the email simply says, "[t]he existing charges will be dismissed in court today." (ECF No. 81-23). More importantly, Ms. Borkowski would not have been privy to any of these conversations at the time she approached Commissioner Robey to file her claims and was subsequently denied nor in the immediate aftermath. (ECF No. 81, ¶ 383). While in retrospect, Ms. Burkowski claims she made a "second attempt" at submitting an application for a statement of charges with Commissioner Ellingson because of the "unlawful influence" Defendants exerted on Commissioner Robey, there is no evidence that she knew the actual reason for this initial denial at any time prior to uncovering these communications in the course of this lawsuit. Therefore, Ms. Borkowski has failed sufficiently to allege that she could be reasonably intimidated by something she has not established she knew about at the time. Neither the SAO's nor Detective Burrows' conduct as it relates to intercepting the summonses independently constitutes retaliation.

As to the last element, the TAC asserts that there "is an affirmative causal link between Defendants' inaction, false assurance, concealment, witness intimidation, and the constitutional injuries suffered by Plaintiffs." (*Id.*, ¶ 372).

Neither the County nor the SAO Defendants dispute that the conduct in question was made in direct response to Ms. Borkowski's protected activity. Thus, there is a clear causal connection between the conduct Ms. Borkowski plausibly alleges would chill a person of ordinary firmness from attempting to refile charges with the District Court Commissioner.

Once a plaintiff carries her burden of showing a constitutional violation has occurred, the burden is on the defendant as to whether that right was clearly established at the time of the alleged misconduct for qualified immunity to apply. *Feminist Maj. Found. v. Hurley*, 911 F.3d. 674, 703-06 (4th Cir. 2018).

The County Defendants argue that Detectives Burrows and Tomas are protected by qualified immunity on Count II as they are "unaware" of *any* caselaw that would clearly establish that any of the following is First Amendment violation:

> (1) to speak with a district court commissioner concerning an application for charges on a matter that the State's Attorney had already declined to prosecute; (2) to investigate a person who filed serial applications for charges in such a case; (3) to intercept, at the direction of a prosecutor, a summons on a charge known to the officer to be dismissed; or (4) to follow the direction of a prosecutor to caution a person known to have been filing serial applications for charges not to do so.

(ECF No. 88-1, at 20-21).  The first, second, and third form of conduct alluded to is no longer at issue.  Similarly, the SAO Defendants argue that "there is no case law or statute which establishes that a State's Attorney cannot send the police to warn a person to stop engaging in harassing or annoying behavior." (ECF No. 89-1, at 18).  As discussed above, however, even if Defendants have a right to "caution a person" against filing serial applications, this does not mean that their *manner* of exercising that right is insulated from oversight.

It is the method of contacting Ms. Borkowski, carried out on behalf of the SAO, that states a First Amendment retaliation claim. *Suarez* itself provided notice in 2000 that threats or intimidation (even by speech) violates the First Amendment if done in retaliation of protected speech.  *Suarez*, 202 F.3d at 687. Moreover, Plaintiffs also point to Fourth Circuit precedent that has established that the First Amendment is violated through "self-censorship" when conduct would deter a person of ordinary firmness from exercising their rights.  *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 136 (4th Cir. 2011).  Either of these cases disproves the Defendants' claim that "no caselaw" exists clearly establishing this right to be free from intimidation in applying for a statement of charges.  Defendants have failed to carry their burden in showing that either the SAO Defendants or Detectives

40

Burrows and Tomas are entitled to qualified immunity. Their motions to dismiss Count II will be denied.

### c. *Monell* Liability

Confusingly, Count II alleges that Baltimore County is also liable for various conduct, despite not naming it as an actual defendant in this Count. For instance, Plaintiffs allege that a "conspiracy was undertaken in furtherance of Baltimore County's and Mr. Petersen and Mr. Sheridan's [23] policy to conceal reports of sexual assault." (ECF No. 81, ¶ 417). Defendants correctly point out this is the sole reference in this count to the County. (ECF No. 88-1, at 21). In fact, the County Defendants show that elsewhere in the TAC Plaintiffs negate their own claim on this front by acknowledging that the SAO Defendants and the two detectives operated *without* the knowledge of the BCPD Chief of Police. (ECF No. 88-1, at 21) (citing ECF No. 81, ¶¶ 427, 434).

Even ignoring this obvious contradiction, Plaintiffs have failed to make out a claim based on *Monell* liability against the County. Municipalities, unlike public officials, are not protected by qualified immunity. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980). *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978), however, limits liability to a

---

[23] Neither of these individuals is named as a Defendant in this count either. In fact, the County Defendants correctly point out that Petersen is not even named as a defendant *in this case*. (ECF No. 88-1, at 21 n. 11).

municipality's *own* illegal act.   (finding a municipality "cannot be held liable *solely* because it employs a tortfeasor").   Instead, a municipality is liable under § 1983 where "it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights."   *Owens v. Balt. City St.'s Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Monell*, 436 U.S. at 694).

Here, Plaintiffs do not even rebut the County Defendants claim that County officials were unaware of the conduct in question, which is likely fatal to the claim.   Failure to respond to this argument is likely fatal to this claim.   *See Faller v. Faller*, No. DKC 09-0889, 2010 WL 3834874 at * 6 (D.Md. Sept. 28, 2010); *see also Ferdinand-Davenport v Child.'s Guild*, 742 F.Supp.2d 772, 777 (D.Md. 2010).   Regardless, the County Defendants correctly point out that Plaintiffs' reformulation of the *Monell* claim in their opposition does little to salvage it.   (ECF No. 101, at 7).

Plaintiffs' attempt to sidestep their otherwise fatal inability to connect the County to any of the conduct in this count by arguing that the decisions of the SAO can be imputed to the county in carrying out County policy.   Defendants are correct that this assertion is highly confusing and unavailing.   (*Id.*).   In particular, Plaintiffs rely on *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), to argue that a "a county prosecutor's direction to the Sheriff's Department . . . implicated municipal liability pursuant to *Monell*." (ECF No. 96-1, at 34).   In *Pembaur*, however,

municipal liability was founded on the fact that the police were ordered by the *County* Prosecutor and not a State prosecutor, as here.  As the County Defendants correctly argue, moreover, the case turned on Ohio law and Ohio law specifically established that the County prosecutor was to establish *County* policy.  (ECF No. 101, at 7-8) (emphasis added).  Here there is no such Maryland law, and, in fact, the SAO has a duty to represent that State, not county.  (*Id.*, at 8) (citing Md. Code. Ann., Crim. Proc. §15-102).  Plaintiffs have failed to establish that the County or that County "policy" had any part to play in the conduct alleged under Count II.  Therefore, the claim as to the County under *Monell* fails and any attempt to amend the complaint to add the County as a defendant under this count would therefore be futile.  Count II as it relates to the County and any invocation of *Monell* liability will be dismissed.

### 3.    The Fourth Amendment

In Count XII, Ms. Borkowski, Ms. Hendler, Ms. Frank, and the "Invasive Testing Subclass" bring claims against Defendants Baltimore County, Johnson, Sheridan, Peterson, Brady,[24]

---

[24] As with Count I, this count lacks precision in that it names the alleged policy makers at BCPD en masse without fully clarifying their role in this alleged Fourth Amendment violation. Count XII simply baldly asserts that all "personally participated in crafting the unlawful policies followed by BCPD Defendants." (ECF No. 81, ¶ 743).

Shellenberger, and Dever for an alleged violation of the Fourth Amendment.

Plaintiffs argued in their SAC that the failure to inform victims that the SAEKs would be destroyed without being used to solve any crimes nullified the consent given by victims.   The previous opinion explained that "voluntary consent to a search by medical professionals turns on whether the consenters 'understood that the request was not being made by medical personnel for medical purposes, but rather by agents of law enforcement for purposes of crime detection.'"  *Borkowski*, 414 F.Supp.3d at 817 (citing *Ferguson v. City of Charleston*, 308 F.3d 380, 397 (4th Cir. 2002)).  Because Plaintiffs did not allege in their SAC that they understood the SAFE exams were conducted by medical personnel for medical purposes, rather than for crime detection, Plaintiffs failed to allege a Fourth Amendment violation.  The fact that some SAEK evidence was destroyed after the examinations occurred did not vitiate the consent given when the exams were conducted.

In their TAC, Plaintiffs now argue that their consent was invalid because they were "deceived" into believing "that the examination would be an initial piece of evidence in the prosecution of their assailants," (ECF No. 81, ¶ 745), when in reality, "[County] Defendants worked with [SAO Defendants], over the course of several years, to carry out a policy that destroyed SAEKs while safeguarding evidence in other crimes."  (*Id.*, ¶ 156).

44

"Had the victims known [that the SAEKS would be destroyed without being used to solve any crimes], they would not have consented." (*Id.*, ¶ 739).  To support the allegation that a "policy and custom of uncessar[ily] destr[oying] SAEKs" existed, Plaintiffs assert that between 2010 and 2018 a total of "1,032 SAEKs [were] collected" and of those, "only 614 [] remain," "approximately forty percent (40%) have been destroyed," and "only thirteen percent (13%) were tested for the presence of DNA." *Id.* at 146-48.  They further assert that "[b]etween 2010 and 2018 the County destroyed 655 SAEKs."[25]  (*Id.* at ¶ 740).

County Defendants counter that the reason Ms. Borkowski and Ms. Hendler's SAEKs were not tested for DNA was because the identity of their alleged assailants was known and the alleged assailants "did not deny sexual contact but claimed it was consensual." (ECF No. 88-1, at 36).

For the County Defendants to have deceived Plaintiffs, and thus vitiated their consent, Plaintiffs would have to allege plausibly that Defendants never had any intent to retain or test Plaintiffs' SAEKs. They have not done so. Furthermore, because Plaintiffs allege that 13% of all SAEKs collected between 2010 and 2018 were tested for DNA evidence, they have not plausibly alleged that the County Defendants had a blanket policy of not testing any

---

[25] Plaintiffs' math does not add up and they do not attach any underlying documents that would allow for clarification.

SAEKs.  Thus, even taken in the light most favorable to Plaintiffs, the facts alleged fall well short of plausibly alleging an absence of good faith intent by County Defendants to use Ms. Borkowski and Ms. Hendler's SAEKs for law enforcement purposes.  Accordingly, consent was not vitiated, and no Fourth Amendment violation can be found.

With respect to the Invasive Test Subclass claim, the GMBC consent forms expressly "authorize the transmittal of a copy of all medical records, other information created, and evidence collected pursuant to the examination to the Police Department." (ECF Nos. 81-7, at 4; 81-50, at 1).  Thus, even if "SAFE subjects are not told [that the collection of evidence pursuant to a SAFE is not medical treatment for the benefit of a patient]" they are on clear notice that the SAEKs are used for law enforcement purposes.  These circumstances are notably different from those in *Ferguson*, where "[n]either th[e] language, nor anything else in [the] form[s], advised or even suggested to Appellants that their urine might be searched for evidence of criminal activity for law enforcement purposes." 308 F.3d at 399.

Plaintiffs further argued in their SAC that the consent forms were inadequate to allow victims to give informed consent.  This argument was dismissed because Plaintiffs did not allege that any individual Defendant played any role in the creation of GMBC's consent forms.  (ECF No. 67, at 58).  Plaintiffs' TAC still does

46

not allege that any individual Defendant played any role in the creation of GBMC's consent forms.  Accordingly, Count XII will be dismissed as to all Defendants.[26]

### D.    42 U.S.C. § 1985(2)

Count III alleges a conspiracy to deprive Ms. Borkowski of her civil rights.   Count VII alleges a conspiracy to obstruct justice in relation to Ms. Frank's Equal Protection claims. The court previously dismissed both counts for failure sufficiently to plead class-based animus as required by § 1985(2).[27]  The second clause of § 1985(2) applies when two or more persons:

---

[26] Plaintiffs add Lieutenant Peterson and Sergeant Brady as Defendants to Count XII without stating whether such addition is in their individual or official capacity.  The court need not address this addition because the count will be dismissed in its entirety.   Further, to the extent that this claim is asserted against Baltimore County as a defendant, it fails under *Monell*; as the County Defendants correctly argue, Ms. Borkowski, Ms. Hendler and Ms. Frank failed to point to any "[constitutional] violation by any county actor, let alone pursuant to an official policy or custom." (ECF No. 88-1, at 39 n. 17).   The allegation that GMBC is an "agent" of Baltimore County is based entirely on the fact that it received *state* funding and that Baltimore County "controlled" their investigatory operations. (ECF No. 81, ¶ 735). Plaintiffs fail factually to support this blanket assertion of control.

[27] Plaintiffs' TAC clarifies that Counts III and VII are both brought under 1985 subsection two.  The TAC does not clarify the previously noted ambiguity as to whether the claim falls under the first or second clause of subsection two.   The court previously analyzed this claim under the second clause noting that Plaintiffs SAC only made reference to Maryland state courts. (*See, e.g.*, ECF No. 21, at 104) ("Defendants . . . conspired . . . to intimidate Ms. Borkowski from giving testimony before a Maryland District Court Commissioner.").   Because Plaintiffs have not added any

> conspire for the purpose of impeding,
> hindering, obstructing, or defeating, in any
> manner, the due course of justice in any State
> or Territory, with intent to deny to any
> citizen the equal protection of the laws, or
> to injure him or his property for lawfully
> enforcing, or attempting to enforce, the right
> of any person, or class of persons, to the
> equal protection of the laws[.]

42 U.S.C. § 1985(2). Stating a violation requires adequate allegation of class-based animus. *See Kush v. Rutledge*, 460 U.S. 719, 726 (1983) ("The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some . . . class-based, invidiously discriminatory animus behind the conspirators' action."). "In order to prove a section 1985 conspiracy, a claimant must show an agreement or a meeting of the minds by defendants to violate the claimant's constitutional rights." *Facey v. Dae Sung Corp.*, 992 F.Supp. 2d 536, 541 (D.Md. 2014). This is a "relatively stringent standard", and the Fourth Circuit "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). A court must dismiss a Section 1985 claim "whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." (*Id.*).

---

reference to any federal court proceedings, the court will continue to analyze this claim under the second clause.

1.    **Conspiracy to Deprive Civil Rights**

Count III alleges that SAO and County Defendants conspired "by preventing Ms. Borkowski, from attending and testifying freely, fully, and truthfully, in a judicial proceeding," by "intimidat[ing] [her] from giving testimony before a Maryland District Court Commissioner" and by "prevent[ing] [her] from filing criminal charges as permitted by Maryland law." (ECF No. 81, ¶¶ 457-59).[28] University officials Dr. Hrabowski and Mr. Sparks are also alleged to have "failed to adequately train, supervise, or discipline Defendant Dillon and their other subordinates." (*Id.*, ¶ 601).

Plaintiffs argue in their opposition and TAC that Defendants "employed facially discriminatory customs and policy, departed from usual proceedings, and treated one class of victims differently from others," (ECF No. 98, at 9) and that, "Ms. Borkowski['s] self-advocacy threatened Defendants' desire to protect male suspects from allegation of sexual assault." (ECF No. 81, ¶ 462).   County Defendants argue that Count III fails because Ms. Borkowski has not pleaded class-based animus or a meeting of the minds and, even if she did, the claim is barred on

---

[28] SAO Defendants point out that Ms. Borkowski includes Ms. Fox as a defendant in her heading but fails to make any allegations against Ms. Fox in the body of the count.

qualified immunity grounds.[29]   SAO Defendants likewise argue that Plaintiffs' claim falls based on its failure to allege facts to support a conspiracy and failure to plead class-based animus. (ECF No. 89-1, at 16-17).

The additional assertions in Plaintiffs' TAC are too conclusory to allege sufficiently that any Defendants were motivated by discriminatory animus.   In particular, Plaintiffs' allegation that "Defendants [acted out of a] desire to protect male suspects from allegations of sexual assault" continues to attempt shotgun style pleading despite the court's previous order. Likewise, the facts put forward by Plaintiffs demonstrating discrepancies in the SAO treatment of rape and sexual assault cases is insufficient to allege plausibly gender-based animus because such facts do not reflect how male victims are treated for those crimes and thus, do not reflect that male victims are treated differently.   Finally, the factual allegations contained in Plaintiffs' TAC do not rise to the level of concreteness required to meet the "relatively stringent" standard set by the Fourth Circuit in *Poe* for alleging a conspiracy.

---

[29] County Defendants also argue that Counts III, V, and VIII warrant dismissal because Plaintiffs have abandoned them by not responding to the arguments raised in the County's motion to dismiss. (*Compare* ECF No. 88-1 at 22-26, 34-35 and ECF No. 96-1).

2.    **Conspiracy to Obstruct Justice**

Count VII alleges that Defendants Dillon and Jagoe conspired with Defendant Lee to block Ms. Frank's report of sexual assault to the police in violation of 42 U.S.C. §1985(2). (ECF No. 81 at ¶ 613).

The University Defendants argue that the claim must be dismissed as to Defendants Dillon and Jagoe (1) for continued failure to allege class-based animus and (2) because they are immune from suit in both their official and individual capacity. (ECF No. 102, at 3-8). As to Mr. Lee, Defendants argue that the claim fails sufficiently to allege a conspiracy. They point out that his name appears in only eleven allegations and "not one of them alleges or implies gender discrimination." (ECF No. 88-1, at 33) (citing ECF No. 81, ¶¶ 582, 583, 584, 586, 587, 588, 589, 594, 613, 614). Instead Mr. Lee's entire involvement as to an alleged conspiracy consists of one conclusory sentence: "Defendants Dillion and Jagoe conspired with Defendant Lee to block Ms. Frank's report of sexual assault to the police." (*Id.*, at 35) (citing ECF No. 81, ¶ 613). Plaintiffs fail to address either of the University Defendants' arguments as to Officers Dillon and Jagoe. (*See generally* ECF No. 96-1). While Plaintiffs do not expressly rebut the claim as to Officer Lee, they simply re-highlight that he drove to UMBCPD and informed Ms. Frank that they had no record of her reported incident. (*Id.* at 9) (citing ECF No. 81, ¶¶ 583-

90).  Implicitly this is meant to support their claim that "no action was being taken into [Ms. Frank's] reported second-degree rape," (ECF No. 96-1, at 9) and the allegation in their complaint that "Defendant Lee was overtly uninterested in taking Ms. Frank's report."  (ECF No. 81, ¶ 583).

As mentioned, a failure to respond to a facially valid argument in an opponent's motion might sometimes be fatal to a claim.  *See Ferdinand-Davenport*, 742 F.Supp.2d at 777.  The TAC itself fails to state a claim.  The only additional fact alleged in Plaintiffs' TAC to support Count VII is that, "No such denial of [Equal Protection] would have occurred if [Ms. Frank] were a male crime victim, as Defendants' bias against female complainants of sexual assault would not have guided them."  (ECF No. 86-1, at 18) (citing ECF No. 81, ¶¶ 617-18).  Such a blanket assertion patently fails to "plead specific facts in a nonconclusory manner." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995).  Plaintiffs have not put forth any useful comparative fact reflecting how Chief Dillion or Mr. Jagoe treated male victims of sexual assault in contrast to female victims or, as described above, any other fact sufficient to show class-based animus.  As these officers' underlying conduct does not plausibly show class-based animus, neither can Dr. Hrabowski and Mr. Sparks be held responsible in their "supervisory" capacity.  (ECF No. 81, ¶ 602).  Thus, Plaintiffs again fail to state a § 1985(2) claim.

### E.   42 U.S.C. § 1986

Ms. Borkowski argues in Count V that Defendants Shellenberger, Dever, Fox of the SAO and Defendants Burrows, Tomas, Montogomery, and Dorfler neglected to prevent conspiracy in violation of 42 U.S.C. § 1986.

As the court previously noted:

> Viability of a § 1986 claim is based on the antecedent § 1985 claim. If the § 1985 claim is dismissed, the § 1986 claim also fails. *Buschi v. Kirven*, 775 F.2d 1240, 1243 (4th Cir. 1985); *Sellner v. Panagoulis*, 565 F.Supp. 238, 249 (D.Md. 1982) ("[S]ection 1986. . . 'merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985.'") (quoting *Williams v. St. Joseph Hosp.*, 629 F.2d 448, 452 (7th Cir. 1980)), *aff'd*, 796 F.2d 474 (4th Cir. 1986).

*Borkowski*, 414 F.Supp.3d at 816. It follows that, because Plaintiffs' have once again failed to make out a viable § 1985 claim, the § 1986 claim in Count V must be dismissed.

### F.   20 U.S.C. § 1681

Plaintiffs bring various claims under Title IX of the Civil Rights of 1964 ("Title IX"). Counts IX, X, XI, XIII, and XIV are brought on behalf of various Plaintiffs and purport to assert different types of violations. The statute generally prohibits discrimination on the basis of sex in educational programs or activities receiving federal benefits. Plaintiffs purport to bring claims arising from several different manifestations of discrimination. For some, Plaintiffs label the cause of action as

"Discrimination/Deprivation of Educational Access," without particularization. For others, the claim is designated as "Deliberate Indifference" or "Erroneous Outcome." In campus disciplinary proceedings:

> Some circuits use formal doctrinal tests to identify general bias in the context of university discipline. For example, the Second Circuit channels such claims into two general categories. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In what has come to be called the "erroneous outcome" category, the plaintiff must show that he "was innocent and wrongly found to have committed the offense." Id. The other category, "selective enforcement," requires a plaintiff to prove that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.;* see *also Plummer v. Univ. of Hous.*, 860 F.3d 767, 777-78 (5th Cir. 2017) (resolving the case by reference to the *Yusuf* framework); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("[W]e will assume for present purposes that a student can show a violation of Title IX by satisfying the 'erroneous outcome' test applied by the Second Circuit in *Yusuf*."). The Sixth Circuit has added two more categories to the mix: "deliberate indifference" and "archaic assumptions." See *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing "at least four different theories of liability" in this context: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions' " (citations omitted)).

*Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). Not every category is, however, applicable to a person who is the

complainant, as opposed to the respondent.  For instance, according
to *Doe v. Baum*, 903 F.3d 575, 588 (6th Cir. 2018):

> The deliberate-indifference theory was
> designed for plaintiffs alleging sexual
> harassment. *See Horner v. Ky.High Sch.*
> *Athletic Ass'n*, 206 F.3d 685, 693 (6th Cir.
> 2000)(explaining that the deliberate
> indifference test arose from Supreme Court
> cases that "all address deliberate
> indifference to sexual harassment). And though
> sexual harassment is a form of discrimination
> for purposes of title IX, *Davis v. Monroe Cty.*
> *Bd. Of Educ.*, 526 U.S. 629, 649-50 (1999), we
> have held that to plead a Title IX deliberate
> indifference claim, "the misconduct alleged
> must be sexual harassment," not just a biased
> disciplinary process. *Miami Univ.*, 882 F.3d
> at 591.

## 1.   Discrimination and Deliberate Indifference

### a.   Marcela Fegler

Ms. Fegler brings Count XIII against Defendant UMBC as
"deliberately indifferent" to Ms. Fegler's reports of sexual
assault as well as her claims of harassment and retaliation she
experienced in reporting this assault. (ECF No. 81, ¶¶ 746-769).
Defendants correctly argue that the vast majority of the conduct
alleged was dismissed in the previous opinion as it was time
barred.[30]   Here, however, as the University Defendants readily
admit, (ECF No. 86-1, at 20-21), Ms. Fegler argues, for the first

---

[30] She filed the lawsuit in September 2018, which was more
than three years (the applicable statute of limitations for Title
IX claims) after the "final adjudication" of her sexual misconduct
complaint in February 2015. (ECF No. 102, at 14); *Borkowski*, 414
F.Supp.3d at 819.

time, that the alleged harassment and retaliation that she endured after making her complaint to UMBC continued even after it "forced [her] to leave UMBC." (ECF No. 81, ¶¶ 764-65). Further, she says that UMBC "was aware of the harassment but did nothing." (*Id.*, ¶ 759). Nonetheless, the University Defendants move to dismiss this count because "Ms. Fegler does not allege that she reported this alleged harassment to UMBC, does not make any specific allegations as to how or when UMBC was made aware of the alleged harassment, and does not allege what UMBC could have done to stop it." (ECF No. 86-1, at 21). More basically, they argue that the statute of limitations still acts as a bar as the alleged continued harassment would (presumably) have occurred at some point during Spring 2015 semester, after she transferred, and thus would still be time barred. (*Id.*).

Plaintiff does not directly refute that the alleged and continued harassment would have occurred in Spring 2015, not long after her student jury trial in January 2015. (ECF No. 97-1, at 37). Instead she simply re-asserts that harassment continued for some indefinite time after she transferred and thus, "as a matter of law" the point at which she was "damaged" is not fixed. (ECF No. 97-1, at 37). Implicitly she argues, therefore, that UMBC's duty extended beyond its adjudication of the matter before it and to stopping the continued harassment. Nowhere does Plaintiff put dates to the incidents of harassment that continued after her

56

transfer, however.  She simply argues this factual determination cannot be made, so such a decision is premature.

Plaintiffs are correct that, as an affirmative defense, the statute of limitations should not be adjudicated on a motion to dismiss, unless the timeframe of alleged and relevant conduct is clear from the complaint itself.  In adjudicating civil rights claims, the Fourth Circuit has announced that "continuing *effects* of a previous discriminatory act do not extend the running of the statute of limitations." *Lendo v. Garrett Cty. Bd. of Educ.*, 820 F.2d 1365, 1368 (4th Cir. 1987) (citing *Delaware St. Coll. V. Ricks*, 449 U.S. 250 (1980) (refusing to extend the statute of limitations in a § 1983 claim for the effects of previous discriminatory acts that fell outside the timely period); *see also Stanley v. Trs. of Cal. St. Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges" in finding that the continuing violation doctrine does not save a time barred Title IX claim) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112-13 (2002)).

Defendants point out that the claim of continuing harassment, as it relates to UMBC, revolves solely around the fact that they "were aware of the harassment but did nothing." (ECF No. 86-1, at 21).  However, as they point out, nowhere in the complaint does Count XIII allege how or when this continued harassment, occurring

after Ms. Felger switched schools, was brought to UMBC's attention. (*Id.*) (citing No. 81, ¶¶ 746-69). Ms. Fegler explains that the harassment occurred after "one of the UMBC basketball players" warned a basketball player at her new school about her, but she never claims that word of this reached UMBC. (ECF No. 81, ¶ 765). Equally importantly, Ms. Fegler fails to show that, even if UMBC did know about this harassment, it had any power or ability to stop it. (ECF No. 86-1);(ECF No. 102, at 15).

In short, all this harassment is said to have spilled out from UMBC's (mis)handling of her case. UMBC's conduct as to this claim does, therefore, have a fixed end: when UMBC adjudicated the matter during a student jury trial in January 2015. (ECF No. 86-1, at 22). Even if the harassment that occurred after the trial was considered, Plaintiffs themselves argue that "damages *reasonably flowed* from the conduct which UMBC is charged," in determining the timeline of relevant events. (ECF No. 97-1, at 38). Such an allegation demonstrates that Plaintiffs are attempting to save the complaint because of alleged continuing effects that are not themselves actionable conduct by the Defendant UMBC. The facts of the complaint clearly demonstrate that any otherwise actionable conduct by UMBC occurred outside of the applicable three-year statute of limitations. The allegations contained in Count XIII remain time-barred and the count will be dismissed.

b.   **Anna Borkowski and Annemarie Hendler**

Count XI alleges a violation of 20 U.S.C. § 1681 for deprivation of educational access and deliberate indifference by Anna Borkowski and Annemarie Hendler against UMBC.   The previous opinion stated, "because Ms. Borkowski and Ms. Hendler are both students of Towson University and not UMBC, they have no standing to make a Title IX gender discrimination claim against the Institutional Defendants." *Borkowski*, 414 F.Supp.3d at 820.   In turn, because Ms. Borkowski and Ms. Hendler did not attend UMBC but were, instead, Towson University students at the time of the incident, thus they still lack standing to bring this claim. (ECF No. 86-1, at 23).

As it relates to Title IX standing, the previous opinion states:

> Title IX prohibits discrimination on the basis of sex in "any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The Supreme Court of the United States has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644 "[B]ecause the harassment must occur 'under' 'the operations of' a funding recipient, *see* 20 U.S.C. § 1681(a); § 1687 (defining 'program or activity'), the harassment must take place in a context subject to the school district's control[.]" *Id.* at 645. A recipient's damages liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in

> which the known harassment occurs. Only then
> can the recipient be said to 'expose' its
> students to harassment or 'cause' them to
> undergo it 'under' the recipient's
> programs." *Id.* Thus, "funding recipients are
> properly held liable in damages only where
> they are deliberately indifferent to sexual
> harassment, of which they have actual
> knowledge, that is so severe, pervasive, and
> objectively offensive that it can be said to
> deprive the victims of access to the
> educational opportunities or
> benefits *provided by the school*." *Id.* at 650
> (emphasis added).

*Borkowski*, 414 F.Supp.3d 788 at 820 (string citations omitted). In arguing that the previous opinion is still applicable here, the University Defendants point to highly persuasive First Circuit caselaw wherein a Providence College student attempted to sue Brown University under Title IX in similarly bringing claims of sexual assault claims against three Brown students. (ECF No. 86-1, at 23) (citing *Doe v. Brown Univ.*, 896 F.3d 127, 131 (1st Cir. 2018) (affirming the district court opinion that plaintiff had no right to sue as Brown lacked any "authority or capacity to take corrective action on behalf of Doe with regard to her education at Providence College")).

In response, Plaintiffs argue that because UMBC accepted Ms. Borkowski ("and later Ms. Hendler") as a "Reporting Party" to the Title IX investigation against their students (the alleged assailants), that this is enough to confer standing on Ms. Borkowski. (ECF No. 97-1, at 34-35). Plaintiffs attempt to

distinguish *Doe v. Brown University* on this front in explaining
that there Brown made it clear that it would only conduct an
inquiry under its own "Code of Student Conduct" and not Title IX,
despite the plaintiff's request to launch an investigation under
the latter. (*Id.*). The University Defendants are right to label
this argument "confusing," but it seems to argue, as they surmise,
that even though UMBC similarly investigated under their own
"Policy on Prohibited Sexual Misconduct, Interpersonal Violence,
and Other Related Misconduct," (ECF No. 81-39), Ms. Borkowski and
Ms. Hendler were granted rights under Title IX in being labeled a
"Reporting Party" as part of an Title IX administrative proceeding.
(ECF No. 97-1, at 34).

The University Defendants correctly argue that, "[t]he mere
fact that UMBC investigated the three respondents to determine if
their actions violated UMBC's [policy] does not mean the UMBC owed
Ms. Borkowski and Ms. Hendler duties under Title IX." (ECF No.
86-1, at 25). In fact, the previous opinion makes clear they were
not owed such a duty and Plaintiffs have not cured this central
defect. Ms. Hendler and Ms. Borkowski were not deprived of any
form of access or benefit from UMBC because they were not students
there. Count XI will be dismissed for a lack of standing.

### 2. Erroneous Outcome

In Count IX, Plaintiffs allege an "erroneous outcome" claim
against Defendant UMBC based on gender discrimination due to the

allegedly biased investigation by Ms. Hunton into Ms. Frank's complaint of sexual assault. Defendant UMBC argues that Plaintiffs' TAC "fail[s] to allege any new facts that remedy [the previous] deficiencies, and [its] allegations are substantially identical as to those in the SAC. (ECF No. 86-1, at 28) (comparing ECF. No 81, ¶¶ 659-99 with ECF No. 21, ¶¶ 318-44). The only new allegation [is] that UMBC allowed her alleged assailant back on campus during the investigation. (ECF No. 81 at ¶680-81). [Plaintiffs] fail[] to allege any facts showing how that single fact resulted in a fundamentally flawed investigation . . . [and] still fail[] to plausibly allege any bias on behalf of the hearing board and/or appellate board that reviewed Ms. Hunton's investigation, took testimony, and reviewed Ms. Frank's complaint on appeal." (ECF No. 86-1, at 25).

Plaintiffs respond by emphasizing alleged deficiencies in how Ms. Hunton conducted the investigation, such as denying additional time for Ms. Frank to retrieve deleted text messages and failing to interview witnesses known to have knowledge of Ms. Frank's intoxication level. (ECF No. 97-1, at 26-27). Plaintiffs also argue that they *do* plausibly alleged gender bias by analogizing the facts here to two erroneous outcome cases in which gender bias was found to be sufficiently alleged. *Id.* at 23-25.

In drawing these analogies, Plaintiffs have overlooked the critical fact that both *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th

Cir. 2019) and *Doe v.* Columbia Univ., 831 F.3d 46, 48 (2nd Cir. 2016), involved instances in which the erroneous outcome claim was brought by the *accused* student, not the victim. This fact is dispositive. Erroneous outcome claims exist to remedy the rights of a person who is improperly disciplined by the university. *See Yusuf v. Vassar College*, 35 F.3d 709, 715 (1994) (Title IX erroneous outcome claims "bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline . . . [such claim are appropriately brought only by] "[p]laintiffs attacking a university disciplinary proceeding on grounds of gender bias . . . [typically,] the claim is [either] that the plaintiff was innocent and wrongly found to have committed an offense [or that] regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id. at 715*. In contrast, deliberate indifference claims exist as a remedy for the victim to charge that the university's "response to known discrimination [wa]s clearly unreasonable in light of the known circumstances." *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F.Supp.2d 438, 447 (D.Conn. 2006) (quoting *Hayut v. St. Univ. of N.Y.*, 352 F.3d 744, 751 ((2d Cir. 2003)) (emphasis added). In short, Title IX erroneous outcome claims and Title IX deliberate indifference claims are mutually exclusive.

Because Plaintiffs' opposition rests on arguing by analogy to two inapposite cases and no new material facts have been alleged, Plaintiffs have failed to cure the deficiencies contained in their SAC.  Accordingly, Plaintiffs Count IX will be dismissed.

### 3.  Denial of Educational Opportunities

### a.  Katelyn Frank

Count VIII alleges a violation of 20 U.S.C. § 1681 for Deprivation of Educational Access by Katelyn Frank against Defendant UMBC.   It revolves around Plaintiffs claim that "Defendants Dillon and Jagoe (UMBCPD) conspired with Defendant Lee (BCPD) to block Ms. Frank's report of sexual assault to police." (ECF No. 81, ¶ 613).   The TAC further asserts that Mr. Jagoe was an agent of Chief Dillon in being "tasked with covering up reports of rape and sexual assault by Defendant Dillon." (*Id.*, ¶ 615). The "purpose of the deception was to further dissuade Ms. Frank from filing a report with BCPD." (*Id.*, ¶ 616).   In fact, "Defendant Dillon refused to initiate a mandatory Title IX process or take steps to ensure her safety until Ms. Frank signed the statement." (*Id.*, ¶ 648).   Instead UMBC simply had Ms. Hunton, as a Title IX attorney, investigate and prepare a draft and final report as to the allegations.  (*Id.*, ¶ 652).   Plaintiffs argue that the ultimate "result" of this conspiracy was to deny Ms. Frank and "other similarly situated female victims of sexual assault generally, their right to equal protection." (*Id.*, ¶ 617).   They

64

similarly assert "such denial" would not have occurred if Ms. Frank
were a man.  (*Id.*, ¶ 618).  As in the SAC, Ms. Frank is alleged to
have lost "one year of education time" and "suffered severe
emotional injury, a decline in academic performance and lost
tuition." (*Id.*, ¶¶ 654, 657).

It is entirely unclear what claim Plaintiffs actually put
forth here or under what standard.  As was said before, Plaintiffs,
"fail to provide any relevant legal citation or standard to analyze
a deprivation of educational opportunities under Title IX."
*Borkowski*, 414 F.Supp.3d at 821.

University Defendants consistently construe this claim as one
of deliberate indifference.  (ECF No. 86-1, at 25); (ECF No. 102,
at 13).  As such, they argue that the allegations fail to state a
claim.  For one, they argue that Chief Dillon, central to the
complaint, did not have the authority criminally to charge or
prosecute reports of first-degree rape by the terms of the
Memorandum of Understanding between UMBC and BCPD which Plaintiffs
append to their complaint.  (ECF No. 86-1, at 26) (citing ECF No.
81-27).  Moreover, the complaint itself admits that Defendant
Dillon *did* reach out to Lieutenant Michael Peterson of the BCPD.
(*Id.*, ¶ 591).  The other evidence pointed to as evidence that UMBC,
in fact, did carry out such an investigation, (*See, e.g*, ECF No.
87-4) (Ms. Hunton's final report), however, goes beyond the
allegations in the complaint and is not properly considered here.

65

(*See* ECF No. 86-1, at 26).  Nonetheless, University Defendants argue that the facts, even as laid out by Plaintiffs, demonstrate that UMBC fully complied with its Title IX obligations. (*Id.*, at 27).  But nowhere in its opposition to the motion to dismiss by the University Defendants do Plaintiffs rebut these claims as to this count. (*See generally* ECF No. 97-1).

The Defendants are correct to frame this as a deliberate indifference claim.  While that phrase itself is not used in this portion of the complaint, "[d]eliberate indifference may be found both when the defendant's *response to known discrimination* is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a length and unjustified delay." *Derby Bd. of Educ.*, 451 F.Supp.2d at 447 (quoting *Hayut* 352 F.3d at 751 (2d Cir. 2003)) (emphasis added).  Other courts have clarified that this remedy is available to a student who is a complainant, but not a respondent, to a Title IX claim. *See, e.g.*, *Doe v. Quinnipiac Univ.*, 404 F.Supp.3d 643, 664 (D.Conn. 2019); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2017) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)) ("[A] deliberate-indifference claim premised on student-on-student misconduct must allege 'harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an education opportunity or benefit.'").  Not only must the institution have actual notice of the harassment but "authority

66

to institute corrective measures." *Doe v. Miami Univ.*, 882 F.3d
at 590 (citing *Mallory v. Ohio Univ.*, 76 Fed.Appx. 634, 638 (6th
Cir. 2003)).

In discussing *Davis*, other circuits have highlighted that the
"deliberate indifference" of an institution must itself subject a
student to further discrimination. *See, e.g.*, *Williams v. Bd. of
Regents of Univ. Sys. Of Georgia*, 477 F.3d 1282, 1295-96 (11th Cir.
2007).  The *Williams* court explained:

> First, Title IX requires that the plaintiff
> prove that the deliberate indifference
> occurred in response to discrimination she
> faced. *Davis,* 526 U.S. at 633. Second, as
> *Davis* requires, a Title IX recipient "may not
> be liable for damages unless its deliberate
> indifference 'subject[s]' its students to
> harassment.   That   is,   the   deliberate
> indifference must, at a *1296 minimum, 'cause
> [students] to undergo' harassment or 'make
> them liable or vulnerable' to it." *Id.* at 644–
> 45 (citing Random House Dictionary of the
> English Language 1415 (1966)) (defining
> "subject" as "to cause to undergo the action
> of something specified; expose" or "to make
> liable or vulnerable; lay open; expose");
> Webster's Third New International Dictionary
> 2275 (1961) (defining "subject" as "to cause
> to undergo or submit to: make submit to a
> particular action or effect: EXPOSE"). Based
> on the *Davis* Court's language, we hold that a
> Title IX plaintiff at the motion to dismiss
> stage   must   allege   that   the   Title   IX
> recipient's deliberate indifference to the
> initial   discrimination   subjected   the
> plaintiff to further discrimination.

*Id.* at 1295-96 (string citations omitted).

Here the only underlying student-on-student on harassment is the alleged sexual assault itself. (ECF No. 81, ¶ 624). As Plaintiffs argue, "[s]exual assault is sexual harassment in its most severe form and constitutes discrimination within the meaning of Title IX." (ECF No. 97-1, at 13) (citing *Feminist Maj. Found.* 911 F.3d at 686 and *Davis*, 526 U.S. at 650). However, as the Fourth Circuit has made clear, "it is not enough that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim." *S.B. ex rel. A.L. v. Bd. of Ed. Of Harford Cty.*, 819 F.3d 69, 77 (4th Cir. 2016) (stressing that "*Davis* sets the bar high for deliberate indifference") *Id.* at 76-77. While the school was clearly aware of Ms. Frank's alleged sexual assault (in her reporting it), there is no allegation that harassment continued, let alone that UMBC's alleged failure to respond properly to her complaint caused further discrimination. She alleges only that, "[a]fter being assaulted, and the subsequent investigation, Ms. Frank suffered severe educational setbacks." (ECF No. 81, ¶ 653). However, as stated, it is not enough to state an institution failed to eliminate student-on-student harassment or that they failed to impose the disciplinary actions a plaintiff seeks.

Moreover, this is not a case where an institution ignored harassment that was occurring for years. *See S.B. ex rel*, 819 F.3d at 74. On the country, the complaint itself suggests "UMBC

complied with its Title IX obligations" in the face of Ms. Frank's initial complaint. (ECF No. 86-1, at 27). While Plaintiffs claim that "Defendant Dillon refused to initiate a mandatory Title IX process or take steps to ensure her safety until Ms. Frank signed the statement" but stop short of arguing that the school failed to address her claims at all. (ECF No. 81, ¶ 846). In fact, as a seemingly routine response, they assigned Ms. Hunton to investigate the case. (*Id.*, ¶ 652). Plaintiffs explain, "[i]n the course of her investigation, Defendant Hunton provided Ms. Frank with advice as to what she should and should not do." (*Id.*). Even seen in the light most favorable to Plaintiffs, they fail to show such alleged "deliberate indifference" subjected her to any further discrimination. Plaintiffs fail to state a claim for deliberate indifference under Count VIII. The count will be dismissed.

   **b.   Kaila Noland**

   Count XIV alleges violation of 20 U.S.C. § 1681 for Deprivation of Educational Access by Kaila Noland against Defendant UMBC. Plaintiff Noland states that she was sexually assaulted in Baltimore County, reported her assault to UMBC, and that UMBC's failure to expel her alleged assailant resulted in her leaving her laboratory position at UMBC. (ECF No. 81, ¶¶ 770, 772-73, 777).

69

As was true of Count VIII, Count XIV is wholly unclear what claim Plaintiffs are setting out here as they, "fail to provide any relevant legal citation or standard to analyze a deprivation of educational opportunities under Title IX." *Borkowski*, 414 F.Supp.3d at 821.   Defendant UMBC, however, consistently treats Count XIV as a deliberate indifference claim in its motion to dismiss, (ECF No. 86-1, at 25), and reply (ECF No. 102, at 13), and Plaintiffs state in the body of the count that "Defendant UMBC was deliberately indifferent to Ms. Noland's reports of rape in that they assigned a biased investigator to pantomime an investigation into the sexual assault complaint made by Ms. Noland." (ECF No. 81, ¶ 784).   Thus, Count XIV will be construed as a deliberate indifference claim.

Deliberate indifference, as mentioned, occurs when the defendant's "response to known discrimination is clearly unreasonable." *Derby Bd. of Educ.*, 451 F.Supp.2d at 447 (quoting *Hayut*, 352 F.3d at 751).   A Title IX recipient "'may not be liable for damages unless its deliberate indifference subject[s]' its students to harassment . . . . That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Williams* 477 F.3d at 1295-96 (citing *Davis*, 526 U.S. at 644-45).

No further instances of harassment have been alleged at all here.   Ms. Noland simply asserts that because "her assailant [was

70

not] banned from campus, [she] was forced to leave her laboratory job for another campus." (ECF No. 81, ¶ 787). The TAC does not assert that the alleged assailant, an agent of his, nor any other party, ever had any contact whatsoever with Ms. Noland at the lab or anywhere else following the assault. Moreover, even if there was an allegation of furthering harassment, Plaintiffs do not allege that anyone at UMBC was aware of it.

Defendants point out that the allegation of hiring a biased investigator is unsupported and contradicted by "Plaintiffs' complaints and the underlying investigation documents" which "demonstrate that UMBC conducted investigations into Plaintiffs' complaints and Plaintiffs were given ample opportunity to respond in the process." (ECF No. 86-1, at 25). This may be true but goes beyond the TAC and is irrelevant because, as stated above, Plaintiffs are required to allege, but have not, that any further instances of discrimination occurred. Accordingly, Count XIV will be dismissed.

### 4. Failure to Prevent Sexual Harassment

In Count X, Plaintiffs argue that UMBC failed to prevent Ms. Frank's sexual assault because it knew her alleged assailant had previously sexually assaulted others. The court previously dismissed this claim finding it fell "far short of proper pleading" because "Plaintiffs d[id] not allege any details as to when the alleged assaults occurred, whom the assailant assaulted, the

71

nature of the allegations, or who at UMBC knew about such alleged assaults." *Borkowski v. Balt. Cty., Md*., 414 F.Supp.3d 788, 822 (D.Md. 2019).

The only new allegations in Plaintiffs' TAC are that "[o]n information and belief, [a] fellow female student reported Ms. Frank's assailant for sexual assault the previous year," (ECF No. 81, ¶ 702), and "[h]ad Defendant Hunton conducted an objective and complete investigation, this critical fact would have been disclosed (assuming UMBC retained records of reported assaults)." (*Id.*, ¶ 703). Defendant UMBC argues, even with the additional allegations, the TAC does "not remedy the deficiencies [previously] identified" because it still does "not allege any details as to when the alleged assaults occurred, whom the assailant assaulted, the nature of the assaults, or whom at UMBC knew about such alleged assaults." (ECF No. 86-1 at 29). Plaintiffs do not respond to Defendant's argument in their Opposition. (*See generally* ECF 97-1).

Because Plaintiffs' TAC does not allege with any specificity when the alleged assault occurred, who at UMBC knew about it, or the nature of the allegations, they have failed to state a claim upon which relief can be granted. Thus, Count X will be dismissed.

## IV.  Motion to Seal

Defendant Hunton has filed a motion to seal Exhibit 1, (ECF No. 91), to her Memorandum of Points and authorities in Support of her motion to dismiss.  (ECF No. 92-1).

The Fourth Circuit has stated that:

> It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings. See *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005). The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny. *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004).  "The distinction between the rights of access afforded by the common law and the First Amendment is significant, because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment." *In re United States for an Order Pursuant to 18 U.S.C. Section 2703*, 707 F. 3d 283, 290 (4th Cir. 2013) (quoting *Va. Dep't of State Police*, 386 F.3d at 575)(internal quotation marks omitted).  The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that "countervailing interests heavily outweigh the public interests in access." *Rushford*, 846 F.2d at 253.  By contrast, the First Amendment secures a right of access "only to particular judicial records and documents," *Stone*, 855 F.2d at 180, and, when it applies, access may be restricted only if closure is "necessitated by a compelling government interest" and the denial of access is "narrowly tailored to serve that interest,"

> *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (internal quotation marks and string citations omitted)).

*Doe v. Public Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014). Local Rule 105.11 requires the party seeking sealing to include "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." Before sealing any documents, the court must provide notice of counsel's request to seal and an opportunity to object to the request before the court makes its decision. *See In re Knight Publi'g Co.,* 743 F.2d 231, 235 (4th Cir. 1984). Either notifying the persons present in the courtroom or docketing the motion "reasonably in advance of deciding the issue" will satisfy the notice requirement. *Id.* When a motion to seal is denied, the party making the filing ordinarily will be given an opportunity to withdraw the materials. Local Rule 105.11.

Ms. Hunton's motion asks that Exhibit 1 be sealed in that it contains her "Final Investigative Report" as to Ms. Frank's Title IX complaint contains "sensitive information directly related to individuals who were then UMBC students." (ECF No. 92-1, at 2). These "education records" are covered by the Family Educations Rights and Privacy Act. (*Id.*) (citing 20 U.S.C. § 1232(g)). It also includes sensitive and "graphic" details of Ms. Frank's

personal life and the lives of her alleged assailants and other third-party witnesses.  Lastly, it argues that sealing the entire exhibit is the most efficient way to maintain confidentiality. Review of the exhibit corroborates the sensitivity of Ms. Hunton's underlying report and that there would be no way to effectively redact this investigative report while having it maintain coherence.  The motion to seal is granted.

University Defendants also filed Exhibits 2, 3, 4, 5, 8, 9, 10, 11, 12, 13 and 16 of their motion to dismiss under seal, without an accompanying motion to seal.  (ECF No. 87).  Although numbered differently, these exact same Exhibits were attached to their previous motion to dismiss (ECF No. 47), and a motion to seal was granted. (ECF No. 48).  For the reasons previously stated for sealing these exhibits, *Borkowski*, 414 F.Supp.3d at 822, they may remain under seal.

## V.   Conclusion

For the foregoing reasons, the motions to dismiss filed by the University Defendants and Bernadette Hunton will be granted and the motions to dismiss filed by the County and SAO Defendants will be granted in part and denied in part.  A separate order will follow.

_____
                    /s/
DEBORAH K. CHASANOW
United States District Judge

75